PROSKAUER ROSE LLP
Lloyd B. Chinn
Eleven Times Square
New York, New York 10036
Tel. 212.969.3000
Fax 212.969.2900
lchinn@proskauer.com

Alexandra R. Reynolds
One International Place
Boston, MA 02110
Tel. 617.526.9600
Fax 617.526.9899
areynolds@proskauer.com

*Attorneys for Defendants*
SMBC Nikko Securities America, Inc., John Bolger, and Omar Zaman

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

HAIDO IRENE HATZIMIHALIS,

                   Plaintiff,

          v.

SMBC NIKKO SECURITIES AMERICA, INC.,
JOHN BOLGER and OMAR ZAMAN, in their
individual and professional capacities,

                Defendants.

------------------------------------------------------------X

Civil Action No.: 20-cv-08037 (JPC)

**ECF CASE**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................................ 1

Statement of Undisputed Material Facts ................................................................................ 1

    I.    Plaintiff Joins Nikko America's Debt Capital Markets ("DCM") Group When It Was a Much Smaller, Less Competitive Player in the Market .......................................................... 2

    II.    DCM Group Transitions Into Public Market Business and Expands Team ...................... 2

    III.    Plaintiff Makes More Than Comparators in FYs 2014-2016 ......................................... 3

    IV.    Plaintiff Cannot Keep Up as DCM Business and Demands Grow ................................ 4

    V.    Beginning in FY 2017, Howard Is Paid Higher And PRomoted Quicker Than Her PEers 8

    VI.    Zaman and Bolger Become Co-Heads and Meet with Plaintiff ..................................... 9

    VII.    Bolger and Zaman Identify Plaintiff for Termination, But Termination is Delayed Due to Onset of COVID-19 Pandemic ........................................................................................... 11

    VIII.    Howard, Nieves, and Asmundson Are Nominated for Promotion While Plaintiff Receives a Gaps Performance Evaluation Rating and a Reduced Bonus ............................... 11

    IX.    Plaintiff Sends Demand Letter and Files Suit, and She is Removed From the Reduction in Force ................................................................................................................................ 13

    X.    Plaintiff Confuses and Angers Nikko America Client and Continues to be a Poor Performer ............................................................................................................................. 14

    XI.    A Senior Executive Raises Concerns Regarding Plaintiff's Performance ..................... 15

    XII.    Plaintiff's Employment Is Terminated .......................................................................... 15

Argument ............................................................................................................................. 15

    I.    Plaintiff's EPA and NYSPEL Gender Discrimination Claims Fail ............................... 15

        A.    Plaintiff Cannot Establish A *Prima Facie* Case Because She Cannot Show that Males Were Paid More than Females ................................................................................... 16

        B.    Any Pay Disparity Was Based on Business-Related Factors Other than Sex ............. 17

        C.    Plaintiff Cannot Demonstrate Any Evidence of Pretext ............................................... 18

    II.    Plaintiff's Title VII and NYSHRL Gender Discrimination Claims Fail ......................... 19

        A.    Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination ................. 19

        B.    Any Pay Disparities and Client Assignments Were Based on Legitimate, Non-Discriminatory Factors .......................................................................................................... 21

        C.    Plaintiff Cannot Demonstrate Pretext ......................................................................... 21

    III.    Plaintiff's NYCHRL Pay Disparity Claim Fails Because She Cannot Show Treatment Was Because of Her Gender ................................................................................................... 22

    IV.    Plaintiff's Failure to Promote Claims Fail as a Matter of Law .................................... 23

    V.    Plaintiff's Retaliation Claims Fail as a Matter of Law .................................................. 25

A.   Legal Standards ................................................................................................................ 25

B.   Plaintiff Cannot Establish Protected Activity Prior to August 5, 2020 ........................ 27

C.   Plaintiff Cannot Establish a Causal Link ....................................................................... 28

D.   Defendants Had Legitimate, Non-Discriminatory Reasons for Termination ............... 29

E.   Plaintiff Has Not Demonstrated Pretext or That Mediation Played Any Role ............. 30

Conclusion ................................................................................................................................ 30

# **TABLE OF AUTHORITIES**

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*Bacchus v. N.Y.C. Dep't of Educ.*,
   137 F. Supp. 3d 214 (E.D.N.Y. 2015) ...................................................................30

*Bentivegna v. People's United Bank*,
   No. 214CV599, 2017 WL 3394601 (E.D.N.Y. Aug. 7, 2017) ..............................18, 19, 20, 22

*Benzinger v. Lukoil Pan Americas, LLC*,
   447 F. Supp. 3d 99 (S.D.N.Y. 2020)......................................................................25

*Boatright v. U.S. Bancorp*,
   No. 18-CV-7293, 2020 WL 7388661 (S.D.N.Y. Dec. 16, 2020) *aff'd,* No. 20-
   4236-CV, 2022 WL 351059 (2d Cir. Feb. 7, 2022).......................................... passim

*Brightman v. Physician Affiliate Grp. of New York, P.C.*,
   No. 20CV4290, 2021 WL 1999466 (S.D.N.Y. May 19, 2021)..............................................16

*Britt v. Merrill Lynch & Co., Inc., et al.*,
   No. 08-CV-5356, 2011 WL4000992 (S.D.N.Y. Aug. 26, 2011)......................................21, 22

*Campbell v. Cellco P'ship*,
   860 F. Supp. 2d 284 (S.D.N.Y. 2012)......................................................................24

*Cherry v. N.Y.C. Housing Auth.*,
   15-CV-6949, 2021 WL 4481004 (E.D.N.Y. Sept. 30, 2021) .................................................16

*Clark Cnty. Sch. Dist. v. Breeden*,
   532 U.S. 268 (2001)..................................................................................................26

*Daly v. Westchester Cty. Bd. of Legislators*,
   No. 19-CV-04642, 2021 WL 229672 (S.D.N.Y. Jan. 22, 2021) ................................26, 27, 28

*Emengo v. Stark*,
   774 F. App'x 26 (2d Cir. 2019) ...........................................................................22

*Feliciano v. City of New York*,
   No. 14 CIV. 6751, 2015 WL 4393163 (S.D.N.Y. July 15, 2015) ...........................................26

*Forrester v. Corizon Health, Inc.*,
   752 F. App'x 64 (2d Cir. 2018) ............................................................................26

*Gagliardi v. Sacred Heart Univ.*,
   855 F. App'x 1 (2d Cir. 2021) ..............................................................................26

*Garcia v. Barclays Capital, Inc.*,
  281 F.Supp.3d 365 (S.D.N.Y. 2017)................................................................. passim

*Garcia v. Yonkers Bd. of Educ.*,
  No. 15 CIV. 0767, 2018 WL 4007648 (S.D.N.Y. Aug. 21, 2018), *aff'd*, 803 F.
  App'x 441 (2d Cir. 2020)................................................................29, 30

*Guzman v. Crothall Healthcare Inc.*,
  No. 17-CV-4306, 2021 WL 5048993 (E.D.N.Y. Sept. 29, 2021) ........................22, 23, 25, 27

*In re N.Y. City Dep't of Educ.*,
  No. 15-CV-7150, 2019 WL 1433163 (S.D.N.Y. Mar. 29, 2019)...........................................25

*Joseph v. Marco Polo Network, Inc.*,
  No. 09 CIV. 1597, 2010 WL 4513298 (S.D.N.Y. Nov. 10, 2010) ........................................29

*Kassman v. KPMG, LLC*,
  925 F. Supp. 2d 453 (S.D.N.Y. 2013).................................................................24

*Lawson v. City of New York*,
  No. 10 CV 5238, 2013 WL 6157175 (E.D.N.Y. Nov. 22, 2013), *aff'd*, 595 F.
  App'x 89 (2d Cir. 2015).................................................................24

*Liang v. Cafe Spice SB, Inc.*,
  911 F. Supp. 2d 184 (E.D.N.Y. 2012) ...............................................16, 17, 19, 21

*Mauze v. CBS Corp.*,
  340 F. Supp. 3d 186 (E.D.N.Y. 2018) ...............................................16, 22

*Mayers v. Emigrant Bancorp, Inc.*,
  796 F.Supp.2d 243,449-450 (S.D.N.Y. 2011) .........................................27

*Mestecky v. New York City Dep't of Educ.*,
  791 F. App'x 236 (2d Cir. 2019), *aff'd*, 791 F. App'x 236 (2d Cir. 2019)...........................26

*Moore v. Kingsbrook Jewish Med. Ctr.*,
  No. 11-cv-3625, 2013 WL 3968748 (E.D.N.Y. July 30, 2013).........................................20, 30

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010).................................................................25

*Pierre v. Air Serv. Sec.*,
  No. 14-CV-5915, 2016 WL 5136256 (E.D.N.Y. Sept. 21, 2016) .........................................26

