**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

HAIDO IRENE HATZIMIHALIS,                          :

                                        :          Civil Action No.: 20-cv-08037 (JPC)

                      Plaintiff,    :

          v.                                                    :

                                            :

SMBC NIKKO SECURITIES AMERICA, INC.,    :
JOHN BOLGER and OMAR ZAMAN, in their       :
individual and professional capacities,                      :

                                            :

                             Defendants.    :

----------------------------------------------------------------X

## PLAINTIFF HAIDO IRENE HATZIMIHALIS'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**WIGDOR LLP**

Valdi Licul
Lindsay M. Goldbrum

85 Fifth Avenue
New York, NY  10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
lgoldbrum@wigdorlaw.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

    I.        BACKGROUND ................................................................................... 1

    II.      SMBC HIRES HATZIMIHALIS ....................................................... 2

    III.    HATZIMIHALIS'S PERFORMANCE ............................................... 2

    IV.    BOLGER'S ARRIVAL ........................................................................ 4

    V.      BOLGER AND ZAMAN TRY TO FORCE HATZIMIHALIS OUT .... 5

    VI.    SMBC FIRES HATZIMIHALIS ......................................................... 6

    VII.   UNEQUAL PAY .................................................................................. 6

ARGUMENT ...................................................................................................................... 7

    I.        THE SUMMARY JUDGMENT STANDARD ..................................... 7

    II.      THE EQUAL PAY CLAIMS .............................................................. 9

            A.     Legal Standard ...................................................................... 9

            B.     The Pay Gap .......................................................................... 9

            C.     Defendants' Affirmative Defenses ....................................... 12

    III.    PAY DISCRIMINATION ................................................................... 19

    IV.    RETALIATION .................................................................................. 21

CONCLUSION .................................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Aponte v. Modern Furniture Mfg. Co., LLC,
  No. 14 Civ. 4813, 2016 WL 5372799 (E.D.N.Y. Sept. 26, 2016) ........................................... 21

Belfi v. Prendergast,
  191 F.3d 129 (2d Cir. 1999) ................................................................................................. 9, 13

Bennett v. Health Mgmt. Sys., Inc.,
  936 N.Y.S.2d 112 (2011) ......................................................................................................... 19

Bentivegna v. People's United Bank,
  No. 2:14 Civ. 599 (ADS)(GRB), 2017 WL 3394601 (E.D.N.Y. Aug. 7, 2017) ...................... 21

Brown v. Henderson,
  257 F.3d 246 (2d Cir. 2001) .................................................................................................... 18

Byrnie v. Town of Cromwell, Bd. of Educ.,
  243 F.3d 93 (2d Cir. 2001) ........................................................................................................ 8

Carter v. Syracuse City School Dist.,
  850 Fed. App'x 22 (2d Cir. 2021) .............................................................................................. 8

Chertkova v. Conn. Gen. Life Ins. Co.,
  92 F.3d 81 (2d Cir. 1996) ........................................................................................................ 20

Danzer v. Norden Systems, Inc.,
  151 F.3d 50 (2d Cir. 1998) ........................................................................................................ 8

David v. Comtech PST Corp.,
  No. Civ. 03-6480, 2006 WL 2713936 (E.D.N.Y. Sept. 22, 2006) ........................................... 12

Delville v. Firmenich Inc.,
  920 F. Supp. 2d 446 (S.D.N.Y. 2013) ................................................................ 7

Doe v. Columbia Univ.,
  831 F.3d 46 (2d Cir. 2016) ................................................................................ 23

EEOC v. Maryland Ins. Admin.,
  879 F.3d 114 (4th Cir. 2018) ...................................................................... 11, 13

Friedman v. Swiss Re America Holding Corp.,
  643 F. App'x 69  (2d Cir. 2016) ......................................................................... 7

Gorzynski v. JetBlue Airways Corp.,
  596 F.3d 93 (2d Cir. 2010) ................................................................................. 8

Green v. Town of East Haven,
  952 F.3d 394 (2d Cir. 2020) ............................................................................... 7

Husser v. New York City Dep't of Educ.,
  137 F. Supp. 3d 253 (E.D.N.Y. 2015) ...................................................... 9, 12, 19

In re Dana Corp.,
  574 F.3d 129 (2d Cir. 2009) ............................................................................... 8

Juarez v. Nw. Mut. Life Ins. Co.,
  69 F. Supp. 3d 364 (S.D.N.Y. 2014) ................................................................. 18

Kaytor v. Elec. Boat Corp.,
  609 F.3d 537 (2d Cir. 2010) ............................................................................... 7

Kazolias v. IBEWLU 363,
  806 F.3d 45 (2d Cir. 2015) ............................................................................... 23

Kessler v. Westchester Cnty Dep't of Soc. Servs.,
  461 F.3d 199 (2d Cir. 2006) ........................................................................ 7, 21

Lavin-McEleney v. Marist Coll.,
  239 F.3d 476 (2d Cir. 2001) ..................................................................... 9, 10, 18

Lenzi v. Systemax, Inc.,
   944 F.3d 97 (2d Cir. 2019) ................................................................................. 19

Mihalik v. Credit Agricole Cheuvreaux, N.A., Inc.,
   715 F.3d 102 (2d Cir. 2013) ......................................................................... 19, 21

Patrick v. LeFevre,
   745 F.2d 153 (2d Cir. 1984) ................................................................................. 8

Quinn v. Green Tree Credit Corp.,
   159 F.3d 759 (2d Cir. 1998) ............................................................................... 21

Rasmy v. Marriott Int'l., Inc.,
   952 F.3d 379 (2d Cir. 2020) ................................................................................. 7

Redd v. N.Y. Div. of Parole,
   678 F.3d 166 (2d Cir. 2012) ................................................................................. 7

Reeves v. Sanderson Plumbing Prods., Inc.,
   530 U.S. 133 (2000) ............................................................................................. 8

Rodriguez v. Vill. Green Realty, Inc.,
   788 F.3d 31 (2d Cir. 2015) ................................................................................... 8

Rose v. Goldman, Sachs & Co., Inc.,
   163 F. Supp. 2d 238 (S.D.N.Y. 2001) ............................................................... 21

Rule v. Brine, Inc.,
   85 F.3d 1002 (2d Cir. 1996) ................................................................................. 8

Ryduchowski v. Port Auth. of N.Y. & N.J.,
   203 F.3d 135 (2d Cir. 2000) ............................................................................... 12

Stratton v. Dep't for the Aging for the City of N.Y.,
   132 F.3d 869 (2d Cir. 1999) ............................................................................... 20

Sumner v. U.S. Postal Serv.,
   899 F.2d 203 (2d Cir. 1990) ............................................................................... 23

