**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- X
HAIDO IRENE HATZIMIHALIS,                  :
                                           :      Civil Action No.: 20-cv-8037 (JCP)
                    Plaintiff,             :
                                           :
         v.                                :
                                           :
SMBC NIKKO SECURITIES AMERICA, INC.,       :
JOHN BOLGER and OMAR ZAMAN, in their       :
individual and professional capacities,    :
                                           :
                    Defendants.            :
------------------------------------------------------------- X
```

### DEFENDANTS' REPLY TO PLAINTIFF'S COUNTERSTATEMENT TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York ("Local Civil Rules") and the Individual Rules of this Court, Defendants SMBC Nikko Securities America, Inc. ("Nikko America" or the "Company"), John Bolger ("Bolger") and Omar Zaman ("Zaman") (together, "Defendants") hereby submit the following Reply to Plaintiff Haido Irene Hatzimihalis ("Hatzimihalis" or "Plaintiff")'s Counterstatement to Defendants' Statement of Undisputed Material Facts ("Defendants' Statement of Facts" or "DSF").

## I.  DEFENDANT NIKKO AMERICA

1.  At all relevant times, Nikko America published and maintained Equal Employment Opportunity and policies within its Employee Handbook, which prohibit discrimination based on sex or gender and other protected characteristics and retaliation.  (Exs. 9-13, SMBC296, SMBC332-334, SMBC443-445, SMBC346-349, SMBC509-512, SMBC612-615, attached to the Declaration of Lloyd B. Chinn ("Chinn Dec.").)

**Response to Paragraph 1:**

Admit that the referenced documents include language prohibiting discrimination and retaliation.  SMBC's statements, however, are hearsay and not proof that SMBC does not, in fact, discriminate or retaliate.

**Defendants' Reply to Paragraph 1**: **UNDISPUTED**.  As to Plaintiff's additional response to Paragraph 1, it is immaterial, impermissible argument, and is a legal conclusion.  Further, Nikko America's policies qualify under the business record exception to hearsay.  *See Dixon v. Int'l Fedn. of Accountants*, 2010 WL 1424007, at *1, n.3 (S.D.N.Y Apr. 9, 2010) ("[T]he IFAC Employee Handbook qualifies as a business record under Rule 803.")

## II.  PLAINTIFF BEGINS WORKING IN DEBT CAPITAL MARKETS ("DCM") IN 2005.

2.      Irene Plaintiff ("Plaintiff" or "Plaintiff") graduated from the Athens University of Economics and Business in 1999.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 32:16-23; Chinn Dec. Ex. 14, SMBC000167.)

**Response to Paragraph 2:**

Admit.

**Defendants' Reply to Paragraph 2**: **UNDISPUTED.**

3.      Plaintiff began working for Blue Financial in December 2001 as a Fund Analyst.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 32:24-33:1, 34:13-15; Chinn Dec. Ex. 14, SMBC000167.)

**Response to Paragraph 3:**

Admit.

**Defendants' Reply to Paragraph 3**: **UNDISPUTED.**

4.      Plaintiff did not have any involvement in debt financing while working at Blue Financial. (Chinn Dec. Ex. 1, Plaintiff I Tr. 34:22-24.)

**Response to Paragraph 4:**

Admit.

**Defendants' Reply to Paragraph 4**: UNDISPUTED.

5.      After working at Blue Financial, Plaintiff began working at Unicredit[o].  (Chinn Dec. Ex. 1, Hatzimihalis I Tr. 34:25-35:1; Chinn Dec. Ex. 14, SMBC000167.)

    **Response to Paragraph 5:**

    Admit.

    **Defendants' Reply to Paragraph 5**: UNDISPUTED.

6.      Plaintiff did not have any involvement in debt finance while working at Unicredit[o]. (Chinn Dec. Ex. 1, Hatzimihalis I Tr. 35:17-19.)

    **Response to Paragraph 6:**

    Admit.

    **Defendants' Reply to Paragraph 6**: UNDISPUTED.

7.      Plaintiff joined BMO Capital Markets as an Analyst in April 2005 working in debt capital markets.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 36:1-4; Chinn Dec. Ex. 14, SMBC000167.)

    **Response to Paragraph 7:**

    Admit.

    **Defendants' Reply to Paragraph 7**: UNDISPUTED.

**III.    PLAINTIFF JOINS NIKKO AMERICA AS AN ASSISTANT VICE PRESIDENT IN OCTOBER 2011**

8.      Plaintiff joined Nikko America's DCM group in October 2011 as an Assistant Vice President.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 54:10-14; Chinn Dec. Ex. 15, SMBC9252.)

    **Response to Paragraph 8:**

    Admit.

    **Defendants' Reply to Paragraph 8**: UNDISPUTED.

9.      At the time Plaintiff joined Nikko America's DCM group, she was the third individual in the group and most junior member in the DCM team.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 52:13-15, 55:13-16.)

    **Response to Paragraph 9:**

Admit. Further, when Plaintiff was hired, she was the only woman in the DCM group.

(Hatzimihalis Decl. ¶ 50).

**Defendants' Reply to Paragraph 9**: **UNDISPUTED.**  As to Plaintiff's additional

response to Paragraph 9, it is irrelevant and immaterial as none of Plaintiff's claims relate

to her hire (as Nikko America did, in fact, hire her) and thus, the gender makeup of the

DCM group at the time of her hire is immaterial to Defendants' motion for summary

judgment.

10.     Plaintiff agreed to a starting annual salary of $85,000.  (Chinn Dec. Ex. 1, Plaintiff
        I Tr.50:12-51:6; Chinn Dec. Ex. 16, SMBC000160.)

**Response to Paragraph 10:**

Admit. However, Plaintiff requested a salary of $100,000 but was denied.  (Hatzimihalis

50:25-51:3)

**Defendants' Reply to Paragraph 10**: **UNDISPUTED.** As to Plaintiff's additional

response to Paragraph 9, it is irrelevant and immaterial as none of Plaintiff's claims relate

to her hire (as Nikko America did, in fact, hire her) and thus, the salary Plaintiff

requested prior to being hired is immaterial to Defendants' motion for summary

judgment.

11.     SMBC0002 accurately reflects the base salary and bonus award amounts Plaintiff
        received while employed at Nikko America.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 63:8-10,
        64:9-16; Chinn Dec. Ex. 17, SMBC00002.)

**Response to Paragraph 11:**

Admit.

**Defendants' Reply to Paragraph 11**: **UNDISPUTED.**

IV.    **DCM GROUP TRANSITION INTO PUBLIC MARKET BUSINESS AND**
       **EXPANDS TEAM**

12.    Yoshihiro Satake became the head of SMBC's DCM group in the fall of 2012.
       (Declaration of Yoshihiro Satake ("Satake Dec."), ¶2; Chinn Dec. Ex. 1, Plaintiff I Tr.
       55:17-56:1.)

       **Response to Paragraph 12:**

       Admit.

       **Defendants' Reply to Paragraph 12**: UNDISPUTED.

13.    In May 2013, Sumitomo Mitsui Financial Group, Inc. in Tokyo ("SMFG") and
       Sumitomo Mitsui Financial Corporation ("SMBC") acquired financial holding company
       ("FHC") status, which enabled the DCM group to engage in securities underwriting on
       DCM transactions and advise on public bond issuance.  (Satake Dec. ¶5; Chinn Dec.
       Ex. 1, Plaintiff I Tr. 56:4-13.)

       **Response to Paragraph 13:**

       Admit. However, prior to May 2013, Plaintiff and DCM were engaged in securities

underwriting using the SMBC Capital Markets Ltd. entity ("UK Entity") instead.  (Hatzimihalis

Decl. ¶ 51). DCM was accepting co-manager and other passive roles in public transactions prior

to May 2013 by using the UK Entity. Id.

       **Defendants' Reply to Paragraph 13**: UNDISPUTED.  As to Plaintiff's additional

       statement, it is irrelevant and immaterial, as Plaintiff admitted that prior to acquiring FHC

       status, Plaintiff and the DCM group *predominantly* advised and executed on private

       market transactions.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 56:4-18.)

14.    Prior to this acquisition of FHC status, Nikko America's DCM group predominantly
       advised and executed on U.S. private placement market transactions.  (Chinn Dec. Ex. 1,
       Plaintiff I Tr. 51:7-12, 56:4-6, 11-18; Satake Dec. ¶¶4-5.)

       **Response to Paragraph 14:**

       Admit.

       **Defendants' Reply to Paragraph 14**: UNDISPUTED.

15.     The "[b]usiness nature of public debt marketing is [] different from that of privates, in terms of timing, analysis, and depth of market knowledge."  (Chinn Dec. Ex. 18, SMBC0005371; Satake Dec. ¶6; Chinn Dec. Ex. 1, Plaintiff I Tr. 57:20-22, 58:20-59:12.)

**Response to Paragraph 15:**

Admit in part, deny in part.  While there are differences between the public versus private markets, Plaintiff disagrees with this statement as it applies to the depth of market knowledge. (Hatzimihalis Decl. ¶ 52).

**Defendants' Reply to Paragraph 15**:  **UNDISPUTED** that the "[b]usiness nature of public debt marketing is [] different from that of privates, in terms of timing, analysis" and as to Plaintiff's denial to the statement as it applies to the depth of market knowledge, Plaintiff's cited evidence merely states that she disagrees with Satake on this point.  That Plaintiff disagrees with her supervisor regarding the nature of the business is irrelevant and immaterial to Defendants' motion for summary judgment.

16.     Originating and executing a public debt offering requires public filings and disclosures while U.S. private placements do not.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 56:19-57:1; Satake Dec. ¶6.)

**Response to Paragraph 16:**

Admit.

**Defendants' Reply to Paragraph 16**: **UNDISPUTED.**

17.     Public debt offerings are more complex than private placements, typically involving more line items than a private placement transaction, with a public transaction involving upwards of 500 line items and a private placement transaction involving 10 to 15 line items.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 57:2-15; Satake Dec. ¶6.)

**Response to Paragraph 17:**

Admit in part, deny in part. While public offerings do involve typically more "line items," i.e., when investors are involved, more investors will buy a smaller piece of a public deal versus fewer investors who would buy larger pieces of a private placement deal.  (Hatzimihalis

Decl. ¶ 53).  This also depends on the size of the deal, as typically the private placements are

smaller transactions versus a public deal that is typically $▮▮▮▮▮▮ and higher.  Id.

However, public deals are not typically viewed as more complex.  Id.  It is the opposite, as

private placement transactions are highly customized to meet the issuer's needs.  Id.  The public

(Investment Grade) transactions are more standard transactions.  Id.

> **Defendants' Reply to Paragraph 17**: **UNDISPUTED** that public debt offerings
>
> typically involve more line items than a private placement transaction and that public
>
> deals are larger.  Plaintiff's assertion that public deals are "not typically viewed as more
>
> complex," is irrelevant given Plaintiff's admissions as to the differences between public
>
> and private deals (Chinn Dec. Ex. 1, Plaintiff I Tr. 56:19-57:1; 57:2-15, 57:20-22, 58:20-
>
> 59:12) and that Nikko America's DCM group indisputably pivoted away from private
>
> and toward public deals.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 51:7-12, 56:4-6, 11-18, 59:15-
>
> 60:11, 60:23-61:8.)

18.   When Satake began transitioning the DCM group, he discussed with Plaintiff whether she
      wanted to be part of the public DCM business in the capital markets team or be part of
      the private placement team.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 59:15-60:11, 60:23-61:8;
      Satake Dec. ¶7.)

> **Response to Paragraph 18:**
>
> Admit.
>
> **Defendants' Reply to Paragraph 18**: **UNDISPUTED.**

19.   Following this conversation with Satake, Plaintiff chose to work in the DCM group and
      within the public DCM business.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 61:16-62:1; Satake
      Dec. ¶7.)

> **Response to Paragraph 19:**
>
> Admit. However, Plaintiff was already working within the DCM group prior to this

conversation with Satake.  (Hatzimihalis Decl. ¶ 54).

**Defendants' Reply to Paragraph 19**: **UNDISPUTED.**  As to Plaintiff's additional statement, it is undisputed that Plaintiff began working in the DCM group in October 2011 (DSF ¶8), the statement in Paragraph 19 refers to her choice to continue working in the DCM group after it became a public debt market business instead of a private placement business (DSF ¶¶13-14).

20.    To build the new public DCM business, Satake hired individuals who had relevant public debt market experience, including Omar Zaman, Jeremy Sisselman, and Matt Morici. (Satake Dec. ¶8; Chinn Dec. Ex. 4, Zaman Tr. 24:16-25:3.)

**Response to Paragraph 20:**

Admit and add that Hatzimihalis had previously worked on numerous public deals while at BMO.  (Hatzimihalis Decl. ¶¶ 55; Chinn Ex. 14; Hatzimihalis 37:12-16) Moreover, Hatzimihalis told Satake that, at BMO, she worked in the DCM group that worked on public high yield and investment grade offerings.  (Hatzimihalis Decl. ¶ 55).

**Defendants' Reply to Paragraph 20**: **UNDISPUTED.**  As to Plaintiff's additional statements, they are irrelevant and immaterial as Plaintiff testified she held a junior Analyst role the entirety of her time at BMO (Chinn Dec. Ex. 1, Plaintiff I Tr. 36:1-7) and that BMO only served as a co-manager and not as active or passive bookrunner on all the public transactions she chose to feature on her resume.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:12-18; Chinn Dec. Ex. 14, SMBC167-168.)  Further, Plaintiff testified that she did not engage in any steps to develop new public debt markets clients while at BMO. (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:19-25.)  By contrast, Zaman and Sisselman testified to extensive public debt capital market experience.  (Chinn Dec. Ex. 4, Zaman Tr. 26:10-19, Chinn Supp. Dec. Ex. 4, Zaman Tr. 27:6-20, 28:22-29:16;Chinn Supp. Dec. Ex. 8, Sisselman Tr. 32:12-33:6.)

21.     Historically, compensation in Nikko America's DCM group had been lower than was typical in a DCM public market enterprise.  (Satake Dec. ¶¶9-10.)

**Response to Paragraph 21:**

Admit. However, the jury may choose to disregard this statement as it was made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 21**: **UNDISPUTED.**  As to Plaintiff's additional statement, it is immaterial and does not create a genuine dispute of material fact. *See Chiaramonte v. Animal Med. Ctr*., 677 F. App'x 689, 693 (2d Cir. 2017) ("That an 'interested witness' has testified regarding a certain issue…does not in and of itself raise a genuine issue of material fact."). *Reeves v. Sanderson Plumbing Prods, Inc.* does not hold differently as it involved a *post-trial* motion not a motion for summary judgment. 530 U.S. 133, 134 (2000).  In Plaintiff's memorandum of law, Plaintiff also cites to *In re Dana Corp*. which does involve a motion for summary judgment, but *In re Dana* does not hold that merely identifying a witness as "interested" creates a genuine dispute of material fact to overcome summary judgment without also identifying any contradictory evidence to dispute it.  574 F.3d 129 (2d Cir. 2009). Plaintiff's additional statement should be disregarded.

22.     As Nikko America's DCM focus shifted to public markets, Satake had to pay higher salaries to attract new employees.  (Satake Dec. ¶10.)

**Response to Paragraph 22:**

Admit that Satake so testified.  However, the jury may choose to disregard this statement by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 22**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

23.   New hires received higher base salaries than legacy DCM employees.  (Satake Dec. ¶11.)

**Response to Paragraph 23:**

Admit that SMBC paid higher bases salaries to men who were less experienced and hired after her.  (Pl 56.1 ¶ 140-144, 194-96)

**Defendants' Reply to Paragraph 23**: **UNDISPUTED**.  Plaintiff does not respond to the factual statement in Paragraph 23, nor does she cite any evidence that contradicts it. Plaintiff's Response is conclusory, unsupported, and immaterial.  In an attempt to support the Response, Plaintiff cites to Pl 56.1 ¶¶140-144 which do not address the factual statement set forth in Paragraph 23.  Instead, they address Nieves's experience before starting at Nikko America. Likewise, Pl 56.1 ¶¶ 194-96 do not address the factual statement in paragraph 23, but instead discuss Asmundson's bonus for fiscal year 2016 and his promotion to VP in fiscal year 2017.  These statements do not contradict Paragraph 23 as both Nieves and Asmundson were hired after the FHC status was acquired and thus were "new hires" as opposed to "legacy" employees.  It also ignores the undisputed fact that when Kaitlin Howard joined Nikko America as a new hire in 2016, her base salary as a female new hire was also higher than Plaintiff's base salary as a legacy employee, and thus that situation was not at all unique to male new hires.  (*See infra* DSF ¶¶11, 53.)

24.   Satake worked to increase and standardize base salaries over time.  (Satake Dec. ¶12.)

**Response to Paragraph 24:**

Admit to the extent that, after Hatzimihalis complained about being paid less than a junior man, Satake told her that he would "make it up in the end of year bonus."  (Pl 56.1 ¶ 148-52)

**Defendants' Reply to Paragraph 24**: **UNDISPUTED**.  Plaintiff has no basis to dispute Paragraph 24 nor does she cite any evidence to contradict it.  As to Plaintiff's additional statement, it is immaterial, irrelevant, and does not respond to the statement in Paragraph 24.  Further, it undisputed that by FY 2017, Plaintiff's base salary was higher than that of newer hires, Nieves and Asmundson, and was equal to newer hire Howard.  (DSF ¶188).

25.    Satake addressed salary disparity by awarding higher year-end bonus compensation to legacy employees.  (Satake Dec. ¶13.)

**Response to Paragraph 25:**

Admit extent that, after Hatzimihalis complained about being paid less than a junior man, Satake told her that he would "make it up in the end of year bonus."  (Pl 56.1 ¶ 148-52)

**Defendants' Reply to Paragraph 25**: **UNDISPUTED**.  Plaintiff has no basis to dispute Paragraph 25.  As to Plaintiff's additional statement, it is immaterial, irrelevant, and does not respond to the statement in Paragraph 25.  Further, it undisputed that Satake awarded Plaintiff, a legacy employee, a higher year-end bonus compensation in FY 2014, FY 2015, and FY 2016, than Satake awarded to newer hires Nieves, Asmundson, and Howard in those same years, thus resulting in Plaintiff making more in total compensation in FY 2014, FY 2015, and FY 2016 than Nieves, Asmundson, or Howard. (*See infra* DSF ¶¶40-41, 48, 54, 56-57).

26.    Mr. Zaman joined Nikko America's DCM Group as an Executive Director in December 2013.  (Chinn Dec. Ex. 3, Zaman Tr. 24:23-25; Chinn Dec. Ex. 1, Plaintiff I Tr. 67:6-10.)

**Response to Paragraph 26:**

Admit.

**Defendants' Reply to Paragraph 26**: **UNDISPUTED.**

27. Jeremy Sisselman joined Nikko America's DCM group as a Vice President in March 2014.  (Chinn Dec. Ex. 8, Sisselman Tr. 21:21-23; Chinn Dec. Ex. 1, Hatzimihalis I Tr. 69:2-5.)

    **Response to Paragraph 27:**

    Admit.

    **Defendants' Reply to Paragraph 27**: **UNDISPUTED.**

## V.   PLAINTIFF MAKES MORE THAN HER COMPARATORS IN FISCAL YEARS ("FY") 2014-2016

28. Satake hired Chris Nieves as an analyst in August 2014.  (Satake Dec. ¶15; Chinn Dec. Ex. 6, Nieves Tr. 28:5-7; Declaration of Christopher Nieves ("Nieves Dec.") Ex. 1, SMBC5385; Chinn Dec. Ex. 1, Plaintiff I Tr. 62:16-18.)

    **Response to Paragraph 28:**

    Admit.

    **Defendants' Reply to Paragraph 28**: **UNDISPUTED.**

29. Nieves graduated from college in 2010.  (Chinn Dec. Ex. 6, Nieves Tr. 50:9-11.)

    **Response to Paragraph 29:**

    Admit.

    **Defendants' Reply to Paragraph 29**: **UNDISPUTED.**

30. After graduation, Nieves began working as an analyst at Citibank.  (Chinn Dec. Ex. 6, Nieves Tr. 50:12-18, 51:4-16.)

    **Response to Paragraph 30:**

    Admit. However, Nieves was not a registered Series 63 or Series 79 representative until

he was employed at SMBC, and Nieves only worked at Citibank for two years.  (Hatzimihalis

Decl. ¶ 56; Nieves Dep. Tr. at 50:9-51:3.)

    **Defendants' Reply to Paragraph 30**: **UNDISPUTED.**  As to Plaintiff's additional

statement, it is irrelevant and immaterial as it is undisputed Nieves did not work in a

DCM business until joining Nikko America. (*see infra* DSF ¶31.) A Series 63 license is
required to sell securities and a Series 79 license allows an individual to offer advice
regarding debt or equity offerings; therefore, Nieves would not have needed such licenses
until working for Nikko America. (Supplemental Declaration of John Bolger ("Bolger
Supp. Dec.")[1], ¶¶3-4.) Nor do Defendants dispute Nieves worked at Citibank for two
years, after which he worked at First Republic Bank for two years until joining Nikko
America. (Chinn Dec. Ex. 6, Nieves Tr. 50:19-51:3, 53:7-17.)

31.    Nieves began working within DCM in August 2014 when he joined Nikko America.
       (Chinn Dec. Ex. 6, Nieves Tr. 53:7-17.)

       **Response to Paragraph 31:**

       Admit.

       **Defendants' Reply to Paragraph 31**: **UNDISPUTED.**

32.    Plaintiff interviewed Nieves prior to his being hired at Nikko America. (Chinn Dec.
       Ex. 1, Plaintiff I Tr. 77:19-22.)

       **Response to Paragraph 32:**

       Admit.

       **Defendants' Reply to Paragraph 32**: **UNDISPUTED.**

33.    SMBC9159 accurately reflects the base salary and bonus compensation Nieves received
       while employed at Nikko America through September 1, 2021. (Chinn Dec. Ex. 19,
       SMBC9159; Chinn Dec. Ex. 6, Nieves Tr. 30:5-7, 21-25, 31:2-4; Chinn Dec. Ex. 1,
       Plaintiff I Tr. 85:13-15, 86:17-24.)

       **Response to Paragraph 33:**

       Admit.

       **Defendants' Reply to Paragraph 33**: **UNDISPUTED.**

---

[1] References to Bolger Dec. II are to the Declaration of John Bolger filed on May 18, 2022.

34.    Nieves' starting base salary in FY 2014 was higher than Plaintiff's FY 2014 base salary. (Chinn Dec. Exs. 17, 19, SMBC0002, SMBC9159.)

**Response to Paragraph 34:**

Admit.

**Defendants' Reply to Paragraph 34**: **UNDISPUTED.**

35.    Nikko America's fiscal year ("FY") runs from April 1 to March 31 of the next year. (Chinn Dec. Ex. 2, Hatzimihalis II Tr. 278:5-6.).

**Response to Paragraph 35:**

Admit in part, deny in part. Prior to 2014, Nikko America's FY ran concurrent with the

calendar year and FY 2020 ran from April 1, 2019 through June 30, 2020.  (Chinn Ex. 2).

**Defendants' Reply to Paragraph 35**: **UNDISPUTED.**  Plaintiff's denial regarding the

dates of Nikko America's fiscal years prior to 2014 is irrelevant and immaterial as none

of Plaintiff's claims relate to compensation in fiscal years prior to FY 2014 when Nieves

was hired.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 62:16-63:3.)  Nor could she make such

claims as the events would have occurred prior to September 29, 2014, the outermost

statute of limitations period available to her – the New York State Pay Equity Law's six

years.  Plaintiff's statement regarding FY 2020 merely cites to Chinn Ex. 2 which is the

deposition transcript for Plaintiff's second day of deposition.  Plaintiff does not identify

any page or line numbers within the transcript in support of this statement and in fact, the

statement conflicts with her sworn testimony in which she testified to the fiscal year 2019

ran from April 1, 2019 to March 31, 2020.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 278:5-6.)

36.    In the summer of 2014, Plaintiff spoke with Sisselman about the disparity between her base salary and Nieves's base salary.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 79:8-14; 79:22-80:7.)

**Response to Paragraph 36:**

Admit. Add that Plaintiff protested to her then supervisor Sisselman "that the new incoming analyst, my analyst, was getting more than I was getting. As an AVP, I was more senior to him." (Hatzimihalis 80:4-7). Sisselman agreed with Hatzimihalis. (Plaintiff 80:2-10).

**Defendants' Reply to Paragraph 36**: **UNDISPUTED.** As to Plaintiff's additional statement, it is irrelevant and immaterial.

37.     Sisselman subsequently told Plaintiff that he spoke with Satake and Satake was going to resolve the base salary disparity between Nieves and Plaintiff with the year-end bonus. (Chinn Dec. Ex. 1, Plaintiff I Tr. 81:8-82:6; 89:8-13.)

**Response to Paragraph 37:**

Admit.

**Defendants' Reply to Paragraph 37**: **UNDISPUTED.**

38.     In the summer of 2014, after speaking with Sisselman about the disparity between her base salary and Nieves's base salary, Plaintiff spoke with Satake about it. (Chinn Dec. Ex. 1, Plaintiff I Tr. 82:23-84:9; 89:8-13.)

**Response to Paragraph 38:**

Admit.

**Defendants' Reply to Paragraph 38**: **UNDISPUTED.**

39.     Satake explained to Plaintiff that new hires were receiving higher base salaries than legacy employees but that he was going to fix the salary disparity with her year-end bonus award. (Chinn Dec. Ex. 1, Plaintiff I Tr. 82:23-84:9; 89:8-13.)

**Response to Paragraph 39:**

Admit. Add that Satake "did not deny" the pay gap. (Hatzimihalis 83:7-10)

**Defendants' Reply to Paragraph 39**: **UNDISPUTED.** As to Plaintiff's additional response to Paragraph 39, it is irrelevant and immaterial. It is undisputed that Satake did not deny Nieves had a higher base salary than Plaintiff in FY 2014, and Plaintiff's response does not contradict Paragraph 39.

40.     Satake awarded Plaintiff and Nieves year-end bonuses for fiscal year 2014 which resulted
        in Plaintiff making $████ more in total compensation for FY 2014 than Nieves (with
        Nieves's sign-on bonus included).  (Chinn Dec. Ex. 1, Plaintiff I Tr. 88:13-25;
        89:1-89:17; Chinn Dec. Ex. 17, SMBC0002; Chinn Dec. Ex. 19, SMBC0009159.)

        **Response to Paragraph 40:**

        Admit. However, in FY 2014 Plaintiff's base salary was $████ less than Nieves, who

was junior to her and had less experience and responsibility than her.  (Chinn Exs. 14, 17, 19;

Nieves Dep. Tr. at 50:9-53:17).  However, SMBC paid Nieves a higher salary, bonus and total

compensation as entry-level analyst than it did Plaintiff when she was hired as an Assistant Vice

President.  (Pl 56.1 ¶ 146-47)

        **Defendants' Reply to Paragraph 40**: **UNDISPUTED.**  As to Plaintiff's additional

        response to Paragraph 40 comparing Nieves' compensation in FY 2014 to Plaintiff's

        compensation three years earlier in 2011 is irrelevant and immaterial because (i) as

        explained above at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and

        2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake

        received a bonus pool each year from Nikko America's parent company Sumitomo

        Mitsui Financial Group, Inc. ("SMFG") based on the financial performance of SMFG,

        SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus

        pool allocated to Satake each year varied depending on the business performance at each

        of those levels.  (DSF ¶¶191-192.)

41.     In FY 2015, Plaintiff had a higher base salary than Nieves's base salary and made
        $████ more than Nieves in total compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr.
        90:15-18, 91:1-4; Chinn Dec. Ex. 17, SMBC00002; Chinn Dec. Ex. 19, SMBC0009159.)

        **Response to Paragraph 41:**

        Admit. However, SMBC paid Nieves as a second-year analyst a higher salary, bonus and

total compensation than it paid Plaintiff when she was a second-year AVP.  (Pl 56.1 ¶153-54)

**Defendants' Reply to Paragraph 41**: **UNDISPUTED.**   As to Plaintiff's additional response to Paragraph 41 comparing Nieves' compensation in FY 2015 to Plaintiff's compensation three years earlier in 2012 is irrelevant and immaterial because (i) as explained above at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)

42.    Satake hired Will Asmundson as an Analyst in November 2015.  (Satake Dec. ¶16; Chinn Dec. Ex. 7, Asmundson Tr. 37:3-10; Declaration of William Asmundson ("Asmundson Dec.") Ex. 1, SMBC5386; Chinn Dec. Ex. 1, Plaintiff I Tr. 62:20-22.)

**Response to Paragraph 42:**

Admit.

**Defendants' Reply to Paragraph 42**: **UNDISPUTED.**

43.    Asmundson graduated from college in 2012.  (Chinn Dec. Ex. 7, Asmundson Tr. 59:25-60:2.)

**Response to Paragraph 43:**

Admit.

**Defendants' Reply to Paragraph 43**: **UNDISPUTED.**

44.    After graduation, Asmundson began working at the financial services company, BBVA. (Chinn Dec. Ex. 7, Asmundson Tr. 59:25-60:6.)

**Response to Paragraph 44:**

Admit.

**Defendants' Reply to Paragraph 44**: **UNDISPUTED.**

45.    Asmundson began working within BBVA's DCM team in September 2013.  (Chinn Dec.
       Ex. 7, Asmundson Tr. 58:13-59:24, 60: 7-11.)

       **Response to Paragraph 45:**

       Admits.

       **Defendants' Reply to Paragraph 45**: **UNDISPUTED.**

46.    Plaintiff interviewed Asmundson prior to him being hired at Nikko America.  (Chinn
       Dec. Ex. 1, Plaintiff I Tr. 120:12-14.)