*Smith v. City of New York*,
  385 F. Supp. 3d 323 (S.D.N.Y. 2019).................................................................25

iv

*Smith v. Planas*,
  975 F. Supp. 303 (S.D.N.Y. 1997) ........................................................................20

*Sosa v. Rockland Cty. Cmty. Coll.*,
  No. 15 Civ. 3329, 2017 WL 3105872 (S.D.N.Y. July 20, 2017) ............................................27

*Sotomayor v. City of N.Y.*,
  862 F. Supp. 2d 226 (E.D. N.Y. 2012) ..................................................................22

*Talwar v. Staten Island Univ. Hosp.*,
  610 F. App'x 28 (2d Cir. 2015) ...............................................................16, 19, 25

*Talwar v. Staten Island Univ. Hosp.*,
  No. 12-CV-33, 2016 WL 1298969 (E.D.N.Y. Mar. 31, 2016)....................................25, 27, 28

*Thelwell v. City of New York*,
  No. 13 CV 1260, 2015 WL 4545881 (S.D.N.Y. July 28, 2015), *aff'd,* 733 F.
  App'x 561 (2d Cir. 2018)........................................................................24

*Tomka v. Seller Corp.*,
  66 F.3d 1295 (2d Cir. 1995), *abrogated on other grounds by Burlington
  Indus., Inc., v. Ellerth,* 524 U.S. 742 (1998)...........................................................20

*Tulino v. City of New York*,
  No. 15-CV-7106, 2018 WL 1568970 (S.D.N.Y. Mar. 27, 2018) ....................................23, 24

*Virgona v. Tufenkain Import-Export Ventures, Inc.*,
  No. 05 Civ. 10856, 2008 WL 4356219 (S.D.N.Y. Sept. 23, 2008)........................................19

*White v. Pacifica Found.*,
  973 F. Supp. 2d 363 (S.D.N.Y. 2013)....................................................................26

*Yarde v. Good Samaritan Hosp., et al.*,
  360 F. Supp. 2d 552 (S.D.N.Y. 2005)....................................................................29

*Yeger v. Inst. Of Culinary Educ., Inc., No. 14-CV-8202*,
  2017 WL 377936 (S.D.N.Y. Jan. 25, 2017) ................................................................20, 27

### STATUTES

29 U.S.C. § 206(d)(1) ...........................................................................16

## PRELIMINARY STATEMENT

Despite the highest paid peer on her team being another woman, Plaintiff Irene Hatzimihalis asserts – against all evidence to the contrary – that Defendant SMBC Nikko Securities America, Inc. ("Nikko America" or "the Company") paid her less because of her gender. Undisputed record evidence shows that, unlike male and female peers, Plaintiff was unable to meet the demands of a growing public debt financing business. Nikko America initially paid her more than her more recently hired peers, male or female. But, over time, her pay reflected her declining relative performance. Managers and peers alike viewed her as a stark underperformer. Her three comparators (one woman and two men) performed far better, as was ultimately reflected in the revenues that they generated for the Company – and, in turn, in their compensation and promotions. Again, the female comparator was promoted faster and compensated far more than the other three on the team, including Plaintiff.

As a result of Plaintiff's underperformance, Nikko America and Plaintiff's direct managers, John Bolger and Omar Zaman, (collectively, the "Defendants"), decided to include her in a firm-wide reduction in force in March 2020. However, the onset of the COVID-19 pandemic postponed those plans. Months later, only after receiving a poor evaluation and a cut in pay – and realizing that her job was in jeopardy – Plaintiff complained of alleged discrimination. As is set forth below, Defendants are entitled to summary judgment on Plaintiff's gender discrimination and retaliation claims under the Equal Pay Act ("EPA"), Title VII of the Civil Rights Act ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and the New York State Pay Equity Law ("NYSPEL").

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Nikko America is part of the SMBC Americas Division of one of Japan's preeminent banking institutions with operations worldwide. At all relevant times, Nikko America published

and maintained Equal Employment Opportunity and Non-Discrimination Policies within its

Employee Handbook, which prohibited discrimination based on gender and retaliation. (SF ¶1.)

### I. Plaintiff Joins Nikko America's Debt Capital Markets ("DCM") Group When It Was a Much Smaller, Less Competitive Player in the Market

In 2011, Plaintiff joined Nikko America's DCM group as an Assistant Vice President. At

the time, the group predominantly advised and executed on private placement market

transactions. (SF ¶¶7, 14, 17.) Plaintiff agreed to a starting salary of $85,000, and in the first few

years of her employment, her salary remained essentially unchanged.  During the same time

period, Nikko America awarded her bonuses in the range of $30,000-$40,000. (SF ¶11.)

| Fiscal Year[1] | Salary | Bonus | Total Compensation |
|---|---|---|---|
| FY 2011 | $85,000 | $2,500 | **$87,500** |
| FY 2012 | $85,000 | $40,000 | **$125,000** |
| FY 2013 | $87,601 | $31,250 | **$118,851** |

### II. DCM Group Transitions Into Public Market Business and Expands Team

Yoshihiro Satake became Head of DCM about a year after Plaintiff joined Nikko

America. In 2013, after Nikko America's parent company acquired Financial Holding Company

status, he began transitioning the group to engage in and advise on DCM public transactions. (SF

¶13.) The business nature of public debt marketing is very different from that of private, in terms

of timing, analysis, and depth of market knowledge. (SF ¶15.) Originating and executing public

debt offerings involve public filings and disclosures and typically far more detail and

complexity. (SF ¶16-17.) As he began transitioning the group, Satake discussed with Plaintiff

whether she wanted the opportunity to be part of the public DCM business or remain part of the

private placement team. (SF ¶18.) Plaintiff chose to work in the public DCM business. (SF ¶19.)

To build the new public DCM business, Satake hired individuals who had relevant public

---

[1]  The fiscal year ("FY") runs from April 1 to March 31. For example, FY 2011 ended on March 31, 2012.

debt market experience, including Omar Zaman as an Executive Director and Jeremy Sisselman, and Matt Morici as Vice Presidents, all senior in title and responsibility to Plaintiff. (SF ¶20.) Historically, given its limited private-side focus, compensation in Nikko America's DCM group lagged the market for a public market enterprise. (SF ¶21.) As Nikko America's DCM focus shifted to public markets, it had to pay higher salaries to attract new employees. (SF ¶22.) As a result, new hires received higher base salaries than legacy DCM employees. (SF ¶23.) Satake intended to increase legacy employees' base salaries over time, but until he was able to do that, he addressed salary disparity by awarding higher bonus compensation to them. (SF ¶¶24-25.)

### III.   Plaintiff Makes More Than Comparators in FYs 2014-2016

In August 2014, Satake hired Chris Nieves as an analyst (junior in title to Plaintiff) at a higher base salary than Plaintiff's base salary. (SF ¶29.) Upon learning of Nieves's pay, Plaintiff spoke with both Satake and Sisselman about it. (SF ¶¶34-39.) Satake explained to her that any legacy to new hire pay differences would be resolved through bonus awards. (SF ¶39.) And that is exactly what happened. Even though Nikko America paid Nieves a higher base salary than it paid Plaintiff, the Company nonetheless paid Plaintiff over $140,000 more than Nieves in total compensation for FY 2014.[2] (SF ¶11, 33, 40.) Again, in FY 2015, Nikko America paid Plaintiff, now a Vice President, more than it paid Nieves in base salary and total compensation. (SF ¶11, 33, 41.) Similarly, Nikko America hired Will Asmundson as an analyst in November 2015 at a higher base salary than Plaintiff, but it still awarded her over $100,000 more than Asmundson in total FY 2015 compensation. (SF ¶¶11, 42, 47, 48.) In FY 2016, Nikko America hired Kaitlin Howard as a Vice President, (a peer to Plaintiff), and Nieves and Asmundson were promoted

---

[2] For simplicity, compensation figures assume a full year of base salary for each individual, even though the individual may have joined mid-fiscal year. If actual compensation figures were used, the gap between Plaintiff's higher total income and that of Nieves or Asmundson would be ever more substantial.

3

from analysts to Associates. (SF ¶¶49, 55.) Satake again addressed the new hire to legacy salary disparity with bonus compensation; consequently, for FY 2016, the Company paid Plaintiff more in total compensation than Howard, Nieves, and Asmundson. (SF ¶¶11, 33, 47, 53, 54, 56, 57.)