Syeed v. Bloomberg L.P.,
   --- F. Supp. 3d ---, 2021 WL 4952486 (S.D.N.Y. Oct. 25, 2021) ............................................. 11

Tomka v. Seiler Corp.,
   66 F.3d 1295 (2d Cir. 1995) ........................................................................................................ 9

Volpe v. Nassau Cty.,
   915 F. Supp. 2d 284 (E.D.N.Y. 2013) ......................................................................................... 9

Walsh v. New York City Housing Auth.,
   828 F.3d 70 (2d Cir. 2016) .................................................................................................... 8, 20

Washington Cty. v. Gunther,
   452 U.S. 161 (1981) ................................................................................................................... 19

Weinstock v. Columbia Univ.,
   No. 95 Civ. 0569 (JFK), 1996 WL 658437 (S.D.N.Y. Nov. 13, 1996) ..................................... 20

White v. ABCO Eng'g Corp.,
   221 F.3d 293 (2d Cir. 2000) ........................................................................................................ 7

Wolf v. Time Warner, Inc.,
   548 F. App'x 693 (2d Cir. 2013) .............................................................................................. 21

Zann Kwan v. Andalex Grp. LLC,
   737 F.3d 834 (2d Cir. 2013) ...................................................................................................... 21

**Other Authorities**

29 C.F.R. § 1620.19 ............................................................................................................................ 12

29 U.S.C. §206 ......................................................................................................................... 1, 9, 12

42 U.S.C. § 2000e ...................................................................................................................... 1, 19

N.Y.C. Admin. Code § 8-101 ................................................................................................... 1, 19

N.Y. Executive Law § 290 ....................................................................................................... 1, 19

N.Y. Lab. Law § 194 ....................................................................................................... 1

## PRELIMINARY STATEMENT

Defendant SMBC Nikko Securities Americas, Inc. ("SMBC" or the "Bank"), pays male employees in the Debt Capital Market ("DCM") group more than women who perform the same work.  Plaintiff Irene Hatzimihalis is a victim of the Bank's discriminatory pay policies.  She came to SMBC with approximately nine years of financial service experience and advanced degrees.  She was praised for being a "hard worker" and a "huge" contributor to her group.  Yet SMBC paid her less than two men with substantially less experience, one of whom she trained.  Plaintiff eventually filed this lawsuit to remedy the pay gap.  The Bank promptly fired her.

Defendants' conduct violated the equal pay, anti-discrimination and anti-retaliation provisions of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); the New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq*. ("NYSPEL"); the Equal Pay Act, 29 U.S.C. § 206 *et seq*. ("EPA"); and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## STATEMENT OF FACTS

### I.      BACKGROUND

Hatzimihalis is a highly competent financial services professional.  She earned undergraduate and graduate degree in economics, business, banking and finance.  (Pl 56.1 ¶¶ 1-2).  Since 2002, she has worked in a number of well-regarded institutions, including BMO Capital Markets ("BMO"), where she worked on public and private debt transactions.  (Pl 56.1 ¶¶ 3-5).  She earned her first regulatory license in 2007, which allowed her to take client-facing responsibilities.  (Pl 56.1 ¶ 6).

## II.   SMBC HIRES HATZIMIHALIS

In 2011, with nine years' experience in the industry, SMBC hired Hatzimihalis as an Assistant Vice President in the DCM group.  (Pl 56.1 ¶¶ 8-9).  She requested that the Bank pay her a starting salary of $110,000.  The Bank only offered her $85,000.  (Pl 56.1 ¶¶ 10-11).  At the time, she was the only woman in the group.  (Pl 56.1 ¶ 12).

As an AVP, Hatzimihalis was responsible for supporting more senior professionals, including putting together presentation materials, conducting research on clients, helping with internal and external requests, and assisting with deal execution.  She also communicated and met with clients.  (Pl 56.1 ¶ 14).

In 2013, SMBC obtain financial holding company status, which enabled the Bank to perform public bond issuance.  (Pl 56.1 ¶ 17).  Hatzimihalis had previously worked on numerous public deals while at BMO (Pl 56.1 ¶ 18) and discussed with her then boss, Yoshohiro Satake, becoming part of SMBC's public placement team.  (Pl 56.1 ¶ 19).  She told Satake that, while at BMO, she had worked in the DCM group that worked on public high yield and investment grade offerings. (Pl 56.1 ¶ 19).  Again, she was the only woman in the group.  (Pl 56.1 ¶ 20).

## III.   HATZIMIHALIS'S PERFORMANCE

Hatzimihalis was considered an excellent performer.  In 2014, Hatzimihalis's work was described as "[c]lear, accurate and error free.  Huge number of coverage and well managed by her own."  According to the Bank, she "[a]lways tr[ies] to provide something new to clients"; has "[s]trong communication skills"; is "[a]lways proactive"; is a "[h]ighly valued hard worker"; "work[s] aggressively"; "made a huge contribution"; and "[a]lways tr[ies] to expand platform and business."  (Pl 56.1 ¶ 29).

Around the same time, Hatzimihalis was recommended for promotion to Vice President ("VP") because, according to then group head Satake, Hatzimihalis made "huge contributions to the [SMBC's] 1st year start-up operation," referring to the public placement business.  According to Satake, Hatzimihalis was "a hard worker, always stays very very late to make sure everything is in place and under control.  She comes to the office even on weekends if she has to do so, to be ready for unexpected meeting request from clients."  Satake described Hatzimihalis as "an excellent sample of 'New Nikko DCM'" and praised Hatzimihalis for playing a "huge role in terms of relationship building" with clients. Satake also praised Hatzimihalis for helping to train Chris Nieves, a newly-hired, junior employee.  (Pl 56.1 ¶ 30)

Satake recommended that SMBC pay Hatzimihalis an annual salary of $150,000 as a first-year VP.  (Pl 56.1 ¶ 31).  While the Bank promoted Hatzimihalis, it only paid her a $110,000 salary.  (Pl 56.1 ¶ 32).

As a VP, Hatzimihalis now had more client-facing opportunities.  (Pl 56.1 ¶ 33).  Her "goals" as a VP were to generate road shows, client calls, attend client meetings, collaborate with others and maintain relationships within and outside the Bank.  (Pl 56.1 ¶ 34).  Developing new business through prospecting was never a requirement.  Rather, it was an "optional" or "stretch goal."  (Pl 56.1 ¶ 35).