       **Response to Paragraph 46:**

       Admit.

       **Defendants' Reply to Paragraph 46**: **UNDISPUTED.**

47.    SMBC9162 accurately reflects the base salary and bonus compensation Asmundson
       received while employed at Nikko America through September 1, 2021.  (Chinn Dec.
       Ex. 20, SMBC9162; Chinn Dec. Ex. 7, Asmundson Tr. 45:14-16, 46:10-17; Chinn Dec.
       Ex. 1, Plaintiff I Tr. 91:7-9, 16-21.)

       **Response to Paragraph 47:**

       Admit.

       **Defendants' Reply to Paragraph 47**: **UNDISPUTED.**

48.    In FY 2015, Nikko America paid Plaintiff more than it paid Asmundson in total
       compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 91:7-9, 91:22-92:13, 93:24-94:1; Chinn
       Dec. Ex. 17, SMBC00002; Chinn Dec. Ex. 20, SMBC9162.)

       **Response to Paragraph 48:**

       Admit. However, Asmundson was not employed by SMBC for the entirety of FY 2015,

and only worked at SMBC for approximately four months in FY 2015.  (Chinn Ex. 20).  Further,

Asmundson's base salary for FY 2015 was $█████ more than Plaintiff's base salary.  (Chinn Ex.

2; Chinn Ex. 20). Moreover, SMBC paid Asmundson as an entry-level analyst a higher salary,

bonus and total compensation than it paid Plaintiff when it hired Plaintiff as an AVP.  (Pl 56.1 ¶¶

187-88)

**Defendants' Reply to Paragraph 48**: **UNDISPUTED.** As to Plaintiff's additional response to Paragraph 48, it is not only undisputed, but also irrelevant and immaterial that Asmundson was not employed by Nikko America for the entirety of FY 2015 because if Asmundson had been employed by Nikko America for the entirety of FY 2015 and thus received his base salary for the entirety of FY 2015, his total compensation ($███ base salary plus $████ bonus compensation plus $████ signing bonus equals $████) instead of a pro-rated base salary amount for starting within the fiscal year, Defendants still paid Plaintiff over $████ more in FY 2015 ($████ base salary plus $████ bonus equals $████) in total compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 92:21-94:1.)  It is further undisputed, immaterial, and irrelevant that Asmundson's base salary for FY 2015 was set at $███ more than Plaintiff's base salary as with bonus compensation awarded in FY 2015, Defendants paid Plaintiff more in total compensation than Asmundson as Plaintiff admits in this very response.  Regarding Plaintiff's additional response to Paragraph 48 comparing Asmundson's compensation in FY 2015 to Plaintiff's compensation four years earlier in 2011 is irrelevant and immaterial because (i) as explained above at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)

49.     Satake hired Kaitlin Howard as a Vice President in November 2016.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 164:5-20; Chinn Dec. Ex. 5, Howard Tr. 21:24-22:6; Declaration of Kaitlin Carter Howard ("Howard Dec."), ''4; Howard Dec. Ex. 1, SMBC 4939.)

**Response to Paragraph 49:**

Admit.

**Defendants' Reply to Paragraph 49**: **UNDISPUTED.**

50.     Howard graduated from college in 2010.  (Chinn Dec. Ex. 5, Howard Tr. 35:12-17.)

**Response to Paragraph 50:**

Admit.

**Defendants' Reply to Paragraph 50**: **UNDISPUTED.**

51.     After graduation, Howard joined Citigroup's DCM group.  (Chinn Dec. Ex. 5, Howard Tr. 35:18-36:16.)

**Response to Paragraph 51:**

Admit.

**Defendants' Reply to Paragraph 51**: **UNDISPUTED.**

52.     Plaintiff interviewed Howard prior to Howard joining Nikko America.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 164:21-23.)

**Response to Paragraph 52:**

Admit.

**Defendants' Reply to Paragraph 52**: **UNDISPUTED.**

53.     SMBC9161 accurately reflects the base salary and bonus compensation Howard received while employed at Nikko America through September 1, 2021.  (Chinn Dec. Ex. 21, SMBC9161; Chinn Dec. Ex. 5, Howard Tr. 33:2-16; Chinn Dec. Ex. 1, Plaintiff I Tr. 98:12-14, 21-25.)

**Response to Paragraph 53:**

Admit.

**Defendants' Reply to Paragraph 53**: **UNDISPUTED.**

54.     In FY 2016, Nikko America paid Plaintiff made more than it paid Howard in total
        compensation.  (Chinn Dec. Ex. 21, SMBC9161; Chinn Dec. Ex. 1, Plaintiff I Tr.
        98:12-14, 99:14-20.)

        **Response to Paragraph 54:**

        Admit. However, Howard was not employed by SMBC for the entirety of FY 2016, and

only worked at SMBC for approximately five months in FY 2016.  (Chinn Ex. 21.)

        **Defendants' Reply to Paragraph 54**: **UNDISPUTED.**  As to Plaintiff's additional

        statement, it is irrelevant and immaterial as even if Howard had been employed by Nikko

        America for the entirety of FY 2016, and thus received the entirety of her base rate salary

        for that fiscal year ($160,000 base salary plus $240,000 bonus compensation plus

        $10,000 signing bonus equals $410,000) instead of a pro-rated base salary amount for

        starting within the fiscal year, Defendants still would have paid Plaintiff more in total

        compensation ($113,200 base salary plus $301,900 bonus compensation equals

        $415,100). (*See* Chinn Ex. 17 & 21; Chinn Ex. 1, Plaintiff I Tr. 98:12-99:20.)

55.     On or about April 1, 2016, based on the recommendation of Satake, Nikko America
        promoted Nieves and Asmundson from analysts to Associates.  (Nieves Dec. Ex. 1,
        SMBC5385; Asmundson Dec. Ex. 1, SMBC5386; Chinn Dec. Exs. 22-23, SMBC5372,
        SMBC5373.)

        **Response to Paragraph 55:**

        Admit.

        **Defendants' Reply to Paragraph 55**: **UNDISPUTED.**

56.     In FY 2016, Nikko America paid Plaintiff $███ more than it Asmundson in total
        compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 97:17-21; Chinn Dec. Ex. 17,
        SMBC00002; Chinn Dec. Ex. 20, SMBC9162.)

        **Response to Paragraph 56:**

        Admit. However, SMBC paid Asmundson, a first year Associate, a higher salary, bonus

and total compensation that it paid Plaintiff as a second-year AVP.  (Pl 56.1 ¶193-94)

**Defendants' Reply to Paragraph 56**: **UNDISPUTED.** As to Plaintiff's additional response to Paragraph 56 comparing Asmundson's compensation in FY 2016 to Plaintiff's compensation four years earlier in 2012 is irrelevant and immaterial because (i) as explained above at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)  As further evidence of the impropriety of any compensation comparison between an amount paid to one employee in 2012 versus an amount paid to another four years later in 2016, Plaintiff's own compensation tripled from a total of $███ for FY 2012 to over $███ for FY 2016.  (*See* Chinn Dec. Ex. 17; Chinn Dec. Ex. 1, Plaintiff I Tr. 63:8-10, 64:9-22; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 65:7-13, 95:22-96:14.)

57.    In FY 2016, Nikko America paid Plaintiff $███ more than it Nieves in total compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 97:1-3; Chinn Dec. Ex. 17, SMBC00002; Chinn Dec. Ex. 19, SMBC0009159.)

**Response to Paragraph 57:**

Admit. However, SMBC paid Nieves, a first year Associate, a higher salary, bonus and total compensation than it paid Plaintiff as a third-year AVP.  (Pl 56.1 ¶ 158-59.)

**Defendants' Reply to Paragraph 57**: **UNDISPUTED.**  As to Plaintiff's additional response to Paragraph 57 comparing Nieves' compensation in FY 2016 to Plaintiff's compensation three years earlier in 2013 is irrelevant and immaterial because (i) as explained above at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and

2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)  As further evidence of the impropriety of any compensation comparison between an amount paid to one employee in 2013 versus an amount paid to another three years later in 2016,  Plaintiff's own compensation tripled from a total of $███████ in FY 2013 to over $███████ in FY 2016.  (*See* Chinn Dec. Ex. 17; Chinn Dec. Ex. 1, Plaintiff I Tr. 63:8-10, 64:9-22; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 65:7-13, 95:22-96:14.)

## VI.   SATAKE GIVES PLAINTIFF HIGH MARKS IN FY 2014 AND FY 2016 AND PROMOTES HER TO VICE PRESIDENT

58.    In Plaintiff's FY 2014 performance evaluation, Satake rated her an overall rating of 5 out of a scale of 1 to 5.  (Satake Dec. ¶25 and Ex. 1, SMBC1031; Chinn Dec. Ex. 1, Plaintiff I Tr. 106:21-107:10; Chinn Dec. Ex. 2, Plaintiff II Tr. 334:11-335:1.)

**Response to Paragraph 58:**

Admit.

**Defendants' Reply to Paragraph 58**: **UNDISPUTED.**

59.    In Plaintiff's FY 2014 performance evaluation, Satake made positive comments about Plaintiff including "made a quick adjustment and huge contribution to the team," "[s]table and firm performance," "worked very hard."  (Satake Dec. Ex. 1, SMBC0001031; Chinn Dec. Ex. 1, Plaintiff I Tr. 106:21-107:10.)

**Response to Paragraph 59:**

Admit.

**Defendants' Reply to Paragraph 59**: **UNDISPUTED.**

60.     Based on the recommendation of Satake, Nikko America promoted Plaintiff from
        Assistant Vice President to Vice President on April 1, 2015.  (Chinn Dec. Ex. 1, Plaintiff
        I Tr. 108:19-20, 110:24-111:3, 111:23-25; Satake Dec. ¶24 and Ex. 3, SMBC9252.)

        **Response to Paragraph 60:**

        Admit.

        **Defendants' Reply to Paragraph 60: UNDISPUTED.**

61.     In the promotion recommendation form recommending Plaintiff be promoted from
        Assistant Vice President to Vice President, Satake made positive comments about her
        including "she is an excellent worker who contributes a lot to the team and the firm..."
        (Chinn Dec. Ex. 1, Plaintiff I Tr. 108:19-20, 110:14-23; Satake Dec. Ex. 3, SMBC9252.)

        **Response to Paragraph 61:**

        Admit.

        **Defendants' Reply to Paragraph 61: UNDISPUTED.**

62.     As compared to Assistant Vice President, Plaintiff had more client-facing opportunities,
        joined more meetings with Sisselman and presented at more client meetings upon
        promotion to Vice President.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 112:9-19, 123:13-124:4.)

        **Response to Paragraph 62:**

        Admit. However, when Nieves and Asmundson were promoted to Vice President, they

were presented with more client-facing opportunities, joined more meetings and presented at

more client meetings than Plaintiff when she was Vice President.  (Hatzimihalis Decl. 57;

Hatzimihalis Dep. Tr. at 186:23-187:22; ).

        **Defendants' Reply to Paragraph 62: UNDISPUTED.** As to Plaintiff's additional

        response to Paragraph 62, the cited testimony does not even reference the words client-

        facing, meetings, or presenting at client meetings, nor does it reference Asmundson.

        While Plaintiff cites to her declaration for evidentiary support, her declaration does not

        contradict the statement in Paragraph 62 as to the comparison between Plaintiff's client-

        facing opportunities as an Assistant Vice President to after she was promoted to Vice

24

President.  Further, Plaintiff admitted she did not know which clients Asmundson or

Nieves had primary coverage over at any time and thus has no evidentiary foundation for

her conclusory assertion.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-

11.)

63.     In Plaintiff's FY 2015 performance evaluation, Satake rated her an overall rating of
        "Exceeds" ratings and an overall rating of "Exceeds" on a scale of Gaps, Meets, and
        Exceeds.  (Satake Dec. ¶26 and Ex. 2, SMBC0005; Chinn Dec. Ex. 1, Plaintiff I Tr.
        131:1-14, 132:15-19; Chinn Dec. Ex. 2, Plaintiff II Tr. 335:9-336:4.)

        **Response to Paragraph 63:**

        Admit.

        **Defendants' Reply to Paragraph 63**: UNDISPUTED.

64.     In Plaintiff's FY 2015 performance evaluation, Satake made positive comments about
        Plaintiff including "[k]ey member of this ultra fast growing team," "[k]ept good and close
        relationship with bank relationship managers", "[o]ur good r[e]lationship with them was
        brought by good communication made by her," and [v]ery hard worker..."  (Satake Dec.
        Ex. 2, SMBC0005; Chinn Dec. Ex. 1, Plaintiff I Tr. 131:1-14, 132:15-19; Chinn Dec. Ex.
        2, Plaintiff II Tr. 335:9-336:4.)

        **Response to Paragraph 64:**

        Admit.

        **Defendants' Reply to Paragraph 64**: UNDISPUTED.

## VII.   SISSELMAN CRITICIZED PLAINTIFF'S PERFORMANCE

65.     Sisselman supervised Plaintiff on a day-to-day basis from 2014 to 2016 when she
        transferred to working with John Bolger.  (Chinn Dec. Ex. 8, Sisselman Tr. 18:21-19:24,
        83:16-20; Chinn Dec. Ex. 1, Plaintiff Tr. 70:7-10, 137:10-13.)

        **Response to Paragraph 65:**

        Admit.

        **Defendants' Reply to Paragraph 65**: UNDISPUTED.

66.     During this time period, Plaintiff provided supporting coverage to accounts over which
        Sisselman had primary coverage.  (Chinn Dec. Ex. 8, Sisselman Tr. 25:18-26:6,
        29:13-22; Chinn Dec. Ex. 1, Plaintiff Tr. 70:7-15.)

2a624559048852dc

**Response to Paragraph 66:**

Admit.

**Defendants' Reply to Paragraph 66**: **UNDISPUTED.**

67.    Sisselman did not make decisions about Plaintiff's pay or promotions.  (Chinn Dec. Ex. 8, Sisselman Tr. 17:25-18:10.)

**Response to Paragraph 67:**

Admit.

**Defendants' Reply to Paragraph 67**: **UNDISPUTED.**

68.    Sisselman did not make any inappropriate statements about gender or sex.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 9:13-17, 256:2-11.)

**Response to Paragraph 68:**

Admit.

**Defendants' Reply to Paragraph 68**: **UNDISPUTED.**

69.    Sisselman did not make any statement revealing any sort of discriminatory intent.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 256:12-16.)

**Response to Paragraph 69:**

Admit.

**Defendants' Reply to Paragraph 69**: **UNDISPUTED.**

70.    Plaintiff set deadlines for the completion of certain things for Sisselman and then failed to meet those deadlines.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 77:14-18; Chinn Dec. Ex. 24, SMBC00011368.)

**Response to Paragraph 70:**

Deny. Plaintiff never failed to meet deadlines.  However, due to the nature of the work, on occasion Sisselman would set unreasonable deadlines or give Plaintiff additional work that would make it impossible for Plaintiff to complete the work by the, sometimes arbitrary, deadlines set.  (Hatzimihalis Decl.¶ 58).  In those discrete circumstances, Plaintiff would often

request extensions of those deadlines and communicate realistic timelines for the completion of work.  Id.  Further, when asked to describe the performance deficiencies he discussed with Plaintiff, Sisselman did not mention failing to meet deadlines.  (Sisselman Dep. Tr. at 40:17-41:20). ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████  Finally, in Plaintiff's review from FY 2015, when she reported to Sisselman, Hatzimihalis's performance review stated that she "[s]eizes upon opportunities to expedite priority outcomes, whether self or team directed.  Requires minimal encouragement from others to accomplish near and longer-term workloads – enjoys working hard" and "Can be counted on to meet individual/team goals successfully, bottom-line oriented, steadfastly pushes self for results.  Productive -meets expected work outcomes in a timely and quality manner." (Satake Ex. 2).  Further, Sisselman was concerned upon providing information regarding Plaintiff's claims that he would be subject to retaliation and that he wanted to "help [the] company."  (Licul Ex. M).

   **Defendants' Reply to Paragraph 70**: **UNDISPUTED**.  The testimony Plaintiff cites
   does not dispute the stated fact and in fact, Plaintiff was asked directly under oath
   whether "it [was] true you had set deadlines for certain things – for the completion of

certain things with Mr. Sisselman and then failed to meet those deadlines." Plaintiff

responded, "Yes" without qualification. (Chinn Dec. Ex. 1, Plaintiff I Tr. 77:14-18.) *See*

*Milani v. Int'l Bus. Mach. Corp., Inc.*, 2004 WL 3068451, at *2 (S.D.N.Y. Dec. 30, 2004)

("submission of an affidavit that contradicts . . . prior testimony in an effort to create an

issue is plainly improper."). Plaintiff further had the opportunity to review her deposition

transcript and identify any errors in an errata sheet, an exercise in which she partook

regarding other portions of her testimony but she did not identify any errors with this

portion of her testimony. (Supplemental Declaration of Lloyd Chinn ("Chinn Supp.

Dec."), Ex. 13.) Further, contemporaneous documentation shows Sisselman messaging

Plaintiff in 2014 regarding not meeting deadlines she communicated to him: "[I] want

you to focus on meeting the deadlines you set. if you tell me an hour, i want it in an hour.

if you are consistently not meeting your self-imposed deadlines, i want you to adjust how

you estimate timing so you can meet estimates." (Chinn Dec. Ex. 24, SMBC00011368.)

As to Plaintiff's additional responses to Paragraph 70, not only do they contradict her

own sworn testimony and documentary evidence that she herself set deadlines with

Sisselman and then failed to meet those deadlines, they are irrelevant and immaterial as

Paragraph 70 concerns deadlines Plaintiff set herself not Sisselman's imposed deadlines

or demands. Further, it is undisputed that Satake, not Sisselman, completed Plaintiff's

FY 2015 performance evaluation which contained the language to which Plaintiff points.

(*See supra* DSF ¶63; see also Chinn Dec. Ex. 8, Sisselman Tr. 17:25-18:10; Chinn Dec.

Ex. 1, Plaintiff I Tr. 104:11-13, 106:7-14, 131:1-10.). As to Plaintiff's reference to

Sisselman's statement, whatever Sisselman stated at the outset of his investigative

interview does not in any way undermine the admissions on this point.

71.     During the time Plaintiff provided support and coverage to Sisselman, he believed she "needed to learn about the bond market…and corporate finance…how to make presentations better, both verbally and in writing." (Chinn Dec. Ex. 8, Sisselman Tr. 40:9-41:17.)

**Response to Paragraph 71:**

Admit that Sisselman so testified.  However, Plaintiff had significant and proficient knowledge about the bond market and corporate finance.  (Hatzimihalis Decl. ¶ 59).  Additionally, Plaintiff regularly received positive feedback from supervisors regarding the quality of her presentations.  (Hatzimihalis Decl. ¶ 60; Satake Ex. 2).  Further, Plaintiff's FY 2015 performance review, when Plaintiff reported to Sisselman, stated, "Demonstrates the appropriate functional and technical knowledge and skills required to fully perform his/her job.  Makes few, if any, technical/functional errors – rarely repeats an error.  Provides reliable, high quality work.  Keeps applicable skills and knowledge current and relevant.  Actively engaged in learning and expanding core knowledge and skills set.  Capably applies available technology to the performance of applicable job duties and outcomes." (Satake Ex. 2).

**Defendants' Reply to Paragraph 71**: **UNDISPUTED.**  As to Plaintiff's additional response to Paragraph 71, it is irrelevant and immaterial as Plaintiff cannot dispute Sisselman's state of mind and his belief as to what skills he thought she needed to improve, particularly without citing to any evidence disputing that the statement in Paragraph 70 accurately represented Sisselman's belief.  Further, it is undisputed that Satake, not Sisselman, completed Plaintiff's FY 2015 performance evaluation which contained the language to which Plaintiff points.  (*See supra* DSF ¶63; see also Chinn Dec. Ex. 8, Sisselman Tr. 17:25-18:10; Chinn Dec. Ex. 1, Plaintiff I Tr. 131:1-10.).

72.     Sisselman suggested to Plaintiff to take a public speaking course, and Nikko America subsequently paid for Plaintiff to take a public speaking course.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 70:16-18, 73:3-12.)

29

**Response to Paragraph 72:**

Admit. In addition, Sisselman complimented Plaintiff's speaking skills subsequently, sending Plaintiff an instant Bloomberg message stating "[I] thought you did great in that meeting.  very eloquent, confident, and good client strategy.  nice job! wow, has irene come a long way :) proud of you."  (Licul Ex. O).

**Defendants' Reply to Paragraph 72**: **UNDISPUTED.**  As to Plaintiff's additional response to Paragraph 72, it is immaterial and irrelevant.

73.   Sisselman criticized Plaintiff including directing her to "please quit negative attitude about meetings…you are instilling bad behavior in your analysts," "stop with the talk backs," and to "please try to control your negative responses at the desk…show me the respect...before you blow up...please try not to explode on the desk.  Everyone can hear us and is watching and listening and it doesn't reflect well on anyone."  (Chinn Dec. Exs. 25-27, SMBC11353, SMBC11355, SMBC11347; Chinn Dec. Ex. 1, Plaintiff I Tr. 118:23-119:6; Chinn Dec. Ex. 8, Sisselman Tr. 39:25-40:21, 41:6-17, 42:11-43:24.)

**Response to Paragraph 73:**

Admit that Sisselman so wrote.  However, several individuals testified about the performance deficiencies that Sisselman had in working with his subordinates, and that Sisselman was both counseled and critiqued regarding how hard he was on the people he worked with.  (Bolger Dep. Tr. at 151:8-155:8, 158:7-159:10; Zaman Dep. Tr. at 39:24-40:23, 44:23-45:19).  Further, Plaintiff denies that she had a "negative attitude" or "negative responses" and that she "explode[d] on the desk."  (Hatzimihalis Decl. ¶ 61).  Further, Plaintiff's FY 2015 performance review, when Plaintiff reported to Sisselman, stated that Plaintiff "[i]s viewed as a team player and trusted colleague who encourages collaboration, group problem-solving, and open communication.  Works well with others.  Drives or energetically contributes to successful group outcomes.  Steps up and quickly helps to find common ground that supports group solutions with efficient purpose and a minimum of noise.  Is not viewed by peers as difficult or

uncooperative.  Values working relationships.  Champions a spirit of cooperation."  (Satake

Ex. 2).

> **Defendants' Reply to Paragraph 73**: **UNDISPUTED.**  As to Plaintiff's additional
>
> response to Paragraph 73, the testimony Plaintiff cites does not dispute the stated fact or
>
> dispute the contemporaneous documentary evidence.  Further, it is irrelevant and
>
> immaterial as to whether Plaintiff disagrees with Sisselman's criticism.  It is also
>
> undisputed that Satake, not Sisselman, completed Plaintiff's FY 2015 performance
>
> evaluation which contained the language to which Plaintiff points.  (*See supra* DSF ¶63;
>
> *see also* Chinn Dec. Ex. 8, Sisselman Tr. 17:25-18:10; Chinn Dec. Ex. 1, Plaintiff I Tr.
>
> 131:1-10.)

74.    Sisselman would not have promoted Plaintiff to Vice President had he been the one
       deciding whether to promote her.  (Chinn Dec. Ex. 8, Sisselman Tr. 69:12-70:5.)

> **Response to Paragraph 74:**
>
> Deny. Sisselman believed that Plaintiff "was on a path for promotion eventually."  (Licul

Ex. M).

> **Defendants' Reply to Paragraph 74**: **UNDISPUTED**, as the evidence Plaintiff cites
>
> does not contradict Paragraph 74.  As Paragraph 74 states, Sisselman testified that he
>
> would not have promoted Plaintiff to Vice President as Satake did in 2015 but would
>
> have either terminated her employment or moved her to another group.  (Chinn Dec. Ex.
>
> 8, Sisselman Tr. 69:12-70:5.)  Sisselman's full statement within Licul Ex. M – contained
>
> in notes from Nikko America's internal investigation interview of Sisselman in
>
> September 2020 – is "It's funny this is all happening now, because I would think she's on
>
> the path for promotion eventually even if it takes awhile."  In September 2020, Plaintiff
>
> was already a Vice President and Sisselman's statement in Licul Ex. M regarding

Plaintiff being "on the path for promotion eventually" referred to a promotion from Vice President to Director.  Nothing about this statement calls into question Sisselman's stated disagreement with promoting Plaintiff to Vice President in 2015.

75.    Sisselman did not believe Plaintiff had the necessary skillset to manage client coverage which required the ability to be proactive and creative in generating ideas and the confidence to call senior representatives at client companies.  He did not believe she possessed those skills.  (Declaration of Jeremy Sisselman, ¶¶4-6.)

**Response to Paragraph 75:**

Deny. Plaintiff's FY 2015 performance review, when Plaintiff reported to Sisselman, stated that Plaintiff "[i]s dedicated to meeting the expectations and requirements of internal and external 'customers' including external clients, regulators and SMBC staff at all levels of the organization.  Acts with these 'customers' in mind by maintaining effective and productive relationships built on clear communication, support, and respect.  Listens and responds effectively to 'customers' questions, applies follow-up as an effective relationship-building tool, and commits to exceeding 'customer' expectations".  (Satake Ex. 2).  Plaintiff also had the necessary skillset to manage client coverage.  Id.  For example, regarding the ▮▮▮▮ transaction, Plaintiff met with the Treasurer of ▮▮▮▮ three times in one year, versus the competitors which met with the Treasurer once a year, sent indicative pricing every three weeks versus competitors who only provide those numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage role with ▮% economics in November 2017 to award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously invited to participate in the ▮▮▮▮ deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ▮▮▮▮▮▮▮ client, SMBC was invited for the first time as an underwriter on ▮▮▮▮▮▮▮▮'s bond deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always were helpful and

thoughtful, and Plaintiff send ███████████ customized materials every month.  (Licul Ex.

W).  Plaintiff received praise from the ███████████ client as a result of a presentation

Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new

issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this

presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products

Group.  Id.  Plaintiff also received thanks and praise from clients at ███████████,

███████████ and ████.  (Licul Exs. X, Y, Z).  Further, Plaintiff's contact with

███████████, the Executive Vice President of Finance with ███████████ led to

Nikko America setting up investor meetings with ████ senior management, which ultimately

led to Nikko America securing an active bookrunner role in September 2019.  (Licul Exs. AA,

BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to

Relationship Managers at SMBC and clients directly for meetings, which led to procuring

meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).

> **Defendants' Reply to Paragraph 75**: **UNDISPUTED**, as the evidence Plaintiff cites
>
> does not contradict Paragraph 75 which asserts Sisselman's state of mind as to Plaintiff's
>
> skillset and performance.  Plaintiff's disagreement with Sisselman's state of mind and his
>
> belief as to her skillset and performance is irrelevant and immaterial as she has not
>
> provided any evidence disputing that the statement in Paragraph 75 is what Sisselman
>
> believed.  Further it is undisputed that Satake, not Sisselman, completed Plaintiff's FY
>
> 2015 performance evaluation which contained the language to which Plaintiff points.
>
> (*See supra* DSF ¶63; *see also* Chinn Dec. Ex. 8, Sisselman Tr. 17:25-18:10; Chinn Dec.
>
> Ex. 1, Plaintiff I Tr. 131:1-10.)  Additionally, a few positive comments do not in any way
>
> call into question the consistent criticism of her performance and further, it is undisputed

that Plaintiff never achieved an active bookrunner role (DSF ¶¶ 140-142), that that the

desired outcome with respect to a public DCM transaction at Nikko America was to

receive the active book runner assignment (DSF ¶222), and that she received criticism

when she was only able to acquire a passive bookrunner role with ▮▮▮ (DSF ¶ 220).

76.     Sisselman informed Zaman about his views of Plaintiff's performance issues.  (Chinn
        Dec. Ex. 8, Sisselman Tr. 43:21-24.)

        **Response to Paragraph 76:**

        Admit. However, the jury may choose to disregard this statement as it was made by an

        interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151

        (2000).

        **Defendants' Reply to Paragraph 76**: **UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

## VIII.   PLAINTIFF ASSIGNED PRIMARY COVERAGE RESPONSIBILITIES IN NOVEMBER 2016

77.     Individuals with "primary coverage" over client accounts are responsible for managing
        the client relationship and working to secure DCM deals favorable to the Company.
        (Chinn Dec. Ex. 3, Bolger Tr. 125:3-11; Howard Dec. ¶7; Chinn Dec. Ex. 4, Zaman Tr.
        80:3-22)

        **Response to Paragraph 77:**

        Admit.

        **Defendants' Reply to Paragraph 77**: **UNDISPUTED.**

78.     Individuals providing "secondary coverage" assist the primary coverage officer.  (Chinn
        Dec. Ex. 3, Bolger Tr. 125:22-126:6; Howard Dec. ¶7; Chinn Dec. Ex. 4, Zaman Tr.
        51:18-22.)

        **Response to Paragraph 78:**

        Admit.

**Defendants' Reply to Paragraph 78**: **UNDISPUTED.**

79.     SMBC banking clients typically have multiple banks participating in a revolving credit facility, and assign the participating banks to different tiers.  (Howard Dec. ¶10; Nieves Dec. ¶7.)

**Response to Paragraph 79:**

Admit.

**Defendants' Reply to Paragraph 79**: **UNDISPUTED.**

80.     Tier 1 is the most desirable for a bank because it has the most revenue generation potential for the bank; Tier 2 is the next most desirable; and Tiers 3 and 4 have less revenue generating potential for the bank.  (Howard Dec. ¶10; Nieves Dec. ¶7.)

**Response to Paragraph 80:**

Admit.