Thus, Plaintiff was paid more for each year FY 2014, 2015 and 2016 than it did to the comparators she identified (or to Howard in Howard's first year). (SF ¶40-41, 48, 54, 56-57.)[3]

| **FY14** | **Total Compensation** | Base | Bonus |
|---|---|---|---|
| **Plaintiff** (Asst. Vice President) | **$346,850** | $87,601 | $259,249 |
| **Nieves** (Analyst) | ███ | ███ | ███ |
| **FY15** | **Total Compensation** | Base | Bonus |
| **Plaintiff** (Vice President) | **$350,000** | $110,000 | $240,000 |
| **Asmundson** (Analyst) | ███ | ███ | ███ |
| **Nieves** (Analyst) | ███ | ███ | ███ |
| **FY16** | **Total Compensation** | Base | Bonus |
| **Plaintiff** (Vice President) | **$415,100** | $113,200 | $301,900 |
| **Howard** (Vice President) | ███ | Base ███ | Bonus ███ |
| **Nieves** (Associate) | ███ | Base ███ | Bonus ███ |
| **Asmundson** (Associate) | ███ | Base ███ | Bonus ███ |

## IV.   Plaintiff Cannot Keep Up as DCM Business and Demands Grow

As the DCM business grew, performance demands grew as well. During the early years of the group's transition, Satake provided Plaintiff with positive performance evaluations, giving her the highest possible overall rating in her FY 2014 and FY 2015 reviews. (SF ¶58-59, 63-64.) He further made positive comments about her work when recommending her to promotion to

---

[3] Howard, Nieves, and Asmundson all graduated from college within two years of each other, and each had roughly the same number of years in banking. (SF ¶_.) Plaintiff, by contrast had been out of college for much longer and spent far more time in banking than the other three. (SF ¶_.) As to DCM-specific experience, Plaintiff had the most, followed by Howard, with Nieves and Asmundson having far less than either of them. (SF ¶_.)

Vice President in 2015. (SF ¶60-61.) However, Sisselman supervised Plaintiff on day-to-day business during the 2014-2016 time period and he repeatedly criticized her performance, including for having a bad attitude and not meeting deadlines, and testified that he would not have promoted her to Vice President if it had been his decision. (SF ¶65-76.) He also suggested she take a public speaking course and the Company subsequently paid for her to do so. (SF ¶72.)

Compared to her time as an Assistant Vice President, as a Vice President, Plaintiff joined and presented at more client meetings. (SF ¶62.) With increased opportunities, however, came increased demands and responsibilities. Individuals with "primary coverage" over client accounts are responsible for managing the client relationship and working to secure favorable deals. Those providing "secondary coverage" assist the primary coverage officer. Before Satake and senior coverage officers – such as Zaman, Morici, and Sisselman – feel comfortable allowing junior officers more responsibility, they assess the individual's performance in secondary coverage and/or primary coverage over a limited number of lower-tiered accounts. (SF ¶81.)[4] This provides the ability to develop skills and demonstrate capabilities while minimizing the risk of assigning – and losing – clients with high revenue potential to those inexperienced or unable to handle such accounts. (SF ¶82.)

In the fall of 2016, Satake hired John Bolger as an Executive Director, senior to Plaintiff, and assigned him to lead the Real Estate Investment Trusts ("REIT") and Healthcare & Pharmaceuticals ("Healthcare") sectors. (SF ¶83-84.) Satake asked Bolger to assign Plaintiff coverage responsibility in the REIT sector. (SF ¶85.) Satake, not confident Plaintiff could handle larger accounts, saw this as an opportunity to grow her knowledge and skills and demonstrate

---

[4] SMBC banking clients typically have multiple banks participating in a revolving credit facility, and assign the participating banks to different tiers. (SF ¶_.) Tier 1 is the most desirable for a bank because it has the most revenue generation potential for the bank; Tier 2 is the next most desirable; and Tiers 3 and 4 have less revenue generating potential. (SF ¶_.)

whether she could handle more. (SF ¶82, 87.) Bolger assigned Plaintiff a number of small REIT accounts for primary coverage while she provided secondary coverage to Bolger on the remainder of the REIT sector. (SF ¶88-89.) Satake and Bolger planned to assess her performance over time to determine whether she was ready for more and larger clients. (SF ¶87.) At the time, Plaintiff told Satake and Zaman she was "happy with the outcome" and that she was "looking forward to covering [her] clients and to working with John on his names!" (SF ¶91.) She further told Sisselman she thought Bolger "want[ing] [her] to be involved" in the rest of the REIT accounts "will be good for both of [them]." (SF ¶90.) Bolger was open to Plaintiff attending meetings and calls with REIT clients outside her primary coverage responsibilities and tried to be a good mentor to her, providing her with advice and feedback. (SF ¶92-93.) He also gave her the opportunity to provide secondary coverage across the entire Healthcare sector. (SF ¶94-95.)

Howard, when she joined in 2016, and Nieves and Asmundson, after their promotions to Vice President in FY 2017, were likewise assigned an allotment of lower-tiered accounts. (SF ¶96, 99, 102.) In later years, she did not perform as well as her peers. (SF ¶103-173.) Satake, Zaman, and Bolger considered Howard, Asmundson, and Nieves to be more proactive in client coverage than Plaintiff. (SF ¶104-106, 115-122.) When evaluating all four in FY 2016, Satake described Howard as having a ███████████████████████ and being a ███████ ██████ and Nieves and Asmundson as ██████████████████████████████████ ████████; he stated that each understood ███████████████████████ (SF ¶109-114.) He did not make the same comments about Plaintiff, rating her as "Meets" while rating the other three as ████████ on the scale of Gaps, Meets, or Exceeds. (SF ¶107-109, 111, 113.)[5]

---

[5] She also did not display the same work ethic as her peers; often arriving to work as late as 9:30 AM while others regularly arrived by 8:00 AM. (SF ¶103-123.) Nor did she demonstrate the same abilities as the others in training junior members of the team. (SF ¶124-125, 179.)

Further, Plaintiff could not identify a single prospective client from whom she sought and obtained DCM business. (SF ¶127.) In fact, she only attempted to prospect one client during her entire tenure. (SF ¶128.) In contrast, Howard, Nieves, and Asmundson engaged in significantly more client prospecting efforts than did Plaintiff. (SF ¶129-134.)

Their efforts paid off, as demonstrated in their respective client successes. By FY 2019, Howard achieved 21 active bookrunner roles, Nieves achieved one active and four passive, and Asmundson achieved two active and three passive, including one described as a "significant active bookrunner win". (SF ¶148-150, 156-158, 166-168, 242.) In contrast, after three years of primary coverage responsibilities, Plaintiff only achieved a single passive bookrunner deal.[6] (SF ¶140-142.)

It is therefore unsurprising Howard, Nieves, and Asmundson outperformed Plaintiff in profit and loss revenue generated for the Company as they pursued clients and revenue more proactively and worked harder. (SF ¶136-170.) This failure to perform is reflected in the relative revenue generated from deals over which each handled primary coverage. (*See id*.)

| P&L Revenue | | | | |
|---|---|---|---|---|
| | **FY17** | **FY18** | **FY19** | **FY20** |
| **Howard** | ██████ | ██████ | ██████ | ██████ |
| **Nieves** | ██████ | ██████ | ██████ | ██████ |
| **Asmundson** | ██████ | ██████ | ██████ | ██████ |
| **Plaintiff** | ██████ | ██████ | ██████ | ██████ |

These numbers speak for themselves. Howard performed the best of the group by far. Nieves too generated ████████ in revenue each year. Asmundson's initial revenue generation started slower, but he consistently grew his production, culminating in over ████████ in revenue by FY 2019. Plaintiff, by contrast, consistently generated multi-millions less than each of her peers.

---

[6] Active bookrunner deals are the most desirable to Nikko America as they generate the most revenue for Nikko America, with passive bookrunner deals being second, and co-manager deals being third. (SF ¶135, 221-222.)

Howard, who joined the DCM group as a Vice President around the same time Plaintiff acquired primary coverage responsibilities, was first assigned primary coverage for a limited set of lower-tiered corporate clients. (SF ¶86, 88, 96, 129-130.) Howard made aggressive efforts to generate business from those clients as well as to prospect for new DCM business. (SF ¶129-130, 143.) When Howard's prospecting success resulted in her needing to focus increased time on a particular sector, she proactively approached Satake to discuss distributing her existing clients to others within the DCM group for coverage. (SF ¶174-175.) Howard purposely did not propose to redistribute any of these clients to Plaintiff because she thought Plaintiff was an "underperformer" and believed Plaintiff would pose a business risk to those accounts after having sat next to her for over a year and observing her performance. (SF ¶177-179.) Howard instead redistributed the clients to Asmundson, Nieves, and senior coverage officer Morici, who she considered to be stronger performers than Plaintiff. (SF ¶176.) Other peers and juniors similarly held negative views of Plaintiff's performance, and in some cases, communicated those views to Bolger and Zaman. (SF ¶124, 125.)