For fiscal year 2015, SMBC rated Hatzimihalis as "[e]xceeds" expectations.  (Pl 56.1 ¶ 36).  As a VP, Hatzimihalis was described as someone who "[t]hinks outside the box . . . in terms of new solutions/improved processes"; "[a]rrives at meetings on time and well-prepared"; "[a]pproaches work with a sense of energetic purpose"; "enjoys working hard"; "bottom line oriented"; is "[p]roductive – meets expected work outcomes in a timely and quality manner;" "[p]rovides reliable, high quality work"; "[m]oves vision to possibilities – forges pathways to

eventual realities"; "[a]nticipates future consequences and trends accurately"; and "creates

potential breakthrough strategies and plans."  (Pl 56.1 ¶ 37).

Moreover, Hatzimihalis had "successfully adjusted" to the "public businesses mindset."

She was also a "[k]ey member" of the public team, "[m]anag[ed] junior members," "[a]lways

meeting deadline[s]," and "[w]orking hard to keep its quality at the very good professional

level."  The latter was "very important for [SMBC's] business."  Once again, Hatzimihalis was a

[v]ery hard worker" who did not "mind coming to the office [o]n the weekend if needed."  (Pl

56.1 ¶ 38).

For 2016, Hatzimihalis again met all of the Bank's expectations and was praised for

being a "hard worker."  (Pl 56.1 ¶ 40).  She was, according to Jeremy Sisselman, one of her

managers, "on a path for promotion eventually."  (Pl 56.1 ¶ 41).

## IV.   <u>BOLGER'S ARRIVAL</u>

In October 2016, Defendant John Bolger joined SMBC as an Executive Director, two

levels above Hatzimihalis.  (Pl 56.1 ¶ 42).  Although Bolger told Hatzimihalis that he was not

her supervisor (Pl 56.1 ¶ 43), Satake told Hatzimihalis to speak to Bolger about distributing

accounts to her.  (Pl 56.1 ¶ 44).  For weeks, however, Bolger did not assign Hatzimihalis primary

coverage on any accounts.  (Pl 56.1 ¶ 45).[1]  Hatzimihalis had to ask her supervisors, Satake and

Sisselman, for help getting substantive assignments.  (Pl 56.1 ¶ 47).  To Hatzimihalis, it appeared

that Bolger was intentionally avoiding giving her accounts to cover and that he was doing so

"because [she's] a woman."  (Pl 56.1 ¶¶ 48-49).  Indeed, Sisselman advised Hatzimihalis not to

---

[1]       "Primary coverage" means the employee is "responsible for managing that relationship,
providing advice to that client" and "making sure the organization is focused on that name and
ultimately driving revenue through those names."  (Pl 56.1 ¶ 46).

ask Bolger for primary coverage on accounts because "senior management didn't like that." Rather, she should "just focus on being [Bolger's] right-hand woman." (Pl 56.1 ¶ 50).

When Bolger finally sat down with Hatzimihalis on November 4, 2016, he stated that he was not aware that he had to share accounts with her, that he was not even aware of her existence when he interviewed for the position and that he did not know he had to share the real estate portfolio with her. (Pl 56.1 ¶ 51). Bolger eventually gave her several clients in the real estate sector, an area he knew was "shrinking," but only after taking three other clients from her. (Pl 56.1 ¶¶ 52-55). Bolger gave other VPs "way more clients." (Pl 56.1 ¶ 56) (quoting Sisselman 69:12-70:5).

At some later point, Sisselman urged Hatzimihalis to "apologize" to Bolger and ask for "another chance." (Pl 56.1 ¶ 57). Bolger believed that Hatzimihalis was being "rude and disrespectful" because she asked for accounts and decided that he was "not going to interact with her on this stuff." (Pl 56.1 ¶ 58).

## V.     BOLGER AND ZAMAN TRY TO FORCE HATZIMIHALIS OUT

In early 2019, SMBC announced that Satake would be returning to Tokyo. The Bank nominated four replacement candidates, including Bolger and Omar Zaman. All of the hand-picked candidates were men. (Pl 56.1 ¶ 69). Ultimately, Bolger and Zaman were given the position of co-heads of DCM and became Hatzimihalis's supervisors. (Pl 56.1 ¶ 76).

Bolger and Zaman immediately tried to force Hatzimihalis out. Within weeks of their promotion, they determined that Hatzimihalis was "not a good fit" for the group. (Pl 56.1 ¶ 79) Neither supervisor had previously been involved in any reviews of Hatzimihalis's performance; indeed, Zaman had never before worked with Hatzimihalis. (Pl 56.1 ¶¶ 77-78). Remarkably, neither of these newly-minted supervisors read through Hatzimihalis's past performance reviews

(Pl 56.1 ¶¶ 80-81).  Bolger believed the reviews, which he admitted were accurate reflections of an employee's performance (Pl 56.1 ¶ 26), were not "useful" in Hatzimihalis's case.  (Pl 56.1 ¶ 80).  Hatzimihalis rejected their proposal.  (Pl 56.1 ¶ 88).

In April/May 2020, Bolger and Zaman again tried to convince Hatzimihalis to leave the group and become a relationship manager.  (Pl 56.1 ¶¶ 106-19).  For the first time, the Bank gave Hatzimihalis a negative performance review and slashed her bonus.  (Pl 56.1 ¶ 112).

## VI.   SMBC FIRES HATZIMIHALIS

In August 2020, Hatzimihalis hired counsel and protested to the Bank that she was the victim of discrimination.  (Pl 56.1 ¶ 123).  In particular (and as explained in further detail below), Hatzimihalis complained that men, even those who had significantly less experience, were paid more than her.  (Pl 56.1 ¶ 123).  In September 2020, Hatzimihalis filed this lawsuit.  (Pl 56.1¶ 125).  By March 2021, one month after an unsuccessful settlement conference, SMBC fired Hatzimihalis.  (Pl 56.1 ¶ 135).

## VII.  UNEQUAL PAY

During Hatzimihalis's employment, SMBC paid two less-experienced male VPs, Nieves and William Asmundson, more than Hatzimihalis.  SMBC hired Nieves as an analyst in 2014 and promptly promoted him to VP in 2016. (Pl 56.1 ¶ 140, 160).  The Bank did similarly for Asmundson.  (Pl 56.1¶ 183, 195).  As VPs, both had the same coverage responsibilities as Hatzimihalis.  (Pl 56.1 ¶ 166, 198).  The Bank paid both men in lock step.  As first year VPs, the Bank paid them salaries of $[REDACTED], bonuses of $[REDACTED] and total compensation of $[REDACTED].  (Pl 56.1 ¶ 122).  The Bank paid Hatzimihalis as a first-year VP a salary of $110,000, bonus of $[REDACTED] and total compensation of $[REDACTED].  (Pl 56.1 ¶ 32, 234).  This pay gap continued

through the remainder of Hatzimihalis's employment, underpaying Hatzimihalis by hundreds of thousands of dollars over time.  (Pl 56.1 ¶ 140-221).