**Defendants' Reply to Paragraph 80**: **UNDISPUTED.**

81.     Before Satake and senior coverage officers – individuals such as Zaman, Morici, and Sisselman – feel comfortable allowing junior officers to manage coverage over larger client accounts, they assess the individual's performance in secondary coverage and/or in primary coverage over a limited number of lower-tiered accounts.  (Satake Dec. ¶36; Chinn Dec. Ex. 3, Bolger Tr. 198:21-199:7; Chinn Dec. Ex. 4, Zaman Tr. 47:16-49:25; Sisselman Dec. ¶5; Howard Dec. ¶¶11-12.)

**Response to Paragraph 81:**

Admit in part, deny in part.  At the time Satake was the group head, Satake had the sole responsibility of determining whether individuals would be provided additional account coverage.  (Zaman Dep. Tr. 48:10-49:10).  When Satake informed Bolger that he had to give Plaintiff between 5-10 clients, he did not specify which clients to provide to Plaintiff, and the names chosen were decided by Bolger.  (See Pl 56.1 ¶ 52; Bolger Dep. Tr at 191:4-196:22; Hatzimihalis Dep. Tr. at 145:14-147:4; Bolger Dep Tr. 194:18-196:22).  However, no clear milestones or guidelines were ever set or communicated to the DCM employees to assist in progression that would lead to the assignment of specific clients.  (Hatzimihalis Decl. ¶ 62).

**<u>Defendants' Reply to Paragraph 81</u>: UNDISPUTED**, as Plaintiff's cited evidence does not contradict Paragraph 81. Plaintiff cites to testimony from Zaman in which Zaman stated: "…Satake…provided his thoughts on how it should be done. But he would rely on those on the front lines. Meaning, for example, if he were to come to me and said I think for example, Chris Nieves, he needs more names or he needs some names so he can get up to speed, what names do you think. And I could give him a handful of names and he may say yes or no. But would look to me for guidance." (Chinn Dec. Ex. 4, Zaman Tr. 48:16-24.) This testimony does not give rise to any dispute as to Paragraph 81. Zaman further testified: "…primary coverage is also a function of the complexity of the issuer, how sophisticated the borrower is. Because if it's a name that requires…hand holding, they're a name that you have to cover them on a daily basis, every hour on the hour, every issuer is different. So if there's somebody that has the expertise that can handle that type of sophisticated borrower, then we're going to have that conversation to figure out how we can allocate primary to them" (Chinn Dec. Ex. 4, Zaman Tr. 49:9-21.) which further supports the statement in Paragraph 81. Nor does Plaintiff's statement that Bolger identified the specific names to assign Plaintiff contradict the statement in Paragraph 81. As to Plaintiff's additional statement, it is irrelevant and immaterial to Defendants' motion for summary judgment. Plaintiff's statement regarding milestones and guidelines is irrelevant and immaterial.

82.     This approach allows individuals to develop skills and demonstrate capabilities while reducing the risk of assigning – and losing – clients with high revenue potential to those inexperienced or unable to handle such accounts. (Satake Dec. ¶38; Howard Dec. ¶¶11-12.)

**<u>Response to Paragraph 82:</u>**

Admit. However, no clear milestones or guidelines were ever set or communicated to the

DCM employees to assist in progression that would lead to the assignment of specific clients.

(Hatzimihalis Decl. ¶ 62).

**Defendants' Reply to Paragraph 82**: **UNDISPUTED.** As to Plaintiff's additional

response to Paragraph 82, it is irrelevant and immaterial to Defendants' motion for

summary judgment.

83.   John Bolger joined Nikko America as an Executive Director in October 2016.  (Chinn
      Dec. Ex. 3, Bolger Tr. 29:14-19; Chinn Dec. Ex. 1, Plaintiff I Tr. 136:6-14; Satake Dec.
      ¶P9)

**Response to Paragraph 83:**

Admit.

**Defendants' Reply to Paragraph 83**: **UNDISPUTED.**

84.   Satake assigned Bolger to lead the Real Estate Investment Trust ("REIT") and Healthcare
      & Pharmaceuticals ("Healthcare") sectors.  (Satake Dec. ¶39; Chinn Dec. Ex. 3, Bolger
      Tr. 38:19-24)

**Response to Paragraph 84:**

Admit. In addition, Satake also assigned Bolger to lead the Chemicals sector.  (Bolger

Dep. Tr. at 38:21-39:4).

**Defendants' Reply to Paragraph 84**: **UNDISPUTED.** As to Plaintiff's additional

response to Paragraph 84, it is irrelevant and immaterial to Defendants' motion for

summary judgment.

85.   Satake asked Bolger to assign Plaintiff coverage responsibility in the REIT sector.
      (Satake Dec. ¶39; Chinn Dec. Ex. 3, Bolger Tr. 191:4-11, 192:11-18)

**Response to Paragraph 85:**

Admit. However, Bolger resisted (Pl 56.1 ¶ 44-54) and Plaintiff only received "4-5

nonactive clients."  (Licul Ex. M).

**Defendants' Reply to Paragraph 85**: **UNDISPUTED.** As to Plaintiff's additional response to Paragraph 85, the statement that Bolger "resisted" is unsupported by evidence which shows Bolger assigned Plaintiff clients within three weeks of his arrival at Nikko America after meeting key constituents, getting oriented with the sectors and the client names within those sectors, all amid travel.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 192:19-194:17.)  It is further impermissible legal argument to describe such events as "resisting" and is additionally irrelevant and immaterial as Plaintiff was assigned clients within three weeks.  As to Plaintiff's additional statement regarding "nonactive clients", the document cited to support the statement does not define nonactive and Plaintiff's do not provide a definition.  If it is meant that the clients were lower-tiered accounts, it is undisputed the initial clients assigned to Plaintiff for primary coverage were lower-tiered accounts as was the practice with all junior officers.  (*See supra* DSF ¶¶81-82.)

86.     Plaintiff did not have primary client coverage responsibilities prior to Bolger assigning her clients in 2016.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 112:23-113:2, 145:14-21; 159:3-8.)

**Response to Paragraph 86:**

Admit.

**Defendants' Reply to Paragraph 86**: **UNDISPUTED.**

87.     Satake and Bolger planned to assess Plaintiff's performance over time.  (Satake Dec. ¶¶36, 38-40, 42; Chinn Dec. Ex. 3, Bolger Tr. 142:21-144:10)

**Response to Paragraph 87:**

Deny. It was Satake's sole responsibility at the time Bolger joined SMBC to assess Plaintiff's performance until Bolger became co-head of the DCM group in 2019.  (Hatzimihalis Decl. ¶ 63; Bolger Dep. Tr. 214:2-18).

**Defendants' Reply to Paragraph 87**: **UNDISPUTED**, as the evidence Plaintiff cites does not contradict the statement in Paragraph 87.  Plaintiff does not provide any

foundation to dispute that Bolger planned to assess her performance over time, nor a foundation to dispute what conversations Satake and Bolger had about assessing her performance.  This is insufficient to create a genuine dispute of material fact.  Further, the testimony to which Plaintiff cites does not contradict the statement in Paragraph 87 nor support Plaintiff's additional response to Paragraph 87 as the testimony merely supports the undisputed fact that Satake, not Bolger, completed performance evaluations for Plaintiff prior to July 1, 2019.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 47:3-48:7; Chinn Dec. Ex. 3, Bolger Tr. 214:2-12.)

88.    In November 2016, Bolger assigned Plaintiff primary coverage for five clients: ███
████████████████████████████████████████████.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 112:23-113:2, 145:14-21; Chinn Dec. Ex. 2, Plaintiff II Tr. 286:1-287:12; Chinn Dec. Ex. 3, Bolger Tr. 194:24-195:8, 196:10-22; Chinn Dec. Ex. 28, SMBC8461.)

**Response to Paragraph 88:**

Admit.

**Defendants' Reply to Paragraph 88**: **UNDISPUTED.**

89.    Plaintiff was also assigned to provide secondary or support coverage for the REIT clients over which Bolger had primary coverage.  (Chinn Dec. Ex. 1, Plaintiff Tr. 141:17-20, 191:24-192:7; Chinn Dec. Ex. 3, Bolger Tr. 46:20-47:6, 196:23-197:4; Chinn Dec. Ex. 28, SMBC8461.)

**Response to Paragraph 89:**

Admit.

**Defendants' Reply to Paragraph 89**: **UNDISPUTED.**

90.    On or about October 19, 2016, Plaintiff stated that being involved in the rest of the REIT accounts "will be good for both of us."  (Chinn Dec. Ex. 29, SMBC11367; Chinn Dec. Ex. 1, Plaintiff I Tr. 147:5-10.)

**Response to Paragraph 90:**

Admit.

**Defendants' Reply to Paragraph 90**: UNDISPUTED.

91.   On or about November 4, 2016, Plaintiff emailed Satake and Zaman that she was "happy with the outcome" that she was "looking forward to covering [her] clients and to working with John on his names!" (Chinn Dec. Ex. 28, SMBC8461; Chinn Dec. Ex. 1, Plaintiff I Tr. 147:11-15.)

**Response to Paragraph 91:**

Admit that Plaintiff so wrote. However, Plaintiff was concerned about working with Bolger given his reticence to provide her with client coverage and the pushback and delay she received during the process. (Hatzimihalis Decl. ¶ 64; Bolger 192:19-196:22). Further, Plaintiff desired to be assigned to higher value clients. Id. Finally, Plaintiff was not "pleased with the circumstances" surrounding her client assignments. (Hatzimihalis Dep. Tr. 147:5-23).

**Defendants' Reply to Paragraph 91**: UNDISPUTED. As to Plaintiff's additional responses to Paragraph 91, it does not dispute the statement in Paragraph 91 and is further irrelevant and immaterial to Defendants' motion for summary judgment, and Defendants further refer to Defendants' Reply to Paragraph 85.

92.   Bolger was open to Plaintiff attending meetings and calls with REIT clients outside her primary coverage responsibilities. (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:3-8.)

**Response to Paragraph 92:**

Admit that Plaintiff was permitted to attend some meetings and calls with REIT clients that she was secondary coverage for. However, Plaintiff was provided with far fewer opportunities to attend meetings and calls than her male counterparts, Asmundson and Nieves. (Hatzimihalis Decl. ¶ 65; Hatzimihalis Dep. Tr. at 167:22-168:16, 186:23-187:2).

**Defendants' Reply to Paragraph 92**: UNDISPUTED. As to Plaintiff's additional response to Paragraph 92, the evidence identified does not contradict the statement in Paragraph 92 and Plaintiff's response contradicts her own sworn testimony. She was specifically asked, "[A]part from those clients where you had primary coverage

responsibility, where you were co-covering in the REIT space…was Mr. Bolger open to you attending meetings and calls with clients?" (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:3-7.)  Plaintiff responded: "Yes, he was." (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:8.)  Plaintiff did not qualify her statement that she was only permitted to attend some meetings and calls either when testifying or in her subsequent errata.  (Supp. Chinn Dec. 13) As to Plaintiff's statement regarding Asmundson and Nieves, the testimony cited relating to Nieves (Chinn Supp. Dec. Ex. 1, Plaintiff I Dep. Tr. at 186:23-187:2) does not refer to meetings or calls at all.  The testimony relating to Asmundson (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. at 167:22-168:16) relates to Healthcare clients is irrelevant and immaterial to Defendants' motion for summary judgment. Further, Plaintiff admitted she did not know which clients Asmundson or Nieves had primary coverage over at any time so she has not established that she would have knowledge as to what opportunities they had to join meetings or present to clients.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-11.)  Plaintiff's vague statement regarding Defendants providing Asmundson and Nieves more opportunities to attend meetings and calls is conclusory and without evidence of foundation.

93.   Bolger tried to be a good mentor to Plaintiff, providing her with advice and feedback. (Chinn Dec. Ex. 1, Plaintiff I 169:17-170:2.)

**Response to Paragraph 93:**

Admit in part, deny in part.  Plaintiff admits that, on occasion, Bolger would provide her with advice and feedback.  However, Plaintiff would not characterize Bolger as being a "good mentor" to Plaintiff, as he provided her lesser qualified counterparts better opportunities to succeed.  (Hatzimihalis Decl. ¶ 66; Hatzimihalis Dep. Tr. at 167:22-168:16; 186:14-193:8).

**Defendants' Reply to Paragraph 93**: **UNDISPUTED**, as Plaintiff's declaration cannot be used to contradict her sworn testimony when asked directly, "Do you think [Bolger] tried to be a good mentor to you?" and she responded, "Yes, I think so."  (Chinn Dec. Ex. 1, Plaintiff I 169:25-170:2.)  Further, when asked under oath, "Did [Bolger] provide you with advice and feedback?", Plaintiff responded, "Yes, he did" and did not offer any argumentative qualification "on occasion" during her testimony or within her subsequent errata.  (Chinn Dec. Ex. 1, Plaintiff I 169:22-24.)  As to Plaintiff's additional response to Paragraph 93, it is irrelevant and immaterial as to how many in-person client meetings Plaintiff and Asmundson attended while providing coverage to the Healthcare sector because it is undisputed that Bolger provided Plaintiff the opportunity to provide secondary coverage to all REIT clients she was not already covering as primary (*see supra* DSF ¶89) and provided Plaintiff the opportunity to provide secondary coverage across the entire Healthcare sector for two years prior to providing that opportunity to Asmundson (*see infra* DSF ¶¶94-95, 120-121). Further, Plaintiff admitted she did not know which clients Asmundson or Nieves had primary coverage over at any time so she has not established that she would have knowledge as to what opportunities they had to join meetings or present to clients.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-11.) Plaintiff's vague statement regarding Defendants providing Asmundson and Nieves more opportunities to attend meetings and calls is conclusory and without evidence of foundation.

94.    Bolger gave Plaintiff the opportunity to provide secondary coverage within the Healthcare sector.  (Chinn Dec. Ex. 2, Bolger Tr. 142:13-20, 142:21-144:10; 160:25-163:63; Chinn Dec. Ex. 1, Hatzimihalis I Tr. 160:13-16, 21-24; Chinn Dec. Ex. 2, Plaintiff II Tr. 341:5-24.)

**Response to Paragraph 94:**

Admit. However, Satake instructed Bolger to do so.  (Bolger Dep. Tr. at 192:6-196:22)

**Defendants' Reply to Paragraph 94**: **UNDISPUTED.**  As to Plaintiff's additional response to Paragraph 94, the cited evidence does not have anything to do with Plaintiff providing secondary coverage within the Healthcare sector but instead relates to Bolger's initial client assignments to Plaintiff within the Real Estate sector and thus does not provide any support for Plaintiff's statement.  Nor does Plaintiff's statement contradict the statement in Paragraph 94.

95.   Plaintiff provided secondary or support coverage to Bolger on the entire healthcare portfolio during (approximately) 2017 and 2018.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 160:13-24; Chinn Dec. Ex. 2, Plaintiff II Tr. 341:5-24; Chinn Dec. Ex. 3, Bolger Tr. 142:13-144:10, 160:25-163:63, 166:22-24.)

**Response to Paragraph 95:**

Admit.

**Defendants' Reply to Paragraph 95**: **UNDISPUTED.**

## IX.   HOWARD, NIEVES, AND ASMUNDSON CLIENT COVERAGE ASSIGNMENTS

96.   When Howard joined Nikko America in November 2016, she was assigned 13 lower-tiered accounts.  (Chinn Dec. Ex. 5, Howard Tr. 22:11-23:23, 24:11-25:6; Howard Dec. ¶¶6-10; Chinn Dec. Ex. 1, Plaintiff I Tr. 165:8-12; Chinn Dec. Ex. 2, Plaintiff II Tr. 272:11-22; Satake Dec. ¶41.)

**Response to Paragraph 96:**

Admit.

**Defendants' Reply to Paragraph 96**: **UNDISPUTED.**

97.   Satake nominated Nieves for promotion to Vice President in or about April 2017 and stated Nieves ███████████████████████████████████████████████████████████
███████████████████████████ " and described
█████████. (Chinn Dec. Ex. 30, SMBC4931.)

**Response to Paragraph 97:**

Admit that Satake so stated.

**Defendants' Reply to Paragraph 97**: **UNDISPUTED.**

98.   Based on Satake's recommendation, Nikko America promoted Nieves to Vice President
      on April 1, 2017.  (Chinn Dec. Ex. 6, Nieves Tr. 28:9-10; Nieves Dec. Ex. 1,
      SMBC5385.)

      **Response to Paragraph 98:**

      Admit.

      **Defendants' Reply to Paragraph 98**: **UNDISPUTED.**

99.   After Nikko America promoted Nieves to Vice President, he was assigned an initial
      allotment of lower-tiered accounts to cover.  (Chinn Dec. Ex. 6, Nieves Tr. 40:4-20;
      Nieves Dec. ¶¶5-8; Satake Dec. ¶40; Chinn Dec. Ex. 1, Plaintiff I Tr. 17:14-18;
      186:14-17; 189:22-190:2.)

      **Response to Paragraph 99:**

      Admit in part, deny in part.  While Nieves was initially allotted lower-tiered accounts, he

was later provided higher-value clients.  (Nieves Dep. Tr. at 40:16-42:15)

      **Defendants' Reply to Paragraph 99**: **UNDISPUTED**, as Plaintiff's evidence does not

      contradict Paragraph 99 which refers to the initial allotment of clients Nieves was

      assigned.  Further, Defendants do not dispute that Nieves was subsequently assigned

      higher-tiered clients after demonstrating capability handling lower-tiered clients. (Chinn

      Dec. Ex. 4, Zaman Tr. 48:3-6; Satake Dec. ¶¶35, 36-38, 40, 45.)

100.  Satake nominated Asmundson for promotion to Vice President in March 2017 and stated
      Asmundson "████████████████████████████████████████████," that
      his "████████████████████████████" and identified ████
      ███████. (Chinn Dec. Ex. 31, SMBC4940.)

      **Response to Paragraph 100:**

      Admit that Satake so stated.

      **Defendants' Reply to Paragraph 100**: **UNDISPUTED.**

101.  Based on Satake's nomination, Nikko America promoted Asmundson to Vice President
      on April 1, 2017.  (Chinn Dec. Ex. 7, Asmundson Tr. 37:15-18; Asmundson Dec. ¶7.)

      **Response to Paragraph 101:**

      Admit.

      **Defendants' Reply to Paragraph 101**: **UNDISPUTED.**

102.  After Nikko America promoted Asmundson to Vice President, he was assigned one to
      two lower-tiered clients.  (Chinn Dec. Ex. 7, Asmundson Tr. 48:22-49:17; Asmundson
      Dec. ¶¶6, 8; Chinn Dec. Ex. 1, Plaintiff I Tr. 18:7-10, 190:5-8, 192:18-23.)

      **Response to Paragraph 102:**

      Admit. While Asmundson was initially allotted lower-tiered clients, he was later

provided higher value clients.  (Asmundson Dep. Tr. at 48:12-51:18).

      **Defendants' Reply to Paragraph 102**: **UNDISPUTED**, as Plaintiff's evidence does not

      contradict Paragraph 99 which refers to the initial allotment of clients Asmundson was

      assigned.  Further, Defendants do not dispute that Asmundson was subsequently assigned

      higher-tiered clients after demonstrating capability handling lower-tiered clients. (Bolger

      Supp. Dec. ¶ 7; Satake Dec. ¶¶35, 36-38, 40, 45.)

**X.    PLAINTIFF'S MANAGERS CONSIDERED HER AN UNDERPERFORMER TO
        HER PEERS**

103.  Prior to the COVID-19 pandemic, the DCM group sat on an open trading desk within
      which they could see each other.  (Chinn Dec. Ex. 1, Hatzimihalis I Tr. 124:22-125:12;
      Chinn Dec. Ex. 7, Asmundson Tr. 77:13-78:19; Howard Dec. ¶26.)

      **Response to Paragraph 103:**

      Admit.

      **Defendants' Reply to Paragraph 103**: **UNDISPUTED.**

104.  Satake never felt Plaintiff demonstrated the capability to manage more and larger
      accounts.  He did not witness her proactively generating ideas for clients, fostering and
      building client relationships, or taking ownership of her coverage responsibilities to
      demonstrate her ability to take on more responsibilities on her own.  He thought she
      struggled in mastering the technical DCM knowledge to enable her to be proactive with

clients, discuss DCM issues with them, and generate ideas and solutions for them.
(Satake ¶¶42-44.)

**Response to Paragraph 104:**

Deny. Satake described Plaintiff in glowing terms.  He described Plaintiff's work as
"[c]lear, accurate and error free.  Huge number of coverage and well managed by her own."
According to the Satake, she "[a]lways tr[ies] to provide something new to clients"; has "[s]trong
communication skills"; is "[a]lways proactive"; is a "[h]ighly valued hard worker"; "work
aggressively"; "made a huge contribution"; and "[a]lways tr[ies] to expand platform and
business."  (Satake Ex. 1).

Later, Satake wrote that Hatzimihalis made "huge contributions to the [SMBC's] 1st year
start-up operation," referring to the public placement business.  According to Satake,
Hatzimihalis "is a hard worker, always stays very very late to make sure everything is in place
and under control.  She comes to the office even on weekend if she has to do so, to be ready for
unexpected meeting request from clients." Satake described Plaintiff as "an excellent sample of
'New Nikko DCM'" and praised Plaintiff for playing a "huge role in terms of relationship
building" with clients.  Satake also praised Hatzimihalis for helping to train Chris Nieves, a
newly-hired, junior employee.  (Chinn Ex. 18; Hatzimihalis 110:6-10, 111:11-15)

According to Satake, Plaintiff "maintain[ed] effective and productive relationships built
on clear communication, support, and respect.  Listens and responds effectively to 'customers'
questions, applies follow-up as an effective relationship-building tool, and commits to exceeding
'customer' expectations."  (Satake Ex. 2).  Moreover, Plaintiff was described as someone who
"[t]hinks outside the box . . . in terms of new solutions/improved processes"; "[a]rrives at
meetings on time and well-prepared"; "[a]pproaches work with a sense of energetic purpose";
"enjoys working hard"; "bottom line oriented"; is "[p]roductive – meets expected work outcomes

in a timely and quality manner;" "[p]rovides reliable, high quality work"; "[m]oves vision to possibilities – forges pathways to eventual realities"; "[a]nticipates future consequences and trends accurately"; and "creates potential breakthrough strategies and plans."  (Satake Ex. 2).

Moreover, Plaintiff had "successfully adjusted" to the "public businesses mindset." (Satake Ex. 2). Plaintiff was also a "[k]ey member" of the public team, "[m]anag[ed] junior members," "[a]lways meeting deadline[s]," and "[w]orking hard to keep its quality at the very good professional level."  (Satake Ex. 2). The latter was "very important for [SMBC's] business."  (Satake Ex. 2).  Once again, Hatzimihalis was a [v]ery hard worker" who did not "mind coming to the office [o]n the weekend if needed."  (Satake Ex. 2).

**Defendants' Reply to Paragraph 104**: **UNDISPUTED**, as the evidence cited by Plaintiff does not contradict Defendants' Paragraph 104 and Plaintiff misconstrues the documents cited in her additional response.  The documents to which Plaintiff cites are Satake Ex. 1, which is the performance evaluation Satake completed for Plaintiff for FY 2014 when she was an Associate Vice President, Chinn Ex. 18, which is the promotion recommendation form Satake completed when recommending Plaintiff for promotion from Associate Vice President to Vice President in 2015, and Satake Ex. 2, the performance evaluation Satake completed for Plaintiff for FY 2015 when she was a Vice President but did not yet have primary coverage responsibilities over any clients.  The statements contained in Defendants' Paragraph 104 refer to Satake's state of mind regarding his observation and assessment of Plaintiff's performance and capabilities after she was assigned primary coverage responsibilities in November 2016.  (Satake ¶¶39, 42-44.)

105.   Satake observed Howard, Asmundson, and Nieves vigorously striving to expand their dialogue with clients and that they were very proactive in covering the clients they were

assigned primary and secondary coverage as well as proactive in prospecting, that they performed well and they gave him confidence they could manage more and larger accounts.  (Satake Dec. ¶45.)

**Response to Paragraph 105:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 105**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

106.   Satake believed Howard, Nieves, and Asmundson's efforts led to increasing revenue generation over time.  He did not see the same behavior or results from Plaintiff.  (Satake Dec. ¶46.)

**Response to Paragraph 106:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000). Further, Satake never told Plaintiff that he felt she did not lead to increasing revenue generation. (Hatzimihalis Decl. ¶ 67).  Further, Plaintiff had several transactions over her tenure at SMBC wherein she increased revenue generation.  Id.

**Defendants' Reply to Paragraph 106**: **UNDISPUTED.**  As to Plaintiff's additional response to Defendants' Paragraph 106, it is irrelevant and immaterial and misconstrues Satake's position, as he made no claim that Plaintiff never contributed to generating revenue, but he did indisputably view her performance as being inferior to that of Howard, Nieves, and Asmundson. As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

107.    Satake assigned Plaintiff an overall rating of "Meets" in her FY 2016 performance
        evaluation on a scale of Gaps, Meets, and Exceeds.  (Satake Dec. ¶31; Satake Dec. Ex. 4,
        SMBC0010; Chinn Dec. Ex. 2, Plaintiff II Tr. 336:11-16, 336:20-337:2.)

        **Response to Paragraph 107:**

        Admit.

        **Defendants' Reply to Paragraph 107**: **UNDISPUTED.**

108.    Satake assigned Plaintiff a lower overall rating in her FY 2016 performance evaluation
        than the overall rating he assigned her in her FY 2014 and FY 2015 performance
        evaluations.  (Satake Dec. Exs. 1-2, 4, SMBC1031, SMBC0005, SMBC0010; Chinn Dec.
        Ex. 2, Plaintiff II Tr. 335:19-336:4, 336:20-337:6. 338:15-19, 339:6-13.)

        **Response to Paragraph 108:**

        Admit. However, the performance evaluation system changed over time.  (Hatzimihalis

Decl. ¶ 68).

        **Defendants' Reply to Paragraph 108**: **UNDISPUTED.** As to Plaintiff's additional

        response to Defendants' Paragraph 108, it is irrelevant and immaterial.  It is undisputed

        that in FY 2014 and FY 2015, Hatzimihalis received an overall rating of 5 on a scale of 1

        to 5, the highest possible overall rating in both instances, and that in FY 2016,

        Hatzimihalis received an overall Meets rating on a scale of Gaps, Meets, Exceeds, which

        was not the highest possible overall rating. (Satake Dec. Exs. 1-2, 4, SMBC1031,

        SMBC0005, SMBC0010; Chinn Dec. Ex. 2, Plaintiff II Tr. 335:19-336:4, 336:20-337:6.

        338:15-19, 339:6-13.)

109.    Satake rated Howard an overall rating of "████████" in her FY 2016 performance
        evaluation on a scale of Gaps, Meets, Exceeds.  (Satake Dec. ¶32; Satake Dec. Ex. 5,
        SMBC11602.)

        **Response to Paragraph 109:**

        Admit.

        **Defendants' Reply to Paragraph 109**: **UNDISPUTED.**

110.  In Howard's FY 2016 performance evaluation, Satake described Howard as a ███████ █████████" having a ███████████████████████████" and that she "███████████████████████████████████." (Satake Dec. Ex. 5, SMBC11602.)

**Response to Paragraph 110:**

Admit.

**Defendants' Reply to Paragraph 110**: **UNDISPUTED.**

111.  Satake rated Nieves an overall rating of "████████ in his FY 2016 performance evaluation on a scale of Gaps, Meets, Exceeds.  (Satake Dec. ¶33; Satake Dec. Ex. 6, SMBC11606.)

**Response to Paragraph 111:**

Admit.

**Defendants' Reply to Paragraph 111**: **UNDISPUTED.**

112.  In Nieves's FY 2016 performance evaluation, Satake described Nieves as "█████████████████████" "████████████████" and he "█████████████████████████████." (Satake Dec. Ex. 6, SMBC11606.)

**Response to Paragraph 112:**

Admit. Add that Satake copied and pasted the same language for the performance reviews of both male Vice Presidents, Nieves and Asmundson, but not in that of the female bankers.  (SMBC11606; 11598).

**Defendants' Reply to Paragraph 112**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 112, it is incorrect and unsupported by any evidence that Nieves and Asmundson were Vice Presidents during the time period covered by the FY 2016 performance evaluations, as they were each Associates during that time period. (Satake Dec. Ex. 6, SMBC11606; Satake Dec. Ex. 7, SMBC11598.)  Further, it is irrelevant and immaterial the evaluations had the same language. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed

Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

113.    Satake rated Asmundson an overall rating of "██████" in his FY 2016 performance evaluation on a scale of Gaps, Meets, Exceeds.  (Satake Dec. ¶34; Satake Dec. Ex. 7, SMBC11598.)

**Response to Paragraph 113:**

Admit.

**Defendants' Reply to Paragraph 113**: **UNDISPUTED.**

114.    In Asmundson's FY 2016 performance evaluation, Satake described Asmundson as "████████████████████████," "████████████████████████", and that he "████████████████████████████████."  (Satake Dec. Ex. 7, SMBC11598.)

**Response to Paragraph 114:**

Admit. Add that Satake copied and pasted the same language for the performance reviews of both male Vice Presidents, Nieves and Asmundson, but not in that of the female bankers.  (Satake Exs. 6, 7.)

**Defendants' Reply to Paragraph 114**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 114, it is incorrect and unsupported by any evidence that Nieves and Asmundson were Vice Presidents during the time period covered by the FY 2016 performance evaluations, as they were each Associates during that time period. (Satake Dec. Ex. 6, SMBC11606; Satake Dec. Ex. 7, SMBC11598.)  Further, it is irrelevant and immaterial the evaluations had the same language. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

115.    Zaman believed Plaintiff needed to improve on topics like prospecting and working more closely with product partners and with banking partners.  He considered Plaintiff the

bottom performer of the DCM team after looking at title, position, value add, and revenue generation.  He did not think she had the drive nor the desire for DCM.  (Chinn Dec. Ex. 4, Zaman Tr. 54:9-24, 62:22-66:4, 77:17-79:21, 80:23-81:14, 143:7-16.)