## V.   BEGINNING IN FY 2017, HOWARD IS PAID HIGHER AND PROMOTED QUICKER THAN HER PEERS

As Nikko America's DCM business became more competitive, Satake was able to standardize base salaries to align more with the market. (SF ¶187.) By FY 2017, there was no longer any legacy to new hire base salary disparity to be addressed through bonus awards. (SF ¶188.) This timing aligns with Plaintiff's compensation beginning to fall behind her peers.

Each year, Satake received a bonus pool by Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. in Tokyo based on the financial performance of SMBC Americas Holdings, Inc., Nikko America, and the DCM group. (SF ¶191.) The size of the pool changed each year depending on how well each entity performed. (SF ¶192.) Thus, as the DCM business

grew more competitive, Satake was able to secure a larger overall bonus pool each year. (SF ¶193.) Starting in FY 2017 – the first year Plaintiff, Howard, Nieves, and Asmundson were all Vice Presidents – Satake relied on individual performance factors when making bonus decisions. (SF ¶49, 60, 98, 101, 194.) That year, Howard, a woman, earned ███████ more than Nieves or Asmundson, and Nieves and Asmundson earned █████ more than Plaintiff. (SF ¶195-196.)

| FY17 | Total Compensation | Base | Bonus |
|---|---|---|---|
| **Howard** (Vice President) | ██████ | ██████ | ██████ |
| **Nieves** (Vice President) | ██████ | ██████ | ██████ |
| **Asmundson** (Vice President) | ██████ | ██████ | ██████ |
| **Plaintiff** (Vice President) | **$420,000** | $200,000 | $220,000 |

The trend continued in FY 2018 based on individual performance in that year, with Howard earning ██████ more than either Nieves and Asmundson, and Plaintiff's compensation lagging further behind all three. (SF ¶11, 33, 47, 53, 197-198.)

| FY18 | Total Compensation | Base | Bonus |
|---|---|---|---|
| **Howard** (Vice President) | ██████ | ██████ | ██████ |
| **Nieves** (Vice President) | ██████ | ██████ | ██████ |
| **Asmundson** (Vice President) | ██████ | ██████ | ██████ |
| **Plaintiff** (Vice President) | **$430,000** | $200,000 | $230,000 |

Thereafter, Satake's expatriate rotation in the U.S. came to an end and he returned to Tokyo. Prior to departing, Satake nominated Howard for promotion to Director. (SF ¶200-201.) Howard's promotion was announced on July 1, 2019. (SF ¶201.)

## VI.     Zaman and Bolger Become Co-Heads and Meet with Plaintiff

On July 1, 2019, Zaman and Bolger became co-heads of DCM. (SF ¶207.) Around the same time, Bolger, dissatisfied with her performance covering Healthcare sector clients for some time, removed Plaintiff from the demanding sector. (SF ¶118-120.) It was not only Bolger who

9

was dissatisfied with her performance. Earlier that year, Bolger additionally received negative performance feedback about Plaintiff from Tony Capozzoli, an Executive Director in another department. (SF ¶180.) Capozzoli often partners with DCM members in making presentations to their clients. (SF ¶181.) In 2019, after presenting to a client as to whom Plaintiff had primary coverage, Capozzoli informed Bolger that Plaintiff had not contributed in any substantive way at the client meeting. (SF ¶182-183.) This behavior stood out to Capozzoli because he had presented at similar meetings with other DCM members, such as Asmundson and Howard, and he had never experienced such a situation where the DCM coverage officer did not materially participate in the conversation with the client. (SF ¶184-185.)

Plaintiff continued working with Bolger on the REIT sector, with primary coverage responsibilities over several clients and secondary coverage over the others. (SF ¶89.) On July 12, 2019, he assigned her a short-term, discrete project involving real estate maturities, but Plaintiff had not completed it nearly a month later before leaving for vacation. (SF ¶210-211.) Additionally, Bolger found the material she ultimately submitted to be unacceptable. (SF ¶212.)

Upon becoming co-heads, Zaman and Bolger held goal setting meetings with their team, including with Plaintiff on July 15, 2019. (SF ¶213-214.) At this meeting, Zaman advised Plaintiff to consider the possibility of becoming a relationship manager with Nikko America's bank affiliate, due to his view that she was unable to perform well as a Vice President within DCM. (SF ¶215-218.) A relationship manager, among other things, oversees client relationships across the Company's various products, but does not need to master the level of technical knowledge and proactive marketing proficiency the DCM group's fast-paced business required. (SF ¶218.)

In the Fall of 2019, Bolger and Zaman met with Plaintiff for a mid-fiscal-year "pulse check". (SF ¶219.) In that meeting, Bolger was critical, among other things, of Nikko America's in Plaintiff's sole bookrunner transaction as it was passive, not active, which is far less desirable. (SF ¶220.) It was well known at that juncture, including by Plaintiff, that active bookrunner deals were being pressed as the gold standard to the coverage teams.  (SF ¶221-224.) At no time in 2019 did Plaintiff raise any concerns to Bolger, Zaman, or anyone at Nikko America, that she was being treated differently than others or that she was dissatisfied with her pay. (SF ¶225-226.)

## VII.   Bolger and Zaman Identify Plaintiff for Termination, But Termination is Delayed Due to Onset of COVID-19 Pandemic

By early March, 2020, Defendants decided to terminate Plaintiff's employment as part of a reduction in force aimed at optimizing the Company's talent. (SF ¶227.) The Business Rationale Form prepared as to Plaintiff stated that: "[t]he DCM business is under mandate to optimize human capital management towards elevated business outcomes" and described Plaintiff as "historically underperforming", "not operating at a Vice President level," and "not demonstrat[ing] the drive or capability to be successful in this senior role." (SF ¶228.) The reduction in force was planned for the week of March 9, 2020. (SF ¶229.) On or about March 6, 2020, the SMBC Americas Division postponed the reduction in force completely, pausing all related terminations, because of the arrival of the COVID-19 pandemic in the U.S. (SF ¶230.)

## VIII.   Howard, Nieves, and Asmundson Are Nominated for Promotion While Plaintiff Receives a Gaps Performance Evaluation Rating and a Reduced Bonus

As co-heads of the group, Bolger and Zaman had the ability to make promotion recommendations. (SF ¶231.) In March 2020, their first year as co-heads, Bolger and Zaman nominated Howard for promotion from Director to Executive Director and Nieves and Asmundson for promotions to Director. (SF ¶232.) The Company did not promote Howard at that time, as she had just been promoted the prior fiscal year and promotion to Executive

Director in a single year would be an extraordinary move for the Company. (SF ¶233.) Nieves

and Asmundson's promotions to Director took effect July 1, 2020. (SF ¶234.)

In March 2020, Bolger and Zaman completed Plaintiff's FY 2019 performance

evaluation. (SF ¶236.) They rated her an overall rating of Gaps, reflective of the reasons that she

was selected in the reduction in force a month prior, and communicated their views on her

performance in an April 2020 evaluation meeting. (SF ¶237.) By contrast, Bolger and Zaman

rated Howard, Nieves, and Asmundson an overall rating of ███████ (SF ¶239.). They identified

Howard's ███████████████████████████ and described her as ███████████

██████████████████ and ███████████████████ Nieves ████

███████████████████████████ as well as ████████████████

████████████ Asmundson's ████████████████ ████████████████

████████████████ and ████████████████ (SF ¶240-242.)

As co-heads of the group, Bolger and Zaman also had the ability to set compensation

(within the confines of the DCM bonus pool) and they based these decisions on performance.

(SF ¶243-245.) For FY 2019, Defendants paid Howard the most total compensation among the

four individuals, awarding her ██████ more than either Nieves or Asmundson. (SF ¶248.) On

or about May 22, 2020, they informed Plaintiff that her FY 2019 bonus compensation would be

cut significantly from the prior year to $100,000 due to her Gaps performance review. (SF ¶250.)

| **FY19** | **Total Compensation** | Base | Bonus |
|---|---|---|---|
| **Howard** (Director) | ██████ | ████ | ████ |
| **Nieves** (Vice President) | ██████ | ████ | ████ |
| **Asmundson** (Vice President) | ██████ | ████ | ████ |
| **Plaintiff** (Vice President) | **$300,000** | $200,000 | $100,000 |

At the same time, they directed Plaintiff to look for other opportunities outside the DCM group. (SF ¶251.) Bolger provided contacts and tried to help her find a new role. (SF ¶¶252-253.)

In FY 2020, the Company continued to pay Howard the highest out of the team.[7] (SF ¶253.) As Plaintiff's employment was terminated prior to the award of FY 2020 bonus incentive compensation, she was ineligible to receive any bonus award for that period. (SF ¶254.)

| FY20 | Base Salary |
|---|---|
| **Howard** (Director) | ███████ |
| **Nieves** (Director) | ███████ |
| **Asmundson** (Director) | ███████ |
| **Plaintiff** (Vice President) | $200,000 |

## IX.   Plaintiff Sends Demand Letter and Files Suit, and She is Removed From the Reduction in Force

On or about July 22, 2020, Zaman and Bolger contacted Human Resources to obtain an update as to the status of the reduction in force previously set for March 2020. (SF ¶255.) Their Human Resources Business Partner replied "we had discussed September timeframe previously," but said she "wouldn't" communicate that timeframe to Plaintiff "just yet." (SF ¶256.)