The Bank also underpaid Hatzimihalis's lone comparable female colleague, Kaitlin Carter.  Despite having the most experience in the group and being considered the "best banker" (Pl 56.1 ¶ 228), SMBC paid Carter REDACTED less as first year VP than the junior men.  (Pl 56.1 ¶ 234).  Like Hatzimihalis, Carter continued to be underpaid compared to her male peers for years. (Pl 56.1 ¶ 232-40).

## ARGUMENT

## I.   THE SUMMARY JUDGMENT STANDARD

Summary judgment must be denied "when the admissible materials in the record 'make it' arguable that the claim has merit."  Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (citation omitted); see Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 457 (S.D.N.Y. 2013) ("A motion for summary judgment prevails '[o]nly when no reasonable trier of fact could find in favor of the nonmoving party.'") (quoting White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000)).  In deciding the motion, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Green v. Town of East Haven, 952 F.3d 394, 406 (2d Cir. 2020) (quoting Kessler v. Westchester Cnty Dep't of Soc. Servs., 461 F.3d 199, 206 (2d Cir. 2006)). Moreover, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record."  Rasmy v. Marriott Int'l., Inc., 952 F.3d 379, 386 (2d Cir. 2020) (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (emphasis omitted) (citation and internal quotation marks omitted)); see Friedman v. Swiss Re America Holding Corp., 643 F. App'x 69, 72  (2d Cir. 2016) (reversing grant of summary judgment where "the

district court failed to consider 'the record as a whole'") (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001)).

Importantly, the Second Circuit has "long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." Walsh v. New York City Housing Auth., 828 F.3d 70, 74 (2d Cir. 2016) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010)). Indeed, "'where subjective issues regarding a litigant's state of mind . . . are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.'" Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 49 (2d Cir. 2015) (quoting Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984)); see id. ("'[A] sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.'") (quoting Patrick, 745 F.2d at 159)).

Finally, a court may not give credence to the moving party's evidence unless it comes from disinterested witnesses and is neither contradicted nor impeached. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009) (reversible error to rely on testimony of interested witness for summary judgment).

In short, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Carter v. Syracuse City School Dist., 850 Fed. App'x 22, 26 n.2 (2d Cir. 2021) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)); see Danzer v. Norden Systems, Inc., 151 F.3d 50, 57 (2d Cir. 1998) ("Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties.").

## II.   THE EQUAL PAY CLAIMS

### A.   Legal Standard

An employer violates the Equal Pay Act, 29 U.S.C. § 206(d) (EPA), when it pays a woman less than a man for work that requires the same skill, effort, and responsibility and is performed under similar working conditions.  Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995)); see Volpe v. Nassau Cty., 915 F. Supp. 2d 284, 292 n.5 (E.D.N.Y. 2013).  To prevail, the plaintiff need not show that the employer intended to discriminate on the basis of sex.  Belfi, 191 F.3d at 136.  Moreover, she "need not demonstrate that her job is identical to a higher paid position," only that it is "substantially equal."  Lavin-McEleney v. Marist Coll., 239 F.3d 476, 480 (2d Cir. 2001).  Thus, differences in job titles or professional responsibilities between a female employee and her male comparators do not necessarily preclude the two positions from being considered "substantially equivalent."  Id. at 480-81.  "Factors that are considered include whether the plaintiff and the comparator work in the same division, whether they have the same supervisor, whether they have similar responsibilities, and whether the employees are required to devote the same effort."  Husser v. New York City Dep't of Educ., 137 F. Supp. 3d 253, 267 (E.D.N.Y. 2015).  Under the NYSEPL (unlike under the federal Equal Pay Act), the employee need only show that the respective employees performed "substantially similar work, when viewed as a composite of skill, effort and responsibility, and performed under similar working conditions."  N.Y.L.L. § 194.

### B.   The Pay Gap

Here, SMBC admits that Hatzimihalis and her male peers, Nieves and Asmundson, performed the same jobs.  (Pl 56.1 ¶¶ 166, 198).  It nevertheless claims that Hatzimihalis was

paid the same, or better, than comparable men.  (Defs 56.1 ¶¶ 28-57).  But a jury could conclude otherwise.

SMBC paid men in Hatzimihalis's group in lock step at each stage of their careers.  In the four years since becoming entry-level VPs (Pl 56.1 ¶¶ 160, 19) and gaining client coverage responsibilities (Pl 56.1 ¶¶ 163, 199), SMBC paid Hatzimihalis's male colleagues Nieves and Asmundson (1) the same salaries ($REDACTED, $REDACTED, $REDACTED and $REDACTED); (2) bonuses ($REDACTED, $REDACTED, $REDACTED and $REDACTED); and total compensation ($REDACTED, $REDACTED, $REDACTED and $REDACTED).  (Pl 56.1 ¶¶ 140-221).[2]

SMBC paid Hatzimihalis less at comparable points:

- In Hatzimihalis's first year as VP (2015), SMBC paid her (1) a salary of $REDACTED ($REDACTED less); (2) a bonus of $REDACTED ($REDACTED less); and (3) total compensation of $REDACTED ($REDACTED less).  (Pl 56.1 ¶¶ 172-73, 234-35).

- In Hatzimihalis's second VP year (2016), SMBC paid her (1) a salary of $REDACTED ($REDACTED less); (2) a bonus of $REDACTED ($REDACTED less); and (3) total compensation of $REDACTED ($REDACTED less).  (Pl 56.1 ¶¶ 174-75, 236-37).

- In Hatzimihalis's third VP year (2017), SMBC paid her the same salary as the men, but only a $REDACTED bonus ($REDACTED less) and total compensation of $REDACTED ($REDACTED less).  (Pl 56.1 ¶¶ 176, 213-15).

- In Hatzimihalis's fourth VP year (2018), SMBC paid her (1) a salary of $REDACTED ($REDACTED less); (2) a bonus of $REDACTED ($REDACTED less); and (3) total compensation of $REDACTED ($REDACTED less). (Pl 56.1 ¶¶ 218-20).[3]

This pay gap, which continued into the next two years, becomes even more glaring given that Hatzimihalis had more years of industry experience (Pl 56.1 ¶¶ 140-142, 183-186) and

---

[2]    During the fourth year, Hatzimihalis's male colleagues were given a new title (Director). (Pl 56.1 ¶¶ 177, 216).  However, it uncontested that, despite the title change, they performed the same job.  Lavin-McEleney, 239 F.3d at 480-81.

[3]    That SMBC did not award Hatzimihalis a Director title in the fourth year does not matter because the job responsibilities for VP and Director were the same.

seniority at SMBC than the men (Pl 56.1 ¶¶ 140, 183), and even supervised and helped train one of the junior men (Nieves).  (Pl 56.1 ¶¶ 30, 144).