**Response to Paragraph 115:**

Admit that Zaman so testified.  However, the jury may choose to disregard this statement as it is made by an interested witness who is also a defendant in this matter.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).  Further, Plaintiff disagrees with Zaman's contentions that she "needed to improve on topics like prospecting and working more closely with product partners and with banking partners," that she was "bottom performer of the DCM team after looking at title, position, value add, and revenue generation" and that she did not have "the drive nor the desire for DCM."  (Hatzimihalis Decl. ¶ 69).  Further, none of these statements were made until after Plaintiff made her protected complaints and filed the instant lawsuit.  Id.  Plaintiff received exclusively positive performance reviews prior to Zaman and Bolger taking over the DCM group.  (Satake Exs. 2, 4).  In fact, regarding the ███ transaction, Plaintiff met with the Treasurer of ████ three times in one year, versus the competitors which met with the Treasurer once a year, sent indicative pricing every three weeks versus competitors who only provide those numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage role with █% economics in November 2017 to award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously invited to participate in the ████ deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ████████ client, SMBC was invited for the first time as an underwriter on ████████'s bond deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff send ████████ customized materials every month.  (Licul Ex. W).  Plaintiff received praise from the ████████ client as a result of a presentation

Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new issue tenors in combination with portfolio risk." (Licul Ex. Q). Plaintiff received praise for this presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group. Id. Plaintiff also received thanks and praise from clients at ████████████████, ████████████████ and ████. (Licul Exs. X, Y, Z). Further, Plaintiff's contact with ████████, the Executive Vice President of Finance with ████████████ led to SMNC setting up investor meetings with ████ senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019. (Licul Ex. AA). Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management. (Hatzimihalis Decl. ¶ 20).

> **Defendants' Reply to Paragraph 115**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 115, it is irrelevant and immaterial if Plaintiff disagrees with Zaman's belief as to what she need to improve, his belief as to how she performed in comparison to others, and his belief as to the amount of drive and desire he believed she demonstrated for DCM. Plaintiff's disagreement with her manager's views of her performance cannot create a dispute of a genuine issue of material fact. *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017). It is further irrelevant and immaterial that Plaintiff's earlier performance evaluations from FY 2014 and FY 2015 (Satake Ex. 2 and 4) were positive as they are (i) undisputed, (ii) occurred when she was an Associate Vice President or prior to acquiring primary coverage responsibilities and (iii) represented the views of a different manager at an earlier time during Plaintiff's career. (DSF ¶¶58-59, 63-64.) It is additionally irrelevant and

immaterial that the specific statements in Defendants' Paragraph 115 are from Zaman's deposition testimony that occurred after Plaintiff brought her lawsuit as it is undisputed that the first fiscal year in which she had primary coverage responsibilities, Satake rated her a Meets out of a scale of Gaps, Meets, and Exceeds, while rating Howard, Nieves, and Asmundson as Exceeds.  (DSF ¶¶107-114.)  It is further undisputed that in the first year Zaman conducted performance evaluations, for FY 2019, he and Bolger rated Plaintiff a Gaps rating and rated Howard, Nieves, and Asmundson as Exceeds.  (DSF ¶¶236-242.)  Plaintiff's reference to alleged praise from individuals other than Zaman, some only relating to weekly update emails (Licul Exs. X, Y, Z) she received is irrelevant and immaterial as to Zaman's beliefs about her performance and at times, further unsupported by the cited evidence.  For example, the cited evidence does not support that *Plaintiff* did the presentation for ▮▮▮▮▮▮▮ identified in Licul Ex. Q as opposed to the other individuals attending such as Anthony Capozzoli and Raj Gramma.  (Supplemental Declaration of Anthony Capozzoli ("Capozzoli Supp. Dec.") ¶¶ 4-8.)  As another example, the cited evidence (Licul Ex. AA) does not support that Plaintiff's contact with ▮▮▮▮▮, Executive Vice President at ▮▮▮▮▮▮ ▮▮▮▮▮ led to Nikko America setting up investor meetings much less securing an active bookrunner role.  Plaintiff was asked about ▮▮▮ at her deposition and did not testify to making the connection with this client nor to prospecting ▮▮▮▮▮ at all.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 180:1-181:4; *see also* DSF ¶¶127-128.)  To the contrary, Plaintiff testified that she was unaware that Bolger contacted the Chief Financial Officer of ▮▮▮ as a means of introducing ▮▮▮ to Sumitomo Mitsui Banking Corporation.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 180:1-181:4) Further, even if the statement

regarding ███ is true, Plaintiff doing her job on secondary coverage at least in part as to

that particular client does not give rise to a genuine fact issue. It is nevertheless irrelevant

and immaterial to Zaman's stated belief. Further, Plaintiff's allegations as to merely

scheduling meetings do not contradict the statement in Paragraph 115, particularly where

it is undisputed that Plaintiff did not achieve any active bookrunner mandates and that her

revenue generation never exceeded $1 million in any year nor did she achieve a single

active bookrunner role while he comparators did far more. (*See infra* DSF ¶¶136-142,

144-150) As to Plaintiff's additional statement regarding an interested witness,

Defendants refer to Defendants' Reply to Paragraph 21.

116.  Zaman considers Howard one of the best bankers in DCM and that Asmundson and
      Nieves have grown tremendously over the course of their career. (Chinn Dec. Ex. 4,
      Zaman Tr. 113:12-114:5.)

**Response to Paragraph 116:**

Admit.

**Defendants' Reply to Paragraph 116**: **UNDISPUTED.**

117.  Bolger believed Plaintiff was unable to meet the expectations of a Vice President and was
      the lowest performer in the DCM group. (Chinn Dec. Ex. 3, Bolger Tr. 46:20-47:6,
      217:15-19; 248:10-250:13.)

**Response to Paragraph 117:**

Admit that Bolger so testified. However, the jury may choose to disregard this statement

by an interested witness who is also a defendant in this matter. See Reeves v. Sanderson

Plumbing Prod., Inc., 530 U.S. 133, 151 (2000). Further, Plaintiff does not agree that she was

"unable to meet the expectations of a Vice President and was the lowest performer in the DCM

group." (Hatzimihalis Decl. ¶ 70). Further, none of these statements were made until after

Plaintiff made her protected complaints and filed the instant lawsuit. Id. Plaintiff received

exclusively positive performance reviews prior to Zaman and Bolger taking over the DCM

group.  (Satake Exs. 2, 4).  In fact, regarding the ███ transaction, Plaintiff met with the

Treasurer of ███ three times in one year, versus the competitors which met with the Treasurer

once a year, sent indicative pricing every three weeks versus competitors who only provide those

numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to

agree to award SMBC with a senior co-manage role with █% economics in November 2017 to

award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously

invited to participate in the ███ deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's

performance with the ██████ client, SMBC was invited for the first time as an

underwriter on ██████'s bond deal, the Chief Financial Officer informed Plaintiff

that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff

send ██████ customized materials every month.  (Licul Ex. W).  Plaintiff received

praise from the ██████ client as a result of a presentation Plaintiff did for the client

wherein they stated that it was "the first time anyone showed them new issue tenors in

combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this presentation

from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group.  Id.

Plaintiff also received thanks and praise from clients at ██████, ███

██████ and ███.  (Licul Exs. X, Y, Z).  Further, Plaintiff's contact with ███

███ the Executive Vice President of Finance with ██████ led to SMNC

setting up investor meetings with ███ senior management, which ultimately led to SMBC

securing an active bookrunner role in September 2019.  (Licul Exs. AA, BB).  Finally, during

Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC

and clients directly for meetings, which led to procuring meetings with embers of companies'

senior management.  (Hatzimihalis Decl. ¶ 20).  By approximately early 2019, Bolger was very

displeased with Plaintiff's efforts and ability to add value in secondary coverage on Healthcare

and understand the Healthcare sector, which he considered a critical sector.

**Defendants' Reply to Paragraph 117**: **UNDISPUTED.** As to Plaintiff's additional

response to Defendants' Paragraph 117, Defendants refer to Defendants' Reply to

Paragraph 116.  The cited evidence does not contradict and is irrelevant and immaterial to

Bolger's stated belief.  Additionally, it appears Plaintiff inadvertently included text from

Paragraph 118 in her response to Paragraph 117.

118.   By approximately early 2019, Bolger was very displeased with Plaintiff's efforts and
       ability to add value in secondary coverage on Healthcare and understand the Healthcare
       sector, which he considered a critical sector.

**Response to Paragraph 118:**

Deny. Defendants do not cite to any evidentiary support for this statement.  Further,

Plaintiff was successful in adding value in secondary coverage on Healthcare and understanding

the Healthcare sector, which she had been working in for four years at the time of her

termination.  (Hatzimihalis Decl. ¶ 71; Hatzimihalis Dep. Tr. at 141:17-19).

**Defendants' Reply to Paragraph 118**: **UNDISPUTED**, as Defendants' Paragraph 118

inadvertently did not include the evidentiary support for the statement, which is Chinn

Dec. 3, Bolger Tr. 137:20-138:13, 185:7-187:13; 166:25-167:24, and Plaintiff's cited

evidence does not contradict the statement in Paragraph 188 as the cited evidence does

not reference anything about Healthcare sector coverage or Bolger's state of mind

regarding Plaintiff's efforts and ability there.

119.   Bolger informed Satake about his views of Plaintiff's lack of performance and interest in
       the Healthcare sector.  (Chinn Dec. 3, Bolger Tr. 137:20-138:13, 185:7-187:13;
       166:25-167:24.)

**Response to Paragraph 119:**

Admit that Bolger so testified.  However, the jury may choose to disregard this statement as it is made by an interested witness who is also a defendant.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).  Further, Plaintiff does not agree that she had a "lack of performance and interest in the Healthcare sector."  (Hatzimihalis Decl. ¶ 72).  Plaintiff received exclusively positive performance reviews prior to Zaman and Bolger taking over the DCM group.  (Satake Exs. 2, 4).  In fact, regarding the ██ transaction, Plaintiff met with the Treasurer of ██ three times in one year, versus the competitors which met with the Treasurer once a year, sent indicative pricing every three weeks versus competitors who only provide those numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage role with █% economics in November 2017 to award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously invited to participate in the ██ deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ██████ client, SMBC was invited for the first time as an underwriter on ████████'s bond deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff send ████████ customized materials every month.  (Licul Ex. W).  Plaintiff received praise from the ████████ client as a result of a presentation Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group.  Id. Plaintiff also received thanks and praise from clients at ████████████, ████ ████████ and ████ (Licul Exs. X, Y, Z).  Further, Plaintiffs contact with ████ ██ the Executive Vice President of Finance with ████████████ led to SMNC

setting up investor meetings with ███ senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019.  (Licul Exs. AA, BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).

**Defendants' Reply to Paragraph 119**: **UNDISPUTED.**  As to Plaintiff's additional response to Defendants' Paragraph 119, the cited evidence does not contradict the statement in Paragraph 119 as it is irrelevant and immaterial if Plaintiff disagrees with Bolger's believe as to Plaintiff's performance covering healthcare.  Plaintiff's disagreement with his beliefs cannot create a dispute of a genuine issue of material fact. *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017).  Nor does Plaintiff cite any evidence contradicting the statement that Bolger shared these views with Satake.  Further, the evidence Plaintiff cites regarding her FY 2014 and FY 2015 performance evaluations were completed by Satake and more importantly, were prior to her providing any coverage in the Healthcare sector which did not begin until approximately FY 2017, (*see supra* DSF ¶95), and thus do not contradict the statement in Paragraph 119.  Plaintiff's other assertions address clients in the Real Estate/REIT sector and not her secondary coverage over the Healthcare sector; thus, they do not contradict the statement in Defendants' Paragraph 119.  As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

120.    In approximately early 2019, Bolger informed Plaintiff that she would no longer be providing coverage in the healthcare sector.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 160:25-161:8; Chinn Dec. Ex. 3, Bolger Tr. 166:22-24, 185:7-19.)

**Response to Paragraph 120:**

Admit.

**Defendants' Reply to Paragraph 120**: **UNDISPUTED.**

121. In approximately early 2019, Asmundson began providing secondary or support coverage to Bolger for the healthcare sector. (Chinn Dec. Ex. 1, Plaintiff I Tr. 160:25-161:4; Chinn Dec. Ex. 3, Bolger Tr. 185:7-19; Chinn Dec. Ex. 7, Asmundson Tr. 64:3-66:8.)

**Response to Paragraph 121:**

Admit.

**Defendants' Reply to Paragraph 121**: **UNDISPUTED.**

122. Bolger stated he thought Asmundson demonstrated better capabilities managing secondary coverage on the Healthcare sector than when Plaintiff had been managing secondary coverage in the Healthcare sector. (Declaration of John Bolger ("Bolger Dec."), ¶13.)

**Response to Paragraph 122:**

Admit that Bolger so testified. However, the jury may choose to disregard this statement by an interested witness who is also a defendant. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000). Further, Plaintiff does not agree that "Asmundson demonstrated better capabilities managing secondary coverage on the Healthcare sector than when Plaintiff had been managing secondary coverage in the Healthcare sector." (Hatzimihalis Decl. ¶ 73).

**Defendants' Reply to Paragraph 122**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 122, it is irrelevant and immaterial as to whether Plaintiff agrees with Bolger's belief as to how he thought Asmundson's capabilities in the Healthcare sector coverage compared to Plaintiff's capabilities in the same sector. Plaintiff's disagreement with his beliefs cannot create a dispute of a genuine issue of material fact. *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017). As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

123. There were times Plaintiff could have arrived at work on or after 9:30 AM while others regularly arrived by 8:00 AM. (Chinn Dec. Ex. 7, Asmundson Tr. 77:13-80:4, 81:7-23;

Chinn Dec. Ex. 8, Sisselman Tr. 83:21-84:12; Chinn Dec. Ex. 2, Plaintiff II Tr. 279:22-25; Chinn Dec. Ex. 7, Nieves Tr. 62:20-63:10, 65:9-17, 68:10-12; Howard Dec. ¶¶26-28.)

**Response to Paragraph 123:**

Deny. Plaintiff was routinely described as hard worker who worked long hours.  (Pl 56.1

¶ 29-30, 37-38)

**Defendants' Reply to Paragraph 123**: **UNDISPUTED**, as Plaintiff admitted the

statement contained within Defendants' Paragraph 123 under oath as to fiscal year 2019,

Chinn Dec. Ex. 2, Plaintiff II Tr. 279:22-25, as did the cited testimony from witnesses

Sisselman, Asmundson, Nieves, and Howard, and Plaintiff's cited evidence does not

contradict the statement as her cited evidence refers to comments contained within

performance evaluations and a promotion recommendation form from 2014 and 2015.

(*See* Satake Dec. Exs. 1, 2; Chinn Dec. Ex. 18)

124.  Bolger and Zaman received feedback from juniors regarding Plaintiff's performance, including "there was a lot of displeasure [working with Plaintiff] . . . "of, and Plaintiff was not teaching juniors, such as Chris Dalton, important concepts like best practices, saving down files, and how presentations should be done.  (Chinn Dec. Ex. 3, Bolger Tr. 119:23-121:4, 121:22-124:10; 263:23-267:22; Chinn Dec. Ex. 7, Nieves Tr. 58:20-63:3, 63:22-65:8.)

**Response to Paragraph 124:**

Admit that these witnesses so testified.  However, the jury may choose to disregard these

statement made by an interested witness See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S.

133, 151 (2000).  Further, Hatzimihalis regularly taught juniors concepts like best practices,

saving down files and how presentations should be done.  (Hatzimihalis Decl. ¶ 74; Hatzimihalis

Dep. Tr. at 111:10-15; 342:7-15; Licul Ex. NN)

**Defendants' Reply to Paragraph 124**: **UNDISPUTED.**  As to Plaintiff's additional

response to Defendants' Paragraph 124, Plaintiff's disagreement with the veracity of the

feedback is irrelevant and immaterial as to whether Bolger and Zaman received the

feedback. *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14,

2017). As to Plaintiff's additional statement regarding an interested witness, Defendants

refer to Defendants' Reply to Paragraph 21.

125.   Nieves considered Plaintiff to have "performance deficiencies" including [t]hings, that...
       were not appropriately or adequately enough explained to the juniors on the team that she
       was working with" including "lack of communication to juniors, lack of oversight and
       similar concepts that just were not explained appropriately or the modeling skills that
       were not appropriately explained or shown to the juniors on the team."  (Chinn Dec.
       Ex. 7, Nieves Tr. 62:2-19.)

**Response to Paragraph 125:**

Admit that this witness so testified.  However, the jury may choose to disregard this

statement made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530

U.S. 133, 151 (2000).  Further, Hatzimihalis regularly communicated with juniors.  (Hatzimihalis

Decl. ¶ 75; Hatzimihalis Dep. Tr. at 111:10-15; Licul Ex. NN).  Plaintiff denies that she had

"performance deficiencies," as Plaintiff received exclusively positive performance reviews prior

to Zaman and Bolger taking over the DCM group.  (Satake Exs. 2, 4).  In fact, regarding the

████ transaction, Plaintiff met with the Treasurer of ████ three times in one year, versus the

competitors which met with the Treasurer once a year, sent indicative pricing every three weeks

versus competitors who only provide those numbers every couple of months, pushed to uptier

SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage role

with █% economics in November 2017 to award us for the DCM coverage Plaintiff had

provided, where SMBC had not been previously invited to participate in the ████ deal in 2015.

(Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ██████████ client,

SMBC was invited for the first time as an underwriter on ████████ 's bond deal, the

Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always

were helpful and thoughtful, and Plaintiff send ██████████ customized materials every

month.  (Licul Ex. W).  Plaintiff received praise from the ████████████ client as a result of

a presentation Plaintiff did for the client wherein they stated that it was "the first time anyone

showed them new issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff

received praise for this presentation from Bolger and Thibaut D'Hollander, Managing Director

of Derivative Products Group.  Id.  Plaintiff also received thanks and praise from clients at

███████████████████████████ and █████ (Licul Exs. X; Y, X).  Further,

Plaintiff's contact with ██████████, the Executive Vice President of Finance with ██████

████████████ led to SMNC setting up investor meetings with █████ senior management,

which ultimately led to SMBC securing an active bookrunner role in September 2019.  (Licul

Exs. AA, BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to

Relationship Managers at SMBC and clients directly for meetings, which led to procuring

meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).

> **Defendants' Reply to Paragraph 125**: **UNDISPUTED.** As to the Plaintiff's additional
>
> response to Defendants' Paragraph 125, Plaintiff's cited evidence is irrelevant and
>
> immaterial as to what Nieves believed and further, Plaintiff's cited evidence does not
>
> contradict Nieves' belief as to Plaintiff's performance with juniors, but rather addresses
>
> entirely subjects, which are addressed elsewhere. Plaintiff's disagreement with his beliefs
>
> cannot create a dispute of a genuine issue of material fact.  *Mello v. Siena College*, 2017
>
> WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017). As to Plaintiff's additional statement
>
> regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

## XI.   PLAINTIFF DID NOT ENGAGE IN PROSPECTING EFFORTS SIMILAR TO HER PEERS

126.   DCM management considered prospecting new business critical to the success of DCM
and expected all team members to do it.  (Chinn Dec. Ex. 4, Zaman Tr. 62:22-63:23;
Bolger Dec. ¶9.)

**Response to Paragraph 126:**

Deny. Prospecting was never included as goal for Plaintiff.  In FY 2019, Zaman and

Bolger wrote "prospecting new clients" as a "stretch goal" for the upcoming fiscal year,

indicating that they did not view it as "critical."  (Licul Ex. L).

**Defendants' Reply to Paragraph 126**: Undisputed that the FY 2019 goals identifies

prospecting as a "stretch goal", but immaterial because it is undisputed that Howard, Nieves, and

Asmundson each consistently engaged in prospecting efforts across multiple potential clients and

that Plaintiff only engaged in prospecting with respect to a single client throughout her entire

tenure at Nikko America. (*See infra* DSF ¶¶127-134.)  Further, Zaman testified that "in order for

[the DCM group] to increase the pie, you have to go out and prospect. You have to go out and

find opportunities where we currently don't have them.  Everybody on the desk has to do it. I

still do it. Bolger still does it. [Sisselman] does it. [Morici] does it. And that's one way that we

grow our business. That's what I mean about prospecting and why it's important." (Chinn Dec.

Ex. 4, Zaman Dep. Tr. 63:14-23.)

127.  Plaintiff could not identify a prospective client who was not already doing DCM business
      with SMBC to which she was able to achieve DCM business.  (Chinn Dec. Ex. 1,
      Plaintiff I Tr. 176:2-12, 178:7-13; Chinn Dec. Ex. 2, Plaintiff II Tr. 284:3-285:1; Chinn
      Dec. Ex. 2, Plaintiff II Tr. 282:3-5, 283:12-21; Chinn Dec. Ex. 32, PL000124.)

**Response to Paragraph 127:**

Admit. However, Plaintiff prospected ███████.  (Hatzimihalis Dep. Tr. at 178:7-13;

284:3-285:1).

**Defendants' Reply to Paragraph 127**: **UNDISPUTED.** As to Plaintiff's additional

response to Defendants' Paragraph 127, it is irrelevant and immaterial as Plaintiff

admitted under oath that she was not able to obtain any DCM business from her attempt

to prospect . (*See infra* DSF ¶128; Chinn Dec. Ex. 1, Plaintiff I Tr. 176:2-12, 178:7-13.)

128.    Plaintiff attempted to prospect one client, the ▮▮▮▮▮, during her employment, and did not generate any DCM business for Nikko America from that client. (Chinn Dec. Ex. 1, Plaintiff I Tr. 178:7-13; Chinn Dec. Ex. 2, Plaintiff II Tr. 284:3-285:1.)

**Response to Paragraph 128:**

Admit. However, Plaintiff's prospecting efforts with ▮▮▮▮▮ was able to generate a senior management meeting with the CEO of ▮▮▮▮▮. (Hatzimihalis Decl. ¶ 76).

**Defendants' Reply to Paragraph 128**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 128, it is irrelevant and immaterial if Plaintiff generated a single meeting that did not result in any DCM business for Nikko America her entire tenure at the Company and further, Plaintiff did not testify to this fact when asked about her prospecting efforts with ▮▮▮▮▮ under oath. (Chinn Dec. Ex. 1, Plaintiff I Tr. 176:2-12, 178:7-13.)

129.    Most of Howard's DCM business has arisen form prospecting new DCM clients. (Chinn Dec. Ex. 5, Howard Tr. 29:3-15; Chinn Dec. Ex. 1, Plaintiff I Tr. 30:16-31:7; Chinn Dec. Ex. 2, Plaintiff II Tr. 272:11-273:6.)

**Response to Paragraph 129:**

Admit.

**Defendants' Reply to Paragraph 129**: **UNDISPUTED.**

130.    Howard's prospecting efforts include that that she typically has a list of clients she is working to prospect, and is constantly on the phone, calling, or emailing them to try to set up meetings or calls, as well as trying to find something to speak about with each prospective client at least on a weekly basis. (Howard Dec. ¶17; Chinn Dec. Ex. 2, Plaintiff II Tr. 272:11-273:6.)

**Response to Paragraph 130:**

Admit.

**Defendants' Reply to Paragraph 130**: **UNDISPUTED.**

131.   Asmundson does a lot of prospecting and a couple of his names that were prospects that
       we did not bank have become clients of the bank and Asmundson is now primary
       coverage on them because [he] was responsible for prospecting them.  (Chinn Dec. Ex. 7,
       Asmundson Tr. 48:22-49:17; 51:7-18; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5,
       390:8-18, 395:13-17.)

**Response to Paragraph 131:**

Admit. However, the jury may choose to disregard this statement as it is made by an

interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

Some of Asmundson's largest clients he "did not bank, and when they became a client of the

bank, I took over" and that he was "given" and "inherited" clients.  (Asmundson Dep. Tr.

50:14-51:18).

**Defendants' Reply to Paragraph 131**: **UNDISPUTED.**  As to Plaintiff's additional

response to Defendants' Paragraph 131, it is irrelevant and immaterial as to Asmundson's

prospecting efforts, and it mischaracterizes Asmundson's testimony as he stated the

clients "we did not bank" were those "[he] was responsible for the prospecting of them.

If I can give examples…it would be names like Kellogg, Whirlpool, some other names

that we did not bank, and when they became a client of the bank, I took over."  (Chinn

Dec. Ex. 7, Asmundson Tr. 51:7-18.)  The cited testimony supports the statement in

Paragraph 131 that Asmundson took over some clients Nikko America did not previously

bank but had since become clients of the bank due to Asmundson's prospecting efforts.

As to Plaintiff's additional statement regarding an interested witness, Defendants refer to

Defendants' Reply to Paragraph 21.

132.   Asmundson typically tries to meet with 10 prospective clients once or twice a year.
       (Asmundson Dec. ¶15.)

**Response to Paragraph 132:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 132**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

133.    Asmundson successfully prospected at least 4 clients to the DCM group since becoming a Vice President.  (Chinn Dec. Ex. 7, Asmundson Tr. 51:7-18, 55:18-22; Asmundson Dec. ¶16.)

**Response to Paragraph 133:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 133**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

134.    Depending on the particular entity and sector, Nieves's prospecting efforts have included sending weekly market update emails and quarterly pricing updates, as well as engaging in dialogue with prospective clients regarding market strategy and ideas if he is able to secure a meeting or call with them.  (Nieves Dec. ¶13; Chinn Dec. Ex. 6, Nieves Tr. 40:21-41:9; Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-18, 395:13-17.)

**Response to Paragraph 134:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000). Further, Plaintiff was also sending weekly market update emails to ███████ in connection with her prospecting efforts.  (Hatzimihalis Decl. ¶ 77).  Further, Nieves was "given" or "handed over" several of his larger revenue generating clients.  (Nieves Dep. Tr. 40:11-42:15).

**Defendants' Reply to Paragraph 134**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 134, it is irrelevant and immaterial as it is undisputed Plaintiff only engaged in prospecting efforts for a single prospective client (*see supra* DSF ¶128) and undisputed that Plaintiff was assigned (or "given") primary coverage for several accounts. It further mischaracterizes Nieves testimony who, in response to the question of "when you were made a VP, were you *given* a number of clients to work on," (emphasis added), he answered "Yes" and further stated, "…they were some of the smaller accounts that [Zaman] just didn't have time to manage.  They weren't as profitable for the bank. So they became my responsibility."  (Chinn Dec. Ex. 6, Nieves Tr. 40:11-20.)  Further, it is undisputed that senior coverage officers first assessed an individual's performance in secondary coverage and/or in primary coverage over a limited number of lower-tiered accounts and it was only after the individual demonstrated capability that he or she would be assigned larger clients for primary coverage (*see supra* DSF ¶81). As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

## XII.   PLAINTIFF DID NOT EARN CLIENT ACHIEVEMENTS SIMILAR TO HER PEERS

135.   From the time Satake joined the DCM business, its ultimate goal with each client was to be selected as active book runner for public DCM transactions.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:3-7; 108:2-9.)

**Response to Paragraph 135:**

Admit. However, at all times, SMBC DCM was also looking for other revenue earning roles, including passive book runner.  (Hatzimihalis Decl. ¶ 78; Hatzimihalis Dep. Tr. at 40:21-42:2).

**Defendants' Reply**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants'

Paragraph 135, it is irrelevant and immaterial.  Further, Plaintiff admitted that acting as

an active book runner has a greater opportunity for revenue than acting as a passive book

runner.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 41:2-6.)

136.  In FY 2017, Plaintiff generated $590,715 in revenue for clients over which she had
primary coverage.  (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr.
285:5-7, 289:14-292:2, 293:21-294:9, 296:7-11.)

**Response to Paragraph 136:**

Admit.

**Defendants' Reply to Paragraph 136**: **UNDISPUTED.**

137.  In FY 2018, Plaintiff generated $494,813 in revenue for clients over which she had
primary coverage.  (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr.
285:5-7, 292:3-294:9, 285:5-7, 293:21-294:9, 296:7-11.)

**Response to Paragraph 137:**

Admit.

**Defendants' Reply to Paragraph 137**: **UNDISPUTED.**

138.  In FY 2019, Plaintiff generated $677,028 in revenue for clients over which she had
primary coverage.  (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr.
285:5-7, 294:10-295:19, 293:21-294:9, 296:7-11.)

**Response to Paragraph 138:**

Admit.

**Defendants' Reply to Paragraph 138**: **UNDISPUTED.**

139.  In FY 2020, Plaintiff generated $903,375 in revenue as of November 25, 2020.  (Bolger
Dec. Ex. 8 SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 296:12-299:12,
293:21-294:9, 296:7-11.)

**Response to Paragraph 139:**

Admit.

**Defendants' Reply to Paragraph 139**: **UNDISPUTED.**

140.   In FY 2017, Plaintiff earned 5 co-manager roles, 1 senior co-manager role, and no active or passive bookrunner roles for clients over which she had primary coverage. (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 289:14-292:2, 293:21-294:9, 296:7-11.)

**Response to Paragraph 140:**

Admit.

**Defendants' Reply to Paragraph 140: UNDISPUTED.**

141.   In FY 2018, Plaintiff earned 3 co-manager roles, 1 senior co-manager role, and no active or passive bookrunner roles for clients over which she had primary coverage. (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 292:3-294:9, 285:5-7, 293:21-294:9, 296:7-11.)

**Response to Paragraph 141:**

Admit.