Approximately two weeks later, Plaintiff sent Nikko America, Bolger, and Zaman a demand letter through counsel, alleging – for the first time – discrimination. (SF ¶257.) The Company conducted an internal investigation into the allegations raised by Plaintiff, in which she ultimately refused to participate, and found no evidence to substantiate the allegations of unequal pay based on gender discrimination or retaliation. (SF ¶258.) On September 29, 2020, the initial Complaint in this litigation was filed.  (Dkt. 01.)  Bolger and Zaman never – either at that time or thereafter – discussed Plaintiff's demand letter or lawsuit with her. (SF ¶261.)

---

[7] Director responsibilities are largely the same as those of a Vice President, except Directors typically have more primary coverage responsibilities. (SF ¶_.)

Notably, as a direct result of receiving this letter, Plaintiff was excluded from the reduction-in-force, which took place eventually in October 2020. (SF ¶260.)

**X.**   **Plaintiff Confuses and Angers Nikko America Client and Continues to be a Poor Performer**

During the week of October 26, 2020, Nikko America provided the Chief Financial Officer ("CFO") of its client ████████████ advice regarding secondary trading levels in its debt, advising the client pause as to its intention to issue additional debt. (SF ¶263.) Plaintiff was part of ██████ coverage team at Nikko America and was very much aware of (and indeed a party to) the advice given to the client. (SF ¶264.) A few days later, on October 30, 2020, Plaintiff emailed the ██████ CFO regarding how "bonds have been performing in the secondary market that week," and specifically identified a particular trade that, without proper context, suggested the earlier advice had been incorrect. (SF ¶265.) Plaintiff offered no explanation as to why the trade she flagged did not in fact impact SMC Nikko's earlier advice. (SF ¶267.) Within 20 minutes of receiving Plaintiff's email, the ██████ CFO emailed Bolger, and two other senior Company members, asking about it. (SF ¶268.) He did not copy Plaintiff. (SF ¶269.) The CFO expressed confusion over Plaintiff's email, given Nikko America's advice a few days earlier. (SF ¶270.) The CFO also contacted Bolger by phone and angrily asked how the email could have been sent in light of the earlier guidance. (SF ¶271-270.) Following that call, Bolger attempted as best possible to deescalate the situation by emailing the CFO and explaining that the quote Plaintiff stated in her email was a one-off small trade that was not consistent with where the bonds were currently being quoted more broadly. (SF ¶273.) He forwarded this exchange to Plaintiff, explained the issue, and directed her to "use better judgment" in the future. (SF ¶274.)

Later that fall, Bolger and Zaman met with Plaintiff in a pulse check meeting and communicated negative feedback regarding her performance. (SF ¶276.) Despite her continued poor performance and mistake with ███████ the Company continued to employ Plaintiff.

## XI.   A Senior Executive Raises Concerns Regarding Plaintiff's Performance

On or about March 4, 2021, various Nikko America employees, including Plaintiff, had a call with senior officials (including the CFO) of client ████████████████████ (SF ¶277.) Richard Eisenberg, then-Managing Director of Nikko America and Co-General Manager of U.S. Corporate and Investment Banking ("CIB") was the most senior SMBC employee on the call. (SF ¶278.) At the time, Plaintiff had had DCM primary coverage responsibilities for ███ for over four years. (SF ¶279.)  Despite that, it is undisputed that she said nothing at all during the call. (SF ¶280.) Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative. (SF ¶281-282.) At the time, Eisenberg was unaware Plaintiff was engaged in litigation or that she had raised complaints about Nikko America, Bolger, or Zaman. (SF ¶284.) In Bolger's and Zaman's minds, this reflected very poorly on DCM. (SF ¶287.)

## XII.   Plaintiff's Employment Is Terminated

The Company terminated Plaintiff's employment, effective March 12, 2021 – a full year after originally planned. (SF ¶288.) During the termination meeting, Bolger stated to Plaintiff that her "level of performance in fiscal year 2020 continues to fall short of the level expected of [her] role," "in November [2020], the CFO of a client contacted [Bolger] to complain about [Plaintiff's] performance," and "following our meeting with ████ [Bolger] received a call from a very senior manager in CIB complaining about [Plaintiff's] lack of participation and initiative." (SF ¶290.) These were the reasons Nikko America terminated Plaintiff's employment.

## ARGUMENT

## I.   Plaintiff's EPA and NYSPEL Gender Discrimination Claims Fail

15

To establish an EPA or NYSPEL claim, Plaintiff must demonstrate that (1) Nikko America pays different wages to employees of the opposite sex; (2) for equal work on jobs requiring equal skill, effort, and responsibility; and (3) which are performed under similar working conditions. *See Talwar v. Staten Island Univ. Hosp*., 610 F. App'x 28, 30 (2d Cir. 2015) ("*Talwar I*").[8] If Plaintiff is able to make this showing, Nikko America must establish that the wage differential is justified under one of the EPA's four exceptions: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Liang v. Cafe Spice SB, Inc*., 911 F. Supp. 2d 184, 202 (E.D.N.Y. 2012) (citing 29 U.S.C. § 206(d)(1)). To survive summary judgment, Plaintiff must then prove the employer's reasons are pretext for sex discrimination. *See id*. Plaintiff cannot succeed at any step of this analysis.

A. <u>Plaintiff Cannot Establish A *Prima Facie* Case Because She Cannot Show that Males Were Paid More than Females</u>

Plaintiff cannot prove that Nikko America paid men more than women for FY 2017 to FY 2020[9] – as she must – because it is undisputed that Nikko America paid Howard, a woman, the most within the peer group of their team for each of those years. In *Talwar I*, with quite similar facts, the plaintiff identified a male peer who was paid more than she, however, another female peer was paid more than both of them and was the highest paid of the group. 610 F. App'x at 30-31. The Court held there was no *prima facie* case because males "as a group" were

---

[8] *See Id.* at 31, n.2. (NYSPEL claim "analyzed under same standards applicable to the federal Equal Pay Act.").

[9] At six years, the NYSPEL has the longest state of limitations of her claims, while the other claims are restricted to two or three years. *See* N.Y. Lab. Law § 198(3) (NYSPEL); 29 U.S.C. § 206(d)(1) (EPA two or three years); *Brightman v. Physician Affiliate Grp. of New York, P.C*., No. 20CV4290, 2021 WL 1999466, at *6 (S.D.N.Y. May 19, 2021) (NYSHRL three years); *Cherry v. N.Y.C. Housing Auth*., 15-CV-6949, 2021 WL 4481004, *33, n.29 (E.D.N.Y. Sept. 30, 2021) (NYCHRL same); *Brightman*, 2021 WL 1999466, at *5 (up to two-year back pay recovery for Title VII). Plaintiff's claims fail in the first instance in the earliest three years of NYSPEL's statute of limitations because it is undisputed Nikko America paid her *more* than her male comparators in FY 2014, FY 2015, and FY 2016. *See Mauze v. CBS Corp*., 340 F. Supp. 3d 186, 207 (E.D.N.Y. 2018), *adhered to on reconsideration*, No. 15CV4905, 2019 WL 8137641 (E.D.N.Y. Jan. 23, 2019).

not paid more than females. *Id*. The Court in *Liang* concluded the same, where the highest paid members of the group, a female and two males, were paid the same amount despite the plaintiff being paid less than all three. 911 F. Supp. 2d at 204. In fact, throughout FY 2014 - FY 2020, Nikko America paid a woman the most among Plaintiff, Howard, Nieves, and Asmundson.

      B.  <u>Any Pay Disparity Was Based on Business-Related Factors Other than Sex</u>

Even if Plaintiff could establish a *prima facie* case – which she cannot – Defendants have established legitimate business-related factors other than sex on which they based pay decisions: individual production and performance. Defendants have demonstrated – and Plaintiff cannot dispute – that once the legacy to new hire disparity resolved in FY 2017, subject to the available bonus pool, bonus decisions were based on individual performance. Specifically, this included employee revenue generation, client coverage performance, and prospecting efforts. And in those areas, it is undisputed that Plaintiff lagged well behind her peers.

It is undisputed that Nikko America management increasingly viewed Plaintiff, in both relative and absolute terms, as an underperformer. This is first seen in the FY 2016 evaluations and it carries through performance meetings and evaluations provided thereafter. The evaluations in FY 2019 further demonstrated Howard, Nieves, and Asmundson's prowess in training junior DCM members in contrast to testimony that Plaintiff struggled in that regard. And while no formal performance evaluations were completed in FY 2017 and FY 2018 for any of the individuals, Satake, Bolger, and Zaman indisputably considered Plaintiff the worst performer of the four throughout this period.