Hatzimihalis was not alone.  SMBC also paid Hatzimihalis's female colleague Carter less than the men:

- As an entry-level VP at SMBC in 2016 with client-coverage responsibilities (Pl 56.1 ¶ 231), SMBC paid Carter (1) a salary of $[REDACTED] ($[REDACTED] less); (2) a bonus of $[REDACTED] ($[REDACTED] less); and (3) total compensation of $[REDACTED] ($[REDACTED] less).  (Pl 56.1 ¶¶ 232, 234-35).

- As a second-year VP, SMBC paid Carter the same salary as the men, but a bonus of $[REDACTED] ($[REDACTED] less) and total compensation of $[REDACTED] ($[REDACTED] less).  (Pl 56.1 ¶¶ 236-37).

- As a third-year VP, SMBC again paid Carter the same salary as the men, but only a $[REDACTED] bonus ($[REDACTED] less) and total compensation of $[REDACTED] ($[REDACTED] less).  (Pl 56.1 ¶¶ 236-40).

- And in her fourth year (2019) when, like the men, Carter was given a Director title, SMBC paid her the same salary as the men but only a $[REDACTED] bonus ($[REDACTED] less) and total compensation of $[REDACTED] ($[REDACTED] less).  (Pl 56.1 ¶¶ 238, 240).[4]

From this evidence a jury could easily conclude that there was one pay scale for men as entry-level VPs and thereafter, and another (lower scale) for women.  See Syeed v. Bloomberg L.P., --- F. Supp. 3d ---, 2021 WL 4952486, at *15 (S.D.N.Y. Oct. 25, 2021) (employee "sufficiently alleges that she was compensated less than . . . male employees . . . hired out of her internship"); EEOC v. Maryland Ins. Admin., 879 F.3d 114, 121 (4th Cir. 2018) (plaintiff made out prima facie case where female "starting salaries were lower than the starting salaries of all four male comparators").[5]

---

[4]    Like Hatzimihalis, Carter had significantly more industry experience than the two junior men.  (Pl 56.1 ¶¶ 222-27).

[5]    SMBC went to extraordinary lengths to make sure that men were treated the same.  As a first year Associate (before earning VP status), SMBC paid Nieves total compensation of $[REDACTED] (Pl 56.1 ¶¶ 158-59).  Predictably, SMBC also paid

SMBC's offer to make up salary gap with a bonus (Pl 56.1 ¶¶ 151-52) only makes things worse for SMBC.  First, the offer to "true up" Hatzimihalis is an admission that the equal pay laws were violated.  Second, EPA regulations require that wages be paid "in the same medium of exchange" and thus expressly forbid an employer from making up a salary gap with a promise of future pay.  29 C.F.R. § 1620.19 ("an employer would be prohibited from paying higher hourly rates to all employees of one sex and then attempting to equalize the pay differential by periodically paying employees of the opposite sex a bonus").  Thus, even if SMBC did "true up" Hatzimihalis's compensation through bonuses (which, as explained above, it did not), SMBC would still have violated the equal pay laws.

## C.  **Defendants' Affirmative Defenses**

A plaintiff prevails upon meeting her prima facie case (a showing of equal work and less pay) unless the employer can prove (not merely assert) one of four affirmative defenses, including, that the pay differential is based on "a factor other than sex."  29 U.S.C. §206(d)(1). The employer's "burden . . . is a heavy one because the statutory exemptions are narrowly construed."  Ryduchowski v. Port Auth. of N.Y. & N.J., 203 F.3d 135, 143 (2d Cir. 2000) (quotations and citations omitted).  Moreover, a defendant "cannot attain summary judgment unless the evidence . . . on that issue is conclusive."  Husser, 137 F. Supp. 3d at 270 (citation omitted); see David v. Comtech PST Corp., No. CV 03-6480, 2006 WL 2713936, at *17 (E.D.N.Y. Sept. 22, 2006) ("The defendants therefore have the burden of proving that the disparity was justified by one of the EPA's affirmative defenses.  Their burden on this score is

---

Asmundson $[REDACTED] ($[REDACTED] salary + $[REDACTED] bonus).  (Pl 56.1 ¶¶ 193-94).  This effort to calibrate the men's salaries to the penny is hardly a coincidence.  Moreover, SMBC copied and pasted the exact same language into each man's annual review.  (Resp. to Defs 56.1 ¶¶ 112, 114).

one of persuasion, not merely production, and the burden is a 'heavy one' -the statutory exceptions are to be 'narrowly construed.'").  In addition, the affirmative defense fails where the employer's explanations for the pay gap are pretextual.  Belfi, 191 F.3d at 139.  "Circumstantial evidence in the form of differing and inconsistent explanations from the [employer] raise questions of fact to rebut its alleged non-discriminatory reasons for the wage disparity, and may provide the jury with a basis to find pretext."  Id.  Importantly, the "statutory language requires that an employer submit evidence from which a reasonable factfinder could conclude not simply that the employer's reasons could explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity."  Maryland Ins. Admin., 879 F.3d at 121 (emphasis in original).

SMBC's purported non-discriminatory explanation for the pay gap – performance as evidenced by revenue generation – is belied by its own documents, which show that revenue generation had no effect on how SMBC paid comparable men.

For instance, as an entry level VP, Nieves purportedly generated $REDACTED in revenue. (Pl 56.1 ¶ 295).  His male peer Asmundson generated only $REDACTED.  (Pl 56.1 ¶ 303).  Yet SMBC paid Asmundson the exact same salary ($REDACTED), bonus ($REDACTED) and total compensation ($REDACTED) as Nieves.  (Pl 56.1 ¶ 207).  As a second-year VP, Nieves purportedly generated $REDACTED in revenue.  (Pl 56.1 ¶ 297).  Asmundson generated only $REDACTED.  (Pl 56.1 ¶ 304).  Once again, SMBC paid Asmundson the same salary ($REDACTED), bonus ($REDACTED) and total compensation ($REDACTED as Nieves.  (Pl 56.1 ¶ 211).  In other words, there was simply no correlation between revenue generation and compensation.  Asmundson (a man) would have earned the same compensation whether he generated $200,000 or $4 million dollars of revenue. However, a woman, like Carter, who generated substantially more revenue ($REDACTED) as a second-year VP than both men combined (Defs 56.1 ¶144), earned less.  (Pl 56.1 ¶¶ 234-37).

From this proof, a jury could easily conclude that sex – not performance or revenue generation – determined employee pay.