**Defendants' Reply to Paragraph 141: UNDISPUTED.**

142.   In FY 2019, Plaintiff earned 1 passive bookrunner role, 4 co-manager roles, and no active bookrunner roles for clients over which she had primary coverage. (Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 294:10-295:19, 293:21-294:9, 296:7-11.)

**Response to Paragraph 142:**

Admit.

**Defendants' Reply to Paragraph 142: UNDISPUTED.**

143.   Howard aims to provide proactive coverage to clients including providing them with market updates, pricing information, as well as calling them to provide value-additive ideas, presenting ideas to clients, including multi-currencies, or, for example, ███████ ████████. She tries to anticipate her clients' needs two, three, and four financial quarters in the future and to come up with solutions that competitors are not showing them and works to develop an interpersonal relationship so when a client realizes they need something, they think to call her first to ask for help. (Howard Dec. ¶¶13-15.)

**Response to Paragraph 143:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 143**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

144.    In FY 2017, Howard generated over $███████ in revenue for clients over which she had primary coverage.  (Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 301:22-302:6.)

**Response to Paragraph 144:**

Admit.

**Defendants' Reply to Paragraph 144**: **UNDISPUTED.**

145.    In FY 2018, Howard generated over $██████ in revenue for clients over which she had primary coverage.  (Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 302:7-13; 303:3-10.)

**Response to Paragraph 145:**

Admit.

**Defendants' Reply to Paragraph 145**: **UNDISPUTED.**

146.    In FY 2019, Howard generated over $██████ in revenue for clients over which she had primary coverage.  (Bolger Dec. Ex. 5, Howard Tr. 34:23-35:8; Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 302:14-22.)

**Response to Paragraph 146:**

Admit.

**Defendants' Reply to Paragraph 146**: **UNDISPUTED.**

147.    In FY 2020, Howard generated over $██████ in revenue for clients over which she had primary coverage.  (Chinn Dec. Ex. 5, Howard Tr. 34:23-35:4; Bolger Dec. Ex. 9, SMBC11375.)

**Response to Paragraph 147:**

Admit.

**Defendants' Reply to Paragraph 147**: **UNDISPUTED.**

148.   In FY 2017, Howard generated earned 4 active bookrunner roles for clients over which she had primary coverage.  (Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 301:22-302:6.)

**Response to Paragraph 148:**

Admit.

**Defendants' Reply to Paragraph 148**: **UNDISPUTED.**

149.   In FY 2018, Howard generated earned 3 active bookrunner roles for clients over which she had primary coverage.  (Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 302:7-13; 303:3-10.)

**Response to Paragraph 149:**

Admit.

**Defendants' Reply to Paragraph 149**: **UNDISPUTED.**

150.   In FY 2019, Howard generated earned 14 active bookrunner roles for clients over which she had primary coverage.  (Chinn Dec. Ex. 5, Howard Tr. 34:23-35:8; Bolger Dec. Ex. 9, SMBC11375; Chinn Dec. Ex. 2, Plaintiff II Tr. 299:18-20; 302:14-22.)

**Response to Paragraph 150:**

Admit.

**Defendants' Reply to Paragraph 150**: **UNDISPUTED.**

151.   Nieves's coverage responsibilities included making sure he was updating them on DCM activities and the financing activity to ultimately generate insular business for the Vice Presidents and advising clients on the best way to access the bond market.  (Chinn Dec. Ex. 6, Nieves Tr. 42:17-43:10.)

**Response to Paragraph 151:**

Admit.

**Defendants' Reply to Paragraph 151**: **UNDISPUTED.**

152.   In FY 2017, Nieves generated over $▮▮▮▮▮ in revenue for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 152:**

Deny. According to SMBC's internal documents, in FY 2017, Nieves's primary coverage clients generated no income.  SMBC gave Nieves over $████████ in revenue credit for clients covered by Zaman.  (Pl 56.1 ¶ 293-95)

**Defendants' Reply to Paragraph 152**: UNDISPUTED.

Plaintiff has no foundation for her assertions regarding the meaning of these two documents.   In fact, Plaintiff admitted she did not know which clients Nieves had primary coverage over at any time and thus has no evidentiary foundation for her conclusory assertion.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-11.) In any event, neither document contradicts the statement in Paragraph 152 as to the revenue Nieves generated in FY 2017.  First, the documents are not from 2017, but from years later.  Licul Ex. N (SMBC9149)'s file name and metadata identifies it as being created in January 2020. (Chinn Supp. Dec. ¶14; Chinn Supp. Dec. Ex. 3, Bolger Tr. 320:23-25, 321:8, 324:10-22, 326:15-19.)  Licul Ex. U (SMBC5036) is a variation of Licul Ex. N and is an attachment to a February 2020 email (SMBC5035) and its metadata indicates that Ex. U was created in January 2020.  (Bolger Supp. Dec. Ex. 10; Chinn Supp. Dec. ¶15 & Ex. 12).  Further underscoring that the excels do not relate to FY 2017 revenue generation, as to the three clients in which Nieves is listed as primary coverage - ████████████████████████████ and ████████████ – Nieves only acquired primary coverage as to these three clients in 2019 upon Howard redistributing them to him.  It is undisputed that Nieves was assigned an initial allotment of lower-tiered accounts to cover when he was promoted to Vice President in 2017 (*see supra* DSF ¶¶97-99) and also undisputed that Howard was assigned several clients when she joined Nikko America in 2016 (see supra DSF ¶96).  Howard testified that these initial clients included ████████

████████████████████ and ██████████████ among others (Chinn Dec. Ex. 5, Howard Tr. 23:14-21) and that "shortly before [she] was promoted to Director" which occurred in 2019, she redistributed those three clients to Nieves (Chinn Dec. Ex. 5, Howard Tr. 28:12-29:2; Howard Dec. ¶ 23; *see infra* DSF ¶176.) What's more, these documents were not generated for the purpose of tracking primary coverage responsibilities and associated revenues. Instead, Licul Ex. N was created to secure capital from Nikko America's parent company, not to identify coverage or give "credit" to DCM members as to revenue generation (Chinn Supp. Dec. Ex. 3, Bolger Tr. 325:17-326:8, 345:5-12.)  Zaman was not asked about Ex. N during his deposition and has explained Ex. N had multiple errors and was not used to identify coverage or give "credit" to DCM members as to revenue generation.  (Supplemental Declaration of Omar Zaman (Zaman Supp. Dec. ¶¶ 5-7.))  Additionally, the documents relied upon contain material errors in terms of identification of primary coverage responsibilities. Zaman identified several errors in the spreadsheet as to Nieves's primary coverage including that by December 2019, Nieves not Zaman had primary coverage as to ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

which is a subsidiary of ████████████████ (Zaman Supp Dec. ¶ 8).  Bolger further identified several errors in the spreadsheet as to Asmundson's primary coverage

including that Bolger began increasing Asmundson's primary coverage responsibilities in 2019 and 2020 including as to  (Bolger Supp Dec. ¶ 7).   Bolger was not asked about Ex. U at his deposition but has identified the same errors existing within Ex. U as to Asmundson's coverage in Ex. N.  (Bolger Supp. Dec. ¶¶ 8-12)  Zaman was not asked about Ex. U at his deposition but has identified the same errors existing within Ex. U as to Nieves's coverage in Ex. N.  (Zaman Supp. Dec. ¶¶ 4-8).

153.    In FY 2018, Nieves generated over $▮▮▮▮▮ in revenue for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 153:**

Deny. According to SMBC's internal documents, in FY 2018, Nieves's primary coverage clients generated no income.  SMBC gave Nieves over $▮▮▮▮ in revenue credit for clients covered by Zaman.  (Pl 56.1 ¶ 296-97)

**Defendants' Reply to Paragraph 153**: As to Plaintiff's response to Defendants' Paragraph 153, Defendants refer to Defendants' Reply to Paragraph 152.

154.    In FY 2019, Nieves generated over $▮▮▮▮ in revenue for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 154:**

Deny. According to SMBC's internal documents, in FY 2019, Nieves's primary coverage clients generated no income.  SMBC gave Nieves over $▮▮▮▮ in revenue credit for clients covered by Zaman. (Pl 56.1 ¶ 298-99)

**Defendants' Reply to Paragraph 154**: As to Plaintiff's response to Defendants' Paragraph 154, Defendants refer to Defendants' Reply to Paragraph 152.

155.     In FY 2020, Nieves generated over $██████ in revenue for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 155:**

Deny. According to SMBC's internal documents, in FY 2020, Nieves's primary coverage clients generated only $██████ in revenue.  SMBC gave Nieves an additional $██████ in revenue credit for clients covered by Zaman. (Pl 56.1 ¶ 300-01)

**Defendants' Reply to Paragraph 155**: As to Plaintiff's response to Defendants' Paragraph 155, Defendants refer to Defendants' Reply to Paragraph 152.

156.     In FY 2017, Nieves earned 1 passive bookrunner role and 12 co-manager roles for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 156:**

Deny. The bookrunner and co-managers roles were awarded to Zaman's primary clients. (Licul Exs. N, U).

**Defendants' Reply to Paragraph 156**: As to Plaintiff's response to Defendants' Paragraph 156, Defendants refer to Defendants' Reply to Paragraph 152.

157.     In FY 2018, Nieves earned 1 active bookrunner role and 9 co-manager roles for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 157:**

Deny. The bookrunner and co-manager roles were awarded to Zaman's clients.  (Licul Exs. N, U).

**Defendants' Reply to Paragraph 157**: As to Plaintiff's response to Defendants' Paragraph 157, Defendants refer to Defendants' Reply to Paragraph 152.

158.     In FY 2019, Nieves earned 2 passive bookrunner roles and 6 co-manager roles for clients over which he had primary coverage.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303: 14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22.)

**Response to Paragraph 158:**

Deny. The bookrunner and co-manager roles were awarded to Zaman's clients.  (Licul

Exs. N, U).

**Defendants' Reply to Paragraph 158**: As to Plaintiff's response to Defendants'

Paragraph 158, Defendants refer to Defendants' Reply to Paragraph 152.

159.   Asmundson approaches primary coverage by working hard to generate ideas to
       proactively initiate dialogue to clients, preparing materials for client meetings,
       coordinating internally at the Company, and managing any follow-up.  (Asmundson Dec.
       ¶11).

**Response to Paragraph 159:**

Admit that Adsmundson so declared.  However, the jury may choose to disregard this

statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc.,

530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 159: UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

160.   Asmundson treated all clients with a duty of care and ownership, whether [he] had
       primary or secondary coverage over them.  (Asmundson Dec. ¶11).

**Response to Paragraph 160:**

Admit that Asmundson so declared.  However, the jury may choose to disregard this

statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc.,

530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 160: UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

161.   Through his primary coverage efforts for one client, Asmundson obtained one of the five active bookrunner roles out of a total of 17 banks in contention. (Asmundson Dec. ¶12).

**Response to Paragraph 161:**

Admit that Admunson so declared. However, Asmundson was given a larger volume and more profitable clients than his female counterparts, including Plaintiff. (Hatzimihalis Dep. Tr. at 190:5-193:8; 272:1-4; Asmundson Dep. Tr. at 48:12-51:18).

**Defendants' Reply to Paragraph 161: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 161, it is irrelevant and immaterial to the statement within Paragraph 161 and it is mischaracterizes the evidence cited as Plaintiff admitted that she does not know which clients were assigned to Asmundson, (Chinn Dec. Ex. 2, Hatzimihalis II Tr. at 312:8-11), and the testimony to which Plaintiff cites does not state that Asmundson received a larger volume or more profitable clients than Plaintiff or Howard, but that Asmundson testified to being assigned lower-tiered clients and prospecting to acquire more clients.

162.   In FY 2017, Asmundson generated $███ in revenue for clients over which he had primary coverage. (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50, SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 162:**

Admit

**Defendants' Reply to Paragraph 162: UNDISPUTED**

163.   In FY 2018, Asmundson generated $███ in revenue for clients over which he had primary coverage. (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50, SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 163:**

Admit.

**Defendants' Reply to Paragraph 163: UNDISPUTED**

164.   In FY 2019, Asmundson generated over $█████ in revenue for clients over which he had primary coverage.  (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50, SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 164:**

Deny. According to SMBC's internal documents, in FY 2019 Asmundson's primary coverage clients generated only $█████.  (Pl 56.1 ¶ 305).  SMBC gave Asmundson an additional $█████ in revenue credit for clients covered by Bolger.  (Pl 56.1 ¶ 306).

**Defendants' Reply to Paragraph 164:** As to Plaintiff's response to Defendants' Paragraph 164, Defendants refer to Defendants' Reply to Paragraph 152.  Plaintiff's statement regarding the revenue identified within Asmundson's primary coverage in Plaintiff's 56.1 Statement of Facts ¶306 is incorrect and not supported by the evidence and Defendants' further refer to Defendants' Response to PSF ¶306.

165.   In FY 2020, Asmundson generated over $█████ in revenue for clients over which he had primary coverage.  (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50; SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 165:**

Deny. According to SMBC's internal documents, in FY 2020, Asmundson's primary coverage clients generated about $█████ in revenue credit.  SMBC gave Asmundson an additional approximately $█████ in credit revenue for clients covered by Bolger.  (Licul Exs. N, U; Chinn Ex. 50).

**Defendants' Reply to Paragraph 165:** As to Plaintiff's response to Defendants' Paragraph 165, Defendants refer to Defendants' Reply to Paragraph 152 and 164.

166.   In FY 2017, Asmundson earned 3 co-manager roles for clients over which he had primary coverage.  (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50;

SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 166:**

Admit.

**Defendants' Reply to Paragraph 166: UNDISPUTED.**

167.   In FY 2018, Asmundson earned 1 passive bookrunner role and 2 co-manager roles for clients over which he had primary coverage.  (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50; SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 167:**

Admit.

**Defendants' Reply to Paragraph 167: UNDISPUTED.**

168.   In FY 2019, Asmundson earned 2 active bookrunner roles, 2 passive bookrunner roles, and 7 co-manager roles for clients over which he had primary coverage.  (Chinn Dec. Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50; SMBC9179; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 168:**

Deny. According to SMBC's internal documents, in FY 2019, Asmundson's earned one

bookrunner and three co-manager roles.  SMBC gave Asmundson credit for an additional three

bookrunner and four co-manager roles earned by Bolger's clients. (Licul Exs. N, U).

**Defendants' Reply to Paragraph 168:** As to Plaintiff's response to Defendants'

Paragraph 168, Defendants refer to Defendants' Reply to Paragraph 152 and 164.

169.   Nikko America's passive book runner role for a ███████ transaction in FY 2019 generated $██████ in revenue for SMBC.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 331:16-19; Bolger Dec. Ex. 8, SMBC11376.)

**Response to Paragraph 169:**

Admit.

**Defendants' Reply to Paragraph 169: UNDISPUTED.**

170.   Nieves and Asmundson, acting in primary coverage roles, generated deals that yielded in
excess of $█████ in FY 2019, including █████████ for Nieves and ██████ for
Asmundson.  (Nieves Dec. Ex. 2, SMBC9180; Chinn Dec. Ex. 2, Plaintiff II Tr. 303:
14-16, 305:18-306:2, 306:11-17, 306:23-307:16, 307:17-22, 332:19-334:4; Chinn Dec.
Ex. 7, Asmundson Tr. 53:16-22; Chinn Dec. Ex. 50; SMBC9179; Chinn Dec. Ex. 2,
Plaintiff II Tr. 308:3-5, 308:19-309:25, 310:6-312:11, 312:18-313:7.)

**Response to Paragraph 170:**

Admit in part, deny in part.  Nieves did not have primary coverage responsibility for

████████████ . (Licul Exs. N, U).

**Defendants' Reply to Paragraph 170: UNDISPUTED.** As to Plaintiff's additional

response to Defendants' Paragraph 170, Defendants refer to Defendants' Reply to Paragraph

152.

171.   Bolger and Zaman are aware which Nikko America DCM individual has primary
coverage over a client at the time a DCM transaction for that client is announced.  (Chinn
Dec. Ex. 2, Plaintiff II Tr. 392:19-393:14; Chinn Dec. Ex. 4, Zaman Tr. 79:8-21,
106:17-18, 107:22-109:9, 110:11-13, 110:11-111:12, 112:7-14, 148:19-150:9; Chinn
Dec. Ex. 3, Bolger Tr. 113:19-23, 114:19-23, 116:5-16.)

**Response to Paragraph 171:**

Admit.

**Defendants' Reply to Paragraph 171: UNDISPUTED.**

172.   Defendants kept records reflecting the DCM revenue generated from each client.  (Nieves
Dec. ¶16; Bolger Dec. ¶28;Plaintiff II Tr. 393:10-14)

**Response to Paragraph 172:**

Admit.

**Defendants' Reply to Paragraph 172: UNDISPUTED.**

173.   Defendants kept records regarding which individual had primary and secondary coverage
over each client account.  (Bolger Dec. ¶28; Plaintiff II Tr. 393:24-394:10)

**Response to Paragraph 173:**

Admit.

**Defendants' Reply to Paragraph 173**: UNDISPUTED.

## XIII.   HOWARD CONSIDERS PLAINTIFF AN UNDERPERFORMER

174.   When Howard's prospecting efforts resulted on her needing to focus increased time on a particular sector, she approached Satake to discuss distributing her existing clients to others within the DCM group for coverage.  (Chinn Dec. Ex. 5, Howard Tr. 28:9-17; Howard Dec. ¶¶21, 22.)

**Response to Paragraph 174:**

Admit that this witness so testified.  However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 174**: UNDISPUTED. As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

175.   Howard told Satake she wanted to redistribute certain Tier 3 and Tier 4 clients to Nieves and Asmundson, as well as redistribute some clients to Morici.  (Howard Dec. ¶22.)

**Response to Paragraph 175:**

Admit that Howard so testified.  However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 175**: UNDISPUTED. As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

176.   Howard subsequently redistributed several clients to Morici, Nieves, and Asmundson. (Howard Dec. ¶23.)

**Response to Paragraph 176:**

Admit that Howard so testified.  However, the jury may choose to disregard this

statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc.,

530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 176: UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

177.   Howard did not propose distributing any of the client accounts to Plaintiff because she
considered Plaintiff an underperformer and thought it would be a business risk to have
Plaintiff cover these clients.  (Howard Dec. ¶24.)

**Response to Paragraph 177:**

Admit in part, deny in part.  Plaintiff denies that she was an underperformer and that it

would be a business risk to have Plaintiff cover certain clients.  (Hatzimihalis Decl. ¶ 79).

Plaintiff denies that she was a poor performer as Plaintiff received exclusively positive

performance reviews prior to Zaman and Bolger taking over the DCM group.  (Satake Exs. 2, 4).

In fact, regarding the ████ transaction, Plaintiff met with the Treasurer of ████ three times in

one year, versus the competitors which met with the Treasurer once a year, sent indicative

pricing every three weeks versus competitors who only provide those numbers every couple of

months, pushed to uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a

senior co-manage role with █% economics in November 2017 to award us for the DCM coverage

Plaintiff had provided, where SMBC had not been previously invited to participate in the ████

deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ████████

████ client, SMBC was invited for the first time as an underwriter on ███████████'s bond

deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they

always were helpful and thoughtful, and Plaintiff send ██████████ customized materials

every month.  (Licul Ex. W).  Plaintiff received praise from the ██████████ client as a
result of a presentation Plaintiff did for the client wherein they stated that it was "the first time
anyone showed them new issue tenors in combination with portfolio risk."  (Licul Ex. Q).
Plaintiff received praise for this presentation from Bolger and Thibaut D'Hollander, Managing
Director of Derivative Products Group.  Id.  Plaintiff also received thanks and praise from clients
at ██████████████████████████ and █████ (Licul Exs. X, Y, Z).  Further,
Plaintiff's contact with ████████, the Executive Vice President of Finance with █████
██████████ led to SMNC setting up investor meetings with █████ senior management,
which ultimately led to SMBC securing an active bookrunner role in September 2019.  (Licul
Exs. AA,BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to
Relationship Managers at SMBC and clients directly for meetings, which led to procuring
meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).  Further,
Howard never shared this view with Plaintiff.  Id.  In addition, the jury may choose to disregard
this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod.,
Inc., 530 U.S. 133, 151 (2000).

> **Defendants' Reply to Paragraph 177**: **UNDISPUTED**, as the evidence Plaintiff cites
> does not contradict the statement in Defendants' Paragraph 177 as Plaintiff's
> disagreement with Howard's belief as to Plaintiff's level of performance is irrelevant and
> immaterial and does not create a genuine dispute of material fact. *Mello v. Siena College*,
> 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017).  Further, Plaintiff has no basis to
> dispute Defendants' Paragraph 177 as Plaintiff testified that she was unaware Howard
> decided to whom to transfer Howard's clients and that she was unaware that Howard
> chose not to transfer any clients to Plaintiff because Howard did not have confidence in

Plaintiff as a DCM banker.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 20:10-14, 23:9-17.)

As to Plaintiff's additional statement regarding an interested witness, Defendants refer to

Defendants' Reply to Paragraph 21.

178.    Howard viewed Plaintiff as an underperformer.  (Chinn Dec. Ex. 5, Howard Tr. 42:3-9.)

**Response to Paragraph 178:**

Admit in part, deny in part.  Admit that Howard so testified.  However, the jury may

choose to disregard this statement as it is made by an interested witness.  See Reeves v.

Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).  Plaintiff denies that she was an

underperformer.  (Hatzimihalis Decl. ¶ 79).  Plaintiff denies that she was a poor performer as

Plaintiff received exclusively positive performance reviews prior to Zaman and Bolger taking

over the DCM group.  (SMBC5-28, 1031-1037).  In fact, regarding the ▮▮▮ transaction,

Plaintiff met with the Treasurer of ▮▮▮ three times in one year, versus the competitors which

met with the Treasurer once a year, sent indicative pricing every three weeks versus competitors

who only provide those numbers every couple of months, pushed to uptier SMBC in T2 from T3

and got the client to agree to award SMBC with a senior co-manage role with ▮% economics in

November 2017 to award us for the DCM coverage Plaintiff had provided, where SMBC had not

been previously invited to participate in the ▮▮▮ deal in 2015.  (Licul Exs. WW, XX.)

Regarding Plaintiff's performance with the ▮▮▮▮▮ client, SMBC was invited for the

first time as an underwriter on ▮▮▮▮▮'s bond deal, the Chief Financial Officer

informed Plaintiff that he wanted to award SMBC because they always were helpful and

thoughtful, and Plaintiff send ▮▮▮▮▮ customized materials every month.  (Licul Ex.

W).  Plaintiff received praise from the ▮▮▮▮▮ client as a result of a presentation

Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new

issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this

presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group. Id. Plaintiff also received thanks and praise from clients at █████████████, █████████████ and ███████ (Licul Exs. X, Y, Z). Further, Plaintiff's contact with ███████████, the Executive Vice President of Finance with █████████████ led to SMNC setting up investor meetings with ██████ senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019. (Licul Exs. AA, BB). Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management. (Hatzimihalis Decl. ¶ 20). Further, Howard never shared this view with Plaintiff. Id. In addition, the jury may choose to disregard this statement as it is made by an interested witness. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

> **Defendants' Reply to Paragraph 178**: **UNDISPUTED**, as the evidence Plaintiff cites does not contradict the statement in Defendants' Paragraph 178 as Plaintiff's disagreement with Howard's belief as to Plaintiff's level of performance is irrelevant and immaterial and does not create a genuine dispute of material fact. *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017). As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

179.  Howard believed Plaintiff was an underperformer because Howard sat next to Plaintiff for a year and a half and cannot remember Plaintiff ever making an outgoing call to a client while the rest of the DCM group were on the phone all day, Plaintiff often asked Howard questions that Howard considered junior in nature and that someone with a Vice President title should already know how to answer. Howard also overheard Plaintiff on the phone meetings with clients and Howard witnessed Plaintiff needing to bring in several other people to assist her on the call in order for the call to run smoothly. (Chinn Dec. Ex. 5, Howard Tr. 42:3-43:13.)

**Response to Paragraph 179:**

Admit in part, deny in part.  Plaintiff regularly made outgoing calls to clients, and often made said calls from a conference room because of the noise that occurred near their regularly assigned seats.  (Hatzimihalis Decl. ¶ 80).  Further, the time period where Plaintiff sat near Howard is the same timeframe wherein Plaintiff up-tiered most of her clients.  Id.  In addition, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 179:** **UNDISPUTED** that Howard believed Plaintiff was an underperformer because Howard sat next to Plaintiff for a year and a half and Plaintiff often asked Howard questions that Howard considered junior in nature and that someone with a Vice President title should already know how to answer, Howard overheard Plaintiff on the phone meetings with clients and Howard witnessed Plaintiff needing to bring in several other people to assist her on the call in order for the call to run smoothly.  As to Plaintiff's denial, Plaintiff's statement that Plaintiff often made outgoing calls to clients from a conference room does not contradict Howard's observations about not hearing Plaintiff ever making an outgoing call on the trading desk and is further irrelevant and immaterial where Howard's other observations are undisputed. As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

## XIV. OTHERS VIEW PLAINTIFF AS AN UNDERPERFORMER

180.    In approximately 2019, Bolger received negative performance feedback about Plaintiff from Tony Capozzoli, an Executive Director in another department.  (Capozzoli Dec. ¶¶1, 8; Bolger Dec. ¶15; Chinn Dec. Ex. 39, SMBC9549; see also Chinn Dec. Ex. 2, Plaintiff II Tr. 346:13-22.)

**Response to Paragraph 180:**

Admit that these witnesses so testified.  However, the jury may choose to disregard these statements made by an interested witnesses.  See Reeves v. Sanderson Plumbing Prod., Inc 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 180**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

181.   Capozzoli often attends client meetings with the DCM group members responsible for managing that client relationship.  (Declaration of Anthony Capozzoli ("Capozzoli Dec.") ¶3.)

**Response to Paragraph 181:**

Admit.

**Defendants' Reply to Paragraph 181**: **UNDISPUTED.**

182.   In approximately 2019, Capozzoli attended a meeting with Plaintiff with Plaintiff's client ███████████.  (Capozzoli ¶¶4-5; Chinn Dec. Ex. 2, Plaintiff II Tr. 349:24-350:7; Chinn Dec. Ex. 51, SMBC8946.)

**Response to Paragraph 182:**

Admit.

**Defendants' Reply to Paragraph 182**: **UNDISPUTED.**

183.   After the client meeting, Capozzoli informed Bolger that Plaintiff had not contributed in any substantive way at the client meeting.  (Capozzoli Dec.¶¶5-8; Chinn Dec. Ex. 2, Plaintiff II Tr. 350:11-21, 392:3-6.).)

**Response to Paragraph 183:**

Deny. Hatzimihalis worked with Capozzoli on the meeting, which was considered a success, including the client and Bolger.  (Pl 56.1 ¶ 91-93)

**Defendants' Reply to Paragraph 183**: **UNDISPUTED**, as Plaintiff has no basis to dispute Defendants' Paragraph 183 as Plaintiff admitted she was not sure she said anything at the meeting (Chinn Dec. Ex. 2, Plaintiff II Tr. 350:11-12) and does not have

any knowledge as to what Capozzoli may or may not have said to Bolger following the client meeting. (Chinn Dec. Ex. 2, Plaintiff II Tr. 350:11-21.)  Further, Plaintiff's disagreement with Capozzoli's feedback to Bolger is irrelevant and immaterial as to the feedback Bolger received.  *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017).  As to Plaintiff's additional statement, it does not contradict the statement in Paragraph 183 as to what Capozzoli informed Bolger and further, Plaintiff's cited evidence refers to a July 2019 client meeting whereas Capozzoli's communications with Bolger referred to a March 2019 client meeting.  (Capozzoli Supp. Dec. ¶¶ 4-5.)

184.    Capozzoli considered this behavior unusual.  (Capozzoli Dec. ¶7.)

**Response to Paragraph 184:**

Deny. Hatzimihalis worked with Capozzoli on the meeting, which was considered a success, including the client and Bolger.  (Pl 56.1 ¶ 91-93

**Defendants' Reply to Paragraph 184: UNDISPUTED**, as Plaintiff's additional response and cited evidence does not contradict the statement within Defendants' Paragraph 184; Plaintiff has no basis to dispute Defendants' Paragraph 184 as Plaintiff has no basis to contradict Capozzoli's belief as to her behavior at the client meeting and whether he viewed it as unusual.  Further, Plaintiff's cited evidence refers to a July 2019 client meeting whereas Capozzoli's communications with Bolger referred to a March 2019 client meeting.  (Capozzoli Supp. Dec. ¶¶ 4-5.)

185.    Capozzoli has attended similar client meetings with other DCM individuals, such as Asmundson and Howard, they typically prepared their own materials.  In instances they may not have done that, [he] do[es] not recall any instance in which they did not provided valuable commentary to the client during the meeting." he had never experienced such a situation where the DCM coverage officer did not participate in the conversation with the client.  (Capozzoli Dec. ¶¶5-7.)

**Response to Paragraph 185:**

Deny. Hatzimihalis worked with Capozzoli on the meeting, which was considered a success, including the client and Bolger.  (Pl 56.1 ¶ 91-93

**Defendants' Reply to Paragraph 185: UNDISPUTED**, as Plaintiff's additional response and cited evidence do not contradict the statement in Paragraph 185.  Further, Plaintiff has no basis to dispute Paragraph 185 as Plaintiff has no basis to contradict Capozzoli's belief as to her behavior in comparison to his observations of Asmundson and Howard at similar meetings and his belief as to how they compared.  Further, Plaintiff's cited evidence refers to a July 2019 client meeting whereas Capozzoli's communications with Bolger referred to a March 2019 client meeting.  (Capozzoli Supp. Dec. ¶¶ 4-5.)