It is also undisputed that Howard – herself a woman and not accused of gender bias – considered Plaintiff a serious underperformer; so much so that Howard thought it would be a business risk to redistribute any of her clients to Plaintiff. Further, it is undisputed that Bolger and Zaman received negative feedback regarding Plaintiff's performance from her peers and

17

juniors as well as from members of other departments, – while receiving no such feedback regarding Howard, Nieves, or Asmundson.

Plaintiff herself does not dispute her failure to successfully prospect a single client to the Company, (SF ¶ _.), while Howard, Nieves, and Asmundson engaged in significantly more prospecting and business development efforts. Basing incentive compensation decisions upon overall job performance, including employee's performance rating, success in training junior employees, and demonstrated ability to cultivate client relationships "[does] not reflect a pay disparity based on gender." *Boatright v. U.S. Bancorp*, No. 18-CV-7293, 2020 WL 7388661, at *13 (S.D.N.Y. Dec. 16, 2020) ("*Boatright I*") *aff'd,* No. 20-4236-CV, 2022 WL 351059 (2d Cir. Feb. 7, 2022) ("*Boatright II*").

Due to their better overall performance, Howard, Nieves, and Asmundson generated more revenue than Plaintiff in FYs 2018, 2019, and 2020, and Howard and Nieves generated more revenue than Plaintiff in FY 2017. Production is a legitimate, business-related factor in determining compensation. *See Garcia v. Barclays Capital, Inc*., 281 F.Supp.3d 365, 379, 388 (S.D.N.Y. 2017) ("pay disparity is more than explained by the fact that her total production figures were invariably and significantly lower than the men whom she claims are her comparators."); *Boatright*, 2020 WL 7388661, at *13.

C.  Plaintiff Cannot Demonstrate Any Evidence of Pretext

Plaintiff has not shown any evidence whatsoever of pretext. It is undisputed Satake made the pay decisions for all four employees for FYs 2014 to 2018 and that a woman – Plaintiff or Howard – was paid the most each year. The same held true in FYs 2019 and 2020 when Bolger and Zaman began making pay decisions, with Howard continuing to be paid the most. *See Bentivegna v. People's United Bank*, No. 214CV599, 2017 WL 3394601, at *19-20 (E.D.N.Y. Aug. 7, 2017) (no pretext "where members of [plaintiff's] protected class also made more money

than [plaintiff]."), *reconsideration on other grounds*, 2017 WL 4277149 (E.D.N.Y. Sept. 25, 2017). Nor is there any evidence Satake, Bolger, Zaman, or anyone else in management made any inappropriate or discriminatory comments relating to gender or sex that could lead to any suggestion of discriminatory animus. *See Boatright I,* 2020 WL 7388661, at *13 (no pretext where plaintiff "offered nothing more than speculation that [comparator's] higher salary [was] because of his gender"). Relying on the mere fact of Nieves's and Asmundson's relative compensation is simply not enough to establish pretext. *See Virgona v. Tufenkain Import-Export Ventures, Inc.*, No. 05 Civ. 10856, 2008 WL 4356219, at *11 (S.D.N.Y. Sept. 23, 2008).

## II.   <u>Plaintiff's Title VII and NYSHRL Gender Discrimination Claims Fail</u>

Plaintiff cannot establish a Title VII or NYSHRL gender discrimination claim.[10] To do so, she must prove (1) she was a member of a protected class; (2) she was qualified for the job in question; (3) she was paid less than members outside her protected class for the same work, or suffered another adverse employment action; and (4) the employer's decision occurred under circumstances that raise an inference of discrimination. *Boatright I*, 2020 WL 7388661, at *14; *Garcia*, 281 F.Supp.3d at 374. Defendants must then set forth a legitimate, non-discriminatory reason for the decision, and Plaintiff would have to show that the reason is pretextual. *See Bentivegna*, 2017 WL 3394601, at *17. This she cannot do.

### A.   <u>Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination</u>

In the first instance, Plaintiff's Title VII and NYSHRL claims fail for the same reasons as her EPA claim; she cannot show that men were paid more than women. *See Talwar I*, 610 F. App'x at 31 (dismissing Title VII claim where males as a group were not paid more than females); *Liang*, 911 F. Supp. 2d at 207 (same).

---

[10] *See Talwar*, 610 F. App'x at 31 (NYSHRL claims "analyzed identically to claims under … Title VII").

Moreover, Plaintiff cannot raise an inference of discrimination to establish a *prima facie* case. To do so, she must do more than merely rely on the fact that Asmundson and Nieves were paid more. *See e.g., Tomka v. Seller Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (no inference of discrimination from "fact that [male] employees were paid more than [plaintiff]"), *abrogated on other grounds by Burlington Indus., Inc., v. Ellerth,* 524 U.S. 742 (1998). This she has not done.

To the contrary, the available evidence points to an inference of <u>non</u>-discrimination. First, a similarly situated member of plaintiff's own protected class receiving favorable treatment undercuts any asserted inference of discrimination. *See Bentivegna*, 2017 WL 3394601, at *19; *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-cv-3625, 2013 WL 3968748, at *10 (E.D.N.Y. July 30, 2013) (collecting cases); *see also Smith v. Planas*, 975 F. Supp. 303, 308 (S.D.N.Y. 1997) (no inference of discrimination where five of seven receiving higher pay were members of plaintiff's protected class). Here, Nikko America paid Howard, a woman, more than Nieves and Asmundson, men, every year in which she was a Nikko America employee. The Company also promoted Howard to Director before promoting Nieves or Asmundson and after she had spent less time as a Vice President than Nieves and Asmundson. Howard has since been promoted to Executive Director, while neither Nieves nor Asmundson have.

Second, Howard decided not to redistribute clients to Plaintiff based upon her own observations of Plaintiff's performance. *See Moore*, 2013 WL 3968748, at *11 (discrimination allegation weakened when decisionmaker is member of plaintiff's protected class); *Yeger v. Inst. Of Culinary Educ., Inc., No. 14-CV-8202*, 2017 WL 377936, at *11 (S.D.N.Y. Jan. 25, 2017). And others – including Capozzoli and Sisselman – complained about Plaintiff's performance. *Id.* at *12 (co-worker complaints about plaintiff undermined inference of discrimination).

Third, Satake engaged in multiple positive acts to support Plaintiff, including providing her with positive evaluations and recommending her for promotion *See Garcia*, 281 F.Spp.3d at 384-385 (allegation of discriminatory animus undermined where same decision maker earlier engaged in positive acts toward plaintiff).  There can be no inference that his pay decisions in FY 2017 and FY 2018 were motivated by Plaintiff's gender.  Plaintiff's Title VII and NYSHRL claims must fail because she simply cannot demonstrate any inference of discrimination.

      B.  <u>Any Pay Disparities and Client Assignments Were Based on Legitimate, Non-Discriminatory Factors</u>

Defendants presented ample evidence that the at-issue compensation decisions were based on legitimate, non-discriminatory factors. As described supra Section ▮, compensation decisions FY-2017 and later were based on production and performance. Basing compensation decisions on production is a legitimate, nondiscriminatory reason under Title VII; as is basing compensation decisions on performance factors. *See Boatright I*, 2020 WL 7388661, at *13 (relative revenue generation legitimate, nondiscriminatory reason); *Garcia*, 281 F.Supp.3d at 379 (same where plaintiff had "consistently and substantially lower total production figures…[i]n every year at issue, with the exception of one man in a single year."); *Britt v. Merrill Lynch & Co., Inc., et al.*, No. 08-CV-5356, 2011 WL4000992, at *10 (S.D.N.Y. Aug. 26, 2011) (poor evaluations and performance deficiencies were legitimate, nondiscriminatory reasons).

      C.  <u>Plaintiff Cannot Demonstrate Pretext</u>

For the reasons described *supra* Section ▮ Plaintiff cannot demonstrate any evidence suggesting Defendants' stated reasons are pretext for any discriminatory animus, particularly where a female colleague was paid the highest of the team for each year in question. *Liang*, 911 F. Supp. at 207. She alleges no comments revealing a discriminatory animus. *Id.* at 207, n. 17 (no Title VII claim where "there is nothing…to demonstrate any discriminatory animus…towards

women with respect to pay"); *Boatright I*, 2020 WL 7388661, at *19 (same). And she admits

Satake completed positive performance evaluations and nominated her for promotion to Vice

President, undermining the allegation that his FY 2017 and FY 2018 pay decisions were based

on any animus toward women. *See Garcia*, 281 F.Supp.3d at 384-385 (supervisor nominating

plaintiff for promotion and award undercut any implication of pretext). Further, multiple peer

employees considered her an underperformer, including Howard, Sisselman, and Capozzoli, each

of whom she testified she was not accusing of harboring any gender bias. Her mere disagreement

with assessments of her performance cannot establish pretext. *See Guzman v. Crothall*

*Healthcare Inc.*, No. 17-CV-4306, 2021 WL 5048993, at *13 (E.D.N.Y. Sept. 29, 2021) ("mere

fact that a plaintiff may disagree [with third party's complaints] and think that her behavior was

justified does not raise an inference of pretext"); *Britt*, 2011 WL4000992, at *10 ("mere

disagreement with her bonus compensation…insufficient for her to survive summary

judgment…"); *Bentivegna*, 2017 WL 3394601, at *17 (plaintiff "cannot merely rationalize,

explain, or disagree with an employer's proffered non-discriminatory reasons to survive

summary judgment."). Therefore, Plaintiff's Title VII and NYSHRL claims must fail.