But it gets worse.  SMBC's own documents show that SMBC inflated the revenue numbers for men to make their performance appear better.  SMBC awarded revenue credit to the employee who had "primary" coverage for a client.  (Defs 56.1 ¶¶ 136-171).  That rule, however, did not apply to men.  SMBC's internal documents show that Nieves had "primary" coverage responsibility for three clients: ███████████ REDACTED ███████████ (Pl 56.1 ¶ 293).[6]  These clients generated no revenue for SMBC for the first three years that Nieves was a VP.  (Pl 56.1 ¶¶ 294, 296, 298).  To plug this gap (and likely justify Nieves's preferential status) SMBC gave Nieves credit for clients that were primarily covered by Zaman (Pl 56.1 ¶ 295, 297, 299), thus making it appear that Nieves generated millions in revenue in his first three years as VP.[7]  Nieves also benefited in 2020 when SMBC gave him an additional approximately $██REDACTED██ in revenue credits for clients covered by Zaman.  (Pl 56.1 ¶ 301).  Asmundson also benefited from SMBC's male-focused largess.  In FY 2019, Asmundson was given approximately $██REDACTED██ revenue for clients covered by Bolger and Morici, another manager. (Pl 56.1 ¶ 306).

Women did not get this benefit.  Neither Bolger nor Zaman gifted Hatzimihalis any revenue credit from their accounts. (Bolger Decl. Ex. 8).[8]  Further exposing the inequality,

---

[6]     During discovery, SMBC produced two internal lists identifying which employees has "primary" and "supporting" coverage for each client.

[7]     Remarkably, in 2020, SMBC gave Nieves a Director title, even though, according to SMBC's own documents, his primary clients had failed to generate any revenue.

[8]     Indeed, Hatzimihalis had to fight to get any primary coverage clients from Bolger when he arrived in 2016.  (Pl 56.1 ¶¶ 44-55).  Bolger resisted, telling Hatzimihalis that he was not even aware of her existence.  (Pl 56.1 ¶ 51).  And, while Bolger eventually gave Hatzimihalis some

SMBC made Carter (a woman) start the FIG business and "build her own portfolio."  (Pl 56.1 ¶ 230).  She did so successfully, earning, at times, tens-of-millions in primary coverage revenue. (Pl 56.1 ¶¶ 242-44).  Yet, as explained above, SMBC paid Carter less than comparable male peers like Nieves, who generated no primary coverage revenue for years.  Certainly, if revenue generation was, in fact, a non-discriminatory explanation for SMBC's pay gap, then Carter should have been paid substantially more (not less) than Nieves, who generated nothing.  (Pl 56.1 ¶¶ 293-98), and Asmundson who generated only $REDACTED and $REDACTED in his first two years.  (Pl 56.1 ¶¶ 303-04).  A jury could easily conclude from these facts, which come from SMBC's own internal documents, that SMBC violated the equal pay laws.[9]

SMBC's argument that other performance metrics justified the pay gap is also belied by the evidence.  Up through mid-2019, when Bolger and Zaman became co-heads of the group, Hatzimihalis was routinely described in written reviews as an excellent performer.  (Pl 56.1 ¶¶ 22-24).  She always met – and often "exceed[ed]" the Bank's expectations.  (Pl 56.1 ¶¶ 28, 36). Among other things, Hatzimihalis was described as "productive," a "hard worker" who did not "mind coming to the office [o]n the weekend if needed" and "aways met deadlines," and a "[k]ey member" of the team who "[m]anage[d] junior members."  (Pl 56.1 ¶¶ 37, 40).  Hatzimihalis was specifically praised for being "proactive," her business generation efforts ("[a]lways tr[ies] to expan platform and business," and for making "huge contributions" to SMBC's newly-formed public platform business.  (Pl 56.1 ¶ 17, 29-30).

---

accounts in an industry that, in his view, was "shrinking," (Pl 56.1 ¶ 53), he gave other VPs "way more clients," which "didn't make sense."  (Pl 56.1 ¶ 56).

[9]     SMBC never listed revenue generation as an annual performance goal for Hatzimihalis. To the contrary, SMBC listed "prospecting" as a "stretch" or "optional" goal (Pl 56.1 ¶ 35), meaning it was not a requirement of the job or a performance measurement metric.  (Pl 56.1 ¶ 23).

Hatzimihalis was also lauded for her client skills.  (Pl 56.1 ¶ 37) (Hatzimihalis "maintain[ed] effective and productive relationships built on clear communication, support, and respect.  Listens and responds effectively to 'customers' questions, applies follow-up as an effective relationship-building tool, and commits to exceeding 'customer' expectations").  According to Satake, Hatzimihalis set an "excellent" example (Pl 56.1 ¶ 30) and, according to Sissleman, she "was on path for promotion eventually."  (Pl 56.1 ¶ 41).

Hatzimihalis was also extolled for her good work on individual client projects, including being told by Sisselman that she had been "eloquent" at a client meeting and had done a "great" job (Pl 56.1 ¶ 65), and by Bolger for being involved in a "very strong presentation filled with "valuable" and "new content" for client Equity Residential.  (Pl 56.1 ¶ 93).  Indeed, the client "was very impressed" with the work.  (Pl 56.1 ¶ 92).

In short, there is overwhelming proof form which a jury could reject SMBC's argument that Hatzimihalis was a poor performer and, as a result, was paid less.[10]

Underperforming men, of course, were treated better.  REDACTED, a member of Bolger's pod with Hatzimihalis (Pl 56.1 ¶ 264) had "developmental issues"; made "a lot of mistakes," which he would "repeat . . . over and over," and was "not very organized."  (Pl 56.1 ¶¶ 267-68, 271).  Supervisors described REDACTED work as "garbage."  (Pl 56.1 ¶ 282).  REDACTED was a "gaps" performer (Pl 56.1 ¶¶ 286-87) who Sisselman believed should be fired.  (Pl 56.1 ¶ 276).  REDACTED poor track record did not hurt his prospects at SMBC.  Rather, in July 2019, immediately after Bolger and Zaman tried to get Hatzimihalis to leave the group (Pl 56.1 ¶¶ 106-

---

[10]      SMBC is free, of course, to argue that Hatzimihalis suddenly forgot how to do her job in mid-2019 when Bolger and Zaman became her supervisors.

19)[11], SMBC promoted REDACTED (Pl 56.1 ¶ 291) and then gave REDACTED secondary responsibility for some of Hatzimihalis's client after firing Hatzimihalis.  (Pl 56.1 ¶ 292).