186.   Bolger shared this feedback with Zaman.  (Bolger Dec. ¶16; Chinn Dec. Ex. 4, Zaman Tr. 57:13-58:12, 61:11-62:18.)

**Response to Paragraph 186:**

Deny. Hatzimihalis worked with Capozzoli on the meeting, which was considered a success, including the client and Bolger.  (Pl 56.1 ¶ 91-93

**Defendants' Reply to Paragraph 186: UNDISPUTED**, as Plaintiff's additional response and cited evidence do not contradict the statement in Paragraph 186.  Plaintiff has no basis to dispute what feedback Bolger shared with Zaman.  Plaintiff admitted under oath she does not have any knowledge as to what Capozzoli may or may not have said to Bolger following the client meeting. (Chinn Dec. Ex. 2, Plaintiff II Tr. 350:11-21.) Further, Plaintiff's cited evidence refers to a July 2019 client meeting whereas Capozzoli's communications with Bolger referred to a March 2019 client meeting. (Capozzoli Supp. Dec. ¶¶ 4-5.)

**XV.   BEGINNING IN FY 2017, HOWARD IS PAID HIGHEST AND PROMOTED QUICKER THAN HER PEERS**

187.   In FY 2017, Satake was able to increase base salaries so Hatzimihalis's base salary was greater than Nieves's' and Asmundson's base salaries.  (Satake Dec. ¶18.)

**Response to Paragraph 187:**

Admit.

**Defendants' Reply to Paragraph 187: UNDISPUTED.**

188.   By FY 2017, Satake no longer considered the new hire versus legacy base salary disparity in setting bonus compensation.  (Satake Dec. ¶¶18-19.)

**Response to Paragraph 188:**

Admit.

**Defendants' Reply to Paragraph 188: UNDISPUTED.**

189.   In Nikko America's 2017 Employee Handbook, the Bonuses policy stated: "Bonuses are discretionary and are based on performance."  (Chinn Dec. Ex. 10, SMBC0478; Chinn Dec. Ex. 52, Pls Amended Responses to Defs' First Requests for Admission, ¶31.)

**Response to Paragraph 189:**

Admit that the policy so states.

**Defendants' Reply to Paragraph 189: UNDISPUTED.**

190.   In Nikko America's 2018, 2019, and 2020 Employee Handbooks, the Incentive Compensation policy stated: "Bonuses are fully discretionary and are based on your performance and the performance of SMBC in the applicable fiscal year."  (Chinn Dec. Exs. 11-13 SMBC0388, SMBC0555, SMBC0660; Chinn Dec. Ex. 52, Pls Amended Responses to Defs' First Requests for Admission, ¶¶32-34.)

**Response to Paragraph 190:**

Admit that the policy so states.

**Defendants' Reply to Paragraph 190: UNDISPUTED.**

191.   Each year Satake was the Head of the DCM group, he received a bonus pool by Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. in Tokyo based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group.  (Satake Dec. ¶20.)

**Response to Paragraph 191:**

Admit.

**Defendants' Reply to Paragraph 191: UNDISPUTED.**

192.   The size of the bonus pool changed each year depending on how well each entity performed.  (Satake Dec. ¶20.)

**Response to Paragraph 192:**

Admit.

**Defendants' Reply to Paragraph 192: UNDISPUTED.**

193.   As the DCM business grew, Satake was able to secure a larger overall bonus pool each year.  (Satake Dec. ¶20.)

**Response to Paragraph 193:**

Admit.

**Defendants' Reply to Paragraph 193: UNDISPUTED.**

194.   Starting in FY 2017, and continuing into FY 2018, Satake relied on individual performance factors when making bonus award decisions including how proactively the individual marketed DCM services to clients, how proactively the individual engaged internally with bankers to acquire and accumulate information about the market to present to clients, the individual's efforts and successes in prospecting new clients to the DCM group, and revenue generation.  (Satake Dec. ¶¶18-19, 21.)

**Response to Paragraph 194:**

Deny. SMBC paid the men in lock step regardless of performance.  (Pl 56.1 ¶ 234-40)

SMBC paid Nieves substantial bonuses even though, for his first three years as a VP, his primary

coverage clients generated no revenue.  (Pl 56.1 ¶ 293-99) SMBC also inflated the revenue

credited to the men by awarding them credit to client's covered by others.  (Pl 56.1 ¶ 293-306).

SMBC did not award Plaintiff any credit for client's covered by others.  (Boger Decl. ¶¶Ex. 8)

**Defendants' Reply to Paragraph 194: UNDISPUTED** as to what Satake relied on

when making bonus award decisions in FY 2017 and FY 2018 as Plaintiff's cited

evidence does not contradict the statement in Defendants' Paragraph 194 since it

identifies several factors in addition to revenue generation as considered when making

bonus award decisions.  Moreover, the mere fact that, based on the identified factors,

Satake chose to compensate two people in the same fashion does not in any way call into

question that Satake relied upon the identified factors.  Further, while Plaintiff

mischaracterizes Nieves's primary coverage responsibilities (*see supra* DSF Reply

¶¶152-160, 164-165, 168, 170), such assertions are irrelevant and immaterial as Satake

identified several factors in addition to revenue generation which he considered when

making bonus award decisions. (*See* DSF ¶¶194, 197.)

195.   Based on those factors, Satake paid Hatzimihalis less in compensation than Howard,
       Nieves, and Asmundson for FY 2017 and FY 2018.  (Satake Dec. ¶22.)

**Response to Paragraph 195:**

Deny. SMBC paid the men in lock step regardless of performance.  (Pl 56.1 ¶ 234-40)

SMBC paid Nieves substantial bonuses even though, for his first three years as a VP, his primary

coverage clients generated no revenue.  (Pl 56.1 ¶ 293-99) SMBC also inflated the revenue

credited to the men by awarding them credit to client's covered by others.  (Pl 56.1 ¶ 293-306).

SMBC did not award Plaintiff any credit for client's covered by others.  (Boger Decl. ¶ Ex. 8)

**Defendants' Reply to Paragraph 195**: Defendants refer to Defendants' Reply to

Paragraph 194 above.

196.   In FY 2017, Nieves and Asmundson each made $███  more than Plaintiff in total
       compensation.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 103:3-9; 103:20-104:1; Chinn Dec. Ex.
       17, SMBC00002; Chinn Dec. Ex. 19, SMBC0009159; Chinn Dec. Ex. 20,
       SMBC0009162.)

**Response to Paragraph 196:**

Admit. However, the third year Plaintiff was a Vice President in FY 2017 she made

$████  less in total compensation than Nieves and Asmundson made in their third year as Vice

Presidents in FY 2019 and the first year Plaintiff was a Vice President in FY 2015 she made
$██████ less in total compensation than Nieves and Asmundson made in their first year as Vice
Presidents in FY 2017.  (Pl 56.1 ¶  140-221, Sakate Ex. 2).

**Defendants' Reply to Paragraph 196**: UNDISPUTED.  As to Plaintiff's additional
response to Paragraph 196 comparing Plaintiff's FY 2017 compensation to Nieves' and
Asmundson's FY 2019 compensation, is irrelevant and immaterial as it is undisputed that
Satake received a bonus pool each year by Nikko America's parent company SMFG
based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko
America, and the DCM group and that the bonus pool changed each year depending on
those performances.  (*See infra* DSF ¶¶13-14, 20-23, 191-192.)

197.    In FY 2018, Satake relied on individual performance factors when making bonus award
        decisions including how proactively the individual marketed DCM services to clients,
        how proactively the individual engaged internally with bankers to acquire and
        accumulate information about the market to present to clients, the individual's efforts and
        successes in prospecting new clients to the DCM group, and revenue generation.  (Satake
        Dec.¶¶18-19, 21.)

**Response to Paragraph 197:**

        Deny. SMBC paid the men in lock step regardless of performance.  (Pl 56.1 ¶ 234-40)
SMBC paid Nieves substantial bonuses even though, for his first three years as a VP, his primary
coverage clients generated no revenue.  (Pl 56.1 ¶ 293-99) SMBC also inflated the revenue
credited to the men by awarding them credit to client's covered by others.  (Pl 56.1 ¶ 293-306).
SMBC did not award Plaintiff any credit for client's covered by others.  (Boger Decl. ¶ Ex. 8)

**Defendants' Reply to Paragraph 197:** Defendants refer to Defendants' Reply to
Paragraph 194 above.

198.    Howard made more in total compensation than Nieves and Asmundson in FY 2017 and
        FY 2018.  (Satake Dec. ¶22; Chinn Dec. Ex. 1, Plaintiff I Tr. 29:10-14, 103:3-6,
        103:20-23; Chinn Dec. Ex. 19, SMBC9159; Chinn Dec. Ex. 20, SMBC9162; Chinn Dec.
        Ex. 21, SMBC9161.)

**Response to Paragraph 198:**

Admit. However, the first year Howard was a Vice President in FY 2016 she made $█████ less in total compensation than Nieves and Asmundson made in their first year as Vice Presidents in FY 2017, the second year Howard was a Vice President in FY 2017 she made $█████ less in total compensation than Nieves and Asmundson made in their second year as Vice Presidents in FY 2018 and the third year Howard was a Vice President in FY 2018 she made $█████ less in total compensation than Nieves and Asmundson made in their third year as Vice Presidents in FY 2019.  (Pl 56.1 ¶¶ 140-245).

**Defendants' Reply to Paragraph 198: UNDISPUTED.**  As to Plaintiff's additional response to Paragraph 198 comparing compensation of one individual in one year to another individuals in another years is irrelevant and immaterial, as it is undisputed that Satake received a bonus pool each year by Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (*See infra* DSF ¶¶13-14, 20-23, 191-192.)

199.   In 2019, Satake's expatriate rotation in the U.S. came to an end and he returned to Tokyo on July 1, 2019.  (Satake Dec. ¶23.)

**Response to Paragraph 199:**

Admit.

**Defendants' Reply to Paragraph 199: UNDISPUTED.**

200.   In early 2019, Satake nominated Howard for promotion to Director after 2 years and 4 months in her title of Vice President.  (Satake Dec. ¶48; Satake Dec. Ex. 8; Chinn Dec. Ex. 1, Plaintiff I Tr. 25:20-25, 27:8-11; Chinn Dec. Ex. 4, Zaman Tr. 23:11-17, 113:4-11.)

**Response to Paragraph 200:**

Admit. However, Howard had already been a Vice President when she joined SMBC, so she had performed the role of Vice President for more than two years and four months, and had been working in finance for nearly a decade.  (Howard Dep. Tr. at 35:15-38:15).

**Defendants' Reply to Paragraph 200**: UNDISPUTED.  As to Plaintiff's additional response to Defendants' Paragraph 200, Howard's pre-Nikko America experience does nothing to undermine that fact that Satake supported her success at Nikko America or the fact that he elected to seek her promotion before any of the other three comparators. (DSF ¶ 202.)

201.    Based on Satake's nomination, Nikko America promoted Howard on July 1, 2019. (Chinn Dec. Ex. 53, SMBC6028; Chinn Dec. Ex. 2, Plaintiff II Tr. 357:19-21, 358:5-8, 359:11-14.)

**Response to Paragraph 201:**

Admit.

**Defendants' Reply to Paragraph 201**: UNDISPUTED.

202.    Howard was the first of Howard, Nieves, Asmundson, and Plaintiff to be promoted beyond Vice President to Director.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 359:11-23.)

**Response to Paragraph 202:**

Admit.

**Defendants' Reply to Paragraph 202**: UNDISPUTED.

203.    Howard worked hard.  (Chinn Dec. Ex. 1, Hatzimihalis I Tr. 30:13-15.)

**Response to Paragraph 203:**

Admit.

**Defendants' Reply to Paragraph 203**: UNDISPUTED.

204.    Howard deserved to be promoted to Director.  (Chinn Dec. Ex. 1, Hatzimihalis I Tr. 26:4-10.)

**Response to Paragraph 204:**

2a624559048852dc

Admit.

**Defendants' Reply to Paragraph 204: UNDISPUTED.**

205.    Vice Presidents are responsible for providing primary and secondary coverage within
their sectors as instructed by the heads of the DCM group and senior coverage officers in
their sector, as well as prospecting new client business, and managing and training junior
officers.  (Chinn Dec. Ex. 5, Howard Tr. 32:11-22; Chinn Dec. Ex. 6, Nieves Tr.
33:14-20; Chinn Dec. Ex. 7, Asmundson Tr. 44:21-45:10; Bolger Dec. ¶3; Declaration of
Omar Zaman ("Zaman Dec."), ¶3.)

**Response to Paragraph 205:**

Admit in part, deny in part.  Plaintiff denies that "prospecting new client business" was a

part of the role of Vice President. (Pl 56.1 ¶ 35)

**Defendants' Reply to Paragraph 205:  UNDISPUTED** that Vice Presidents are

responsible for providing primary and secondary coverage within their sectors as instructed by

the heads of the DCM group and senior coverage officers in their sector and managing and

training junior officers.  As to Plaintiff's denial regarding prospecting new client business being

part of the role of Vice President, it is immaterial because (i) DCM management believed it to be

important for the success of the business and (ii) it is undisputed that Howard, Nieves, and

Asmundson each engaged in prospecting efforts across multiple potential clients and that

Plaintiff only engaged in (unsuccessful) prospecting with respect to a single client throughout her

entire tenure at Nikko America. (*See infra* DSF ¶¶ 105, 127-134; Chinn Dec. Ex. 4, Zaman Dep.

Tr. 63:14-23.)

206.    Directors have substantially similar responsibilities as Vice Presidents, except they
typically have primary coverage over a larger number of clients than Vice Presidents.
(Chinn Dec. Ex. 5, Howard Tr. 32:11-22; Chinn Dec. Ex. 6, Nieves Tr. 33:14-20; Chinn
Dec. Ex. 7, Asmundson Tr. 44:21-45:10; Bolger Dec. ¶4; Zaman Dec. ¶4.)

**Response to Paragraph 206:**

Admit in part, deny in part.  Admit that Directors have substantially similar

responsibilities as Vice Presidents.  Deny that Directors have "primary coverage over a larger

number of clients." (Hatzimihalis Decl. ¶ 81). For example, Sisselman had more clients as a Vice President than he did when he was a Director. Id.

> **Defendants' Reply to Paragraph 206**: **UNDISPUTED** that Directors have substantially similar responsibilities as Vice Presidents. As to Plaintiff's denial, Plaintiff's cited evidence does not contradict the statement in Defendants' Paragraph 206 that Directors "typically" have a larger number of primary coverage clients than Vice Presidents. Further, Sisselman had less clients as a Director than a Vice President because the DCM team had expanded since Sisselman had joined in March 2014, including with the additions of Bolger and Morici so there were more individuals over which to spread clients. (DSF ¶¶20, 83-84)

## XVI.   ZAMAN AND BOLGER BECOME CO-HEADS OF DCM AND MEET WITH PLAINTIFF

207.   John Bolger and Omar Zaman became co-heads of the DCM group on July 1, 2019. (Chinn Dec. Ex. 2, Bolger Tr. 47:7-19; Chinn Dec. Ex. 3, Zaman Tr. 18:16-18; Chinn Dec. Ex. 1, Plaintiff I Tr. 193:18-23.)

> **Response to Paragraph 207:**

> Admit.

> **Defendants' Reply to Paragraph 207: UNDISPUTED.**

208.   Upon becoming co-heads of DCM, Zaman and Bolger now had the ability to nominate individuals for promotions. (Chinn Dec. Ex. 5, Zaman Tr. 25:9-26:7; Chinn Dec. Ex. 3, Bolger Tr. 47:7-19.)

> **Response to Paragraph 208:**

> Admit.

> **Defendants' Reply to Paragraph 208: UNDISPUTED.**

209.   Bolger and Zaman made base salary and year-end-bonus compensation decisions for Nikko America's DCM group – including for Plaintiff, Nieves, Asmundson, and Howard – after July 1, 2019. (Chinn Dec. Ex. 5, Zaman Tr. 25:9-26:7; Chinn Dec. Ex. 3, Bolger Tr. 47:7-19; Chinn Dec. Ex. 1, Plaintiff I Tr. 29:1-4.)

**Response to Paragraph 209:**

Admit.

**Defendants' Reply to Paragraph 209: UNDISPUTED.**

210.    On July 12, 2019, Bolger assigned Plaintiff a project involving real estate maturities. (Chinn Dec. Ex. 1, Plaintiff I Tr. 198:15-199:12, 201:12-16, 202:2-8; Chinn Dec. Ex. 35, SMBC8630; Declaration of Marie Austensen ("Austensen Dec.") Ex. 1, SMBC4930.)

**Response to Paragraph 210:**

Admit.

**Defendants' Reply: UNDISPUTED.**

211.    Plaintiff had not completed the real estate maturities project before leaving for vacation on August 7, 2019.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 198:15-199:12, 201:12-16, 202:2-8; Chinn Dec. Ex. 35, SMBC8630, Ex. 36 SMBC10321; Austensen Dec. Ex. 1, SMBC4930.)

**Response to Paragraph 211:**

Admit. However, Bolger did not set a deadline for the completion of the real estate maturities project.  (Hatzimihalis Decl. ¶ 82).  In addition, Bolger was aware of the status of the project upon Plaintiff's departure for vacation and gave no objection and/or raised no issue with the status of said project.  Id.

**Defendants' Reply to Paragraph 211: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 211, it is irrelevant and immaterial as to whether Bolger set a deadline for completion of the real estate maturities project, given that he made clear the exigency of the project by email dated July 12, 2019, "Would be great to get in front of this trend and share to our clients first (before hearing from others)." (Chinn Dec. Ex. 35, SMBC8630.)  Nevertheless whether Bolger gave no objection and/or raised no issue with Plaintiff as to the status of said project when she left for vacation, it is immaterial.

212.   Bolger did not find the material Plaintiff ultimately submitted acceptable.  (Bolger Dec. ¶17; Austensen Dec. Ex. 1, SMBC4930.)

**Response to Paragraph 212:**

Deny. Bolger was satisfied with the work product provided to him by Plaintiff, which was evidenced by his inclusion of the work product created by Plaintiff on this project in multiple client presentations.  (Hatzimihalis Decl. ¶ 83).

**Defendants' Reply to Paragraph 212: UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 212.  Contemporaneous documentation reveals that Bolger considered Plaintiff's work on this project to be "atrocious."  (Austensen Dec. Ex. 1, SMBC4930.)  That later versions of the work product, after it had been revised by Bolger, were included in multiple client presentations is irrelevant and immaterial as to Bolger's view of the work product when Plaintiff submitted it.  (Bolger Supp. Dec. ¶18.)

## XVII.   SUMMER 2019 GOAL SETTING MEETING BETWEEN PLAINTIFF, BOLGER, AND ZAMAN

213.   Upon becoming co-heads, Zaman and Bolger held goal setting meetings with their team, including with Plaintiff on July 15, 2019.  (Chinn Dec. Ex. 54, SMBC11566.)

**Response to Paragraph 213:**

Admit.

**Defendants' Reply to Paragraph 213: UNDISPUTED.**

214.   On July 15, 2019, Bolger, Zaman, and Plaintiff met for a "Goal Setting meeting" for Plaintiff.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 351:2-12; Chinn Dec. Ex. 4, Zaman Tr. 53:11-23; Chinn Dec. Ex. 3, Bolger Tr. 214:13-25, Chinn Dec. Ex. 55, SMBC11565; Austensen Dec. Ex. 1, SMBC4930.)

**Response to Paragraph 214:**

Admit.

**Defendants' Reply to Paragraph 214: UNDISPUTED.**

215. At the July 15, 2019 goal setting meeting, Zaman told Plaintiff to think about the possibility of becoming a relationship manager with Nikko America's bank affiliate. (Chinn Dec. Ex. 2, Plaintiff II Tr. 351:2-12, 351:20-22; Chinn Dec. Ex. 1, Plaintiff I Tr. 194:15-195:3; Chinn Dec. Ex. 4, Zaman Tr. 68:4-9.)

**Response to Paragraph 215:**

Admit.

**Defendants' Reply to Paragraph 215: UNDISPUTED.**

216. Zaman told her to consider becoming a relationship manager due to his view that she was unable to perform well as a Vice President within DCM.  (Chinn Dec. Ex. 4, Zaman Tr. 68:4-9; 118:16-119:18; Zaman Dec. 1 ¶¶5-6.)

**Response to Paragraph 216:**

Admit in part, deny in part.  Zaman wanted Plaintiff to leave the group and become a relationship manager.  However, at no time during the aforementioned meeting did Zaman express the view that Plaintiff was unable to perform well as a Vice President within DCM. (Hatzimihalis Decl. ¶84).

**Defendants' Reply to Paragraph 216: UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement in Defendants' Paragraph 216 that Zaman suggested to Plaintiff as early as July 2019 that she leave the DCM group, and whether Zaman expressed his rationale for the suggestion to Plaintiff is immaterial.

217. A relationship manager, among other things, oversees client relationships across the Company's various products.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 125:19-24; Chinn Dec. Ex. 4, Zaman Tr. 118:16-119:2; Zaman Dec. ¶6.)

**Response to Paragraph 217:**

Admit.

**Defendants' Reply to Paragraph 217: UNDISPUTED.**

218. Relationship managers do not need to master individual products like DCM, because they are generalists who can enlist product experts for more detailed needs.  Zaman; Chinn Dec. Ex. 3, Bolger Tr. 214:13-25, 215:9-25; Zaman Dec. ¶6.)

**Response to Paragraph 218:**

Admit.

**Defendants' Reply to Paragraph 218: UNDISPUTED.**

## XVIII. FALL 2019 PULSE CHECK

219.   Plaintiff had a pulse check meeting with Bolger and Zaman in November 2019.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 356:6-9, 359:24-360:5; Chinn Dec. Ex. 37, SMBC8632.) Austensen Dec. Ex. 1, SMBC4930.)

**Response to Paragraph 219:**

Admit.

**Defendants' Reply to Paragraph 219: UNDISPUTED.**

220.   During the November 2019 pulse check meeting, Bolger was critical of the role Nikko America was awarded in the ▮▮▮ transaction because it was a passive and not active bookrunner role.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 359:24-362:9, 362:11-23; Austensen Dec. Ex. 1, SMBC4930; Chinn Dec. Ex. 3, Bolger Tr. 334:9-339:3.)

**Response to Paragraph 220:**

Admit. However, the ▮▮▮ transaction in November 2017 generated $▮▮▮ for SMBC, in November 2018 generated $▮▮▮ of revenue for SMBC and in September 2019 generated $▮▮▮ of revenue for SMBC and in August 2020 generated $▮▮▮ in revenue for SMBC.  (Hatzimihalis Dep. Tr. at 290:14-21; 292:18-22; 295:6-9; 297:16-23). Further, the passive book runner role was the highest level SMBC could have achieved.  (Hatzimihalis Dep. Tr. 328:5-12; 360:24-241:24).

**Defendants' Reply to Paragraph 220: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 220, it is irrelevant and immaterial as it is does not contradict that Bolger was critical of the awarded role because it was passive and not active.  (*See infra* DSF ¶222.)

221.   In a public debt capital markets ("DCM") transaction, a financial institution that is an "active book runner" is the book runner who sells bonds, "passive book runner" is an

underwriter who does not sell bonds, and "co-manager" is an underwriter who does not sell bonds and has less economics.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 40:4-15.)

**Response to Paragraph 221:**

Admit.

**Defendants' Reply to Paragraph 221: UNDISPUTED.**

222.  The desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:3-7.)

**Response to Paragraph 222:**

Admit. However, both active and passive bookrunner roles were eligible for Bookrunner

League Table credit.  (Hatzimihalis Decl. ¶ 85).  Passive bookrunner roles were revenue-earning

roles at SMBC.  Id.  (Hatzimihalis Dep. Tr. at 290:14-21; 292:18-22; 295:6-9; 297:16-23;

328:5-12; 360:24-241:24).

**Defendants' Reply to Paragraph 222: UNDISPUTED.** As to Plaintiff's additional

response to Defendants' Paragraph 222, it is irrelevant and immaterial and Plaintiff

admitted that acting as an active book runner has a greater opportunity for revenue than

acting as a passive book runner.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 41:2-6.)

223.  Among the active bookrunners, a financial institution could serve as "lead left" in highyield debt offerings and as billing and delivery in investment grade offerings.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:12-15, 43:1-7.)

**Response to Paragraph 223:**

Admit.

**Defendants' Reply to Paragraph 223: UNDISPUTED.**

224.  By the time Bolger joined, Nikko America wanted to be assigned the billing and delivery role on a public debt deal.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 43:13-25.)

**Response to Paragraph 224:**

Admit. However, this was unlikely given that in 2016 when Bolger joined SMBC, the

DCM group had no active bookrunner deals from the real estate sector, so it would not be

possible to be a billing and delivering agent until that was accomplished.  (Hatzimihalis

Decl. ¶86).

    **Defendants' Reply to Paragraph 224**: **UNDISPUTED.**  As to Plaintiff's additional

response to Defendants' Paragraph 224, Defendants do not dispute that Bolger earned the

first active bookrunner role for Nikko America in the Real Estate sector, but this is

irrelevant and immaterial as those roles were ultimately achieved on a frequent basis by

the DCM group and Plaintiff had the opportunity to achieve them as well.  (Bolger Supp.

Dec. ¶14.)

## XIX.   **PLAINTIFF TESTIFIED TO NO COMPLAINTS IN 2019**

225.    At no time in 2019 did Plaintiff raise any concerns to Bolger or Zaman that she was being
treated differently than others or that she was dissatisfied with her pay.  (Chinn Dec. Ex.
1, Plaintiff Tr. 209:9-203:14, 216:12-22, 221:25-222:21; Chinn Dec. Ex. 2, Plaintiff II Tr.
356:6-357:18, 359:24-363:3, 363:4-22; Chinn Dec. Ex. 3, Bolger Tr. 246:17-248:9.)

    **Response to Paragraph 225:**

    Deny. In 2019, Plaintiff told Bolger that she was unhappy that he was discounting her

contributions and that she felt that she had to prove herself all the time.  (Hatzimihalis Decl.

¶87). In response, Bolger simply said that they should keep talking. Id.

    **Defendants' Reply to Paragraph 225**: **UNDISPUTED**.  Even here in Plaintiff's

purported denial, there is no reference to being "treated differently than others," much

less alleged gender discrimination.  Moreover, Plaintiff cannot rely on her own

declaration to contradict her prior sworn deposition testimony.  *See Tube City IMS, LLC*

*v. Anza Capital Partners*, 2016 WL 5864887, at *3 (S.D.N.Y. Oct. 6, 2016) ("a party

cannot create a triable issue of fact … by renouncing deposition testimony to the effect

that he could not remember a particular fact which he now purports to remember"). Plaintiff was repeatedly asked whether she raised any concerns to Bolger and Zaman in 2019 that she was being treated differently or was dissatisfied with her pay. After testifying regarding the November 2019 pulse check meeting and failing to testify to any reference to informing Bolger she was unhappy that he was discounting her contributions or that she felt she had to prove herself all the time, Plaintiff was specifically asked, "Do you remember anything else from this November 2019 pulse check meeting?" to which Plaintiff responded, "I remember being very upset by [the ███ comment. I don't recall anything else. To the best of my recollection, I don't," and when then asked: "Now, you don't remember anything else other than what you've described so far from this meeting. Were there other things discussed at the meeting that you don't recall?" she responded, "That's the best of my recollection," Chinn Dec. Ex. 1, Plaintiff II Tr. 356:6-357:18, 359:24-363:3.  When asked even more broadly, "Do you recall any other discussions with Mr. Bolger or Mr. Zaman in late calendar year 2019 in which you discussed your employment with SMBC?" Plaintiff responded, "Other than this pulse check, I do not," Chinn Dec. Ex. 1, Plaintiff II Tr. 363:18-22. Further, after testifying regarding the May 2020 bonus conversation with Bolger and Zaman, Plaintiff was asked: "I had asked you whether you had had a conversation with Mr. Bolger about compensation and you identified a conversation in May of 2020, and you've already testified about that.  Do you recall any other conversation with Mr. Bolger in which you discussed compensation with him," to which Plaintiff responded, "I don't," Chinn Dec. Ex. 1, Plaintiff I Tr. 216-12-22, "…do you recall any other occasion complaining to [Mr. Bolger or Mr. Zaman] about

your compensation?" to which Plaintiff responded, "I don't think so," Chinn Dec. Ex. 1,

Plaintiff I Tr. 221:25-222:21.

226.   The only time Plaintiff complained to Bolger about her compensation prior to the August
       5, 2020 demand letter was in a May 2020 meeting following communication of her
       reduction bonus.  Plaintiff told Bolger and Zaman she was surprised that her bonus was
       going to be lower than the prior year and she wanted to know what she did differently
       because she did not understand. (Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-203:14,
       216:14-22; 221:25-222:-21; Chinn Dec. Ex. 3, Bolger Tr. 246:17-248:9)

       **Response to Paragraph 226:**

       Admit in part, deny in part.  In addition to the above statements, Plaintiff also told Bolger

during the May 2020 meeting that she was dissatisfied with her bonus not only because it was

lower than the prior year, but also because it was an extremely low bonus number for a Vice

President.  (Hatzimihalis Decl. ¶ 88).

       **Defendants' Reply to Paragraph 226:** **UNDISPUTED**, as the evidence Plaintiff cites

       does not contradict the statement within Defendants' Paragraph 226.  Further, Plaintiff

       was repeatedly asked under oath whether she remembered anything else discussed at the

       May 2020 performance meeting and she did not testify to making this additional

       statement, Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-203:14, 216:14-22; 221:25-222:21.  In

       any case, it is irrelevant and immaterial as it does not change the earliest date upon which

       Plaintiff complained about her compensation to Bolger as being in May 2020, that she

       made the statements in Paragraph 226 and that she said nothing about any sort of alleged

       gender discrimination during that meeting.