## III.   **<u>Plaintiff's NYCHRL Pay Disparity Claim Fails Because She Cannot Show Treatment Was Because of Her Gender</u>**

To establish an NYCHRL discrimination claim, Plaintiff must demonstrate she has been

"treated less well…*because* of [her protected status]." *Emengo v. Stark*, 774 F. App'x 26, 30 (2d

Cir. 2019) (internal citation omitted). A pay differential alone is insufficient as she "must still

link the adverse employment action to a discriminatory motivation." *Sotomayor v. City of N.Y.*,

862 F. Supp. 2d 226, 258 (E.D. N.Y. 2012) (no NYCHRL claim where plaintiff could not

establish she was treated differently "because of" her race, national origin, or age).

Plaintiff has failed to allege any facts to prove that she was treated less well than any other Nikko America employee because of her gender. *Mauze*, 340 F. Supp. at 209 (no NYCHRL claim where no evidence she was paid differently "because of any… gender-based discriminatory motives…"). She cannot overcome the fact that Howard was paid more than anyone else in the group and nominated for back-to-back promotions, ultimately reaching two corporate levels above her. *See supra*. Nor can she point to any other fact indicating employment decisions were made *because of* her gender. *See Guzman*, 2021 WL 5048993, at *13-14 (no NYCHRL claim where there was no evidence colleagues' complaints and employer's reaction to those complaints "can be attributed, even in part, to a discriminatory animus.").

Plaintiff also cannot demonstrate that she experienced any non-pay related discrimination based on gender. She cannot dispute that management applied the same client assignment approach to everyone – male and female alike. She admitted Bolger provided her opportunities and an open invitation to attend client meetings, as well as gave her the opportunity to demonstrate her abilities providing coverage to the entire Healthcare sector with him. She cannot point to any facts suggesting his view of her poor performance on those accounts was based on her gender. And, despite allegations that she did not have opportunities to engage in the hiring process within DCM, she admitted to having interviewed Howard, Nieves, and Asmundson before they were hired. With the undisputed facts that Howard was paid the highest, nominated for back-to-back promotions ahead of the men, and that all four employees were given similar client assignment opportunities, Plaintiff cannot meet her burden. She has wholly failed to establish any facts suggesting she was treated any differently *because of* her gender.

## IV.   Plaintiff's Failure to Promote Claims Fail as a Matter of Law

To state a Title VII or NYSHRL *prima facie* claim for failure to promote, Plaintiff must show that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3)

she applied for and was denied promotion to a position for which she was qualified; and (4) the position remained open and the employer continued to seek applicants. *See Tulino v. City of New York*, No. 15-CV-7106, 2018 WL 1568970, at *5 (S.D.N.Y. Mar. 27, 2018). Plaintiff, unable to demonstrate the capabilities of client coverage even at a VP level, fails at the third prong – she was not qualified for promotion to Director; she was a Gaps performer even in her Vice President position.[11] *See id.* at *7 (claim fails where plaintiff "does not establish that she was qualified for the positions, let alone that she was more qualified than the men who received them"). "[T]he mere fact that [Plaintiff] believe[s] she was qualified [for promotion] is conclusory and insufficient to survive…summary judgment…" *Lawson v. City of New York*, No. 10 CV 5238, 2013 WL 6157175, at *13 (E.D.N.Y. Nov. 22, 2013), *aff'd,* 595 F. App'x 89 (2d Cir. 2015) (only support was Plaintiff's belief that she deserved a promotion because it had been more than two years since her last promotion).

Nor can she establish a failure to promote claim under the NYCHRL. *Thelwell v. City of New York*, No. 13 CV 1260, 2015 WL 4545881, at *13 (S.D.N.Y. July 28, 2015), *aff'd,* 733 F. App'x 561 (2d Cir. 2018). These claims fail for the same reasons noted above; she cannot demonstrate any evidence that her lack of promotion was due to her gender. It is not enough to show men were promoted while she was not promoted; Plaintiff must demonstrate she was "'treated less well than other employees' *due* to unlawful discrimination." *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 295 (S.D.N.Y. 2012) (emphasis added). It is undisputed that Satake, who promoted her to Vice President in 2015, promoted Howard to Director after two years and four months as a Vice President, while simultaneously choosing not to promote Plaintiff to

---

[11] There is no failure to promote claim available under the under EPA. *Kassman v. KPMG, LLC*, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013) ("[T]he EPA does not afford a remedy for denial of promotions . . . .").

Director despite holding a Vice President role for over four years. When Bolger and Zaman promoted Nieves and Asmundson to Director a year later, it was only after they had served three years as Vice Presidents with far more successful performance in the position than Plaintiff – even solely on their revenue generation. Further, that same year, 2020, Bolger and Zaman nominated Howard, albeit unsuccessfully, for a further promotion to Executive Director (which she inevitably received the following year). None of these facts support an inference that the Company's promotion decisions were motivated in any way by gender. *In re N.Y. City Dep't of Educ.*, No. 15-CV-7150, 2019 WL 1433163, at *13 (S.D.N.Y. Mar. 29, 2019) (under NYCHRL, "'plaintiff must still show that the conduct complained of is caused by a discriminatory motive.'") (internal citation omitted).

## V.   <u>Plaintiff's Retaliation Claims Fail as a Matter of Law</u>

Plaintiff's claims that Defendants reduced her bonus in May 2020 and terminated her in March 2021 in retaliation for protected activity fail for multiple reasons.

### A.   <u>Legal Standards</u>

To establish a *prima facie* case of retaliation, Plaintiff must show: (1) participation in protected activity; (2) that Defendants knew of such participation; (3) an adverse employment action followed; and (4) a causal connection between the protected activity and the adverse employment action.[12] *See Boatright I*, 2020 WL 7388661, at *19 (Title VII, NYSHRL); *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (EPA); *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020) (NYSPEL).

---

[12] NYCHRL standard "identical" to Title VII's apart from a broader standard for adverse employment actions. *Smith v. City of New York*, 385 F. Supp. 3d 323, 345-46 (S.D.N.Y. 2019).

To establish the first prong, Plaintiff must have complained with enough specificity to notify Defendants that her "complaints were about gender discrimination, not just general unsatisfactory or unfair conduct." *See Talwar I*, 610 F. App'x at 30 (Title VII); *Guzman*, 2021 WL 5048993, at *16 (NYSHRL); *Talwar v. Staten Island Univ. Hosp.*, No. 12-CV-33, 2016 WL 1298969, at *10 (E.D.N.Y. Mar. 31, 2016) ("*Talwar II*") (NYCHRL); *Pierre v. Air Serv. Sec.*, No. 14-CV-5915, 2016 WL 5136256, at *9 (E.D.N.Y. Sept. 21, 2016) (EPA).

To establish the fourth prong, the adverse action must occur sufficiently close to the protected activity to establish a causal connection through temporal proximity. *See e.g., Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-04642, 2021 WL 229672, at *12 (S.D.N.Y. Jan. 22, 2021) (period of over two months too attenuated); *Feliciano v. City of New York*, No. 14 CIV. 6751, 2015 WL 4393163, at *10 (S.D.N.Y. July 15, 2015) (under NYCHRL, "temporal proximity ordinarily requires…retaliatory act occur within two months of … protected activity"). However, "temporal proximity alone does not create an inference of causation where 'gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity.'" *Boatright II*, 2022 WL351059, at *2 (*citing Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (proceeding along "previously contemplated, though not definitively determined" lines "is no evidence whatever of causality" under Title VII); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 385-86 (S.D.N.Y. 2013) (NYSHRL). Courts similarly apply this reasoning to NYCHRL claims. *See Boatright II*, 2022 WL 351059, at *3 (NYCHRL); *Mestecky v. New York City Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (same), *aff'd*, 791 F. App'x 236 (2d Cir. 2019).