REDACTED, too, was considered a poor performer.[12]  He was difficult to work with and the subject of multiple employee complaints.  (Pl 56.1 ¶¶ 252-53).  Zaman considered REDACTED a "gaps" performer who was not "satisfactorily driving results" and needed to "to perform at a higher level."  (Pl 56.1 ¶¶ 257-58, 260).  Bolger and Zaman had "many conversation" with REDACTED about his poor performance.  (Pl 56.1 ¶ 256).  And, while they considered dismissing REDACTED, they did not do so.  (Pl 56.1 ¶¶ 261-62).

There is yet additional proof that women were treated worse than men.  For instance, the Bank denied Carter, who was viewed as the "best banker" in the group (Pl 56.1 ¶ 228), a promotion to Executive Director in 2021 based on a purported policy that did not permit promotions in consecutive years.  (Pl 56.1 ¶ 90).  This purported policy did not stop the Bank from giving Nieves and Asmundson (two men) "fast" and "super fast" promotions, including in consecutive years.  (Pl 56.1 ¶¶ 156, 160-61,183, 189, 195, 197).  In addition, Bolger only took Hatzimihalis to two client meeting, while giving the men additional client facing opportunities.  (Pl 56.1 ¶ 62).

---

[11]     Neither Bolger nor Zaman bothered to read Hatzimihalis's written reviews.  (Pl 56.1 ¶¶ 80-81).  Indeed, Zaman had never even worked with Hatzimihalis at that time.  (Pl 56.1 ¶ 78). That did not stop the two newly-minted managers form trying to push Hatzimihalis out within weeks of becoming her managers.

[12]     SMBC hired REDACTED as a VP in 2014 at a salary of $REDACTED (Pl 56.1 ¶ 248), REDACTED more than it paid Hatzimihalis when she was promoted to VP in 2016.  (Pl 56.1 ¶ 32).

Again, from these facts, a jury could reasonably conclude that SMBC's "performance" rationale for the pay gap was wholly pretextual and that, in fact, it was another example of the Bank's preferential treatment of men.[13]

To avoid a trial, SMBC attempts to raise the bar Hatzimihalis must clear to prove her claims.  According to SMBC, Hatzimihalis must show that SMBC paid women generally less than men.  However, this is a single-plaintiff equal pay case, not a class or collective action, and there is nothing that requires Hatzimihalis to make a Rule 23 class-type showing to prove her individual case.  Indeed, courts have made clear that "discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex."  Juarez v. Nw. Mut. Life Ins. Co., 69 F. Supp. 3d 364, 369 (S.D.N.Y. 2014), amended, No. 14 Civ. 5107 (KBF), 2014 WL 12772237 (S.D.N.Y. Dec. 30, 2014) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).  To the contrary, courts in this circuit have made clear that a female employee is entitled to a jury trial where there is evidence that is she paid less than specific male comparators.  See Lavin-McEleney, 239 F.3d at 481 (affirming judgment for plaintiff where, among other things, she "identified a male comparator").  Indeed, the NYSEPL's language makes this point plain.  N.Y.L.L. § 194 ("[n]o employee with status in one or more protected calls or classes shall be paid a wage at a rate that is less than the rate at which an employee without status within the same protected class or status in the same establishment is paid").[14]

---

[13]   SMBC is free, of course, to try to explain away the disparate treatment by, for example, arguing to a jury that the underperforming men improved their performance over time. However, this is a quintessential fact question.

SMBC's argument nevertheless fails for a more fundamental reason: as explained above, SMBC paid men in the DCM group in lock step while the Bank paid Hatzimihalis and the only other comparable woman (Carter) less.  (Pl 56.1 ¶¶ 207, 211, 214, 220).

## III.   PAY DISCRIMINATION

Unequal pay is also a form of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "State Law"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. (the "City Law"), where there is evidence that the employer intentionally discriminated.  Lenzi v. Systemax, Inc., 944 F.3d 97 (2d Cir. 2019).  Under those laws, however, the plaintiff need not prove that she performed equal work, only that the work was "comparable."  Washington Cty. v. Gunther, 452 U.S. 161, 178-79 (1981).  Under Title VII and the State Law, an employer is liable where sex was a motivating factor for the pay disparity.  Husser, 137 F. Supp. 3d at 270.  Under the relaxed City Law standard, an employer is liable where there is evidence that it treated the employee "less well, at least in part "for a discriminatory reason."  Mihalik v. Credit Agricole Cheuvreaux, N.A., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013).  Indeed, a court "must" deny summary judgment under the City Law "[i]f the plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete."  Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 123-24 (2011).

Under all three statutes, a court must consider the evidence as a whole.  "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination. To use the apt metaphor coined by Vincent Gambini . . . a plaintiff may satisfy her burden by

building a wall out of individual evidentiary bricks."  Walsh v. N.Y.C. Hous. Author., 828 F.3d

70, 76 (2d Cir. 2016) (citing MY COUSIN VINNY (Twentieth Century Fox Entertainment

1992)).  Moreover, "[s]ince it is rare indeed to find in an employer's records proof that a

personnel decision was made for a discriminatory reason, whatever other relevant depositions,

affidavits and materials are before the district court must be carefully scrutinized for

circumstantial evidence that could support an inference of discrimination."  Chertkova v. Conn.

Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).

> For the same reasons stated above with respect to the equal pay claims, a jury can also
find that SMBC intentionally discriminated against Hatzimihalis in pay.

> In particular, a plaintiff may prove her case through, among other things, comparative
evidence showing that she was treated less well than her male peers, Weinstock v. Columbia
Univ., No. 95 Civ. 0569 (JFK), 1996 WL 658437, at *9 (S.D.N.Y. Nov. 13, 1996), or pretext.
See Stratton v. Dep't for the Aging for the City of N.Y., 132 F.3d 869, 879 (2d Cir. 1999).

> Here, as explained above, there is evidence of both.  First, there is proof that SMBC paid
Hatzimihalis less in comparison to her similarly-situated male peers.  (Pl 56.1 ¶¶ 140-240).
SMBC moved the men up the ranks "super fast", paying them exactly the same compensation
regardless of their revenue generation.  SMBC even made identical remarks in their performance
reviews. And, when the men fell flat, SMBC inflated their revenue numbers to mask their
failures.  Moreover, SMBC's explanation that performance as measured by revenue affected pay
is wholly pretextual since it did not matter if a man generated $200,000 or $4 million (or zero) in
revenue; he was paid the same as his male peer.