## XX.   BOLGER AND ZAMAN DECIDE TO TERMINATE PLAINTIFF IN A REDUCTION IN FORCE BUT THE TERMINATION IS PAUSED DUE TO THE COVID-19 PANDEMIC

227.   By early March, 2020, Defendants decided to terminate Plaintiff's employment as part of
       a reduction in force aimed at optimizing the Company's talent.  (Chinn Dec. Ex. 38,
       SMBC5642; Chinn Dec. Ex. 3, Bolger Tr. 183:11-185:6, 189:15-190:19; Chinn Dec. Ex.
       4, Zaman Tr. 74:7-16, 77:14-19, 78:3-79:7.)

**Response to Paragraph 227:**

Admit in part, deny in part.  Admit that Bolger and Zaman wanted to include Plaintiff in a reduction in force.  They were not permitted to do so after SMBC received Plaintiff's complaint of discrimination through counsel. (Zaman 128:8-22).

**Defendants' Reply to Paragraph 227: UNDISPUTED**, as none of Plaintiff's stated evidence contradicts the statement within Defendants' Paragraph 227 as it refers to the decision made in early March, 2020 not whether the termination was ultimately carried out at that time.

228.   The Business Rationale Form prepared as to Plaintiff stated that: "[t]he DCM business is under mandate to optimize human capital management towards elevated business outcomes" and described Plaintiff as "historically underperforming", "not operating at a Vice President level," and "not demonstrat[ing] the drive or capability to be successful in this senior role."  (Chinn Dec. Ex. 39, SMBC9549; Chinn Dec. Ex. 3, Bolger Tr. 188:4-14.)

**Response to Paragraph 228:**

Admit that the document so says.  However, Plaintiff denies that she was "historically underperforming", "not operating at a Vice President level," and "not demonstrat[ing] the drive or capability to be successful in this senior role."  (Hatzimihalis Decl. ¶ 89).  Plaintiff denies that she was a poor performer.  Plaintiff received exclusively positive performance reviews prior to Zaman and Bolger taking over the DCM group.  (Satake Exs. 2, 4).  In fact, regarding the ▆▆▆ transaction, Plaintiff met with the Treasurer of ▆▆▆ three times in one year, versus the competitors which met with the Treasurer once a year, sent indicative pricing every three weeks versus competitors who only provide those numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage role with ▆% economics in November 2017 to award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously invited to participate in the ▆▆▆ deal in 2015.

(Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ██████████ client, SMBC was invited for the first time as an underwriter on ██████████'s bond deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff send ██████████ customized materials every month.  (Licul Ex. W).  Plaintiff received praise from the ██████████ client as a result of a presentation Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group.  Id.  Plaintiff also received thanks and praise from clients at ██████████████████████ and ██████ (Licul Exs. X, Y, Z).  Further, Plaintiff's contact with ██████████, the Executive Vice President of Finance with ██████ ██████████ led to SMNC setting up investor meetings with ██████ senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019.  (Licul Ex. AA, BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).

> **Defendants' Reply to Paragraph 228: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 228, it is irrelevant and immaterial as to whether Plaintiff's agrees with the statements within the Business Rationale Document, and Plaintiff has provided no evidence to contradict that the statements contained therein.
>
> *Mello v. Siena College*, 2017 WL 1013077 at *17-18 (N.D.N.Y. Mar. 14, 2017).

229.   The reduction in force was planned for the week of March 9, 2020.  (Austensen Dec. ¶5; Ex. 40, SMBC5357.)

> **Response to Paragraph 229:**

Admit.

**Defendants' Reply to 229: UNDISPUTED.**

230. On or about March 6, 2020, the SMBC Americas Division postponed the reduction in force completely, pausing all related terminations, because of the arrival of the COVID-19 pandemic in the U.S.  (Austenesen Dec. ¶6; Chinn Dec. Ex. 4, Zaman Tr. 81:22-82:20; Chinn Dec. Ex. 3, Bolger Tr. 257:6-15; Chinn Dec. Ex. 41, SMBC5356.)

**Response to Paragraph 230:**

Admit.

**Defendants' Reply to Paragraph 230: UNDISPUTED.**

## XXI.   HOWARD, NIEVES, AND ASMUNDSON ARE NOMITATED FOR PROMOTION

231. As co-heads of the group, Bolger and Zaman had the ability to make promotion recommendations.  (Chinn Dec. Ex. 3, Bolger Tr. 57:23-10; Chinn Dec. Ex. 4, Zaman Tr. 127:11-18.)

**Response to Paragraph 231:**

Admit.

**Defendants' Reply to Paragraph 231: UNDISPUTED.**

232. In March 2020, their first year as co-heads, Bolger and Zaman nominated Howard for promotion from Director to Executive Director and Nieves and Asmundson for promotions to Director.  (Chinn Dec. Ex. 4, Zaman Tr. 126:16-19, 127:8-10, 19-22; Bolger Dec. Ex. 5, SMBC 8577; Ex. 6, SMBC6488; Ex. 7, SMBC 6621.)

**Response to Paragraph 232:**

Admit.

**Defendants' Reply to Paragraph 232: UNDISPUTED.**

233. The Company did not promote Howard at that time, as promotions in two consecutive years would be an unusual move for the Company.  (Chinn Dec. Ex. 4, Zaman Tr. 127:19-128:22, 129:19-130:11.)

**Response to Paragraph 233:**

Admit in part, deny in part. Admit that the Company did not promote Howard at that time. However, the Company promoted both Nieves and Asmundson in two consecutive years. (SMBC4931; 4940). Nieves's promotion was "super fast." (Pl 56.1 ¶ 161).

**Defendants' Reply to Paragraph 233**: UNDISPUTED, as Plaintiff's cited evidence does not contradict the statement that promotions in consecutive years would be an unusual move for the Company, nor does it address a promotion from Director to Executive Director. As to Plaintiff's additional statement, while interview notes from an interview of Sisselman indicate that Sisselman considered Nieves's promotion to Director to be "superfast" in comparison to Sisselman's own promotion, Sisselman likewise described Howard as being "promoted fast." (Licul Ex. M at SMBC11417.)

234.   Nieves and Asmundson's promotions to Director took effect July 1, 2020. (Chinn Dec. Ex. 4, Zaman Tr. 106:8-16; Nieves Dec. Ex. 1, SMBC5385; Asmundson Dec. Ex. 1, SMBC5386.).

   **Response to Paragraph 234:**

   Admit.

   **Defendants' Reply to Paragraph 234**: UNDISPUTED.

235.   Bolger and Zaman ultimately promoted Howard to Executive Director on April 1, 2021. (Chinn Dec. Ex. 4, Zaman Tr. 111:16-112:6; Howard Dec. ¶1; Chinn Dec. Ex. 1, Plaintiff I Tr. 26:11-20, 27:12-17.)

   **Response to Paragraph 235:**

   Admit.

   **Defendants' Reply to Paragraph 235**: UNDISPUTED.

## XXII.   PLAINTIFF RECEIVES A GAPS PERFORMANCE EVALUATION AND A REDUCED BONUS

236.   In March 2020, Bolger and Zaman completed Plaintiff's FY 2019 performance evaluation. (Chinn Dec. 42, SMBC9150.)

   **Response to Paragraph 236:**

Admit.

**Defendants' Reply to Paragraph 236: UNDISPUTED.**

237.    They rated her an overall rating of Gaps, on a scale of Gaps, Meets, Exceeds, reflective of the reasons they selected her in the reduction in force a month prior.  (Chinn Dec. Ex. 42, SMBC9150; Chinn Dec. Ex. 4, Zaman Tr. 71:19-72:12; Chinn Dec. Ex. 3, Bolger Tr. 255:5-256:3.)

**Response to Paragraph 237:**

Admit in part, deny in part. Plaintiff admits that she received a "Gaps" rating.  However, Plaintiff was never informed that she was selected in a reduction of force a month prior, was not terminated during a reduction in force, and disagrees with the "Gaps" rating she received. (Hatzimihalis Decl.¶ 90).

**Defendants' Reply to Paragraph 237: UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 237, as whether Plaintiff was informed she was selected in a reduction in force a month prior, whether she was ultimately terminated as part of the reduction in force, and whether she disagrees with the "Gaps" rating she received, are all irrelevant and immaterial as to whether the reasons she was rated an overall rating of Gaps were reflective of the reasons she was selected in the reduction in force.

238.    They communicated their views on her performance in an April 2020 evaluation meeting. (Chinn Dec. Ex. 42, SMBC9150; Chinn Dec. Ex. 4, Zaman Tr. 71:19-72:12; Chinn Dec. Ex. 3, Bolger Tr. 255:5-256:3.)

**Response to Paragraph 238:**

Admit in part, deny in part.  Plaintiff states that Bolger and Zaman communicated their supposed views on her performance in the evaluation meeting for FY 2019.  (Hatzimihalis Decl. ¶ 91).

**Defendants' Reply to Paragraph 238**: **UNDISPUTED**.  Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 238 as the referenced April 2020 evaluation meeting is the evaluation meeting for FY 2019.  Although not mentioned by Plaintiff, Defendants inadvertently identified Chinn Dec. Ex. 42 but the referenced evidence should have been Chinn Dec. Ex. 60, the April 24, 2020 evaluation meeting for FY 2019.

239.    Zaman and Bolger rated Howard, Nieves, and Asmundson an overall rating of ███████ (Bolger Dec. Ex. 3, SMBC0999, Ex. 2, SMBC1007, Ex. 4, SMBC1016)

    **Response to Paragraph 239:**

    Admit that the reviews so state.

    **Defendants' Reply to Paragraph 239**: **UNDISPUTED.**

240.    Howard's FY 2019 performance evaluated identified her "█████████████████████ ██████████" and described her as "████████████████████████████████████ ██████," and "██████████████████████████████████████,"  Bolger Dec. Ex. 3, SMBC0999

    **Response to Paragraph 240:**

    Admit.

    **Defendants' Reply to Paragraph 240**: **UNDISPUTED.**

241.    Nieves's FY 2019 performance evaluation identified him "█████████████████████ ██████████████████████████" as well as "███████████████████████████," Bolger Dec. Ex. 2, SMBC1007

    **Response to Paragraph 241:**

    Admit that the review so says.  However, SMBC gave Nieves revenue for clients covered by others.  (Pl 56.1 ¶ 293-301) Plaintiff believes the performance of Asmundson was not deserving of said review.  (Hatzimihalis Decl. ¶ 92).  Nieves was receiving credit for fees generated by Zaman for clients run by Zaman.  (Hatzimihalis Decl. ¶ 92; Hatzimihalis Dep. Tr. Ex. 36).  Further, it was well known in the DCM group that Nieves had a temper and would

regularly get angry during the course of normal business.  (Hatzimihalis Decl. ¶ 92).

Hatzimihalis also observed on multiple occasions that Nieves would speak to Relationship

Managers with a negative attitude.  (Hatzimihalis Decl. ¶ 92).  Further, Nieves' financial

modeling skills were lacking, as many times he would hardcode the excel models and save them

hardcoded, which often risked sending the client indicative pricing updates with mistakes, which

occurred on occasion.  (Hatzimihalis Decl. ¶ 92).

> **Defendants' Reply to Paragraph 241: UNDISPUTED.** As to Plaintiff's additional
>
> response to Defendants' Paragraph 241, it is irrelevant and immaterial as a matter of law
>
> whether Plaintiff believes the performance of Nieves (assuming she meant to refer to
>
> Nieves and not Asmundson) warranted the review that he received from Nikko America
>
> management.  Moreover, these particular comments on Nieves' evaluation do not relate
>
> to revenue generation as such; Plaintiff's assertion on that point (addressed above at DSF
>
> ¶152) is thus immaterial.   Further, an employee's view of a co-employee's relative
>
> performance is irrelevant.  *Macri v. Newburgh Enlarged City Sch. Dist.*, 2004 WL
>
> 1277990, at *10 (S.D.N.Y. June 8, 2004).

242.   Asmundson's FY 2019 performance evaluation identified his "            



",  "                                        ", and "            

             ," Bolger Dec. Ex. 4, SMBC1016

**Response to Paragraph 242:**

Admit that the review so says.  However, SMBC gave Nieves revenue for clients covered

by others.  (Pl 56.1 ¶ 293-301).  He also received bookrunning credit for clients covered by

others.  (Hatzimihalis Decl. ¶ 92).  Plaintiff believes the performance of Nieves was not

deserving of said review.  (Hatzimihalis Decl. ¶ 92).  Asmundson was receiving credit for fees

generated by Zaman for clients run by Zaman.  (Hatzimihalis Decl. ¶ 92; Hatzimihalis Dep. Tr.

Ex. 36).

**Defendants' Reply to Paragraph 242**: **UNDISPUTED.**  As to Plaintiff's additional response to Defendants' Paragraph 242, Defendants refer to Defendants' Reply to Paragraph 241 above.

243.   As co-heads of the group, Bolger and Zaman had the ability to set compensation.  (Chinn Dec. Ex. 4, Zaman Tr. 43:15-44:6, 46:8-16; Chinn Dec. Ex. 3, Bolger Tr. 108:9-112:12)

**Response to Paragraph 243:**

Admit.

**Defendants' Reply to Paragraph 243**: **UNDISPUTED.**

244.   As co-heads of DCM, Bolger and Zaman receive a bonus pool by Nikko America's parent company Sumitomo Mitsui Financial Group, Inc. in Tokyo ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group.  (Bolger Dec. ¶26; Zaman Dec. ¶7.)

**Response to Paragraph 244:**

Admit.

**Defendants' Reply to Paragraph 244**: **UNDISPUTED.**

245.   The size of the bonus pool changes each year depending on how well each entity performs.  (Bolger Dec. ¶26; Zaman Dec. ¶7.)

**Response to Paragraph 245:**

Admit.

**Defendants' Reply to Paragraph 245**: **UNDISPUTED.**

246.   Bolger based his bonus award decisions on individual performance, including revenue production, supporting the broader pod, leadership with juniors and other activities, and performance evaluations.  (Chinn Dec. Ex. 3, Bolger Tr. 113:2-18.)

**Response to Paragraph 246:**

Deny. SMBC paid the men in lock step regardless of performance.  (Pl 56.1¶ 234-40)

SMBC paid Nieves substantial bonuses even though, for his first three years as a VP, his primary

coverage clients generated no revenue.  (Pl 56.1 ¶ 293-99) SMBC also inflated the revenue

credited to the men by awarding them credit to client's covered by others.  (Pl 56.1 ¶ 293-306).

SMBC did not award Plaintiff any credit for client's covered by others.  (Boger Decl. Ex. 8)

> **Defendants' Reply**: **UNDISPUTED** as to what Bolger relied on when making bonus
>
> award decisions as Plaintiff's cited evidence does not contradict the statement in
>
> Defendants' Paragraph 246. Moreover, the mere fact that, based on the identified factors,
>
> Bolger (and Zaman) chose to compensate two people in the same fashion does not in any
>
> way call into question that they relied upon the identified factors. Further, while it is false
>
> that Nieves primary coverage clients generated no revenue and that Nikko America
>
> awarded Nieves or Asmundson credit for revenue that they did not cover (addressed
>
> above at DSF Reply ¶¶152-160, 164-165, 168, 170), such assertions are also irrelevant
>
> and immaterial as Bolger identified several factors in addition to revenue generation
>
> which he considered when making bonus award decisions.

247.   Zaman based his bonus award decisions on performance considering factors including
individual production in terms of revenue generation as well as the individual's
contribution to their sector(s), to DCM, and to SMFG as a whole, including how
proactively they cover their clients over which they have primary and/or secondary
coverage, how proactively they pursue prospective clients, and their ability and drive to
manage, train, and teach junior officers, and performance evaluations.  (Chinn Dec. Ex. 4,
Zaman Tr. 43:15-25, 46:8-16; Zaman Dec. ¶9.)

> **Response to Paragraph 247:**

Deny. SMBC paid the men in lock step regardless of performance.  (Pl 56.1 ¶ 234-40)

SMBC paid Nieves substantial bonuses even though, for his first three years as a VP, his primary

coverage clients generated no revenue.  (Pl 56.1 ¶ 293-99) SMBC also inflated the revenue

credited to the men by awarding them credit to client's covered by others.  (Pl 56.1 ¶ 293-306).

SMBC did not award Plaintiff any credit for client's covered by others.  (Boger Decl. Ex. 8)

> **Defendants' Reply to Paragraph 247**: **UNDISPUTED** as to what Zaman relied on
>
> when making bonus award decisions as Plaintiff's cited evidence does not contradict the

statement in Defendants' Paragraph 246.  Moreover, the mere fact that, based on the

identified factors, Zaman (and Bolger) chose to compensate two people in the same

fashion does not in any way call into question that they relied upon the identified factors.

Further, while it is false that Nieves primary coverage clients generated no revenue and

that Nikko America awarded Nieves or Asmundson credit for revenue that they did not

cover (addressed above at DSF Reply ¶¶152-160, 164-165, 168, 170), such assertions are

also irrelevant and immaterial as Zaman identified several factors in addition to revenue

generation which he considered when making bonus award decisions.

248.   For FY 2019, Defendants paid Howard the most total compensation among the four
individuals, awarding her $█████ more than either Nieves or Asmundson.  (Chinn Dec.
Ex. 21; Chinn Dec. Ex. 19; Chinn. Dec. Ex. 20.)

**Response to Paragraph 248:**

Admit.

**Defendants' Reply to Paragraph 248: UNDISPUTED.**

249.   Defendants cut Plaintiff's FY 2019 bonus compensation from the prior year to $█████
due to her poor performance and Gaps evaluation.  Chinn Dec. Ex. 4, Zaman Tr.
73:12-74:4; Chinn Dec. Ex. 3, Bolger Tr. 248:10-250:13; 253:17-255:3.)

**Response to Paragraph 249:**

Admit in part, deny in part.  Plaintiff admits that Defendants cut her FY 2019 bonus to

$█████.  However, Plaintiff asserts that the cut in bonus was due to their discriminatory acts

and biases.  (Hatzimihalis Decl. ¶ 91).

**Defendants' Reply to Paragraph 249: UNDISPUTED**, as Plaintiff's denial is

impermissible argument and a legal conclusion.

250.   On or about May 22, 2020, they informed Plaintiff that her FY 2019 bonus compensation
would be cut significantly from the prior year to $█████ due to her Gaps performance
review.  (Chinn Dec. Ex. 43, PL271.)

**Response to Paragraph 250:**

Admit in part, deny in part.  Plaintiff admits that on May 22, 2020, Bolger and Zaman informed Plaintiff that her FY 2019 bonus would be cut to $████.  However, Plaintiff asserts that the cut in bonus was due to their discriminatory acts and biases.  (Hatzimihalis Decl. ¶ 91; 203:8-209:25).  Further, Bolger and Zaman stated that bonuses were low across the board and that others were similarly unhappy with their bonus compensation.  Id.

**Defendants' Reply to Paragraph 250: UNDISPUTED.**  When Plaintiff testified to this conversation, she did not testify to telling Bolger or Zaman that she thought her bonus was being cut due to her gender nor did she testify that she was told bonuses were low across the board.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 203:8-209:25.)  Plaintiff testified that when she asked why her bonus was so low, she was told that she should be looking for other opportunities outside DCM.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 203:8-21.)

251.  On or about May 22, 2020, Bolger and Zaman directed Plaintiff to look for other opportunities outside the DCM group.  (Chinn Dec. Ex. 43, PL271; Chinn Dec. Ex. 3, Bolger Tr. 256:17-257:5)

**Response to Paragraph 251:**

Admit.

**Defendants' Reply to Paragraph 251: UNDISPUTED.**

252.  Bolger provided Plaintiff with contacts and tried to help her find a job.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 363:25-364:6.)

**Response to Paragraph 252:**

Admit in part, deny in part.  Plaintiff admits that Bolger provided Plaintiff with contacts, however Plaintiff does not believe that Bolger made any concerted effort to help her find a job. (Hatzimihalis Decl. ¶ 93).

**Defendants' Reply to Paragraph 252**: **UNDISPUTED**, as Plaintiff cannot use a declaration to refute her sworn testimony that when asked, "Did you believe Mr. Bolger was trying to help you find a job?" Plaintiff responded, "Sure." (Chinn Dec. Ex. 2, Plaintiff II Tr. 363:25-364:6.) *See Milani v. Int'l Business Machines Corp., Inc*., 2004 WL 3068451, at *2 (S.D.N.Y. Dec. 30, 2004) ("submission of an affidavit that contradicts . . . . prior testimony in an effort to create an issue is plainly improper.").

253.   In FY 2020, the Company continued to pay Howard the highest out of the team.  (Chinn Dec. Ex. 21; Chinn Dec. Ex. 19; Chinn. Dec. Ex. 20.)

**Response to Paragraph 253:**

Admit in part, deny in part.  Defendants do not make clear what "team" they are referring to, who is included in this "team" and the compensation of all others on this "team." (Hatzimihalis Decl. ¶ 94).

**Defendants' Reply to Paragraph 253:**  As has been the case throughout its briefing, Defendants referred to the relative compensation by Nikko America of Plaintiff, Howard, Nieves, and Asmundson. There is no dispute that Nikko America paid Howard more in total compensation for FY 2020 than it paid to Plaintiff, Nieves, or Asmundson. (Chinn Dec. Ex. 21; Chinn Dec. Ex. 17; Chinn Dec. Ex. 19; Chinn. Dec. Ex. 20; Chinn Dec. Ex. 1, Plaintiff I Tr. 85:13-15, 86:17-24, 91:7-9, 91:16-21, 98:12-14, 98:21-25.)

254.   Plaintiff's employment was terminated prior to the award of FY 2020 bonus incentive compensation, making her ineligible to receive any bonus award for that period.  (Chinn Dec. Ex. 13, SMBC660-661.)

**Response to Paragraph 254:**

Admit.

**Defendants' Reply to Paragraph 254**: **UNDISPUTED.**

### XXIII. PLAINTIFF'S COUNSEL SENDS DEMAND LETTER AND FILES SUIT

255.  On or about July 22, 2020, Zaman and Bolger contacted Human Resources to obtain an update as to the status of the reduction in force previously set for March 2020.  (Chinn Dec. Ex. 44, SMBC5057.)

**Response to Paragraph 255:**

Admit.

**Defendants' Reply to Paragraph 255: UNDISPUTED.**

256.  Their Human Resources Business Partner replied "we had discussed September timeframe previously," but said she "wouldn't' communicate that timeframe to Plaintiff "just yet."  (Chinn Dec. Ex. 44, SMBC5057.)

**Response to Paragraph 256:**

Admit.

**Defendants' Reply to Paragraph 256: UNDISPUTED.**

257.  On August 5, 2020, Plaintiff sent a demand letter through counsel to Defendants alleging discrimination.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 364:7-10; Chinn Dec. Ex. 3, Bolger Tr. 18:18-24, 19:10-13.)

**Response to Paragraph 257:**

Admit. However, Plaintiff sent another letter through counsel on August 26, 2020 providing more details about her claims, including that Defendants committed "violations of the sex discrimination, equal pay and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"); the Equal Pay Act of 1963 ("EPA"); the New York State Human Rights Law (the "Executive Law"); the New York State Pay Equity Law ("NYSPEL"); and the New York City Human Rights Law (the "City Law")."  (Licul Ex. HH).

**Defendants' Reply to Paragraph 257: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 257, Defendants admit that Plaintiff sent such a letter on August 26, 2020.

258.   The Company conducted an internal investigation into the allegations raised by Plaintiff, in which she ultimately refused to participate, and found no evidence to substantiate the allegations of unequal pay based on gender discrimination or retaliation.  (Chinn Dec. Ex. 45, SMBC11463.)

**Response to Paragraph 258:**

Admit in part, deny in part.  Plaintiff denies that she "refused to participate" in the

investigation.  (Hatzimihalis Decl. ¶ 95).

**Defendants' Reply to Paragraph 258: UNDISPUTED** that the Company conducted an

internal investigation into the allegations raised by Plaintiff and found no evidence to

substantiate the allegations of unequal pay based on gender discrimination or retaliation.

Plaintiff's denial regarding refusing to participate is not supported by the evidence.

(Chinn Supp. Dec. Ex. 11.)

259.   On September 29, 2020, the initial Complaint in this litigation was filed.  (Dkt. 01.)

**Response to Paragraph 259:**

Admit.

**Defendants' Reply to Paragraph 259: UNDISPUTED.**

260.   Plaintiff's name was removed from the reduction in force list ultimately conducted in October 2020 because of the demand letter she sent and lawsuit she filed.  (Chinn Dec. Ex. 3, Bolger Tr. 257:6-259:7.)

**Response to Paragraph 260:**

Admit.

**Defendants' Reply to Paragraph 260: UNDISPUTED.**

261.   Bolger and Zaman never discussed Plaintiff's demand letter or lawsuit with her.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 375:23-377:1.)

**Response to Paragraph 261:**

Admit.

**Defendants' Reply to Paragraph 261: UNDISPUTED.**

262.    Bolger and Zaman never discussed the February 2021 mediation in this case with Plaintiff.  (Bolger Dec. ¶31; Zaman Dec. ¶10.)

   **Response to Paragraph 262:**

   Admit.

   **Defendants' Reply to Paragraph 262: UNDISPUTED.**

## XXIV. PLAINTIFF CONFUSES AND ANGERS NIKKO AMERICA CLIENT

263.    During the week of October 26, 2020, Nikko America provided the Chief Financial Officer ("CFO") of its client ███████████, advice regarding secondary trading levels in its debt, advising the client pause as to its intention to issue additional debt. (Chinn Dec. Ex. 1, Plaintiff I Tr. 223:24-224:3, 224:6-225:3, 229:16-230:15; 240:18-241:14; Chinn Dec. Ex. 3, Bolger Tr. 295:15-296:5.)

   **Response to Paragraph 263:**

   Admit.

   **Defendants' Reply to Paragraph 263: UNDISPUTED.**

264.    Plaintiff was part of ██████ coverage team at Nikko America and aware of the advice given to the client.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 223:24-224:3, 224:6-225:3, 229:16-230:15; 240:18-241:14; Chinn Dec. Ex. 3, Bolger Tr. 311:23-312:11.)

   **Response to Paragraph 264:**

   Admit.

   **Defendants' Reply to Paragraph 264: UNDISPUTED.**

265.    On October 30, 2020, Plaintiff emailed the ██████ CFO regarding how "bonds have been performing in the secondary market that week," and specifically identified a particular trade, stating: "RWLVCA 4.625% 2029 we saw them trade in size this week at T+490/G+501 ($500K "Dealer Buy" on 10/28) vs last week at T+485/G+496".  (Chinn Dec. Ex. 1, Plaintiff I Tr. 223:24-224:3, 224:6-225:10; Chinn Dec. Ex. 46, SMBC6470; Chinn Dec. Ex. 3, Bolger Tr. 302:13-303:13, 303:14-304:24, 305:6-306:21.)

   **Response to Paragraph 265:**

   Admit.

   **Defendants' Reply to Paragraph 265: UNDISPUTED.**

266.     Reference to the small trade suggested something contrary to the advice that had been
         given by Nikko America earlier in the week.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 227:16-22,
         231:2-16, 233:14-25, 236:3-237:3; Chinn Dec. Ex. 3, Bolger Tr. 295:8-296:5,
         298:14-299:3, 309:24-310:8, 312:12-313:2.)

**Response to Paragraph 266:**

Deny. Plaintiff's communication did not "suggest" anything, and rather, was a regular

market update email that was sent regularly in the regular course of business.  (Hatzimihalis

Decl. ¶ 96; Hatzimihalis Dep. Tr. at 224:6-225:3).

**Defendants' Reply to Paragraph 266: UNDISPUTED**, as Plaintiff's cited evidence

does not contradict the statement in Defendants' Paragraph 266 and Plaintiff's denial here

attempts to dispute her own testimony under oath.  At her deposition, Plaintiff was asked

this exact question directly, "And you confused Mr. ███ because you referred to a

small trade that suggested something contrary to the advice that had been given by

SMBC earlier in the week? That was the source of the confusion?" to which Plaintiff

responded, "Correct."  (Chinn Dec. Ex. 1, Plaintiff I Tr. 233:20-25.)  Plaintiff did not

dispute the term "suggest" while under oath or in her subsequent errata sheet.

Additionally, when Plaintiff was asked "Mr. ███ was confused by your reference to

this small transaction that indicated something different than what you all had been

telling ███ earlier in the week, right? That was the concern Mr. ███ raised,"

Plaintiff responded "Correct. Mr. ███ was confused with what I wrote."  (Chinn

Dec. Ex. 1, Plaintiff I Tr. 231:2-10.)  Plaintiff was next asked, "He's confused with what

you wrote because it was, in his mind, inconsistent with the advice SMBC had given

earlier in the week, correct," to which Plaintiff responded, "Correct."  (Chinn Dec. Ex. 1,

Plaintiff I Tr. 231:11-16.)  Plaintiff's belated attempt to dispute her own sworn testimony

should not be indulged.

267.    Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact [Nikko America]'s earlier advice.  (Chinn Dec. Ex. 46, SMBC6471.)

**Response to Paragraph 267:**

Admit.  However, Plaintiff's email did not necessitate any such explanation, as the email

was a regular market update email that was sent regularly in the regular course of business.

(Hatzimihalis Decl. ¶ 97; Hatzimihalis Dep. Tr. at 224:6-225:3).

**Defendants' Reply to Paragraph 267: UNDISPUTED.** As to Plaintiff's additional

response to Defendants' Paragraph 267, it is irrelevant and immaterial in addition to

contradicting Plaintiff's own sworn testimony as detailed *supra* in DSF ¶266.