If she establishes a *prima facie* case of retaliation and Defendants articulate a legitimate, non-retaliatory reason for their action, Plaintiff must then establish the proffered reason was

pretext for a retaliatory motive. *See Boatright I*, 2020 WL 7388661, at *21; *Gagliardi v. Sacred Heart Univ.*, 855 F. App'x 1, 5 (2d Cir. 2021). To demonstrate pretext, temporal proximity alone is insufficient. *See Gagliardi*, 855 F. App'x at 5; *Mestecky*, 2018 WL 10509457, at *13; *Forrester v. Corizon Health, Inc*., 752 F. App'x 64, 66 (2d Cir. 2018). Further, where gradual adverse job actions began long prior to the protected activity, pretext cannot be established. *See Boatright II*, 2022 WL 351059, at *2-3; *Yeger*, 2017 WL 377936, at *16; *Sosa v. Rockland Cty. Cmty. Coll.*, No. 15 Civ. 3329, 2017 WL 3105872, at *7 (S.D.N.Y. July 20, 2017).

B.  <u>Plaintiff Cannot Establish Protected Activity Prior to August 5, 2020</u>

There is no evidence Plaintiff engaged in protected activity prior to the August 5, 2020 demand letter. This dooms any retaliation claim regarding her May 2020 bonus. The alleged complaints in 2014 to Satake and Sisselman about Nieves's salary had nothing to do with discrimination and were, in any event, far too attenuated to be connected to an adverse action nearly six years later. In fact, in the years following the alleged 2014 complaint, Nikko America paid Plaintiff *more* than Nieves and Asmundson. The first adverse action she alleges is nearly three years later, when Nieves and Asmundson first began making more than she did. This is far too long to demonstrate a causal link. *See e.g., Daly*, 2021 WL 229672, at *12.

Further, although amorphously alleging she engaged in protected activity in the Fall of 2019 in the Third Amended Complaint – it is undisputed she made no such complaint at that time. She did not testify to making any complaints whatsoever during the November 2019 pulse check; rather she testified to no other discussions of her employment with Bolger or Zaman in the Fall of 2019. Under oath, Plaintiff identified only one instance when she allegedly complained about her compensation to Bolger – in May 2020 <u>following</u> notice of her reduced

bonus.[13] And even if that was protected activity, the bonus award had already been decided and communicated by that point. *See Talwar II*, 2016 WL 1298969, at *12 (no inference of retaliation where protected activity occurred after adverse action).

###### C.   Plaintiff Cannot Establish a Causal Link

Additionally, even if some form of protected activity occurred in "late 2019," the earliest adverse action – the bonus reduction – did not occur until over six months later in May 2020. *See e.g., Daly*, 2021 WL 229672, at *12 (period of over two months too attenuated).

Nor can Plaintiff establish any retaliation claim arising from her August 2020 demand letter and September 2020 filing of her complaint as her employment was terminated six and seven months thereafter, undermining any inference of causation. *See id*.

And while the employment termination occurred a little over a month after the February 2021 mediation, "gradual adverse job actions began well before [she] ever engaged in any protected activity," extinguishing any inference of a causal link. *See e.g. Boatright II*, 2022 WL 351059, at *2 (prior to any protected activity, plaintiff already received lower bonuses due to performance deficiencies, a performance improvement plan, and a performance review and multiple emails expressing concerns about her interpersonal skills) (citing *Slattery*, 248 F.3d at 95). It is undisputed that: (1) the downward trend in Plaintiff's performance evaluations began in 2016; (2) Howard, Nieves, and Asmundson's compensation began to overtake hers in 2017; (3) Nikko America promoted Howard to Director ahead of Plaintiff in 2019; (4) Zaman suggested

---

[13] Even if credited, a vague assertion that she told Bolger she had "to prove [her]self all the time" and that many of her accomplishments are either "discounted" or "lost" (Dkt. 33, ¶40.) does not constitute protected activity as a matter of law. She did not compare herself to or reference male colleagues in any way. *See, Talwar II*, 2016 WL 1298969, *10-11 (no protected activity where plaintiff identified male colleague by name but did not allege unequal treatment was due to gender); *Guzman*, 2021 WL 5048993, at *16 ("vague complaint of generally being singled out" without reference or innuendo to protected trait insufficient)*; Mayers v. Emigrant Bancorp, Inc*., 796 F.Supp.2d 243,449-450 (S.D.N.Y. 2011). Even if Plaintiff had in fact raised a concern about gender and promotions, such a complaint would have been unreasonable as a matter of law, as she was fully aware that Howard had just been promoted to Director.

Plaintiff find another position in mid-2019 because he did not think she could satisfactorily perform within DCM; (5) the decision to terminate her employment occurred by early March 2020, months before any protected activity; (6) Plaintiff received a negative performance evaluation outlining multiple performance deficiencies (and a corresponding reduction in compensation); and (7) she was admonished to use better judgment after her email confused a client. These circumstances undermine any inference of a causal connection.

Further, an intervening causal event can defeat an inference based on temporal proximity. *Garcia v. Yonkers Bd. of Educ.*, No. 15 CIV. 0767, 2018 WL 4007648, at *7 (S.D.N.Y. Aug. 21, 2018), *aff'd*, 803 F. App'x 441 (2d Cir. 2020). It is undisputed that Plaintiff did not speak on the March 4, 2021 client call and that Eisenberg immediately contacted Bolger to complain about her non-participation. A transgression occurring between the protected activity and adverse action eliminates any inference based upon proximity. *Joseph v. Marco Polo Network, Inc*., No. 09 CIV. 1597, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) (no *prima facie* case with 10-days between protected activity and adverse action because of undisputed intervening event); *Yarde v. Good Samaritan Hosp., et al.*, 360 F. Supp. 2d 552, at 562 (no retaliation where it was undisputed intervening event occurred).

### D.  Defendants Had Legitimate, Non-Discriminatory Reasons for Termination

As detailed above, there were legitimate, non-discriminatory reasons to reduce Plaintiff's bonus and terminate her employment. As described *supra*, Nikko America took steps to terminate (and had in fact, decided to terminate) Plaintiff's employment in March 2020 due to her poor performance long before she engaged in any protected activity. She admitted that her October 2020 email confused the ███████████ CFO and that she had been aware of the Company's earlier guidance at the time of sending the email. It is undisputed that the ██████ ████████ CFO angrily called Bolger regarding this email and that Bolger subsequently advised

Plaintiff to "use better judgment" in the future. It is also undisputed that she did not provide any comments during the ███ call – a client for which she had primary coverage for over four years – and that Eisenberg called Bolger, unprompted and without knowledge of this suit, to complain about her lack of participation and initiative. Any of these are legitimate, nondiscriminatory reasons for terminating her employment and certainly so in the aggregate. *See supra.*

  E. Plaintiff Has Not Demonstrated Pretext or That Mediation Played Any Role

   Lastly, Plaintiff can rely on nothing more than temporal proximity to assert that a failed mediation played any role her termination. Temporal proximity is insufficient to show pretext, especially when the termination decision occurred *months* before protected activity. *See e.g.*, *Boatright II*, 2022 WL 351059, at *2-3. It is undisputed Bolger and Zaman never discussed her demand letter or lawsuit with her, much less the mediation. She testified she had no basis to believe they did not actually believe the reasons provided when terminating her. She also does not dispute they actually believed she was a poor performer. *See Boatright I*, 2020 WL 7388661, at *22 (no pretext where plaintiff "concedes…none of the reasons given for her termination were false"); *Moore*, 2013 WL 3968748, at *12.[14] Plaintiff has alleged no inconsistencies or contradictions in Defendants' proffered legitimate, non-retaliatory reasons for their actions and fails to raise a triable issue regarding a supposed "true rationale" for the termination, particularly in light of the undisputed superseding event.  *Garcia*, 2018 WL 4007648, at *7.

## **CONCLUSION**

   For the reasons set forth above, Defendants Nikko America, Bolger, and Zaman respectfully request this Court grant Motion for Summary Judgment on each claim.

---

[14] Even with NYCHRL's more liberal standard, Plaintiff cannot succeed where she claims that Defendants had already decided to terminate her long before she ever complained. (Dkt. 001, ¶¶48-51.); *See Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 243 (E.D.N.Y. 2015) (no NYCHRL claim where plaintiff "herself alleges disciplinary actions…to terminate her…[were] well underway when she made her first complaint").

Dated:  March 11, 2022
New York, New York

Respectfully submitted,

**PROSKAUER ROSE LLP**

By:
/s/ *Lloyd B. Chinn*

Lloyd B. Chinn

Eleven Times Square
New York, New York 10036
(212) 969-3000
lchinn@proskauer.com

Alexandra R. Reynolds
One International Place
Boston, MA 02110
Tel. 617.526.9600
Fax 617.526.9899
areynolds@proskauer.com

*Attorneys for Defendants*
*Sumitomo Mitsui Banking Corporation*
*John Bolger*
*Omar Zaman*

31