## IV.    <u>RETALIATION</u>

Title VII, the EPA, the NYLL, the State and City Laws prohibit retaliation against an employee for complaining of sex discrimination and equal pay violations.  <u>Kessler</u>, 461 F.3d at 205-06; <u>Mihalik</u>, 715 F.3d at 112; <u>Rose v. Goldman, Sachs & Co., Inc.</u>, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001).  Under these statutes (with the exception of the local laws), an employer is liable where retaliation was the "but for" cause of the adverse employment action.  <u>Wolf v. Time Warner, Inc.</u>, 548 F. App'x 693, 695 (2d Cir. 2013); <u>Aponte v. Modern Furniture Mfg. Co., LLC</u>, No. 14-CV-4813, 2016 WL 5372799, at *16 (E.D.N.Y. Sept. 26, 2016).  '[B]ut-for' causation does not require proof that [discrimination] was the only cause of the employer's action, but only that the [dismissal] would not have occurred in the absence of the [discriminatory] motive." <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 846 (2d Cir. 2013).  There can be "multiple 'but-for' causes, each one of which may be sufficient to support liability."  <u>Id.</u> at 846 n.5.  Under the city and state laws, however, an employer is liable if retaliation played any role in the adverse action.  <u>Mihalik</u>, 715 F.3d at 116.  Evidence of pretext and close temporal proximity between an employee's complaints of discrimination and termination "are sufficient to create a triable issue of fact" as to retaliation.  <u>Zann Kwan</u>, 737 F.3d at 847.

Here, the timing is close.  In September 2020, Hatzimihalis engaged in protected activity when she filed her claims with this Court and the U.S. Equal Employment Opportunity Commission.  On February 8, 2021, the parties participated in a mediation.  (Pl 56.1 ¶ 133). Sure enough, SMBC fired Hatzimihalis the next month after nearly a decade of employment. (Pl 56.1 ¶ 135).  <u>See</u> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 769 (2d Cir. 1998) (two months between protected activity and adverse action sufficient to support inference of retaliation).  A jury may certainly draw an inference of discrimination from these events.  <u>See</u>

Bentivegna v. People's United Bank, No. 2:14 Civ. 599 (ADS)(GRB), 2017 WL 3394601, at *22

(E.D.N.Y. Aug. 7, 2017) ("[c]ourts in the Second Circuit have been willing to find a factual issue

regarding causation for up to a year between the protected activity and the adverse action under

certain circumstances").

Moreover, there is significant evidence that SMBC's performance-based excuses for

underpaying Hatzimihalis are pretextual.  The same is true of the Bank's excuse for firing

Hatzimihalis.  Hatzimihalis's email to REDACTED, which SMBC cites as a basis for her dismissal,

was a routine email that she had sent numerous times before providing the client with

information about the company's most recent trade.  (Pl 56.1 ¶ 308-12)  It did not contain any

inaccurate information.  (Pl 56.1 ¶ 314) And, while the client may have been confused (Pl 56.1 ¶

314, 317), the client did not complaint about Hatzimihalis (Pl 56.1 ¶ 315), the matter was quickly

resolved (Pl 56.1 ¶ 318-19), the client continued to do business with (Pl 56.1 ¶ 32), and, most

notably, Bolger continued to send similar emails to the client.  (Pl 56.1 ¶ 321-22)  Nevertheless,

in an effort to find an excuse to fire Hatzimihalis, Bolger falsely told Zaman that Hatzimihalis

"provided incorrect information" to Genting.  (Pl 56.1 ¶ 323).

SMBC's "REDACTED excuse" is equally suspect.  By his own admission, Bolger was present

for call with REDACTED executives and did not find anything problematic about Hatzimihalis's

participation.  (Pl 56.1 ¶ 328, 332).  Hatzimihalis did not speak because there was no opportunity

to do so on a conference call with approximately a dozen other participants.  (Pl 56.1 ¶ 325).  In

the ensuing days, Hatzimihalis had three other calls with client where she was a key speaker.  (Pl

56.1 ¶ 333-37).

In other words, a jury could certainly conclude that there was nothing remarkable about

either the REDACTED email or REDACTED call that warranted Hatzimihalis's termination.  However,

Bolger, who needed an excuse to fire Hatzimihalis, leaned into the excuse that others complained about Hatzimihalis to cover his tracks.  Indeed, that Bolger did not even give Hatzimihalis an opportunity to explain her significant communications with ▇REDACTED▇, further supports the pretext conclusion.  See Doe v. Columbia Univ., 831 F.3d 46, 56-57 (2d Cir. 2016) (discrimination alleged where "investigator . . . declined to seek out potential witnesses . . . favorable to [plaintiff]" and decisionmaker "reached conclusions that were incorrect and contrary to the weight of the evidence").[15]

That Bolger and Zaman already wanted to push Hatzimihalis out of the group either by convincing her to move to another job in the Bank or including her in an organizational restructuring, does not eliminate critical factual issues.  In or about August 2020, those efforts ceased and Hatzimihalis was no longer in jeopardy of being fired.  (Austensen Decl. ¶ 8) (admitting that Hatzimihalis "was removed from the list of individuals whose employment would be terminated in the talent optimization effort").  On September 29, 2020, however, Hatzimihalis filed this action and Bolger became "upset at [her]." (Pl 56.1 ¶¶ 124-28).  He then began sending emails to HR, excluding Hatzimihalis complaining about Hatzimihalis, something he had not done before.  (Pl 56.1 ¶ 129-30).  A jury could conclude from this timing and Bolger's response, that Hatzimihalis's court complaint was either the "but for," are at least a factor, in the decision to fire her.  See Kazolias v. IBEWLU 363, 806 F.3d 45, 49-50 (2d Cir. 2015) (decisionmaker's expressed resentment of plaintiffs' claims could show "retaliatory animus against Plaintiffs for their complaints" and a jury could infer that such resentment "had been brewing ever since

---

[15]   It is uncontested that Eisenberg did not request or even suggest that Bolger fired Hatzimihalis.  (Eisenberg Decl. ¶ 8).  He merely told Bolger that he was "unhappy."  (Eisenberg Decl. ¶ 8).  It certainly would have easy for Bolger to speak to Hatzimihalis, learn about her extensive communications with the client and then inform Eisenberg.  That he chose not to do so and immediately fired Hatzimihalis is telling.

[plaintiffs] brought their age discrimination charges" five months prior); Sumner v. U.S. Postal

Serv., 899 F.2d 203, 210-11 (2d Cir. 1990) ("war-like attitude" is direct evidence of retaliatory

animus).

## **CONCLULSION**

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion

in its entirety.

Dated: April 15, 2022
New York, New York                          Respectfully submitted,

                                             **WIGDOR LLP**

                                             By: _____
                                                  Valdi Licul
                                                  Lindsay M. Goldbrum

                                             85 Fifth Avenue
                                             New York, NY 10003
                                             Telephone: (212) 257-6800
                                             Facsimile: (212) 257-6845
                                             vlicul@wigdorlaw.com
                                             lgoldbrum@wigdorlaw.com

                                             *Counsel for Plaintiff*