268.    Within 20 minutes of receiving Plaintiff's email, the ███ CFO emailed Bolger, and two other senior Company members, asking about it.  (Chinn Dec. Ex. 46, SMBC6467; Chinn Dec. Ex. 1, Plaintiff I Tr. 225:7-226:7, 228:6-15.)

**Response to Paragraph 268:**

Admit.

**Defendants' Reply to Paragraph 268: UNDISPUTED.**

269.    He did not copy Plaintiff.  (Chinn Dec. Ex. 46, SMBC6470; Chinn Dec. Ex. 1, Plaintiff I Tr. 228:2-5.)

**Response to Paragraph 269:**

Admit.

**Defendants' Reply to Paragraph 269: UNDISPUTED.**

270.    In his email, the CFO expressed confusion over Plaintiff's email, given Nikko America's advice a few days earlier.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 231:2-16; 233:17-25; Chinn Dec. Ex. 2, Plaintiff II Tr. 398:1-16; Chinn Dec. Ex. 46, SMBC6470)

**Response to Paragraph 270:**

Admit in part, deny in part.  In the email, ███████ expressed confusion over the

trading levels, not Plaintiff's email.  (Chinn Ex. 46; Hatzimihalis Dep. Tr. 256:5-7.)

**Defendants' Reply to Paragraph 270**: **UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 270.  The cited deposition testimony does not even reference the email or the ███ CFO but instead refers to Sisselman.  Further, Plaintiff's denial attempts to dispute her own testimony in which she admits the CFO was confused by what she wrote (addressed above at Defendants' Reply to DSF ¶160.)   Plaintiff testified, "Mr. ███ was confused **with what I wrote**."  (Chinn Dec. Ex. 1, Plaintiff I Tr. 231:2-10.) (emphasis added).

Plaintiff's belated attempt to dispute her own sworn testimony should not be indulged.

271.   The CFO also contacted Bolger by phone and asked how the email could have been sent in light of the earlier guidance provided.  (Chinn Dec. Ex. 3, Bolger Tr. 295:8-296:9, 298:14-299:3 303:14-304:17, 306:23-307:7, 313:8-18; Chinn Dec. Ex. 1, Plaintiff I Tr. 226:22-227:1; Chinn Dec. Ex. 2, Plaintiff II Tr. 398:24-399:5.)

**Response to Paragraph 271:**

Admit.

**Defendants' Reply to Paragraph 271**: **UNDISPUTED.**

272.   Based on the CFO's tone of voice and use of swear words, Bolger understood him to be angry.  (Chinn Dec. Ex. 3, Bolger Tr. 295:8-296:25, 298:5-299:3 303:14-304:17, 313:8-18; Chinn Dec. Ex. 1, Plaintiff I Tr. 226:22-227:1.)

**Response to Paragraph 272:**

Admit.  However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

273.   Following that call, Bolger attempted to deescalate the situation by emailing the CFO and explaining that the quote Plaintiff stated in her email was a one-off small trade that was not consistent with where the bonds were currently being quoted more broadly.  (Chinn Dec. Ex. 3, Bolger Tr. 313:19-23; Chinn Dec. Ex. 1, Plaintiff I Tr. 227:2-22; Chinn Dec. Ex. 46, SMBC6467.)

**Response to Paragraph 273:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply: UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.  Further, the statement in Paragraph 273 is not just based on Bolger's statement but also the contemporaneous email between Bolger and the CFO.  (Chinn Dec. Ex. 46, SMBC6467.)

274.   Bolger forwarded this exchange to Plaintiff, explained the issue, and directed her to "use better judgment" in the future.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 245:7-14; Chinn Dec. Ex. 46, SMBC6467; see also id. at 243:21-244:1.)

**Response to Paragraph 274:**

Admit. However, Bolger also waited until three days after the exchange to discuss the alleged issue with Plaintiff, indicating that it was not an urgent issue or significant mistake. (Chinn Ex. 46).

**Defendants' Reply to Paragraph 274: UNDISPUTED.**  As to Plaintiff's additional response to Defendants' Paragraph 274, it is irrelevant and immaterial as it is undisputed that the exchange occurred on a Friday afternoon, and while Bolger handled the client's concerns immediately, he waited until Monday to address the issue with Plaintiff. (Chinn Dec. Ex. 46; *see supra* DSF ¶¶268, 271-273).

275.   Bolger informed Zaman of the events involving Plaintiff's email to the ███ CFO as well as the CFO's response.  (Chinn Dec. Ex. 3, Bolger Tr. 280:16-281:17, 282:2-21, 283:7-24; Chinn Dec. Ex. 4, Zaman Tr. 87:12-91:8)

**Response to Paragraph 275:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 275**: **UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

276.    In November 2020, Bolger and Zaman met with Plaintiff in a pulse check meeting and communicated negative feedback regarding her performance.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 367:25-368:17; Chinn Dec. Ex. 47, SMBC 5056)

**Response to Paragraph 276:**

Admit. However, this meeting occurred following Plaintiff's protected complaints of discrimination, retaliation and equal pay violations and the filing of the instant action.  (Licul Ex. II; Dkt. No. 1.)

**Defendants' Reply to Paragraph 276**: **UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 276, it is irrelevant and immaterial and impermissible legal argument.  Moreover, the negative feedback provided to Plaintiff in November 2020 was entirely consistent with the negative feedback previously provided to her that had prompted Nikko America to decide to terminate Plaintiff's employment long prior to any protected activity.

## XXV.   A SENIOR COMPANY EXECUTIVE CALLED BOLGER REGARDING PLAINTIFF'S PERFORMANCE ON A CALL WITH █████

277.    On or about March 4, 2021, various Nikko America employees, including Plaintiff, had a call with senior officials (including the CFO) of client ████████████████ ("█████").  (Chinn Dec. Ex. 48, SMBC1038; Declaration of Richard Eisenberg ("Eisenberg Dec.") ¶¶2-4

**Response to Paragraph 277:**

Admit.

**Defendants' Reply to Paragraph 277**: **UNDISPUTED.**

278.    Richard Eisenberg, then-Managing Director of Nikko America and Co-General Manager of U.S. Corporate and Investment Banking ("CIB") was the most senior SMBC employee

on the call.  Eisenberg Dec. ¶¶2-3; Bolger Dec. ¶18; Chinn Dec. Ex. 1, Plaintiff I Tr. 248:12-15, 248:16-249:1.)

**Response to Paragraph 278:**

Admit.

**Defendants' Reply to Paragraph 278: UNDISPUTED.**

279.   As of March 4, 2021, Plaintiff had primary coverage responsibilities over ███ for over four years.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 247:11-18.)

**Response to Paragraph 279:**

Admit.

**Defendants' Reply to Paragraph 279: UNDISPUTED.**

280.   Plaintiff did not speak during Nikko America's March 4, 2021 call with representatives from ███  (Eisenberg Dec. ¶6; Chinn Dec. Ex. 1, Plaintiff I Tr. 247:23-248:2.)

**Response to Paragraph 280:**

Admit. However, Plaintiff was not afforded the opportunity to speak on this call, nor was there an occasion that necessitated Plaintiff speaking on this call.  Moreover, she spoke to ███ management three times over the next ten days.  (Pl 56.1 ¶ 324-38)

**Defendants' Reply to Paragraph 280: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 280, Plaintiff's disagreement with Eisenberg's assessment that Plaintiff should have found an opportunity to speak on a call with a client over which she had primary coverage is irrelevant and immaterial to Eisenberg's assessment of her inaction and his communication of that view to Plaintiff's direct management. (*See infra* DSF ¶281-82.)

281.   Eisenberg was disappointed in Plaintiff's failure to participate in the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly including its CFO.  (Eisenberg Dec. ¶¶5-7).

**Response to Paragraph 281:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply: UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

282.  Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call.  (Eisenberg Dec. ¶¶5-8; Chinn Dec. Ex. 1, Plaintiff I Tr. 249:2-5, 8-14; Chinn Dec. Ex. 2, Plaintiff II Tr. 399:24-402:17; Chinn Dec. Ex. 3, Bolger Tr. 271:14-272:4, 272:19-273:5, 276:19-278:5.)

**Response to Paragraph 282:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply: UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

283.  Bolger did not do anything to prompt Eisenberg to reach out about Plaintiff's performance on the call.  (Eisenberg Dec. ¶8; Chinn Dec. Ex. 1, Plaintiff I Tr. 249:15-18; Chinn Dec. Ex. 3, Bolger Tr. 276:19-277:2.)

**Response to Paragraph 283:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000). Further, as evidence of the insignificance of this occurrence, Bolger did not even realize that Plaintiff had not participated on the call until Eisenberg pointed it out to him.  (Bolger Dep. Tr. at 277:4-13).

**Defendants' Reply: UNDISPUTED.** As to Plaintiff's additional response to Defendants' Paragraph 283, it is irrelevant and immaterial as to Eisenberg, the senior executive's assessment of Plaintiff's performance on the call.  Additionally, Bolger testified that he had not realized Plaintiff had not participated because he had become so

used to Plaintiff's passive skills of covering clients.  (Chinn Dec. Ex. 3, Bolger Tr.

277:17-22.) As to Plaintiff's additional statement regarding an interested witness,

Defendants refer to Defendants' Reply to Paragraph 21.

284.    At the time, Eisenberg was unaware Plaintiff was engaged in litigation or that she had
        raised complaints about Nikko America, Bolger, or Zaman.  (Eisenberg Dec. ¶10.)

        **Response to Paragraph 284:**

        Admit.  However, the jury may choose to disregard this statement as it is made by an

interested witness.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 151 (2000).

        **Defendants' Reply to Paragraph 284: UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

285.    Eisenberg has made similar calls to supervisors when he has observed individuals not
        participating on client calls at a level commensurate with their title and/or coverage
        responsibility, including with respect to a male Executive Director in DCM whose
        employment was ultimately terminated.  (Eisenberg Dec. ¶9; Chinn Dec. Ex. 3, Bolger
        Tr. 284:4-285:8.)

        **Response to Paragraph 285:**

        Admit. However, the jury may choose to disregard this statement as it is made by an

interested witness.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 151 (2000).

        **Defendants' Reply to Paragraph 285: UNDISPUTED.** As to Plaintiff's additional

statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph

21.

286.    Bolger shared Eisenberg's feedback with Zaman.  (Chinn Dec. Ex. 3, Bolger Tr.
        271:14-24, 280:16-281:17, 282:2-21, 283:7-24; Chinn Dec. Ex. 4, Zaman Tr. 54:9-24,
        57:13-58:12, 59:14-24; 86:17-88:6; 91:9-94:18.)

        **Response to Paragraph 286:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 286: UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

287.   Bolger and Zaman believed Eisenberg's dissatisfaction with Hatzimihalis's performance on the call reflected poorly on DCM, given Eisenberg's seniority at the Company. (Chinn Dec. Ex. 3, Bolger Tr. 274:21-275:6; 276:19-278:5, 280:16-281:17, 284: 4-12, 286:24-287:4; Chinn Dec. Ex. 4, Zaman Tr. 54:9-24, 57:13-58:12, 59:14-24, 86:17-88:6.)

**Response to Paragraph 287:**

Admit in part, deny in part. Plaintiff denies that her not speaking on the ▮▮▮ call reflected poorly on DCM. (Pl 56.1 ¶ 324-37). Further, the jury may choose to disregard this statement as it is made by an interested witness. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 287: UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 287 as Plaintiff has no basis to dispute what Bolger and Zaman believed and it is irrelevant and immaterial whether Plaintiff agrees that her not speaking on the ▮▮▮ call reflected poorly on DCM, the statement within DSF ¶287 was that Bolger and Zaman believed that *Eisenberg's dissatisfaction* with Plaintiff's performance on the call reflected poorly on DCM given his seniority at the Company. As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

## XXVI. TERMINATION

288.   Nikko America terminated Plaintiff's employment on March 12, 2021. (Chinn Dec. Ex. 2, Plaintiff II Tr. 371:14-18; Chinn Dec. Ex. 3, Bolger Tr. 270:7-15; 279:13-16; Chinn Dec. Ex. 4, Zaman Tr. 86:17-24.)

**Response to Paragraph 288:**

Admit.

**Defendants' Reply to Paragraph 288: UNDISPUTED.**

289.   Bolger and Zaman made the decision to terminate Plaintiff's employment, with the advice of HR, and with the approval of Bungo Miura.  (Chinn Dec. Ex. 3, Bolger Tr. 280:2-8; Ex. 4, Zaman Tr. 99:16-21.)

**Response to Paragraph 289:**

Admit.

**Defendants' Reply to Paragraph 289: UNDISPUTED.**

290.   During the termination meeting, Bolger read prepared talking points to Plaintiff including that Plaintiff's "level of performance in fiscal year 2020 continues to fall short of the level expected of [her] role," "in November [2020], the CFO of a client contacted [Bolger] to complain about [Plaintiff's] performance," and "following our meeting with ███ [Bolger] received a call from a very senior manager in CIB complaining about [Plaintiff's] lack of participation and initiative."  (Chinn Dec. Ex. 49, SMBC6885; Chinn Dec. Ex. 2, Plaintiff II Tr. 372:3-5, 372:21-374:11; Chinn Dec. Ex. 3, Bolger Tr. 346:2-3, 346:14-348:15; Chinn Dec. Ex. 4, Zaman Tr. 99:5-100:25, 100:10-18; see also Chinn Dec. Ex. 2, Plaintiff II Tr. 372:3-5, 372:21-374:11, 374:20-25, 375: 8-22.)

**Response to Paragraph 290:**

Admit in part, deny in part.  Plaintiff admits that Bolger read the prepared talking points.

Plaintiff denies that the talking points were accurate, namely that her performance "continues to

fall short of the level expected of [her] role."  (Hatzimihalis Decl. ¶ 98).  For example, regarding

the ███ transaction, Plaintiff met with the Treasurer of ███ three times in one year, versus

the competitors which met with the Treasurer once a year, sent indicative pricing every three

weeks versus competitors who only provide those numbers every couple of months, pushed to

uptier SMBC in T2 from T3 and got the client to agree to award SMBC with a senior co-manage

role with ██% economics in November 2017 to award us for the DCM coverage Plaintiff had

provided, where SMBC had not been previously invited to participate in the ███ deal in 2015.

(Licul Exs. WW, XX).  Regarding Plaintiff's performance with the ███ client,

131

SMBC was invited for the first time as an underwriter on ███████████ 's bond deal, the Chief Financial Officer informed Plaintiff that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff send ████████████ customized materials every month.  (Licul Ex. W).  Plaintiff received praise from the ████████████ client as a result of a presentation Plaintiff did for the client wherein they stated that it was "the first time anyone showed them new issue tenors in combination with portfolio risk."  (Licul Ex. Q).  Plaintiff received praise for this presentation from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group.  Id.  Plaintiff also received thanks and praise from clients at ███████████████████████████ and ████ (Licul Exs. X, Y, Z).  Further, Plaintiff's contact with ████████████, the Executive Vice President of Finance with ████ ███████████ led to SMNC setting up investor meetings with ████ senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019.  (Licul Exs. AA, BB).  Finally, during Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management.  (Hatzimihalis Decl. ¶ 20).  Plaintiff also denies that the incidents with ████ or █████ necessitated her termination.  (Hatzimihalis Decl. ¶ 99).

> **Defendants' Reply to Paragraph 290: UNDISPUTED**, as Plaintiff's cited evidence
> does not contradict the statement within Defendants' Paragraph 290 as Plaintiff's belief
> as to the accuracy of the statements within the talking points is irrelevant and immaterial
> as to whether those talking points were read at the termination meeting as the reasons
> provided for her termination of employment.  And in fact, Plaintiff admitted that Bolger
> and Zaman truly believed the statements listed in the talking points for the termination

meeting.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 372:3-5, 372:21-374:11, 374:20-25, 375:
8-22.)

291.   Bolger and Zaman believed Plaintiff was a poor performer.  (Chinn Dec. Ex. 49,
SMBC6885 Chinn Dec. Ex. 2, Plaintiff II Tr. 372:3-5, 372:21-374:11, 374:20-25, 375:
8-22.)

**Response to Paragraph 291:**

Admit in part, deny in part.  Plaintiff denies that she was a poor performer.  Plaintiff

received exclusively positive performance reviews prior to Zaman and Bolger taking over the

DCM group.  (Satake Exs. 2, 4).  In fact, regarding the ███ transaction, Plaintiff met with the

Treasurer of ███ three times in one year, versus the competitors which met with the Treasurer

once a year, sent indicative pricing every three weeks versus competitors who only provide those

numbers every couple of months, pushed to uptier SMBC in T2 from T3 and got the client to

agree to award SMBC with a senior co-manage role with ██% economics in November 2017 to

award us for the DCM coverage Plaintiff had provided, where SMBC had not been previously

invited to participate in the ███ deal in 2015.  (Licul Exs. WW, XX).  Regarding Plaintiff's

performance with the ██████ client, SMBC was invited for the first time as an

underwriter on ████████'s bond deal, the Chief Financial Officer informed Plaintiff

that he wanted to award SMBC because they always were helpful and thoughtful, and Plaintiff

send ██████ customized materials every month.  (Licul Ex. W).  Plaintiff received

praise from the ██████ client as a result of a presentation Plaintiff did for the client

wherein they stated that it was "the first time anyone showed them new issue tenors in

combination with portfolio risk." (Licul Ex. Q).  Plaintiff received praise for this presentation

from Bolger and Thibaut D'Hollander, Managing Director of Derivative Products Group.  Id.

Plaintiff also received thanks and praise from clients at ████████████

██████ and ███ (Licul Exs. X, Y, Z).  Further, Plaintiff's contact with ███

███ the Executive Vice President of Finance with ████████████ led to SMNC

setting up investor meetings with █████ senior management, which ultimately led to SMBC

securing an active bookrunner role in September 2019.  (Licul Exs. AA, BB).  Finally, during

Plaintiff's tenure at SMBC, Plaintiff proactively reached out to Relationship Managers at SMBC

and clients directly for meetings, which led to procuring meetings with members of companies'

senior management.  (Hatzimihalis Decl. ¶ 20).

> **Defendants' Reply to Paragraph 291**: **UNDISPUTED**, as Plaintiff's cited evidence
>
> does not contradict the statement within Defendants' Paragraph 291 as Plaintiff's belief
>
> of her own level of performance is irrelevant and immaterial as to whether Bolger and
>
> Zaman believed she was a poor performer.  And in fact, Plaintiff admitted that Bolger
>
> and Zaman truly believed that she was a poor performer.  (Chinn Dec. Ex. 2, Plaintiff II
>
> Tr. 372:3-5, 372:21-374:11, 374:20-25, 375:8-22.)

## XXVII.      NO ALLEGED INAPPROPRIATE COMMENTS

292.    Satake did not make any inappropriate remarks regarding gender or sex.  (Chinn Dec.
Ex. 1, Plaintiff I Tr., 256:19-25.)

> **Response to Paragraph 292:**
>
> Admit.
>
> **Defendants' Reply to Paragraph 292**: **UNDISPUTED.**

293.    Satake did not say anything that revealed a discriminatory intent based on gender or sex.
(Chinn Dec. Ex. 1, Plaintiff I Tr. 257:1-7.)

> **Response to Paragraph 293:**
>
> Admit. However, Satake's actions made it clear that he was motivated by discrimination.

(Hatzimihalis Dep. Tr. at 257:1-23).

> **Defendants' Reply to Paragraph 293**: **UNDISPUTED.** As to Plaintiff's additional
>
> response to Defendants' Paragraph 293, it is impermissible legal argument.  Moreover, if

anything, Satake's actions in Plaintiff's favor give rise to an inference of non-discrimination.  (*See* DSF ¶¶58-61, 63-64.)

294.   Zaman did not make any inappropriate regarding gender or sex.  (Chinn Dec. Ex. 1, Plaintiff I Tr., 258:19-24; 259:5-9.)

**Response to Paragraph 294:**

Deny. Plaintiff cannot admit to this statement as it does not appear to be a full sentence. However, if Defendants intended to write "Zaman did not make any inappropriate statements regarding gender or sex," Plaintiff also denies.  Zaman stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader" in contrast to Nieves and Asmundson. (Hatzimihalis Dep. Tr. at 213:24-214:16).

**Defendants' Reply to Paragraph 294**: **UNDISPUTED**.  Defendants' Paragraph 294 inadvertently left out the word "statements" and as Plaintiff surmises was meant to read: "Zaman did not make any inappropriate statements regarding gender or sex."  Plaintiff's denial of Defendants' Paragraph 294 should be rejected because it contradicts her own sworn testimony, in which she was asked, "You have not claimed in your federal court complaints or in your EEOC charges that Mr. Zaman ever said anything inappropriate in your presence regarding gender or sex; is that accurate?" to which she responded, "Correct", and when next asked, "You have never made any claim that Mr. Zaman made any sort of statement that revealed any sort of discriminatory intent based on gender or sex; is that correct?" to which she responded, "Correct," and finally, when asked "And just to confirm, Mr. Zaman has never, in fact, made any such statement – made any inappropriate statement about gender or sex in your presence?" to which she responded, "Correct."  (Chinn Dec. Ex. 1, Plaintiff I Tr., 258:19-259:9.)  The statements Plaintiff points to in her response were made during Plaintiff's April 2020 evaluation meeting, a

meeting which occurred prior to Plaintiff's filing of her federal court complaints, her

EEOC charges, her deposition, and were contained in her own notes of the meeting – and

yet she has before never asserted that Zaman's reference to "leadership" had anything to

do with gender.  (*See* Chinn Supp. Dec. Ex. 10, PL000265-000268.)  Further, such

statements are irrelevant and immaterial as referring to someone as not being viewed as a

"leader" has no gendered connotation.  Leadership qualities are a valid employment

consideration and commenting on a lack thereof does not reveal any underlying gender

bias – as evidenced by Satake's description of Howard as having "███████."

(Satake Ex. 8.)

295. Zaman did not make any statement that revealed a discriminatory intent based on gender
or sex.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 258:25-259:4.)

**Response to Paragraph 295:**

Deny. Zaman stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed

as a leader" in contrast to Nieves and Asmundson.  (Hatzimihalis Dep. Tr. at 213:24-214:16.)

**Defendants' Reply to Paragraph 295: UNDISPUTED**. Plaintiff's denial of

Defendants' Paragraph 295 should be rejected for the same reasons described in Defendants'

Reply to Paragraph 294 above.

296. Bolger did not make any inappropriate relating to her being a woman.  (Chinn Dec. Ex. 1,
Plaintiff I Tr. 170:9-12; 259:12-18.)

**Response to Paragraph 296:**

Deny. Plaintiff cannot admit to this statement as it does not appear to be a full sentence.

However, if Defendants intended to write "Bolger did not make any inappropriate statements

regarding gender or sex," Plaintiff also denies.  Bolger stated in Plaintiff's FY 2019 annual

review that Plaintiff was not "viewed as a leader."  (Hatzimihalis Dep. Tr. at 204:22-25.)

**Defendants' Reply to Paragraph 296:** Defendants' Paragraph 296 inadvertently left out the word "statements" and as Plaintiff surmises was meant to read: "Bolger did not make any inappropriate statements regarding gender or sex."  Plaintiff's denial of Defendants' Paragraph 296 should be rejected as whether Bolger stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader" is irrelevant and immaterial as the statement is not related to gender or sex and when asked under oath, "Did Mr. Bolger ever say anything to you that you found to be inappropriate, you know, relating to you being a woman?" Plaintiff responded, "No, he did not," and when asked, "But just to confirm, with Mr. Bolger, you've never in any public filing made any claim that Mr. Bolger made any sort of comment based on your gender or sex – any sort of inappropriate comment based on your gender or sex?" to which she responded, "Correct," and finally, when asked, "And you have never claimed that Mr. Bolger made any sort of statement revealing any discriminatory intent," she responded "Correct."  (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:9-12; 259:12-24.)  The statements Plaintiff points to in her response were made during Plaintiff's FY 2019 annual review, a meeting which occurred prior to Plaintiff's filing of her federal court complaints, her EEOC charges, her deposition, and were contained in her own notes of the meeting– and yet she has before never asserted that Zaman's reference to "leadership" had anything to do with gender.  (*See* Chinn Supp. Dec. Ex. 10, PL000265-PL000268.)  Further, such statements are irrelevant and immaterial as referring to someone as not being viewed as a "leader" has no gendered connotation.  Leadership qualities are a valid employment consideration and commenting on a lack thereof does not reveal any underlying gender bias – as evidenced by Satake's description of Howard as having " ███████████ ." (Satake Ex. 8.)

297.   Bolger did not make any statements discriminatory towards women.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:13-16.)

**Response to Paragraph 297:**

Admit.

**Defendants' Reply to Paragraph 297: UNDISPUTED.**

298.   Bolger did not make any statement revealing any discriminatory intent.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 259:19-24.)

**Response to Paragraph 298:**

Deny. Bolger stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader."  (Hatzimihalis Dep. Tr. at 204:22-25).  In addition, Plaintiff felt as if she needed to prove herself to Bolger constantly in a way that her male counterparts did not, and that Bolger regularly discounted Plaintiff's achievements.  (Hatzimihalis Decl. ¶ 100).  One such example of Bolger discounting Plaintiff's achievements is in her securing a passive bookrunner deal with ███████ Id.

**Defendants' Reply to Paragraph 298: UNDISPUTED**, as Plaintiff's cited evidence does not contradict the statement within Defendants' Paragraph 298, as whether Bolger stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader" is irrelevant and immaterial as the statement is not related to gender or sex and when asked under oath, "And you have never claimed that Mr. Bolger made any sort of statement revealing any discriminatory intent" Plaintiff responded, "Correct."  (Chinn Dec. Ex. 1, Plaintiff I Tr. 259:19-24.)  Plaintiff's attempt to rely on this statement as revealing a discriminatory intent for the first time should be rejected.  As to Plaintiff's additional statements, they do not support any assertion that Bolger made "any statement revealing any discriminatory intent."

299.   Plaintiff testified that she was not accusing Howard of discriminating against her on the basis of gender.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 11:15-20.)

**Response to Paragraph 299:**

Admit.

**Defendants' Reply to Paragraph 299: UNDISPUTED.**

300.   Howard did not view women as inferior debt capital markets bankers.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 12:20-23.)

**Response to Paragraph 300:**

Admit. However, the jury may choose to disregard this statement as it is made by an interested witness.  See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000).

**Defendants' Reply to Paragraph 300: UNDISPUTED.** As to Plaintiff's additional statement regarding an interested witness, Defendants refer to Defendants' Reply to Paragraph 21.

301.   No one in management at Nikko America made any inappropriate comment about gender or sex.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 260:1-7.)

**Response to Paragraph 301:**

Deny. Bolger stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader." (Hatzimihalis Dep. Tr. at 204:22-25).  In addition, Plaintiff felt as if she needed to prove herself to Bolger constantly in a way that her male counterparts did not, and that Bolger regularly discounted Plaintiff's achievements.  (Hatzimihalis Decl. ¶ 100).  One such example of Bolger discounting Plaintiff's achievements is in her securing a passive bookrunner deal with

███ Id. Zaman stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader" in contrast to Nieves and Asmundson.  (Hatzimihalis Dep. Tr. at 213:24-214:16). Further, Robin Milberg stated, "Satake's view of her performance? He probably found her easy to manage and quiet, which was the style early on, but now we get a Kaitlin who is more

aggressive and that's what we like." (SMBC11410-11; Licul Ex. JJ).  Sisselman stated, "She probably felt this is happening to me and acting like a victim without realizing she had issues and that's why it was happening."  (Licul Ex. M).

**Defendants' Reply to Paragraph 301: UNDISPUTED**.  Plaintiff's denial should be rejected as it contradicts her own testimony when asked, "Is there anyone in management at SMBC Nikko, anyone in management who had anything to do with your employment, who you believe ever made a statement, an inappropriate comment about gender or sex in your presence?" to which she responded, "No.  To the best of my recollection, no." (Chinn Dec. Ex. 1, Plaintiff I Tr. 260:1-7.)  Whether Bolger stated in Plaintiff's FY 2019 annual review that Plaintiff was not "viewed as a leader" is irrelevant and immaterial as addressed above at Defendants' Reply to Paragraph 296.  Further, whether Plaintiff's assertion that Bolger discounted her achievements including discounting a passive bookrunner win is irrelevant and immaterial as it does not reveal any inappropriate comment about gender.  Whether Zaman stated Plaintiff was not "viewed as a leader" is irrelevant and immaterial as addressed above at Defendants Replies to Paragraphs 294 and 295.  Plaintiff's reliance on Sisselman's statement is irrelevant and immaterial as it is undisputed Sisselman did not make any inappropriate statements regarding gender or sex or that reveal any sort of discriminatory intent.  (DSF ¶¶68-69.)  Finally, the statements made by Robin Milberg are irrelevant and immaterial as they merely constitute her estimation of Satake's comparison of whether one woman is "aggressive" compared to another.

Dated: May 20, 2022                           Respectfully submitted,
       New York, New York

                                              **PROSKAUER ROSE LLP**


                                              By: /s/ Lloyd B. Chinn_____

                                                 Lloyd B. Chinn
                                                 Eleven Times Square
                                                 New York, New York 10036
                                                 (212) 969-3000
                                                 lchinn@proskauer.com

                                                 Alexandra R. Reynolds
                                                 One International Place
                                                 Boston, MA 02110
                                                 Tel. 617.526.9600
                                                 Fax 617.526.9899
                                                 areynolds@proskauer.com

                                                 *Attorneys for Defendants*
                                                 *SMBC Nikko Securities America, Inc.*
                                                 *John Bolger*
                                                 *Omar Zaman*