**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

HAIDO IRENE HATZIMIHALIS,                                :

         Plaintiff,                                    :     Civil Action No.: 20-cv-08037 (JPC)

                             :

         v.                                              :

SMBC NIKKO SECURITIES AMERICA, INC.,                     :
JOHN BOLGER and OMAR ZAMAN, in their                     :
individual and professional capacities,                  :

         Defendants.                                   :

-------------------------------------------------------- X

## DEFENDANTS' REPLY TO PLAINTIFF'S
## LOCAL RULE 56.1(C) STATEMENT OF FACTS

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York ("Local Civil Rules") and the Individual Rules of this Court,

Defendants SMBC Nikko Securities America, Inc. ("Nikko America" or the "Company"), John

Bolger ("Bolger") and Omar Zaman ("Zaman") (together, "Defendants") hereby submit the

following Responses to Plaintiff Haido Irene Hatzimihalis ("Hatzimihalis" or "Plaintiff")'s 56.1

Statement of Disputed Facts (Dkt. 92, 101) ("Plaintiff's Statement of Facts" or "PSF").

However, Plaintiff's submission does not contain "*separate*, short and concise statement of

additional material facts as to which it is contended that there exists a genuine issue to be tried"

as required by Local Rule 56.1(b).  S.D.N.Y. R. 56.1(b) (emphasis added).  A large portion of

Plaintiff's "disputed facts" repeat facts Defendants include in their 56.1 statement and are

undisputed.  This is an inappropriate waste of judicial resources.

## I.     HATZIMIHALIS BACKGROUND AND EXPERIENCE

1.      In 1999, Hatzimihalis earned her Bachelor of Science in Economics from the

Athens University of Economics and Business in Greece. (Hatzimihalis Ex. A[1]; Hatzimihalis

32:16-23).

**Defendants' Response to Paragraph 1**: **UNDISPUTED.**  Further, the statement within

PSF ¶1 is almost identical to Defendants' 56.1 Statement of Undisputed Facts ("DSF")

¶2, and only adds the type of degree acquired and the country where the university was

located.

2.      In 2003, she earned her Master of Science in Banking and Finance from the

University of Sienna in Italy. (Hatzimihalis Ex. A; Hatzimihalis 35:2-5).

**Defendants' Response to Paragraph 2**: **UNDISPUTED.**

3.      From 2002 to 2004, Hatzimihalis worked at Unicredit Produzioni Accentrate

group Unicredito Italiano as a Money Market Settlement Specialist. (Hatzimihalis Decl. ¶ 3;

Chinn Ex. 14[2]).

**Defendants' Response to Paragraph 3**: **UNDISPUTED.**  Further, the statement within

PSF ¶3 is almost identical to DSF ¶5, and only adds the title of Plaintiff's position, of

which it is undisputed did not involve work in debt finance, *see* DSF ¶6.

4.      From 2005 to 2009, Hatzimihalis worked as an Analyst in Debt Capital Markets

at BMO Capital Markets ("BMO"), where she analyzed historical data and projected financial

information for public and private companies, performed pro forma for new issuance financial

---

[1]      "Hatzimihalis Ex. __" refers to exhibits attached to the Declaration of Plaintiff Haido Irene Hatzimihalis in
Opposition to Defendants' Motion for Summary Judgment.

[2]      "Chinn Ex. __" refers to exhibits attached to the Declaration of Lloyd B. Chinn, Esq. in Support of
Defendants' Motion for Summary Judgment (Dkt. Nos. 64, 65).

analysis and capital structure, prescreened potential investors and led the development of new business identifying potential candidates for issuing traditional private placement debt (an effort that resulted in winning mandates). (Hatzimihalis Decl. ¶ 4; Hatzimihalis Ex. A; Chinn Ex. 14).

**Defendants' Response to Paragraph 4**:  **UNDISPUTED**.  However, Plaintiff did not take any steps to develop new public debt markets clients while at BMO.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 42:23-25.)

5.      At BMO, Hatzimihalis worked on numerous public and private debt transactions. (Hatzimihalis Decl. ¶ 5; Chinn Ex. 14; Hatzimihalis 37:3-16). The majority of these were public transactions. (Hatzimihalis 37:12-16).

**Defendants' Response to Paragraph 5**: **UNDISPUTED**.  However, on Plaintiff's resume, she described herself as having "[s]ignificant [r]esponsibility" on select private transactions at BMO with no such signifier describing her work on "Select Public/Capital Market Transactions" at BMO and the select public/capital market transactions she listed from her time at BMO were all co-manager roles in which she served as an analyst on the transaction and had no primary coverage.  (Chinn Dec. Ex. 14; Chinn Dec. Ex. 1, Plaintiff I Tr. 33:20-22, 42:8-18; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 37:17-38:17, 39:8-19.)

6.      She earned her first regulatory license in 2007. (Hatzimihalis Decl. ¶ 6; Licul Ex. I at p. 5).

**Defendants' Response to Paragraph 6**:  **UNDISPUTED.**

7.      Beginning in 2009, Hatzimihalis expanded her expertise by studying Financial Modeling, Valuing a Business, Corporate Finance, Venture Capital, Private Equity and

Advanced Corporate Finance at the New York University Continuing Education Program. (Hatzimihalis Decl. ¶ 7; Hatzimihalis Ex. A; Chinn Ex. 14; Hatzimihalis 44:4-7).

**Defendants' Response to Paragraph 7**: **UNDISPUTED** that Plaintiff attended classes in those subjects at New York University Continuing Education Program but did not receive a degree from New York University.  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 44:12-17.)

## II.    HATZIMIHALIS'S EMPLOYMENT WITH SMBC

### A.    Hatzimihalis's Background and Hire

8.    In 2011, SMBC Nikko Securities America, Inc. ("SMBC" of the "Bank") hired Hatzimihalis as an Assistant Vice President ("AVP"). (Hatzimihalis 50:4-11; 54:10-14).

**Defendants' Response to Paragraph 8**:  **UNDISPUTED**. Further, the statement within PSF ¶8 is almost identical to DSF ¶8.

9.    At the time, Hatzimihalis had worked in the finance industry for approximately nine years, (Hatzimihalis Decl. ¶ 8; Chinn Ex. 14).

**Defendants' Response to Paragraph 9**:  Deny.  At the time Plaintiff was hired by Nikko America in October 2011, she had worked in the finance industry from December 2001 to July 2002 at Blue Financial (7 months), from July 2002 to December 2004 at Unicredito (2 years and 5 months), and from April 2005 to July 2009 at BMO (4 years, 3 months) before she was laid off in 2009, totaling approximately 7 years of working in the finance industry.  (Chinn Dec. Ex. 14; Chinn Dec. Ex. 1, Plaintiff I Tr. 32:24-33:1, 34:25-35:1, 35:20-25, 36:1-7; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 44:1-3.)

10.    Hatzimihalis requested that SMBC pay her a salary of $█████. (Hatzimihalis 49:21-24). SMBC offered her only $█████. (Hatzimihalis 50:25-51:3).

**Defendants' Response to Paragraph 10**:   **UNDISPUTED** that Plaintiff stated her desired base salary was $█████ and that Nikko America offered her $█████, to which she agreed.  *See* DSF ¶10.

11.       In its offer letter to Hatzimihalis, SMBC stated, "[w]e are confident that your education and experience have prepared you for a challenging and rewarding opportunity with SMBC Nikko Securities America, Inc." (Licul Ex. J).

**Defendants' Response to Paragraph 11**:   **UNDISPUTED.**

12.       When she started at SMBC, Hatzimihalis was the only woman in her group. (Hatzimihalis Decl. ¶ 9; Licul Ex. K).

**Defendants' Response to Paragraph 12**:   **UNDISPUTED**, but irrelevant and immaterial as none of Plaintiff's claims relate to her hire, and thus, the gender makeup of the DCM group at the time of her hire is immaterial to Defendants' motion for summary judgment.

13.       Hatzimihalis was an "exempt" employee and therefore was not subject to SMBC's policies and practices applicable to "non-exempt" employees. (Licul Ex. L).

**Defendants' Response to Paragraph 13**:   **UNDISPUTED**.

14.       As an AVP, Hatzimihalis was responsible for supporting more senior professionals, including putting together presentation materials, conducting research on clients, helping with internal and external requests and assisting with deal execution. (Hatzimihalis 54:17-23; 55:11-12). Hatzimihalis also communicated and met with clients. (Hatzimihalis 72:13-19).

**Defendants' Response to Paragraph 14**:   **UNDISPUTED**.

15.       An AVP was senior to an Officer or Analyst. (Hatzimihalis Decl. ¶ 10).

**Defendants' Response to Paragraph 15**:   **UNDISPUTED**.

16.     In October 2012, Yoshohiro Satake became Hatzimihalis's manager. (Hatzimihalis 55:17-56:2).

**Defendants' Response to Paragraph 16**: **UNDISPUTED**. Further, the statement within PSF ¶16 is almost identical to DSF ¶12.

17.     In May 2013, SMBC obtained financial holding company status, which enabled the Bank to advise on public bond issuance. (Hatzimihalis 56:4-13).

**Defendants' Response to Paragraph 17**: It is **UNDISPUTED** thatSumitomo Mitsui Financial Group, Inc. in Tokyo ("SMFG") and Sumitomo Mitsui Financial Corporation acquired the financial holding company status not SMBC Nikko Securities America, Inc. but that acquisition did enable the DCM group within SMBC Nikko Securities America, Inc. to advise on public bond issuance.  (*See* DSF ¶13.)

18.     Hatzimihalis had previously worked on numerous public deals while at BMO. (Hatzimihalis Decl. ¶ 11; Chinn Ex. 14; Hatzimihalis 37:12-16)

**Defendants' Response to Paragraph 18**:  **UNDISPUTED**.  However, on Plaintiff's resume, she described herself as having "[s]ignificant [r]esponsibility" on select private transactions at BMO with no such signifier describing her work on "Select Public/Capital Market Transactions" at BMO and the select public/capital market transactions she listed from her time at BMO were all co-manager roles in which she served as an analyst on the transaction and had no primary coverage.  (Chinn Dec. Ex. 14; Chinn Dec. Ex. 1, Plaintiff I Tr. 33:20-22, 42:8-18; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 37:17-38:17, 39:8-19.)

19.     Hatzimihalis and Satake discussed her becoming part of the public side of the

business. Hatzimihalis told Satake that, at BMO, she worked in the DCM group that worked on

public high yield and investment grade offerings. (Hatzimihalis Decl. ¶ 12).

> **Defendants' Response to Paragraph 19**:  **UNDISPUTED**, and immaterial.  On
>
> Plaintiff's resume, she described herself as having "[s]ignificant [r]esponsibility" on
>
> select private transactions at BMO with no such signifier describing her work on "Select
>
> Public/Capital Market Transactions" at BMO and the select public/capital market
>
> transactions she listed from her time at BMO were all co-manager roles in which she
>
> served as an analyst on the transaction and had no primary coverage.  (Chinn Dec. Ex.
>
> 14; Chinn Dec. Ex. 1, Plaintiff I Tr. 33:20-22, 42:8-18; Chinn Supp. Dec. Ex. 1, Plaintiff
>
> I Tr. 37:17-38:17, 39:8-19.)

20.     Hatzimihalis was the only woman in the public placement group. (Hatzimihalis

62:2-7; Licul Ex. K).

> **Defendants' Response to Paragraph 20**: It is **UNDISPUTED** that Plaintiff was the only
>
> woman in the DCM group when she joined Nikko America in October 2011, *see supra*
>
> PSF ¶12.  It is unclear what Plaintiff refers to as the "public placement group" as the
>
> DCM group engaged predominantly in *private* placement transactions prior to the FHC
>
> status when it began engaging more in public debt offerings.  If Plaintiff is referring to
>
> the DCM group during the time period between Plaintiff's hire in October 2011 and
>
> SMFG and Sumitomo Mitsui Financial Corporation acquiring FHC status in May 2013, it
>
> is incorrect that Plaintiff was the only woman in the group.  The evidence to which
>
> Plaintiff cites does not support such a statement as the organizational chart in Licul Ex. K
>
> is dated 11/01/11.  (Licul Ex. K, SMBC149.)  Junko Sweringa was a member of the

DCM group at least as of November 29, 2012 and was still a member of the group when Zaman joined Nikko America in December 2013.  (Chinn Supp. Dec. Ex. 9, SMBC000000177; Chinn Supp. Dec. Ex. 4, Zaman Tr. 137:21-138:4, 138:18-20.) Further, it is irrelevant and immaterial as none of Plaintiff's claims relate to her hire (as Nikko America did, in fact, hire her) and thus, the gender makeup of the DCM group at the time of her hire is immaterial to Defendants' motion for summary judgment.

21.     As a result, Hatzimihalis became responsible for supporting the newly hired calling officers, providing market updates and reads for specific issuers and analyzing financial data to make recommendations. (Chinn Ex. 18).

**Defendants' Response to Paragraph 21**: **UNDISPUTED** that as an Assistant Vice President, Plaintiff was responsible for supporting the newly hired calling officers, providing market updates and reads for specific issuers and analyzing financial data to make recommendations.  Defendants deny that it was because she was a woman in the DCM group as an impermissible legal conclusion that is unsupported by evidence.

**B.      Hatzimihalis's Performance**

22.     SMBC's annual review process includes goal setting, a pulse check in the fall of each year and of year review. (Bolger 88:17-89:8; Zaman 34:19-35:3).

**Defendants' Response to Paragraph 22**: **UNDISPUTED** that Nikko America's annual review process includes goal setting, a pulse check in the fall of each year, and an end of year review.

23.     The goals are used as a "benchmark" to measure performance. (Zaman 38:3-8).

**Defendants' Response to Paragraph 23**:  **UNDISPUTED**.

24.     The purpose of the annual review "is to let the individual know how they perform over the fiscal year versus their goals." (Bolger 94:17-22).

**Defendants' Response to Paragraph 24**:  **UNDISPUTED**.

25.     It is also to "provide feedback and career trajectory" for employees. (Zaman 34:16-20).

**Defendants' Response to Paragraph 25**: **UNDISPUTED** that the purpose of the annual review process is to provide feedback and career trajectory for employees.

26.     It is important that the annual review be accurate. (Bolger 94:23-25).

**Defendants' Response to Paragraph 26**: **UNDISPUTED**.

27.     No one at SMBC intentionally falsified reviews. (Bolger 95:2-4).

**Defendants' Response to Paragraph 27**: **UNDISPUTED**.

28.     For fiscal year 2014, SMBC rated Hatzimihalis a "five" out of "five," the highest rating possible. (Satake Ex. 1[3]; Hatzimihalis 334:8-335:1).

**Defendants' Response to Paragraph 27**: **UNDISPUTED**.  Further, PSF ¶28 is nearly identical to DSF ¶58.

29.     Hatzimihalis's work was described as "[c]lear, accurate and error free. Huge number of coverage and well managed by her own." According to the Bank, she "[a]lways tr[ies] to provide something new to clients"; has "[s]trong communication skills"; is "[a]lways proactive"; is a "[h]ighly valued hard worker"; "work aggressively"; "made a huge contribution"; and "[a]lways tr[ies] to expand platform and business." (Satake Ex. 1).

---

[3]     "Satake Ex. __" refers to exhibits attached to the Declaration of Yoshihiro Satake in Support of Defendants' Motion for Summary Judgment (Dkt. No. 72).

**Defendants' Response to Paragraph 29**: **UNDISPUTED** that Plaintiff's work was so described within her FY 2014 performance evaluation.  (Satake Ex. 1.)

30.     Around that same time Hatzimihalis was recommended for promotion to VP because, according to then group head Satake, Hatzimihalis made "huge contributions to the [SMBC's] 1st year start-up operation," referring to the public placement business. According to Satake, Hatzimihalis "is a hard worker, always stays very very late to make sure everything is in place and under control. She comes to the office even on weekend if she has to do so, to be ready for unexpected meeting request from clients." Satake described Hatzimihalis as "an excellent sample of 'New Nikko DCM'" and praised Hatzimihalis for playing a "huge role in terms of relationship building" with clients. Satake also praised Hatzimihalis for helping to train Chris Nieves, a newly hired, junior employee. (Chinn Ex. 18; Hatzimihalis 110:6-10, 111:11-15).

**Defendants' Response to Paragraph 30**:  **UNDISPUTED** that the Promotion Recommendation form completed by Satake so states, except it stated Plaintiff "played a huge role in terms of relationship building between new Nikko DCM member and Bank RMs" not with clients as so stated above.

31.     Satake recommended that SMBC pay Hatzimihalis an annual salary of $██████ as a first-year VP. (Chinn Ex. 18).

**Defendants' Response to Paragraph 31**:  **UNDISPUTED**.

32.     While SMBC promoted Hatzimihalis (Hatzimihalis 111:10-25), it only paid her $█████. (Chinn Ex. 17).

**Defendants' Response to Paragraph 32**:  **UNDISPUTED** that Nikko America promoted Plaintiff to Vice President in April 2015 and her base salary that fiscal year was

$█████.  (Chinn Dec. Ex. 17; Chinn Dec. Ex. 1, Plaintiff I Tr. 108:19-20, 110:24-111:3,

111:23-25; Satake Dec. ¶24 and Ex. 3, SMBC9252.)

33.     Hatzimihalis now had more "client facing-opportunities."

(Hatzimihalis 112:9-22).

**Defendants' Response to Paragraph 33**:  **UNDISPUTED**.  Further, PSF ¶33 is nearly

identical to DSF ¶62.

34.     Hatzimihalis's "goals" as VP were to generate road shows, client calls, attend

client meetings, collaborate with others and maintain relationships within and outside the Bank.

(Licul Ex. L).

**Defendants' Response to Paragraph 34**:  Admit that Plaintiff's "Target Goals" as a

Vice President in her FY 2019 "Annual Goals" form were to generate road shows,

"[g]enerate more client calls, touch points and broaden dialogue with them in the context

of becoming a trusted advisory," attend global client meetings, collaborate with others,

"develop and maintain relationships with other groups within [the Company]."  The

"Target Goals" further stated that she should "[c]ontinue to develop influential skills as I

interact with the junior members of the team.  Convey them the 'bigger picture' of the

purpose of each client meeting/idea. Get them excited and help them become more

proactive in working on the different projects & client ideas."  (Chinn Dec. Ex. 42; Licul

Ex. L.)  In addition, it is undisputed that Vice Presidents are responsible for providing

primary and secondary coverage within their sectors as instructed by the heads of the

DCM group and senior coverage officers in their sector and managing and training junior

officers.  (*See* DSF ¶205.)

35.     Developing new business through prospecting was never a requirement. Rather, it was an "optional" or "stretch goal." (Chinn Ex. 42).

**Defendants' Response to Paragraph 35**:  Admit that Plaintiff's "Stretch Goal (Optional)" as a Vice President her FY 2019 "Annual Goals" form included developing new business opportunities through prospecting. (Chinn Dec. Ex. 44; Licul Ex. L.) Deny that Plaintiff's statement that developing new business through prospecting was never a requirement within the role of Vice President, and further state that such dispute is immaterial because it is undisputed that Kaitlin Carter ("Howard"), Nieves, and Asmundson each consistently engaged in prospecting efforts across multiple potential clients and that Plaintiff only engaged in prospecting with respect to a single client throughout her entire tenure at Nikko America. (*See infra* DSF ¶¶127-134.)  Further, Zaman testified that "in order for [the DCM group] to increase the pie, you have to go out and prospect. You have to go out and find opportunities where we currently don't have them.  Everybody on the desk has to do it. I still do it. Bolger still does it. [Sisselman] does it. [Morici] does it. And that's one way that we grow our business. That's what I mean about prospecting and why it's important." (Chinn Dec. Ex. 4, Zaman Tr. 63:14-23.)

36.     For fiscal year 2015, SMBC rated Hatzimihalis as meeting, and even exceeding, the Bank's expectations on various metrics. Overall, SMBC rated Hatzimihalis as "[e]xceeds." (Satake Ex. 2 at p. 4; Hatzimihalis 131:5-132:22, 335:15-18).

**Defendants' Response to Paragraph 36**:  **UNDISPUTED**.

37.     According to the Bank, Hatzimihalis "maintain[ed] effective and productive relationships built on clear communication, support, and respect. Listens and responds

effectively to 'customers' questions, applies follow-up as an effective relationship-building tool, and commits to exceeding 'customer' expectations." (Satake Ex. 2 at p. 1). Moreover, Hatzimihalis was described as someone who "[t]hinks outside the box . . . in terms of new solutions/improved processes"; "[a]rrives at meetings on time and well-prepared"; "[a]pproaches work with a sense of energetic purpose"; "enjoys working hard"; "bottom line oriented"; is "[p]roductive—meets expected work outcomes in a timely and quality manner"; "[p]rovides reliable, high quality work"; "[m]oves vision to possibilities—forges pathways to eventual realities"; "[a]nticipates future consequences and trends accurately"; and "creates potential breakthrough strategies and plans." (Id. at pp. 2-4).

> **Defendants' Response to Paragraph 37**: **UNDISPUTED** that in Plaintiff's FY 2015 performance evaluation, on a scale of Gaps, Rates, Exceeds, Satake rated Plaintiff as "Exceeds" or "Meets" on metrics that included these descriptors. (Satake Ex. 2.).

38.    According to SMBC, Hatzimihalis had "successfully adjusted" to the "public businesses mindset." (Id. at p. 4). Hatzimihalis was also a "[k]ey member" of the public team, "[m]anag[ed] junior members," "[a]lways meeting deadline[s]," and "[w]orking hard to keep its quality at the very good professional level." (Id.). The latter was "very important for [SMBC's] business." (Id.). Once again, Hatzimihalis was a [v]ery hard worker" who did not "mind coming to the office [o]n the weekend if needed." (Id.).

> **Defendants' Response to Paragraph 38**: **UNDISPUTED** that Satake so wrote in Plaintiff's FY 2015 Performance Evaluation.

39.    Hatzimihalis could not have received a higher rating for 2015. (Hatzimihalis 336:1-4).[4]

**Defendants' Response to Paragraph 39**:  **UNDISPUTED** that Plaintiff could not have received a higher overall rating in her performance evaluation for FY 2015 but Plaintiff could have received higher ratings on individual metrics where she was rated as "Meets" and not "Exceeds."

40.    For fiscal year 2016, Hatzimihalis was rated as "meets" expectations and was a "hard worker." (Satake Ex. 4).

**Defendants' Response to Paragraph 40**:  **UNDISPUTED**.

41.    Hatzimihalis's manager, Jeremy Sisselman, thought that Hatzimihalis "was on a path for promotion eventually." (Licul Ex. M).

**Defendants' Response to Paragraph 41**:  **UNDISPUTED** that Sisselman stated this in September 2020.

C.    **Bolger's Arrival**

42.    In October 2016, Bolger joined SMBC as an Executive Director, two levels above Hatzimihalis. (Hatzimihalis 136:6-19; Bolger 36:17-25).

**Defendants' Response to Paragraph 42**:  **UNDISPUTED**.

43.    Bolger told Hatzimihalis that he was not her supervisor. (Bolger 48:8-15).

**Defendants' Response to Paragraph 43**: **UNDISPUTED** and Bolger said he told Plaintiff this under the meaning that a "supervisor" is the person who determines pay and

---

[4]    Beginning in fiscal year 2015, SMBC changed from a numeric rating system to a "gaps," "meets" and "exceeds" system. (Hatzimihalis 335:19-24).

promotions, which he did not do prior to becoming co-head of DCM on July 1, 2019. Bolger did oversee the Real Estate ("REIT") sector pod within the DCM group of which Plaintiff was a part, and oversaw the Healthcare sector pod of which Plaintiff was a part in 2017 and 2018.  (Chinn Dec. Ex. 3, Bolger Tr. 38:19-24, 47:7-48:23; Satake Dec. ¶39.)

44.    Nevertheless, the supervisor of the group, Satake, told Hatzimihalis to speak to Bolger about distributing accounts. (Hatzimihalis 153:18-20).

**Defendants' Response to Paragraph 44**:  **UNDISPUTED** that Satake asked Bolger to assign Plaintiff coverage responsibility in the REIT sector, the sector over which Satake had assigned Bolger to lead.  *See supra* DSF ¶¶84-85.

45.    For weeks, Bolger did not assign Hatzimihalis primary coverage on any account. (Hatzimihalis 150:22-151:8; Bolger 191:12-191).

**Defendants' Response to Paragraph 45**:  **UNDISPUTED** that Bolger joined Nikko America in October 2016 and assigned Plaintiff primary coverage on accounts approximately 2-3 weeks later on or about November 3, 2016 after meeting key constituents, getting oriented with the sectors and the client names within those sectors, all amid travel. (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 151:5-8; Chinn Supp. Dec. Ex. 3, Bolger Tr. 191:12-194:17.)

46.    "Primary coverage" means the employee is "responsible for managing that relationship, providing advice to that client" and "making sure the organization is focused on that name and ultimately driving revenue through those names." (Bolger 125:3-11).

**Defendants' Response to Paragraph 46**:  **UNDISPUTED**.

47.    Hatzimihalis had to ask her managers, Satake and Sisselman, for help. (Hatzimihalis 150:22-151:8; Sisselman 65:19-24).

**Defendants' Response to Paragraph 47**:  Admit Plaintiff asked Satake about getting client assignments from Bolger during the period of three weeks between Bolger joining Nikko America and assigning her accounts.

48.     To Hatzimihalis, it appeared that Bolger was intentionally avoiding giving her accounts to cover. (Hatzimihalis 151:21-23, 152:13-17,167:6-8).

**Defendants' Response to Paragraph 48**: **UNDISPUTED** that Plaintiff asserts that is how it appeared to her.  Deny that Bolger was intentionally avoiding giving her accounts to cover.  Bolger did not consider the 3 weeks to be a delay as he was meeting key constituents, getting oriented with the sectors and the client names within those sectors, all amid travel. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 192:19-194:17.)  Further, it is immaterial as it is undisputed Bolger assigned Plaintiff primary coverage over several clients and she further provided secondary coverage over the rest of the REIT sector and in 2017-2018, provided secondary coverage to the entire Healthcare sector. (*See* DSF ¶¶88-89, 94-95.)

49.     Hatzimihalis believed that Bolger gave her fewer opportunities "because [she's] a woman." (Hatzimihalis 167:22-168:4).

**Defendants' Response to Paragraph 49**:  **UNDISPUTED** Plaintiff has stated that is her belief but her belief is immaterial because mere speculation cannot give rise to a genuine fact dispute.  Deny that Bolger gave Plaintiff fewer opportunities and deny that Bolger gave or withheld any opportunities because Plaintiff was a woman.

50.     Sisselman, advised Hatzimihalis that she should not ask Bolger for primary coverage on accounts, that "senior management didn't like that," and that she should "just focus on being [Bolger's] right-hand woman." (Hatzimihalis 166:13-18; Sisselman 67:4-12)

**Defendants' Response to Paragraph 50**: Admit that Plaintiff so testified but that she did not testify as to the time period which Sisselman gave her this advice – prior to Bolger assigning her clients or after working with Bolger but asking for more primary coverage than the 5 clients he assigned. The statement in Paragraph 50 further mischaracterizes Sisselman's testimony. Sisselman testified to speaking with Plaintiff after she had been working with Bolger and continued to be asking for more primary coverage accounts than the five she had been assigned. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 65:19-22, 66:19-25.) He testified to advising Plaintiff that instead of arguing she deserved more accounts merely because she was a Vice President, she should consider supporting Bolger as secondary coverage to demonstrate the value she could add and that more opportunities for client coverage would arise from there. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 66:19-67:12.) Even if Sisselman had advised Plaintiff not to ask for primary coverage on accounts at the outset and instead should focus on being Bolger's right hand woman, it is immaterial as it is undisputed Bolger assigned Plaintiff primary coverage over several accounts. (DSF ¶88.)

51.    When Bolger finally sat down with Hatzimihalis on November 4, 2016, he stated that he was not aware that he had to share accounts with her, that he was not even aware of her existence when he interviewed for the position and that he did not know he had to share the real estate portfolio with her. (Hatzimihalis 152:13-153:13, 157:24-158:2).

**Defendants' Response to Paragraph 51**: Irrelevant and immaterial as it is undisputed Bolger assigned Plaintiff primary coverage over several clients. (DSF ¶¶85-89.)

52.    Hatzimihalis told Bolger that Satake told her that she would get five-to-ten real estate clients from Bolger. (Hatzimihalis 153:18-20).

**Defendants' Response to Paragraph 52**:  **UNDISPUTED** that Plaintiff told Bolger this.

53.     At the time, the "real estate sector went through a repositioning. For a long time, it was shrinking rather than expanding. So there was not much prospecting involved." (Hatzimihalis 174:19-22, 176:23-25).

**Defendants' Response to Paragraph 53**:   Bolger joined Nikko America in 2016 particularly because the Real Estate sector was growing.  While push for new business within a sector may ebb and flow due to the Company's available balance sheet at different time points, prospecting is still conducted even in slower periods so as to establish new business for when the balance sheet is more available.  (Bolger Supp. Dec. ¶13.)  Even if the statement in Paragraph 53 were true, it is immaterial because it is undisputed Plaintiff only attempted to prospect a single client her entire tenure at Nikko America (DSF ¶¶127-128) and it is undisputed Defendants assigned Plaintiff as secondary coverage in the Healthcare sector for two years (DSF ¶¶94-95) and would have had the opportunity to prospect within that sector as well.

54.     Bolger knew that the "real estate portfolio" was "shrinking faster than it's expanding." (Hatzimihalis 353:3-6, 196:25-197:3).

**Defendants' Response to Paragraph 54**:  Nikko America's real estate portfolio in connection with public bond offerings has grown in visibility and reputation since Bolger joined in 2016.  (Bolger Supp. Dec. ¶15.)  Even if the statement in Paragraph 54 were true, it is immaterial because it is undisputed Defendants also assigned Plaintiff as secondary coverage in the Healthcare sector for two years. (DSF ¶¶94-95.)

55.     As Hatzimihalis and Bolger were discussing her list of clients, Hatzimihalis asked to cover ███████████. Bolger agreed, but only after he took three other clients from her. (Hatzimihalis 156:12-157:6).

**Defendants' Response to Paragraph 55**: Admit in part, deny in part.  After Bolger proposed a handful of names for Plaintiff, Plaintiff wanted to remove three of them and countered with a proposal of ███████████.  (Chinn Dec. Ex. 3, Bolger Tr. 194:24-195:8.)  Nor does Plaintiff's cited testimony support the statement in Paragraph 55 as she testified that she raised concerns about the three other clients and Bolger "gave [her] ███████████" as "a trade."  (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 156:9-17.) Nonetheless, it is immaterial as it is undisputed Bolger assigned Plaintiff several clients (DSF ¶88) and undisputed that he did not assign her the clients she raised concerns about. (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 156:9-17.)

56.     According to Sisselman, SMBC gave other VPs "way more clients." "[I]t didn't really make sense." (Sisselman 69:12-70:5.)

**Defendants' Response to Paragraph 56**: Mischaracterizes Sisselman's testimony. Sisselman testified: "…I probably would have let her go or moved her to another group years earlier.  I wouldn't have promoted her to vice-president. And I wouldn't have given her, you know, four names – four clients – four or five, whatever it was…People have way more clients than that in DCM. So it didn't really make sense to me, that approach." (Chinn Dec. Ex. 8, Sisselman Tr. 69:22-70:5.)  Additionally, it is undisputed that Asmundson was assigned one to two lower-tiered clients after being promoted to Vice President.  (DSF ¶102.)  Further, Defendants do not dispute that based on observations of performance handling coverage over a limited number of lower-tiered accounts,

19

Defendants subsequently assigned Vice Presidents more and larger accounts if the Vice President had demonstrated they could handle such responsibility.  (Satake Dec. ¶¶36-37.)  However, Satake, Bolger, and Zaman did not believe Plaintiff demonstrated such capabilities based on their observations of her performance.  (Satake Dec. ¶¶42-43; DSF ¶¶104-105, 115-119.)

57.     At some point, Sisselman advised Hatzimihalis that she should "apologize" to Bolger and ask "him to give [her] another chance." (Sisselman 67:19-22.)

**Defendants' Response to Paragraph 57**:  The statement in Paragraph 57 mischaracterizes Sisselman's testimony.  Sisselman testified: "And then I said, well, you're going to have to repair some of the damage, the relationship damage…I think she was pretty hostile at the time, is my understanding.  And I was like, if John is going to work with you and trust you, you're going to have to like basically apologize and ask…him to give you another chance." (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 67:15-22.)

58.     Bolger believed that Hatzimihalis was being "rude and disrespectful" because she asked for accounts and decided that he was "not going to interact with her on this stuff." (Sisselman 68:15-25).

**Defendants' Response to Paragraph 58**:  The cited testimony does not support the fact.  Sisselman stated this not Bolger.  (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 68:15-21.)  It is irrelevant and immaterial as it is not alleged Plaintiff's employment was terminated for being rude and disrespectful.

59.     Hatzimihalis also assisted Bolger in covering healthcare accounts. (Hatzimihalis 160:5-16, 341:5-11). She was "involved in all the materials provided to clients" and answering all client questions. (Hatzimihalis 342:7-343:1).

**Defendants' Response to Paragraph 59**:  Admit Plaintiff provided secondary coverage to Bolger on the entire Healthcare portfolio.  (DSF ¶95.)  Distinction that she was involved in "all" materials and questions is immaterial.

60.     However, SMBC did not give Hatzimihalis secondary credit for such coverage. (Licul Ex. N at tab 2[5], columns D, O; Bolger 324:17-325:13, 326:15-19).

**Defendants' Response to Paragraph 60**: The testimony cited by Plaintiff does not support the stated fact.  First, it is undisputed that Plaintiff provided secondary coverage in the Healthcare sector in 2017 and 2018 but was removed from that coverage in approximately early 2019.  (DSF ¶¶95, 120.)  As to Plaintiff's reference to Licul Ex. N, Defendants refer to Defendants' Reply to DSF ¶152.

61.     "Secondary coverage" means "working under a more senior originator" and "helping support those names as a secondary person." (Bolger 125:22-126:6).

**Defendants' Response to Paragraph 61**:  **UNDISPUTED**.

62.     Moreover, Bolger only invited Hatzimihalis to "two in-person meetings" with healthcare clients. (Hatzimihalis 168:10-16, 344:15-23).

**Defendants' Response to Paragraph 62**:  Bolger was open to and invited Plaintiff to attend both telephonic and in-person meetings with healthcare clients.  (Bolger Supp. Dec. ¶5.)  He did not provide Plaintiff with fewer of those opportunities than he provided

---

[5]      Licul Ex. N will be produced to the Court in its native form. "Tab" refers to the tabs located at the bottom of the spreadsheet to distinguish sheets.

21

Asmundson when Asmundson later took over secondary coverage on Healthcare.
Plaintiff admitted she did not know which clients Asmundson or Nieves had primary
coverage over at any time and thus has no evidentiary foundation for her conclusory
assertion.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-11.)
Nonetheless, even if the statement in Paragraph 62 were true, it is immaterial as it is
undisputed Defendants provided Plaintiff the opportunity to provide secondary coverage
on the Healthcare sector for two years and that by early 2019, Bolger was dissatisfied
with her performance and interest in the sector.  (DSF ¶¶95, 119.)

63.     By contrast, when Hatzimihalis's junior male colleague, William Asmundson,
began assisting Bolger with healthcare accounts, Bolger took Asmundson to more in-person
meetings (Hatzimihalis 168:10-16) and gave Asmundson secondary credit for the coverage.
(Bolger 185:7-19; Asmundson 64:3-15; Licul Ex. N).

**Defendants' Response to Paragraph 63**:  Bolger was open to and invited Plaintiff to
attend both telephonic and in-person meetings with healthcare clients.  (Bolger Supp.
Dec. ¶5.)  He did not provide Plaintiff with fewer of those opportunities than he provided
Asmundson when Asmundson later took over secondary coverage on Healthcare.
Plaintiff admitted she did not know which clients Asmundson or Nieves had primary
coverage over at any time and thus has no evidentiary foundation for her conclusory
assertion.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22; 312:8-11.)  As to
Plaintiff's statement regarding credit for secondary coverage, Defendants refer to
Defendants Reply to DSF ¶152.  Nonetheless, even if the statement in Paragraph 63 were
true, it is immaterial as it is undisputed Defendants provided Plaintiff the opportunity to
provide secondary coverage on the Healthcare sector for two years and that by early

22

2019, Bolger was dissatisfied with her performance and interest in the sector.  (DSF ¶¶95, 119.)  As to Plaintiff's reference to Licul Ex. N, Defendants refer to Defendants' Reply to DSF ¶152.

64.    Similarly, while Hatzimihalis assisted Bolger with numerous real estate clients (Hatzimihalis 169:7-11), SMBC did not give her any credit for such work.

**Defendants' Response to Paragraph 64**:  Deny that Nikko America did not give Plaintiff credit for her secondary coverage over real estate clients and Plaintiff has not cited any evidence to support this statement.

65.    On December 21, 2017, Sisselman commended Hatzimihalis for doing "great" at a meeting, describing her as "eloquent" and exhibiting "good client strategy." He was "proud" of Hatzimihalis and stated that she had "come a long way." (Sisselman 74:19-76:1; Licul Ex. O).

**Defendants' Response to Paragraph 65**:  **UNDISPUTED** and immaterial that Sisselman provided Plaintiff with positive feedback once.  It is undisputed Sisselman did not think Plaintiff should have been promoted to Vice President in the first place and criticized her job performance repeatedly when she worked for him. (DSF ¶¶65-76.) Further, by December 2017, Hatzimihalis provided secondary coverage to Bolger, and no longer provided any coverage to Sisselman.  (DSF ¶¶65, 85, 89.)

66.    Sisselman also commended Hatzimihalis on the "progress [she had] made." (Sisselman 76:21-77:25; Licul Ex. O).

**Defendants' Response to Paragraph 66**:  **UNDISPUTED**, except that the cited exhibit does not support the fact but the cited testimony does.  Nevertheless, it is immaterial that Sisselman provided Plaintiff with positive feedback once.  It is undisputed Sisselman did not think Plaintiff should have been promoted to Vice President in the first place and

criticized her job performance repeatedly when she worked for him. (DSF ¶¶65-76.)

Further, by December 2017, Hatzimihalis provided secondary coverage to Bolger, and no

longer provided any coverage to Sisselman.  (DSF ¶¶65, 85, 89.)

67.     Sisselman recommended that Hatzimihalis mentor one of the Bank's new

analysts. (Sisselman 78:2-24; Licul Ex. P).

**Defendants' Response to Paragraph 67**:  **UNDISPUTED** and immaterial.

68.     Sisselman needed Hatzimihalis's help because the new analyst had "attitude" and

"performance" issues. (Sisselman 78:20-24).

**Defendants' Response to Paragraph 68**: This mischaracterizes Sisselman's testimony.

Sisselman testified he thought the analyst needed a mentor, that the analyst had issues

with attitude and performance, and that Sisselman "was hoping that [Plaintiff] could help

me in terms of helping him see straight."  (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 78:15-

24.)  Nevertheless, it is immaterial as it is undisputed Sisselman did not think Plaintiff

should have been promoted to Vice President in the first place and criticized her job

performance repeatedly when she worked for him. (DSF ¶¶65-76.) Further, by December

2017, Hatzimihalis provided secondary coverage to Bolger, and no longer provided any

coverage to Sisselman.  (DSF ¶¶65, 85, 89.)

**D.     Bolger and Zaman Try Convince Hatzimihalis to Leave the DCM Group**

69.     In February or March 2019, SMBC announced that Satake would be returning to

Tokyo and nominated four candidates to replace Satake. All four were men. (Bolger 51:18-52:9).

**Defendants' Response to Paragraph 69**:  **UNDISPUTED**, but immaterial as none of

Plaintiff's claims allege she should have been considered to replace Satake.

70.     In July 2019, SMBC promoted two men, Bolger and Zaman, to co-heads of DCM. (Hatzimihalis Decl. ¶ 13; Hatzimihalis 193:18-23, 386:8-11; Bolger 47:7-19, 57:23-25; Zaman 18:16-18).

**Defendants' Response to Paragraph 70**:  **UNDISPUTED**.

71.     SMBC also promoted Geoffrey Benson, another man, to Head of High Yield Capital Markets, (Hatzimihalis Decl, ¶ 14; Licul Ex, I at p. 63),

**Defendants' Response to Paragraph 71**:  Undisputed and immaterial as Plaintiff has not claimed she should have been considered for the Head of High Yield Capital Markets.

72.     The Bank did not promote any women within DCM at that time, (Hatzimihalis Decl. ¶ 15),

**Defendants' Response to Paragraph 72**:  Deny.  It is undisputed Nikko America promoted Kaitlin Howard, effective July 1, 2019, the same date Bolger and Zaman became Co-Heads of DCM.  (See DSF ¶¶201, 207.)

73.     As of November 19, 2021, there were 32 employees in DCM. Only three were women, (Bolger 68:22-69:3),

**Defendants' Response to Paragraph 73**:  Admit, except four of the 32 were women (Kaitlin Howard, Ashley Jia, Dani Warnock, Sabrina Ann Hahn), with one new female employee starting the next week (Skylar McClane), and one female employee hired to start the next year (Melanie Stiler).  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 137:21-138:17, 140:18-141:15.)  Further, the number of women within the DCM group is immaterial.

74.     One of the women was an "assistant" who "helps with travel expenses," (Bolger 63:19-64:5),

**Defendants' Response to Paragraph 74**:  **UNDISPUTED** and immaterial.

75.     Within DCM, there were five Managing Directors, All were men, (Bolger 76:19-77:7),

**Defendants' Response to Paragraph 75**:  **Undisputed**. It is immaterial as none of Plaintiff's claim allege she should have been promoted to Managing Director nor that any of these Managing Directors were her comparators.

76.     Bolger and Zaman became Hatzimihalis's supervisors. (Bolger 49:4-6; Zaman 18:4-9).

**Defendants' Response to Paragraph 76**:  **UNDISPUTED**.  Bolger and Zaman became Hatzimihalis's supervisors on July 1, 2019, in terms of determining pay, promotions, and conducting performance reviews.  (DSF ¶¶207-209; Chinn Dec. Ex. 5, Zaman Tr. 25:9-26:7; Chinn Dec. Ex. 3, Bolger Tr. 47:7-19; Chinn Supp. Dec. Ex. 3, Bolger Tr. 50:10-17.)  Bolger had managed Plaintiff in the Real Estate sector pod since fall 2016 and in the Healthcare sector in 2017 and 2018.  (DCF ¶¶84-89, 94-95; Chinn Supp. Dec. Ex. 3, Bolger Tr. 45:16-23; Chinn Dec. Ex. 3, Bolger Tr. 217:15-19.)  Zaman worked within the DCM group open trading desk in which everyone sat since December 2013 and witnessed Plaintiff's work.  (DSF ¶¶26, 103; Chinn Dec. Ex. 4, Zaman Tr. 62:22-63:6, 63:24-64:11, 64:18-65:10.)

77.     Prior to July 2019, neither Bolger nor Zaman were responsible for performance reviews. (Bolger 50:23-25; Zaman 22-25).

**Defendants' Response to Paragraph 77**:  **UNDISPUTED**.

78.     Zaman had never before worked with Hatzimihalis. (Zaman 24:7-15, 53:3-10).

**Defendants' Response to Paragraph 78**:  Admit Zaman did not work on the same sector of clients as Plaintiff but Zaman worked within the DCM group open trading desk in

which everyone sat since December 2013 and witnessed Plaintiff's work.  (DSF ¶26, 103; Chinn Dec. Ex. 4, Zaman Tr. 62:22-63:6, 63:24-64:11, 64:18-65:10.)  Zaman further testified that the group was so small that they would have group meetings in which they went around the room and each individual described what they were working on but Plaintiff consistently stayed silent during these meetings.  (Chinn Dec. Ex. 4, Zaman Tr. 65:14-66:4.)

79.     Only five weeks after becoming co-heads, Bolger and Zaman concluded that Hatzimihalis was "not a good fit" for DCM. (Bolger 214:19-25, 215:10-16).

**Defendants' Response to Paragraph 79**: Admit that Bolger and Zaman informed Plaintiff in July 2019 that she may not be a good fit for DCM.  Bolger had managed Plaintiff in the Real Estate sector pod since fall 2016 and in the Healthcare sector in 2017 and 2018.  (DCF ¶¶84-89, 94-95; Chinn Supp. Dec. Ex. 3, Bolger Tr. 45:16-23; Chinn Dec. Ex. 3, Bolger Tr. 217:15-19.)  Zaman worked within the DCM group open trading desk in which everyone sat since December 2013 and witnessed Plaintiff's work.  (DSF ¶26, 103; Chinn Dec. Ex. 4, Zaman Tr. 62:22-63:6, 63:24-64:11, 64:18-65:10.)  Zaman further testified that the group was so small that they would have group meetings in which they went around the room and each individual described what they were working on but Plaintiff consistently stayed silent during these meetings.  (Chinn Dec. Ex. 4, Zaman Tr. 65:14-66:4.)

80.     Bolger, who had access to Hatzimihalis's past performance reviews, never read them. He didn't think they would include any "useful information." (Bolger 250:8-252:15).

**Defendants' Response to Paragraph 80**:  The cited testimony does not support the statement.  Bolger testified that he did not know if he had access to Plaintiff's prior

performance reviews and that he did not think they would have useful information because he already had a very good understanding of her capabilities and productions after managing her within the Real Estate sector pod since late 2016 and Healthcare sector pod in 2017 and 2018.  (DCF ¶¶84-89, 94-95; Chinn Supp. Dec. Ex. 3, Bolger Tr. 45:16-23; Chinn Dec. Ex. 3, Bolger Tr. 217:15-19.) Further, the performance reviews Satake completed were from FY 2014 and FY 2015 prior to Plaintiff acquiring primary coverage over any clients, and FY 2016 in which she only had primary coverage over clients for 5 months whereas Bolger managed her within the Real Estate and Healthcare sectors for multiple years in which she had primary coverage and provided secondary coverage support directly to him.

81.    Zaman likewise never read Hatzimihalis's past performance reviews nor did he ask to see such reviews. (Zaman 12-21-23, 13:5-8).

**Defendants' Response to Paragraph 81**:  Immaterial as Zaman worked within the DCM group open trading desk in which everyone sat since December 2013 and witnessed Plaintiff's work.  (DSF ¶26, 103; Chinn Dec. Ex. 4, Zaman Tr. 62:22-63:6, 63:24-64:11, 64:18-65:10.)  Zaman further testified that the group was so small that they would have group meetings in which they went around the room and each individual described what they were working on but Plaintiff consistently stayed silent during these meetings. (Chinn Dec. Ex. 4, Zaman Tr. 65:14-66:4.)

82.    Bolger and Zaman met with Hatzimihalis and tried to convince her to leave the group to become a relationship manager. (Hatzimihalis 194-95, 351:16-22; Zaman 68:4-7).

**Defendants' Response to Paragraph 82**:  Admit.

83.     During that conversation, they did not mention anything about Hatzimihalis's performance. (Hatzimihalis 195:4-19). Rather, they told her that she would be a "great relationship manager." (Hatzimihalis 196:1-8, 352:16-22).

**Defendants' Response to Paragraph 83**:  Admit Bolger and Zaman told Plaintiff that she would be a great relationship manager and they did so because they thought it could potentially align with her capabilities and skill set given the challenges she had in the DCM role, and that it may be a better fit for her using her experience from DCM to perform in a banking role as a relationship manager.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 68:4-69:9; Chinn Supp. Dec. Ex. 3, Bolger Tr. 220:12-20, 221:3-10, 222:3.)  Immaterial as to whether they mentioned anything about her performance during the conversation.

84.     A relationship manager "sits on the banking side" and "is responsible for the relationship with the client." (Hatzimihalis 124:21-25).

**Defendants' Response to Paragraph 84**:  Admit. Further, a relationship manager manages the overall client relationship, primarily working on the lending side.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 221:11-222:2; 224:22-225:4.)  They need to understand what products are relevant for that client and making sure the introductions and relationships for those products are connected to the client.  (*Id.*)  It is a client-facing role. (*Id.*)  It is a pivotal and key role in the Company.  (*Id.*)

85.     Hatzimihalis thought the suggestion was a joke given how Zaman derided relationship managers. (Hatzimihalis 196:6-24, 352:23-353:2).

**Defendants' Response to Paragraph 85**:  Admit that Plaintiff so testified.  Deny that Zaman derided relationship managers.  Bolger and Zaman testified to never hearing anyone at the Company make a negative comment about the relationship manager role.

(Chinn Supp. Dec. Ex. 3, Bolger Tr. 224:22-225:8; Chinn Supp. Dec. Ex. 4, Zaman Tr. 117:21-118:9.)  Bolger testified that he had heard comments regarding specific relationship managers not adding value to a meeting but that the relationship manager role itself is a pivotal and key role in the Company.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 224:22-225:8.)  Zaman testified that he had heard comments making an observation of what relationship managers are responsible for relative to product partners but that the relationship manager role is not an easy job, describing it as the quarterback of the relationship issuer and without the relationship manager, it is very difficult to have an impactful relationship with an issuer.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 117:21-119:2.)

86.     At no point during this meeting did Bolger or Zaman state or even suggest that Hatzimihalis's performance was the basis for their suggestion. (Hatzimihalis 353:21-354:6).

**Defendants' Response to Paragraph 86**: Deny and immaterial.  Bolger and Zaman testified to suggesting to Plaintiff that they thought that a relationship manager role could potentially align with her capabilities and skill set given the challenges she had in the DCM role, and that it may be a better fit for her using her experience from DCM to perform in a banking role as a relationship manager.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 68:4-69:9; Chinn Supp. Dec. Ex. 3, Bolger Tr. 220:12-20, 221:3-10, 222:3.)

87.     Bolger and Zaman did not tell any of Hatzimihalis's male peers that they were not a "good fit" and should find a different job within SMBC. (Bolger 216:8-217:14).

**Defendants' Response to Paragraph 87**: The cited evidence does not support the statement as it only references testimony from Bolger.  Further, it is immaterial as Bolger and Zaman believed Plaintiff's male peers, Asmundson and Nieves, as well as her female

30

peer, Howard, demonstrated better capabilities in providing primary and secondary coverage to clients than Plaintiff.  (DSF ¶¶115-117, 122; Chinn Dec. Ex. 4, Zaman Tr. 54:9-24, 62:22-66:4, 77:17-79:21, 80:23-81:14, 113:12-114:5, 143:7-144:16; Chinn Dec. Ex. 3, Bolger Tr. 46:20-47:6, 217:15-19; 248:10-250:13; Declaration of John Bolger ("Bolger Dec.") ¶13.)

88.     Hatzimihalis told Bolger and Zaman that she was not interested in the relationship manager role. (Bolger 225:20-226:7).

**Defendants' Response to Paragraph 88**: UNDISPUTED.

89.     Hatzimihalis, beginning in July 2019 when Bolger and Zaman became co-heads of DCM, continued to state that "[s]he wanted to have more account coverage." (Bolger 245:2-12).

**Defendants' Response to Paragraph 89**:  UNDISPUTED.

90.     Bolger refused, telling her that she had to "prove" herself with existing accounts. (Bolger 245:13-246:2).

**Defendants' Response to Paragraph 90**: The statement mischaracterizes the testimony. Bolger testified that he told Plaintiff that to obtain more accounts she needed to prove that she could manage her existing clients through up-tiering, winning active bookrunner business, as well as through prospecting.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 245:13-246:2.)

**E.     Hatzimihalis's Continued Good Performance**

91.     On July 25, 2019, Anthony Capozzoli worked with Hatzimihalis for a meeting with ███████████ about client's portfolio. The two worked together with Raj Gramma and

Van Buchanan, and "brought together LM (Liquidity Money), DCM and Derivatives teams in a coordinate and aligned manner." (Licul Ex. Q).

**Defendants' Response to Paragraph 91**:  Admit and immaterial as the meeting involved Capozzoli's quantitative debt simulation and Gramma's liability management analysis and Plaintiff may have provided a brief DCM update.  (Supplemental Declaration of Anthony Capozzoli ("Capozzoli Supp. Dec.") ¶ 6.)

92.      ███████████ "was very impressed with the analysis. They told [SMBC] this is the first time anyone showed them new issue tenors in combination with portfolio risk." Everyone "felt it was a very successful pitch. The client was very engaged and praised the thought it went into [the] presentation." (Id.).

**Defendants' Response to Paragraph 92**:  Undisputed and immaterial as the meeting involved Capozzoli's quantitative debt simulation and Gramma's liability management analysis and Plaintiff may have provided a brief DCM update.  (Capozzoli Supp. Dec. ¶ 6.)

93.      Bolger agreed that the ███████████ presentation was a "[v]ery strong presentation" filled with "valuable" and "new content." According to Bolger, it "[s]ound[ed] like a very collaborative presentation and effective with getting ████'s attention. Great team work." (Id.).

**Defendants' Response to Paragraph 93**:  The statement mischaracterizes the evidence. Bolger stated that Capozzoli's section in the presentation "is exciting new content" and noted Gramma's "pages are always well received" and further stated "Very strong presentation filled with valuable content."  Bolger did direct the following statement to

Plaintiff: "[s]ound[ed] like a very collaborative presentation and effective with getting ▮▮▮▮'s attention. Great team work." (Licul Ex. Q.)

94.     In November 2019, Hatzimihalis had a "pulse check" meeting with Bolger and Zaman to discuss her performance. During the meeting they did not tell her that she needed to improve her performance or that she needed to gain credibility with clients. (Hatzimihalis 356:6-25, 360:3-5; Licul Ex. R).

**<u>Defendants' Response to Paragraph 94</u>**: Immaterial as it is undisputed that Zaman had already suggested to Plaintiff about considering transferring to a relationship manager role in July 2019 and Bolger was critical of Plaintiff's ▮▮▮▮ transaction during the pulse check meeting because it was a passive role and not active.  (DSF ¶¶215-216, 220.) Further, Bolger testified that at the November 2019 pulse check with Plaintiff, he and Zaman informed her that they needed to see more improvement around the goals including prospecting, better command of the juniors, being more convincing with clients to be the trusted advisor and to win more business.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 233:2-6, 233:21-234:5, 235:24-236:13.)  Zaman testified that at the November 2019 pulse check, he and Bolger spoke with Plaintiff regarding the same issues they had raised at the July 2019 goal setting meeting which included discussing areas she needed to improve across the board such as prospecting, working more closely with product partners and banking partners to be viewed as an adviser.  (Chinn Dec. Ex. 4, Zaman Tr. 54:9-24; Chinn Supp. Dec. Ex. 4, Zaman Tr. 70:2-6.)

95.     In July 2019, Hatzimihalis's work was included regarding real estate maturities in a number of client presentations, including, but not limited to, presentation to ▮▮▮▮▮▮▮▮ ▮▮▮▮ on September 25, 2019 ("▮▮▮▮▮▮▮▮▮▮ Discussion Materials,

September 25, 2019") and ███████ on March 3, 2020 ("███████. Discussion Materials, March 3, 2020"). (Hatzimihalis Decl. ¶ 16; Licul Ex. S).

**Defendants' Response to Paragraph 95**:  Admit that the real estate maturities project Bolger assigned to Plaintiff in July 2019 was ultimately included in several client presentations including presentation to ███████████████ on September 25, 2019 ("███████████████ Discussion Materials, September 25, 2019") (Licul Ex. S at SMBC0006689) and ██████ on March 3, 2020 ("███████ Discussion Materials, March 3, 2020") (Licul Ex. S at SMBC0008829).  However, Plaintiff did not generate and prepare the data and material included in those slides.  After Plaintiff returned work product that did not have the necessary data or structure, Bolger directed the team how to pull the data and how to put together the slides.  The final product included in the ███████████ and ███████ presentations were the result of that work.

96.    Zaman and Bolger also expressed their satisfaction with Hatzimihalis's work in earning the passive bookrunner role in a September 2019 bond transaction for ██████ another client. (Licul Ex. T).

**Defendants' Response to Paragraph 96**:  The cited testimony does not support the statement.  In Licul Ex. T, Bolger responded to Plaintiff's email regarding the passive bookrunner role for Kilroy by stating, "Congrats!".  Nothing in Licul Ex. T reflects Zaman expressing satisfaction with Plaintiff's work on the transaction.  Further, it is undisputed that Bolger was critical of the ██████ transaction in the November 2019 pulse check meeting because it was a passive bookrunner role and not an active bookrunner role.  (DSF ¶220.)

97.     Numerous clients Hatzimihalis covered "uptiered" the Bank, including,

████████████████████████████████████████████████████. (Hatzimihalis Decl. ¶ 17; Licul

Ex. U).

**Defendants' Response to Paragraph 97**:  Admit. Irrelevant and immaterial as Plaintiff

doing her job only to a minimal degree does not give rise to a genuine issue of fact.

98.     "Uptiering" means the client allowed SMBC to lend more money and therefore

move to a higher "tier" within the client's banking group. "Uptiering" would result in eligibility

to win more DCM and other business from the client and, also, eligibility to win higher paying

roles from the client.

**Defendants' Response to Paragraph 98**:  Admit. Irrelevant and immaterial as Plaintiff

doing her job only to a minimal degree does not give rise to a genuine issue of fact.

99.     SMBC was awarded the first ever bond underwriting role on transactions during

the years Hatzimihalis had primary coverage responsibilities for ███████████████  and

████ (Hatzimihalis Decl. ¶ 18).

**Defendants' Response to Paragraph 99**: Admit and immaterial as it is undisputed

Nikko America served as co-manager on the ██████████████████  and ████

transactions.  (DSF ¶¶140-141; Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2,

Plaintiff II Tr. 285:5-7, 289:14-294:9, 296:7-11.)  And it is further undisputed that "co-

manager" is an underwriter who does not sell bonds and has less economics (DSF ¶221)

and that the desired outcome with respect to a public DCM transaction at Nikko America

was to receive the active book runner assignment. (DSF ¶222.)

100.    Despite SMBC's lower tier status, SMBC was never removed as an underwriter on a syndicated bond transactions for ███████████ and █████ during the years she had primary coverage responsibilities. (Hatzimihalis Decl. ¶ 19).

**Defendants' Response to Paragraph 100**:  Admit and immaterial as it is undisputed Nikko America served as co-manager on all ████████████ and █████ transactions while being managed by Plaintiff.  (DSF ¶¶140-142; Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 289:14-295:19, 296:7-11.)  And it is further undisputed that "co-manager" is an underwriter who does not sell bonds and has less economics (DSF ¶221) and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶222.)

101.    On July 31, 2019, J. D. Benko, Executive Director and Group Head of the Real Estate Finance Department, praised Hatzimihalis to █████ Chief Financial Officer, ██████, and Treasurer, ██████████, stating, "you have been in good hands with [] [Hatzimihalis]." (Licul Ex. V).

**Defendants' Response to Paragraph 101**: Admit J.D. Benko emailed ██████████ the quoted language.  The cited evidence does not support the statement that he praised Plaintiff.

102.    SMBC was invited for the first time as an underwriter, for the first time, when ██████████ invited SMBC to be an underwriter on its bond deal. The client's Chief Financial Officer selected SMBC because the Bank always was helpful and thoughtful, and Hatzimihalis sent ██████████ customized materials every month. (Licul Ex. W).

**Defendants' Response to Paragraph 102**:   Admit and immaterial as it is undisputed Nikko America served as co-manager on the ███████████ transaction.  (DSF ¶¶140-141; Bolger Dec. Ex. 8, SMBC11376; Chinn Dec. Ex. 2, Plaintiff II Tr. 285:5-7, 289:14-294:9, 296:7-11.)  And it is further undisputed that "co-manager" is an underwriter who does not sell bonds and has less economics (DSF ¶221) and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶222.)

103.     Hatzimihalis also received thanks and praise from clients at ███████████ ███████████ . A representative from Columbia Property Trust wrote to Hatzimihalis to say that "[they] appreciate [her] keeping [them] in the loop." (Licul Ex. X). SMBC's contact at ███████████ stated that they "always appreciate [Hatzimihalis's] updates and market color." (Licul Ex. Y). Another representative from ██████ "appreciate[d] [Hatzimihalis] sending [] briefs," as "they [were] very informative." (Licul Ex. Z).

**Defendants' Response to Paragraph 103**:   Admit but immaterial as it is undisputed Plaintiff never succeeded in acquiring a book runner role from ███████████ and ██████ over which she had primary coverage (DSF ¶¶140-142; Bolger Dec. Ex. 8, SMBC11376).  It is further undisputed that "co-manager" is an underwriter who does not sell bonds and has less economics (DSF ¶221) and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶222.)  Immaterial that a contact at ███████████ stated a single positive comment about Plaintiff.

104.     Hatzimihalis's contact with ███████████ , the Executive Vice President of Finance with ███████████ , led to SMBC setting up investor meetings with ██████

senior management, which ultimately led to SMBC securing an active bookrunner role in September 2019. (Licul Exs. AA, BB).

**Defendants' Response to Paragraph 104**: The cited evidence (Licul Ex. AA) does not support that Plaintiff's contact with ████████, Executive Vice President at ████ ████████ ("████ led to Nikko America setting up investor meetings and securing an active bookrunner role. Plaintiff was asked about ████ at her deposition and did not testify to making the connection with the client nor testify to prospecting ████ at all. (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 180:1-181:4; *see also infra* DSF ¶¶127-128.) To the contrary, Plaintiff testified that she was unaware that Bolger contacted the Chief Financial Officer of ████ to create an introduction to ████ (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 180:1-181:4.)  In any event, Plaintiff doing her job on secondary coverage at least in part as to that particular client does not give rise to a genuine fact issue.

105.     During Hatzimihalis's tenure at SMBC, she proactively reached out to Relationship Managers at SMBC and clients directly for meetings, which led to procuring meetings with members of companies' senior management. (Hatzimihalis Decl. ¶ 20).

**Defendants' Response to Paragraph 105**:  Immaterial as it is undisputed Plaintiff generated less than $████ in revenue each year from 2017-2020, *see* DSF ¶¶ 136-139, Plaintiff only attempted to prospect a single client (DSF ¶¶128), and did not succeed in generating revenue from any prospecting efforts, (DSF ¶127-128).

**F.     Bolger and Zaman Again Try to Convince Hatzimihalis to Leave**

106.     In April 2020, Hatzimihalis had a performance conversation with Bolger and Zaman, (Hatzimihalis 208:3-7), where Hatzimihalis was told that she was "doing well"; was "very likable" the team enjoyed working with her and having her on the desk; she was doing an

"excellent job" with her "skills" and collaboration"; she is able to "deliver [the] bank to clients"; and that she was "instrumental" in getting the Bank a "bookrunner" role. (Hatzimihalis 210:10-216:5; Licul Ex. CC).

**Defendants' Response to Paragraph 106**:  The cited evidence does not support the statement as Bolger and Zaman did not tell Plaintiff "she was 'doing well.'"  Based on Plaintiff's own notes from the conversation, Bolger and Zaman stated they would provide her with "what [she is] doing well [at]" as well as "areas of development" based on "feedback of all product groups (R[elationship] M[anagers], Deriv[atives], Corp[orate] Strategy and all feedback on [Plaintiff].)"  (Licul Ex. CC at 1; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 210:6-9, 211:13-21.)  When identifying things in which she was "doing well", Bolger told Plaintiff she was "very likable", the team enjoyed working with her and having her on the desk.  (Licul Ex. CC at 1; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 210:6-9, 211:22-212:1.)  They did not say she was doing an "'excellent job' with her 'skills'", but identified "skills" in which she was doing well, which included "collaboration;  excellent job."  (Licul Ex. CC at 1; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 210:6-9, 212:2-3.)  Bolger continued that she is "able to deliver bank to clients" and that her work with the "███ road show, LA ,San Francisco, New York, treasurer and CFO" were "instrumental" in getting the Company a "pass[ive] bookrunner role."  (Licul Ex. CC at 1; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 210:6-9, 212:14-19.)  Bolger and Zaman then provided Plaintiff with her "areas of development" including "tak[ing] collaboration one step further.  More conviction, and take further independent view…We need VPs and above to become trusted advisors to add value and conviction," "establish [her]self as a mentor and set tone and example, and teaching them.  Area of development get everyone

excited about their work and accomplish their work," "reliability as VP to demonstrate
ability to finish projects in a timely manner." (Licul Ex. CC at 2; Chinn Supp. Dec. Ex.
1, Plaintiff I Tr. 210:6-9, 213:5-25.) They further informed Plaintiff "Managing people
not easy, diff[erent] personalities challenges on a day to day basis. Feedback: is always
necessary? All needed? Other VPs will offer help to juniors ie what is that you're
missing? Is there s[o]m[e]th[ing] I can do to resolve the bottleneck." (Licul Ex. CC at 2;
Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 214:1-6.)

107.    Bolger and Zaman used the meeting to praise Hatzimihalis's male peers. Without



providing any specifics, Zaman stated that " ███████████████ " Nieves and that " ██
███████████████████████████████████████ ." Zaman described both
men as willing to " ████████████████████ ." (Hatzimihalis 214:9-16.)

**Defendants' Response to Paragraph 107**: Deny. Bolger and Zaman provided Plaintiff
with specific performance feedback and areas of development, which included
"[e]stablish[ing] [herself] as a mentor and set tone and example and teaching
them…Managing people not easy, diff[erent] personalities challenges on a day to day
basis. Feedback: is always necessary? All needed? Other VPs will offer help to juniors
ie what is that you're missing? Is there s[o]m[e]th[ing] I can do to resolve the bottleneck.
VPs on the desk and everybody operates differently, i.e. C[hris] N[ieves] ████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████ ."
(Licul Ex. CC; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 213:15-214:16.) At the time, April

2020, Nieves and Asmundson were the only other VPs as Howard had been promoted to Director. (DSF ¶201.)

108.     Neither Bolger nor Zaman mentioned Kaitlin Carter, the only other woman in the group, who (as explained below), was considered the best performer. (Hatzimihalis Decl. ¶ 21).

**Defendants' Response to Paragraph 108**:  Immaterial.  At the time, April 2020, Nieves and Asmundson were the only other VPs as Howard had been promoted to Director. (DSF ¶201.)  Bolger and Zaman were describing to Plaintiff how other VPs performed managing juniors as compared to Plaintiff.

109.     At the meeting, Hatzimihalis requested a promotion. She was denied one but told that "2019 reflected areas of significant improvement." (Hatzimihalis 215:15-18; Licul Ex. CC).

**Defendants' Response to Paragraph 109**:  When Plaintiff asked if she would get promoted, Bolger and Zaman responded that "2019 reflected areas of significant improvement.  End of May, going to have new goals. Extension of Gaps 2019.  Gaps to be fixed, meaningful changes to even have conversation for step with the new fiscal year."  Zaman informed Plaintiff, "No promotion this year on the table.  If we fix issues identified. Plenty of work to be done before conversation about promotion.  [We need] strong framework to put in place, so no confusion.  Goals meet and also exceed for that."  (Licul Ex. CC; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 215:15-216:5.)

110.     In May 2020, Hatzimihalis discussed her compensation with Bolger and Zaman in a review meeting. (Hatzimihalis 202:9-203:2; Licul Ex. DD).

**Defendants' Response to Paragraph 110**:  Agree that Plaintiff discussed compensation with Bolger and Zaman in May 2020 when the "bonus discussions happened."  (Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-17.)  Agree that Plaintiff discussed compensation with

Bolger and Zaman in May 2020 but this conversation occurred on a call regarding her bonus not in a review meeting.  Plaintiff first testified she thought the compensation conversation was in the context of a review meeting (Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-13.), but then testified that she was confusing two conversations together, (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 204:14-19.)  Plaintiff's own meeting notes reflect Plaintiff had an annual review meeting with Bolger and Zaman on April 24, 2020 in which they provided her feedback about her performance (Licul Ex. CC) and that Plaintiff had a subsequent meeting with Bolger and Zaman on May 22, 2020 in which "Bolger communicated to [Plaintiff] that [her] bonus for the year was going to be █ ██████████████████." (Licul Ex. EE; Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-203:14; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 219:21-220:14.)  Plaintiff's cited evidence, Licul Ex. DD does not reference any conversation regarding her compensation.

111.    Bolger told Hatzimihalis she was "very likable in DCM"; "people enjoy working with" her; she was "doing a great job collaborating with other product areas of the bank"; and did a "good job" with the ██████ "road show, knowing the mandate." (Hatzimihalis 204:5-10).

**<u>Defendants' Response to Paragraph 111</u>**:  This mischaracterizes Plaintiff's testimony. Plaintiff first testified to the compensation conversation occurring during a review meeting and that Bolger made the statements in Paragraph 111 at the same time (Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-13; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 204:2-10), but then testified that she was confusing two conversations together, (Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 204:13-19).  Plaintiff's meeting notes reflect Plaintiff had an annual review meeting with Bolger and Zaman on April 24, 2020 in which they provided her feedback about her performance, including the statements referenced in Plaintiff's

Paragraph 111 above (Licul Ex. CC) and that Plaintiff had a subsequent meeting with Bolger and Zaman on May 22, 2020 in which "Bolger communicated to [Plaintiff] that [her] bonus for the year was going to be ███████████████."  (Licul Ex. EE; Chinn Dec. Ex. 1, Plaintiff I Tr. 202:9-203:14; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 219:21-220:14.)  These each occurred but not at the same meeting.

112.     Nevertheless, they told her that her bonus would be only $█████, which was "extremely low" from the prior year. (Hatzimihalis 203:8-21, 221:12-13; Licul Ex. EE.)

**Defendants' Response to Paragraph 112**:  Agree that Bolger and Zaman informed Plaintiff her bonus would be $█████ for fiscal year 2019, which Plaintiff characterized as "extremely low" (Chinn Dec. Ex. 1, Plaintiff I Tr. 203:6-13), and which was $██████ less than the previous fiscal year in which her bonus compensation was $██████ (Plaintiff Tr. Plaintiff I Tr. 29:10-14; Chinn Dec. Ex. 19, SMBC9159.) In Plaintiff's notes from the May 22, 2020 bonus call, Plaintiff drew an arrow from "$████ bonus" to "my performance review" in which she had received a Gaps rating.  (Licul Ex. EE; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 219:21-220:14; Chinn Dec. Ex. 1, Plaintiff I Tr. 221:1-13.)

113.     Hatzimihalis complained, asking "why is it so low." (Hatzimihalis 221:25-222:4, 222:9-17).

**Defendants' Response to Paragraph 113**:  Agreed and Plaintiff testified that the answer Bolger and Zaman gave her to that question was contained in her notes for the May 22, 2020 bonus call.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 221:25-222:8; Licul Ex. EE.)  In Plaintiff's notes from the May 22, 2020 bonus call, Plaintiff drew an arrow from "$████ bonus" to "my performance review" in which she had received a Gaps meeting. (Licul

Ex. EE; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 219:21-220:14; Chinn Dec. Ex. 1, Plaintiff I Tr. 221:1-13.)

114.    Once again, Bolger and Zaman tried to convince Hatzimihalis to leave the group and become a relationship manager. (Hatzimihalis 221:15-17, 355:11-22; Bolger 228:8-229:13, 256:17-257:5).

**Defendants' Response to Paragraph 114**:  Agree that Bolger and Zaman informed Plaintiff she should look for opportunities outside the DCM group.  During the May 22, 2020 bonus call, Bolger and Zaman informed Plaintiff she should look for "other opportunities within the bank to pursue outside DCM.  Explor[e] alternative options fit [her] better…sooner rather than later[.] [G]uidance to look for other opportunities within the bank."  (Ex. EE; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 219:21-220:14; Chinn Dec. Ex. 1, Plaintiff I Tr. 221:15-19.)

115.    At some point, Bolger even provided Hatzimihalis names outside of SMBC from whom she could seek employment. (Hatzimihalis 363:25-364:3).

**Defendants' Response to Paragraph 115**:  **UNDISPUTED**, and Plaintiff stated she believed Bolger was trying to help her find job.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 363:25-364:6.)

116.    Hatzimihalis understood that Bolger and Zaman wanted to push her out of the group. (Hatzimihalis Decl. ¶ 22).

**Defendants' Response to Paragraph 116**:  Admit that Plaintiff so understood and that after informing Plaintiff of her Gaps performance review and issues with her performance, Bolger and Zaman told Plaintiff she should look for opportunities outside the DCM group that fit her better sooner rather than later.  (Ex. EE; Chinn Supp. Dec. Ex.

1, Plaintiff I Tr. 219:21-220:14; Chinn Dec. Ex. 1, Plaintiff I Tr. 221:15-19.)  Zaman

testified that he told Plaintiff to consider becoming a relationship manager due to his

view that she was unable to perform well as a Vice President within DCM. (DSF ¶216;

Chinn Dec. Ex. 4, Zaman Tr. 68:4-9; 118:16-119:18; Zaman Dec. 1 ¶¶5-6.)  Bolger

testified that after the performance review and compensation communication with

Plaintiff, he and Zaman let Plaintiff know that it would be in her best interest to be

seeking employment either internally or externally and reiterated that a relationship

manager position would still be a good option given her skill set.  (Chinn Supp. Dec. Ex.

3, Bolger Tr. 228:8-229:13, 259:25-260:7.)

117.    Zaman believed that Hatzimihalis did not have the "drive" or the "desire" for

DCM; described her as "complacent"; thought she "rode the gravy train" while Satake was in

charge; believed she would be "eaten alive" by a CFO or treasurer; and admitted that "becoming

a director has never been on the table for" her. (Zaman 143:8-144:16; Chinn Ex. 45 at p. 6).

**Defendants' Response to Paragraph 117**:  Admit that Zaman's view of Plaintiff's

capabilities were that she did not have the "drive" or the "desire" for DCM; that he

described her as "complacent"; thought she "rode the gravy train" while Satake was in

charge; believed she would be "eaten alive" by a CFO or treasurer.  (Chinn Supp. Dec.

Ex. 4, Zaman Tr. 143:8-144:2.)  Zaman stated that "becoming a director has never been

on the table for her…[g]iven her previous performance" and that the statement was made

"[i]n the context of her not performing."  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 144:8-16.)

118.    At no point, however, did Bolger, Zaman or anyone else at SMBC suggest that

Hatzimihalis was in jeopardy of losing her job because of her performance. (Hatzimihalis

Decl. ¶ 23).

**Defendants' Response to Paragraph 118**:  Deny.  In July 2019, Zaman told Plaintiff to consider becoming a relationship manager.  (DSF ¶216; Chinn Dec. Ex. 4, Zaman Tr. 68:4-9; 118:16-119:18; Zaman Dec. 1 ¶¶5-6.)  In March 2020, Bolger and Zaman made the decision to terminate Plaintiff's employment but the termination timing was paused due to the COVID-19 pandemic.  (DSF ¶¶227-230.)  In April 2020, Bolger and Zaman rated Plaintiff a "Gaps" rating out of a scale of Gaps, Meets, and Exceeds.  (Chinn Dec. 42, SMBC9150.)  Within that performance review, Bolger and Zaman stated, "[Plaintiff] has struggled to consistently demonstrate the necessary capabilities to deliver against increasingly complex business objectives….her overall performance level is still below her peers operating at the VP level within DCM…The DCM business is under manage to optimize human capital management towards elevated business outcomes.  [Plaintiff] has not demonstrated the drive needed to grow past her DCM responsibilities as a VP at this time."  (Id.)  During the May 22, 2020 bonus call, Bolger and Zaman informed Plaintiff to look for other opportunities with the Company pursue outside DCM that fit her better "sooner rather than later."  (Ex. EE)

119.    Hatzimihalis was the only individual in the DCM group selected for the purported reduction in force that was allegedly slated to occur in Spring 2020. (Licul Ex. FF).

**Defendants' Response to Paragraph 119**:  **UNDISPUTED.** Bolger and Zaman testified that they considered performance across the DCM team, including considering title, position, value add, and revenue generation, and that Plaintiff was identified as the bottom performer in the group.  (Chinn Dec. Ex. 4, Zaman Tr. 77:14-19, 78:3-79:7; Chinn Supp. Dec. Ex. 3, Bolger Tr. 45:16-23; Chinn Dec. Ex. 3, Bolger Tr. 217:15-19.)

### G.   SMBC Fires Hatzimihalis After She Protests Discrimination

120.    On August 5, 2020, Hatzimihalis, through counsel, sent SMBC a letter protesting

discrimination. (Licul Ex. GG; Hatzimihalis 364:7-10; Hatzimihalis Decl. ¶ 24).

**Defendants' Response to Paragraph 120**:  **UNDISPUTED**.

121.    Bolger learned of the letter around the time it was sent. (Bolger 19:10-13).

**Defendants' Response to Paragraph 121**:  **UNDISPUTED**.

122.    Zaman saw the letter on August 5, 2020. (Zaman 14:23-15:6).

**Defendants' Response to Paragraph 122**: **UNDISPUTED**.

123.    On August 26, 2020, counsel for Hatzimihalis sent a second letter to SMBC,

detailing Hatzimihalis's allegations that SMBC violated federal and local equal pay,

discrimination and retaliation laws. (Licul Ex. HH).

**Defendants' Response to Paragraph 123**:  **UNDISPUTED**.

124.    On September 29, 2020, Hatzimihalis filed a charge of discrimination with the

U.S. Equal Employment Opportunity Commission. (Licul Ex. II).

**Defendants' Response to Paragraph 124**:  **UNDISPUTED**.

125.    On September 29, 2020, Hatzimihalis filed the instant action. (Dkt. No. 1).

**Defendants' Response to Paragraph 125**:  **UNDISPUTED**.

126.    Sisselman "was not surprised that [Hatzimihalis] had raised claims against

SMBC." (Sisselman 8:15-9:4; Licul Ex. M).

**Defendants' Response to Paragraph 126**:  This statement is mischaracterizing the

evidence and Sisselman's testimony.  The referenced notes indicate Sisselman said, "I

read it and am not surprised," (Licul Ex. M) without the additional statements Plaintiff

has included in Paragraph 126.  Further, Sisselman testified that the exact phrase used in

Plaintiff's Paragraph 126, that he "was not surprised that [Plaintiff] had raised claims against SMBC" was "taking my words out of context." (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 8:15-22.) Sisselman explained that HR representatives had emailed him asking to speak and he had been worried as he did not know what they wanted to talk about. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 11:2-8.) When he joined the call, the HR representatives mentioned allegations involving Plaintiff, and then took a brief break. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 11:9-12.) During the break, Sisselman conducted a google search and located a webpage describing Plaintiff raising claims against Nikko America. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 11:12-15.) Sisselman testified that when he rejoined the call, he stated that he was "not surprised" as to the impetus behind the call because he had now just googled and seen the news article. (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 11:12-20.) Sisselman further testified that he did not believe the foundation of Plaintiff's complaint was accurate as his "understanding is that this is a gender discrimination case and I don't believe that is really accurate in terms of what happened…it's…the core of the nature of the complaint that I don't really agree with….Because I think that it was a performance issue, not a gender issue." (Chinn Dec. Ex. 8, Sisselman Tr. 17:7-24.)

127.    Bolger learned of the complaint around the time it was filed. (Bolger 19:14-18.)

**Defendants' Response to Paragraph 127**:  **UNDISPUTED**.

128.    Bolger was unhappy about the complaint and "upset at Ms. Hatzimihalis for making the complaint." (Bolger 308:23-309:4.)

**Defendants' Response to Paragraph 128**:  Admit that Bolger so testified and explained that he was unpleased to be falsely accused of engaging in discrimination. (Chinn Supp.

Dec. Ex. 3, Bolger Tr. 19:22-20:2; 308:18-309:4.)  Further, Bolger's feelings are immaterial because it is undisputed Bolger and Zaman decided to terminate Plaintiff's employment by early March 2020 (DSF ¶227), five months before Plaintiff complained about alleged discrimination in August 2020.

129.    Bolger began to send Human Resources emails complaining about Hatzimihalis. On October 30, 2020, Bolger sent to HR an email exchange between him and Hatzimihalis concerning a client. He had never before sent such an email. (Bolger 316:9-20, 331:24-332:7; Licul Ex. JJ).

**Defendants' Response to Paragraph 129**:  This mischaracterizes the evidence and testimony.  Robbi Marmur is the HR representative who conducted the internal investigation into Plaintiff's allegations after Plaintiff complained about alleged discrimination in August 2020.  (Bolger Supp. Dec. ¶ 21.)  Marmur's investigation included asking Bolger to send her any relevant emails discussing Plaintiff's performance, to which Bolger responded October 21, 2020 attaching multiple emails. (Bolger Supp. Dec. ¶ 21; Bolger Supp. Dec. Ex.  2, SMBC11495.)  Nine days later, Bolger forwarded Marmur the email chain in Licul Ex. JJ as another example of Plaintiff's performance, which was the email chain in which the ████ CFO expressed confusion about Plaintiff's email.  (Bolger Supp. Dec. ¶ 21; Bolger Supp. Dec. Ex.  3, SMBC11481.)

130.    On November 25, 2020, Bolger sent an email to Human Resources and SMBC's lawyer listing various information about Hatzimihalis's accounts. (Bolger Ex. 8[6]).

---

[6]    "Bolger Ex. __" refers to exhibits attached to the Declaration of Defendant John Bolger in Support of Defendants' Motion for Summary Judgment (Dkt. Nos. 57, 68).

**Defendants' Response to Paragraph 130**:  Admit.  Robbi Marmur is the HR
representative who conducted the internal investigation into Plaintiff's allegations after
Plaintiff complained about alleged discrimination in August 2020.  (Bolger Supp. Dec. ¶
21.)  Marmur asked Bolger to provide her with the revenue generation information for
accounts over which Plaintiff had primary coverage and Bolger sent the email contained
in Bolger Dec. Ex. 8 in response.  (Bolger Supp. Dec. ¶ 22.)  Further, it is undisputed that
Bolger is aware of which Nikko America DCM individual has primary coverage over a
client at the time a DCM transaction for that client is announced and that Defendants kept
records reflecting the DCM revenue generated from each client.  (DSF ¶¶171-172).

131.    He did not send the email to Hatzimihalis, nor had he ever discussed such
information previously with Hatzimihalis, either during a review, bonus meeting or pulse check.
(Hatzimihalis 381:8-19). Neither did Zaman. (Hatzimihalis 381:20-22). Neither had Satake when
he was her supervisor. (Hatzimihalis 382:2-6).

**Defendants' Response to Paragraph 131**:  The statements in Paragraph 131 are
immaterial as it is undisputed that Bolger is aware of which Nikko America DCM
individual has primary coverage over a client at the time a DCM transaction for that
client is announced and that Defendants kept records reflecting the DCM revenue
generated from each client.  (DSF ¶¶171-172).  Further, it is undisputed the revenue
identified in Bolger Dec. Ex. 8 is the entirety of revenue Plaintiff generated from 2017-
2020.  (DSF ¶¶136-139.)  Additionally, in her FY 2019 performance evaluation provided
to Plaintiff in April 2020, Bolger and Zaman stated that "[Plaintiff] has certainly taken to
utilizing the resources that SMBC has available across fixed incomes…but needs to
ensure the bank gets the return for those efforts," (Chinn Dec. Ex. 42 at SMBC9154), that

"[Plaintiff needs to have more impact with her clients," (*Id*. at SMBC9156), "[Plaintiff]

overall performance level is still below her peers operating at the VP level within DCM.

[Plaintiff] has struggled to consistently demonstrate the necessary capabilities to deliver

against increasingly complex business objections.  The US DCM team continues to have

increasingly higher [sic] goals from senior management in terms of league table and

revenues," (*Id*. at SMBC9157.)

132.    Prior to filing this action, Hatzimihalis had never seen a document where SMBC

tallied the revenue generated by her, either as a primary or secondary coverage person.

(Hatzimihalis 386:2-6.)

> **Defendants' Response to Paragraph 132**:  The statement in Paragraph 132 is
>
> immaterial as it is undisputed that Bolger is aware of which Nikko America DCM
>
> individual has primary coverage over a client at the time a DCM transaction for that
>
> client is announced and that Defendants kept records reflecting the DCM revenue
>
> generated from each client.  (DSF ¶¶171-172).  Further, it is undisputed the revenue
>
> identified in Bolger Dec. Ex. 8 is the entirety of revenue Plaintiff generated from 2017-
>
> 2020.  (DSF ¶¶136-139.)

133.    On February 8, 2021, the parties participated in a mediation to settle the matter

(Dkt. No. 14), which was unsuccessful. (See Dkt. No. 16.)

> **Defendants' Response to Paragraph 133**:  **UNDISPUTED**.

134.    Hatzimihalis believed that SMBC would terminate her employment if the parties

could not reach an agreement during the mediation. (Hatzimihalis 379:20-22; see Hatzimihalis

396:20-25).

**Defendants' Response to Paragraph 134**:  The statement in Paragraph 134 is immaterial as Plaintiff's belief as to whether Nikko America would terminate her employment if the parties could not reach agreement during the mediation has no bearing on the reasoning behind Bolger and Zaman's decision to terminate Plaintiff's employment in March 2021.  Further, it is undisputed Bolger and Zaman decided to terminate Plaintiff's employment by early March 2020, nearly a year prior to the mediation.  (DSF ¶227.)

135.     On March 12, 2021, SMBC fired Hatzimihalis. (Hatzimihalis 371:14-17; Licul Ex. KK).

**Defendants' Response to Paragraph 135**:  **UNDISPUTED**.

136.     One of Hatzimihalis's colleagues, Nieves, was "taken aback" and "shocked" that Hatzimihalis had been fired, believed it "odd that she was let go," and "thought that that would be deemed as retaliation." (Nieves 24:10-25:13).

**Defendants' Response to Paragraph 136**:  The statement in Paragraph 136 is immaterial as a third party's surprise as to hearing Plaintiff's employment had been terminated and belief that it was "odd" or "would be deemed as retaliation" has no bearing on the reasoning behind Bolger and Zaman's decision to terminate Plaintiff's employment in March 2021.

137.     Another colleague, Asmundson, was "surprised that [Hatzimihalis] wasn't working with us anymore." (Asmundson 72:3-6.)

**Defendants' Response to Paragraph 137**:  The statement in Paragraph 137 is immaterial as a third party's expression of surprise as to hearing Plaintiff's employment

had been terminated has no bearing on the reasoning behind Bolger and Zaman's decision to terminate Plaintiff's employment in March 2021.

138.    Three men, Bolger, Christopher Dalton and Andreas Tonckens "continued coverage of [Hatzimihalis's] universe." (Asmundson 73:14-17; Bolger 46:18-19).

**Defendants' Response to Paragraph 138**:  The statement in Paragraph 138 is immaterial and mischaracterizes the testimony.  Defendants admit that Bolger, Dalton, and Tonckens continued coverage of the Real Estate sector but neither Dalton or Tonckens filled Plaintiff's Vice President role.  It is undisputed Bolger was at least two levels above Plaintiff (PSF ¶42), and that Dalton, an analyst and later an associate, and Tonckens, an analyst, are not Vice Presidents and held roles junior to a Vice President and did not have primary responsibility over accounts.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 45:25-46:2; Chinn Dec. Ex. 3, Bolger Tr. 198:9-20.)  Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.)

139.    At the time Hatzimihalis was dismissed, there were no women above the Director level in the DCM group. (Hatzimihalis Decl. ¶ 25).

**Defendants' Response to Paragraph 139**: Admit that on the date of Plaintiff's termination of employment, March 12, 2021, there were no women above the Director level in the DCM group but Howard was promoted to Executive Director and Head of FIG DCM two weeks later on April 1, 2021. (Howard Dec. Ex. 1)  Further, the statement

in Paragraph 139 is immaterial as none of Plaintiff's claims allege Plaintiff should have

held a role above the Director level.

### III.   HATZIMIHALIS'S COLLEAGUES

#### A.   Christopher Nieves

140.    Nieves started at SMBC as an analyst in August 2014, three years after

Hatzimihalis.  (Hatzimihalis 62:16-18; Nieves 28:5-7).

**Defendants' Response to Paragraph 140**:  **UNDISPUTED**. However, it is undisputed

that SMFG and SMBC did not acquire FHC status until May 2013, which enabled the

DCM group to engage in securities underwriting on DCM transactions and advise on

public bond issuance (DSF ¶13), which means Plaintiff had only been part of the DCM

group for a little over a year following FHC acquisition prior to Nieves joining.

141.    At the time, Nieves had only four years' financial services experience

(Hatzimihalis Decl. ¶ 26; Licul Ex. I at p. 19)—three years fewer than Hatzimihalis.

(Hatzimihalis Decl. ¶ 26; Chinn Ex. 14).

**Defendants' Response to Paragraph 141**:  **UNDISPUTED**.

142.    Moreover, he did not have any regulatory licenses. (Hatzimihalis Decl. ¶ 27; Licul

Ex. I at p. 17).

**Defendants' Response to Paragraph 142**:  Immaterial as the regulatory licenses at

issue, Series 63 which enables an individual to sell securities and Series 79 which enables

an individual to advise on debt or equity offerings, were not necessary in Nieves work

prior to joining the DCM group at Nikko America.  (Bolger Supp. Dec. ¶ 3.)

143.    SMBC offered Nieves a starting salary of $████ – $████ more than it paid

Hatzimihalis when she was hired as an AVP. (Hatzimihalis 86:2-4, 87:2-5; Chinn Ex. 19).

**Defendants' Response to Paragraph 143**:  It is irrelevant and immaterial to compare Nieves' starting salary in FY 2014 to Plaintiff's compensation three years earlier in 2011 because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue.

144.    Once hired, Hatzimihalis trained Nieves for over approximately a year. (Nieves 57:25-58:3).

**Defendants' Response to Paragraph 144**:  **UNDISPUTED**.

145.    Indeed, Nieves's starting salary ($▮▮▮▮) was higher than Hatzimihalis's 2014 salary ($▮▮▮▮) even though she started three years earlier (Hatzimihalis 52:9-12), had more industry experience (Hatzimihalis Decl. ¶ 28; Licul Ex. I; Chinn Ex. 14), was an AVP (Hatzimihalis 54:10-14) and Nieves's supervisor. (Hatzimihalis 80:4-7; 84:13-16; Chinn Exs. 17, 19).

**Defendants' Response to Paragraph 145**:  It is immaterial and irrelevant that Nieves's starting salary ($▮▮▮▮) was higher than Plaintiff's 2014 salary ($▮▮▮▮) as it is undisputed that, as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue and awarded bonuses such that Plaintiff made $▮▮▮▮ more than Nieves in FY 2014.  (DSF ¶40.)

146.    For fiscal year 2014, SMBC rated Nieves a "4" out of "5." (Licul Ex. LL).

**Defendants' Response to Paragraph 146**:  **UNDISPUTED**.

147.    For fiscal year 2014, during which Nieves only worked four months, SMBC paid him a bonus of $▮▮▮▮ (Hatzimihalis 88:2-6; Chinn Ex. 19) – $▮▮▮▮ more than it paid Hatzimihalis during her first year as an AVP for 2011. (Chinn Ex. 17).

**Defendants' Response to Paragraph 147**: The statement in Paragraph 147 mischaracterizes the evidence and is immaterial.  It is undisputed that at least starting in FY 2014, Nikko America's fiscal year ran from April 1 to March 31 of the next year (DSF 35), and that Nieves joined Nikko America in August 2014 (DSF ¶28, PSF ¶140), meaning Nieves worked at Nikko America for eight months in FY 2014 from August 2014 through March 2015.  (DSF ¶35.)  It is irrelevant and immaterial to compare Nieves' bonus compensation in FY 2014 to Plaintiff's bonus compensation three years earlier in 2011 because it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)

148.    Hatzimihalis protested to her then supervisor Sisselman "that the new incoming analyst, my analyst, was getting more than I was getting. As an AVP, I was more senior to him." (Hatzimihalis 80:4-7).

**Defendants' Response to Paragraph 148**:  **UNDISPUTED**.  Admit that Plaintiff so stated to Sisselman in the summer of 2014 and that Satake awarded Plaintiff and Nieves year-end bonuses for fiscal year 2014 and paid Plaintiff $███ more in total compensation for FY 2014 than Nieves (with Nieves's sign-on bonus included).  (Chinn Dec. Ex. 1, Plaintiff I Tr. 88:13-25; 89:1-17; Chinn Dec. Ex. 17, SMBC00002; Chinn Dec. Ex. 19, SMBC0009159.)

149.    Sisselman agreed with Hatzimihalis. (Hatzimihalis 80:2-10).

**Defendants' Response to Paragraph 149**:  The statement in Paragraph 149 is unclear as to what Sisselman "agreed with".  Admit that after Plaintiff informed Sisselman in summer 2014 that Nieves' base salary was higher as an analyst than her base salary as an Associate Vice President, Sisselman told Plaintiff he would speak to Satake about it and subsequently told Plaintiff that he spoke with Satake and Satake was going to resolve the base salary disparity between Nieves and Plaintiff with the year-end bonus and undisputed Satake awarded Plaintiff and Nieves year-end bonuses for fiscal year 2014 and paid Plaintiff $███ more in total compensation for FY 2014 than Nieves (with Nieves's sign-on bonus included).  (DSF ¶¶36-37, 40.)

150.    Sisselman spoke to Satake, who acknowledged the pay gap and stated that Hatzimihalis "shouldn't be worrying about it." (Hatzimihalis 81:18-82:2).

**Defendants' Response to Paragraph 150**:  Admit that Sisselman spoke to Satake, Satake was aware Nieves had a higher base salary than Plaintiff, and that Satake told Sisselman that Plaintiff shouldn't be worrying about it because Satake was going to resolve the base salary disparity between Nieves and Plaintiff with the year-end bonus. (DSF ¶¶36-37.)  Further, Satake awarded Plaintiff and Nieves year-end bonuses for fiscal year 2014 and paid Plaintiff $███ more in total compensation for FY 2014 than Nieves (with Nieves's sign-on bonus included).  (DSF ¶40.)

151.    Sisselman told Hatzimihalis that she was "performing very well" and that, according to Satake, "he's going to make it up in end-of-the year bonus." (Hatzimihalis 82:3-6).

**Defendants' Response to Paragraph 151**:  **UNDISPUTED**.  Further, Satake awarded Plaintiff and Nieves year-end bonuses for fiscal year 2014 and paid Plaintiff $███

more in total compensation for FY 2014 than Nieves (with Nieves's sign-on bonus

included).  (DSF ¶40.)

152.    Hatzimihalis also spoke to Satake about "how [she] was getting paid less than

[her] analyst." Satake "agreed" and "did not deny it." Satake stated that "he was going to fix it

with [Hatzimihalis's] bonus." (Hatzimihalis 83:7-10.)

**Defendants' Response to Paragraph 152**:  **UNDISPUTED**. Further, it is undisputed

Satake explained to Plaintiff that new hires were receiving higher base salaries than

legacy employees but that he was going to fix the salary disparity with her year-end

bonus award (DSF ¶¶38-39), and that Satake awarded Plaintiff and Nieves year-end

bonuses for fiscal year 2014 and paid Plaintiff $███ more in total compensation for

FY 2014 than Nieves (with Nieves's sign-on bonus included), (DSF ¶40.)

153.    For fiscal year 2015, SMBC paid Nieves, a second-year analyst, a salary of

$███ (Chinn Ex. 19) – $███ more than it paid Hatzimihalis as a second-year AVP for

2012. (Chinn Ex. 19).

**Defendants' Response to Paragraph 153**: It is irrelevant and immaterial to compare

Nieves' salary in FY 2015 to Plaintiff's salary three years earlier in 2012 because (i) as

explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to

address the legacy and new hire issue.  Additionally, describing Plaintiff as a "second-

year AVP" in 2012 is mischaracterizing the evidence as Plaintiff joined Nikko America

as an AVP in October 2011 and thus was only an AVP for two months prior to the start

of 2012.  (DSF ¶8.)

154.    For fiscal year 2015, SMBC paid Nieves a bonus of $███ (Chinn Ex. 19) –

$███ more than it paid Hatzimihalis as second-year AVP for 2012. (Chinn Ex. 17).

**Defendants' Response to Paragraph 154**:  It is irrelevant and immaterial to compare Nieves' bonus compensation in FY 2015 to Plaintiff's bonus compensation three years earlier in 2012 because it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.) Additionally, describing Plaintiff as a "second-year AVP" in 2012 is mischaracterizing the evidence as Plaintiff joined Nikko America as an AVP in October 2011 and thus was only an AVP for two months prior to the start of 2012.  (DSF ¶8.)

155.    "[E]arly on," Nieves had " ███████ with his " ███████████████ " and " ████████ (Nieves 47:9-25.)

**Defendants' Response to Paragraph 155**:  The cited evidence does not support the statement in Paragraph 155.  The cited testimony does not contain any of the identified quotes and is instead discussing a compensation meeting Nieves had with Bolger and Zaman in which they informed him of his bonus for FY 2019.  (Chinn Supp. Dec. Ex. 6, Nieves Tr. 47:9-25.)  If the reference is meant to be to Sisselman's testimony, while Sisselman testified that " ██████████████████████████████████████████ ███████████████████ " he further testified that Nieves " ███████████████████ ████████████████████████████████ "  (Exhibit E to Licul Declaration, Sisselman Tr. 47:9-25.)

156.    In 2016, SMBC promoted Nieves to Associate, a level below AVP. (Nieves 28:7-9).

**Defendants' Response to Paragraph 156**: Admit Nieves was promoted to Associate in June of 2016.   Deny that Associate was a level below Associate Vice President as Associate Vice President was part of a prior corporate titling system at Nikko America and was a level below Vice President, similar to Associate being a level below Vice President in the subsequent corporate titling system in Nikko America.

157.     An associate is considered a "junior." (Bolger 119:18-21)

**Defendants' Response to Paragraph 157**:  Admit.  Further, it is immaterial as Defendants paid Plaintiff $███ more in total compensation that Nieves in FY 2016. (DSF ¶57).

158.     For fiscal year 2016, SMBC paid Nieves, first year Associate, a salary of $███ (Chinn Ex. 19) – $███ more than it paid Hatzimihalis as a third-year AVP for 2013. (Chinn Ex. 17).

**Defendants' Response to Paragraph 158**:  It is irrelevant and immaterial to compare Nieves' salary in FY 2016 to Plaintiff's salary three years earlier in 2013 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)  Additionally, describing Plaintiff as a "third-year AVP" in 2013 is mischaracterizing the evidence as Plaintiff joined Nikko America as an AVP in October 2011 and thus was only an AVP for 1 year and two months prior to the start of 2013.  (DSF ¶8.)

159.     For fiscal year 2016, SMBC paid Nieves a bonus of $███████ (Chinn Ex. 19) –

$███████ more than it paid Hatzimihalis as a third-year AVP for fiscal year 2013. (Chinn Ex.

17).[7]

**Defendants' Response to Paragraph 159**: It is irrelevant and immaterial to compare

Nieves' bonus compensation in FY 2016 to Plaintiff's bonus compensation three years

earlier in 2013 because it is undisputed that Satake received a bonus pool from Nikko

America's parent company SMFG based on the financial performance of SMFG, SMBC

Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool

allocated to Satake each year varied depending on the business performance at each of

those levels.  (DSF ¶¶191-192.) Additionally, describing Plaintiff as a "third-year AVP"

in 2013 is mischaracterizing the evidence as Plaintiff joined Nikko America as an AVP in

October 2011 and thus was only an AVP for 1 year and two months prior to the start of

2013.  (DSF 8.)

160.     In 2017, SMBC promoted Nieves to VP. (Nieves 28:9-10).

**Defendants' Response to Paragraph 160**:  **UNDISPUTED**.

161.     The Bank gave Nieves a "super fast promotion." (Licul Ex. M).

**Defendants' Response to Paragraph 161**:  Deny.  Admit that interview notes from an

interview of Sisselman stated that Sisselman considered Nieves's promotion to Director

to be "superfast" in comparison to Sisselman's own promotion to Director.  Sisselman

additionally described Howard as being "promoted fast."  (Licul Ex. M at SMBC11417.)

---

[7]     In 2014, SMBC switched from a calendar fiscal year to a fiscal year beginning in April. Defs' MOL at n.1. As such, Hatzimihalis received a bonus in February ($██████ and a second bonus in June ($██████ (Chinn Ex. 17).

162.   At the point, Nieves began to have primary coverage responsibilities that were given to him by Zaman. (Hatzimihalis 186:10-17; Nieves 40:11-13, 40:15-20).

**Defendants' Response to Paragraph 162**:  Admit.  After Nikko America promoted Nieves to Vice President, Zaman assigned Nieves an initial allotment of lower-tiered accounts for primary coverage responsibilities. (Chinn Dec. Ex. 6, Nieves Tr. 40:4-20; Nieves Dec. ¶¶5-8; Satake Dec. ¶40; Chinn Dec. Ex. 1, Plaintiff I Tr. 17:14-18; 186:14-17; 189:22-190:2.)

163.   Over time, Nieves took over more of Zaman's clients. (Nieves 41:5-9).

**Defendants' Response to Paragraph 163**:  Admit, and Zaman testified that before senior coverage officers like himself feel comfortable allowing junior officers to manage coverage over larger client accounts, he assesses the individual's performance in secondary coverage and/or in primary coverage over a limited number of lower-tiered accounts, and that as individuals demonstrated that they had the wherewithal and competencies to handle accounts, more accounts would be allocated to them. (DSF ¶81; Chinn Dec. Ex. 4, Zaman Tr. 47:16-49:25.)

164.   These clients were ███████████████████████████. (Nieves Ex. 2; Licul Exs. N, U).

**Defendants' Response to Paragraph 164**:  The cited evidence does not support the statement in Paragraph 164.  First, it is unclear whether Paragraph 164 refers to the initial client assignments Nieves received when becoming a Vice President in 2017 or clients Zaman assigned him over time.  If it is meant to refer to the clients Zaman assigned Nieves in 2017, the evidence Plaintiff cites to – Nieves Dec. Ex. 2 – does not support the statement as these three clients only appear in the list of 2020 transactions not in the 2017

transactions.  As to the reference to Licul Exs. N and U, Defendants further refer to Defendants' Reply to DSF ¶152.

165.    Zaman took Nieves to visit clients once every two-to-three weeks. (Nieves 44:12-17).

**Defendants' Response to Paragraph 165**:  Admit but immaterial given that Bolger was open to Plaintiff attending meetings and calls with REIT clients outside her primary coverage responsibilities.  (Chinn Dec. Ex. 1, Plaintiff I Tr. 170:3-8.)

166.    As VP, Nieves had the same responsibilities as Hatzimihalis. (Nieves 33:2-8).

**Defendants' Response to Paragraph 166**:  **UNDISPUTED**.

167.    Beginning in fiscal year 2019, Bolger and Zaman became co-heads of the group and decided what accounts to give him. (Hatzimihalis 383:11-16).

**Defendants' Response to Paragraph 167**:  The cited evidence does not support the statement as Plaintiff admitted she did not know which clients Asmundson or Nieves had primary coverage (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22, 312:8-11) and that she is unaware of what conversations resulted in various coverage responsibilities for Nieves's clients. (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-18, 395:13-17.) Admit Bolger and Zaman became co-heads of the group in July 2019 and that Zaman determined which accounts to assign Nieves as the senior officer in the sector of clients. (Zaman Supp. Dec. ¶ 3.)

168.    Nieves was given credit for an important client, ▓▓▓▓ even though he did not have primary coverage over that client. (Hatzimihalis 189:3-7, 191:20-24; Licul Exs. N, U).

**Defendants' Response to Paragraph 168**:  It is unclear what is meant by "given credit" in Paragraph 168.  Admit that Nieves provided secondary coverage to Zaman on ▓▓▓▓

just as it is undisputed that Plaintiff provided secondary coverage to Bolger on all Real

Estate clients that were not within her own primary coverage responsibilities (DSF ¶89),

and provided secondary coverage to Bolger on the entire healthcare portfolio during 2017

and 2018 (DSF ¶95).  Satake, Bolger, and Zaman testified to considering both primary

and secondary coverage performance when making pay determinations.  (DSF ¶¶194,

246-247; Satake Dec. ¶¶18-19, 21; Chinn Dec. Ex. 3, Bolger Tr. 113:2-114:16; Chinn

Dec. Ex. 4, Zaman Tr. 43:15-25, 46:8-16; Zaman Dec. ¶9.)  Further, Plaintiff admitted

she did not know which clients Asmundson or Nieves had coverage over.  (Chinn Dec.

Ex. 2, Plaintiff II Tr. 303:14-16, 307:17-22, 312:8-11.)  As to Plaintiff's reference to

Licul Exs. N and U, Defendants refer to Defendants' Reply to DSF ¶152.

169.    Nieves was also given credit or "implicit" revenue, that is revenue for clients

where he does not provide primary coverage. (Zaman 80:5-16, 108:20-23)

**Defendants' Response to Paragraph 169**:  Immaterial as it is undisputed that Plaintiff

provided secondary coverage to Bolger on all Real Estate clients that were not within her

own primary coverage responsibilities (DSF ¶89), and provided secondary coverage to

Bolger on the entire healthcare portfolio during 2017 and 2018 (DSF ¶95).  Satake,

Bolger, and Zaman testified to considering both primary and secondary coverage

performance when making pay determinations.  (DSF ¶¶194, 246-247; Satake Dec. ¶¶18-

19, 21; Chinn Dec. Ex. 3, Bolger Tr. 113:2-114:16; Chinn Dec. Ex. 4, Zaman Tr. 43:15-

25, 46:8-16; Zaman Dec. ¶9.)

170.    After Bolger and Zaman took over in 2019, SMBC credited Nieves with
$█████. (Nieves Ex. 2[8]).

**Defendants' Response to Paragraph 170**:  Admit.

171.    Nieves did not "buil[d]" businesses at SMBC. (Hatzimihalis 388:24-389:2).

**Defendants' Response to Paragraph 171**:  The cited evidence does not support the

statement in Paragraph 171.  Plaintiff testified that she is not aware of any business that

Nieves built and that she is unaware of what conversations resulted in various coverage

responsibilities for Nieves's clients. (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-

18, 395:13-17.)  Further, it is undisputed that Nieves's prospecting efforts have included

sending weekly market update emails and quarterly pricing updates, as well as engaging

in dialogue with prospective clients regarding market strategy and ideas if he is able to

secure a meeting or call with them.  (DSF 134; Nieves Dec. ¶13; Chinn Dec. Ex. 6,

Nieves Tr. 40:21-41:9; Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-18, 395:13-

17.)

172.    For fiscal year 2017, SMBC paid Nieves, a first-year VP, a salary of $█████
(Chinn Ex. 19) – $█████ more than it paid Hatzimihalis as a first-year VP for 2015. (Chinn Ex.

17).

**Defendants' Response to Paragraph 172**:  It is irrelevant and immaterial to compare

Nieves' compensation in FY 2017 to Plaintiff's compensation two years earlier in 2015

because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013

and 2017 to address the legacy and new hire issue.

---

[8]      "Nieves Ex. __" refers to exhibits attached to the Declaration of Christopher Nieves in Support of
Defendants' Motion for Summary Judgment (Dkt. Nos. 55, 67).

173.    For fiscal year 2017, SMBC paid Nieves a bonus of $███ (Chinn Ex. 19) –
$███ more than it paid Hatzimihalis as a first-year VP for 2015. (Chinn Ex. 17).

**Defendants' Response to Paragraph 173**:  It is irrelevant and immaterial to compare
Nieves's bonus compensation in FY 2017 to Plaintiff's bonus compensation in 2015 as it
is undisputed that Satake received a bonus pool each year from SMFG based on the
financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and
the DCM group and that the bonus pool changed each year depending on those
performances.  (DSF ¶¶ 191-192.)

174.    For fiscal year 2018, SMBC paid Nieves, a second-year VP, a salary of $███
(Chinn Ex. 19) – $███ more than it paid Hatzimihalis as second-year VP for 2016. (Chinn Ex.
17).

**Defendants' Response to Paragraph 174**:  It is irrelevant and immaterial to compare
Nieves's base salary compensation in FY 2018 to Plaintiff's base salary compensation
two years earlier in 2016 because as explained at DSF ¶¶13-14, 20-23, Satake altered
base salaries between 2013 and 2017 to address the legacy and new hire issue.

175.    For fiscal year 2018, SMBC paid Nieves a bonus of $███ (Chinn Ex. 19) –
$███ more than it paid Hatzimihalis as a second-year VP for 2016. (Chinn Ex. 17).

**Defendants' Response to Paragraph 175**:  It is irrelevant and immaterial to compare
Nieves's bonus compensation in FY 2018 to Plaintiff's bonus compensation two years
earlier in 2016 as it is undisputed that Satake received a bonus pool each year from
SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc.,
Nikko America, and the DCM group and that the bonus pool changed each year
depending on those performances.  (DSF ¶¶191-192.)

176.     As third-year VPs, Nieves (2019) and Hatzimihalis (2017) were paid the same base salary ($███████). (Chinn Exs. 17, 19). However, Nieves's bonus ($███████) (Chinn Ex. 19)     was nearly double Hatzimihalis's bonus ($███████). (Chinn Ex. 17).

**Defendants' Response to Paragraph 176**:  It is irrelevant and immaterial to compare Nieves's bonus compensation in FY 2019 to Plaintiff's bonus compensation two years earlier in 2017 as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶ 191-192.)

177.     In 2020, SMBC promoted Nieves to Director. (Nieves 28:10-12).

**Defendants' Response to Paragraph 177**:  **UNDISPUTED**.

178.     His responsibilities did not change, only his title. (Nieves 33:14-20).

**Defendants' Response to Paragraph 178**:  **UNDISPUTED**.

179.     For fiscal year 2020, SMBC paid Nieves a salary of $██████ (Chinn Ex. 19) – $█████ more than it paid Hatzimihalis as a fourth-year VP. (Chinn Ex. 17).

**Defendants' Response to Paragraph 179**:  It is irrelevant and immaterial to compare base salary compensation alone.

180.     Zaman believed that Nieves was "███████████ (Zaman 144:17-23).

**Defendants' Response to Paragraph 180**:  Admit Zaman described Nieves as ███████ and that Zaman testified that "████████████████████████████." (Chinn Supp. Dec. Ex. 4, Zaman Tr. 144:17-23.)

181.     Nieves did not "buil[d]" any businesses at SMBC. (Hatzimihalis 388:20-23).

**Defendants' Response to Paragraph 181**:  Paragraph 181 is identical to Paragraph 171 and the cited evidence does not support the statement in Paragraph 171 or Paragraph 181. Plaintiff admitted that she is not aware of any business that Nieves built and further admitted that she is unaware of what conversations resulted in various coverage responsibilities for Nieves's clients. (Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-18, 395:13-17.)  Further, it is undisputed that Nieves's prospecting efforts have included sending weekly market update emails and quarterly pricing updates, as well as engaging in dialogue with prospective clients regarding market strategy and ideas if he is able to secure a meeting or call with them.  (DSF ¶134; Nieves Dec. ¶13; Chinn Dec. Ex. 6, Nieves Tr. 40:21-41:9; Chinn Dec. Ex. 2, Plaintiff II Tr. 303:14-16, 390:8-18, 395:13-17.)

182.     Nevertheless, Nieves had primary coverage over three accounts. (Hatzimihalis Decl. ¶ 34).

**Defendants' Response to Paragraph 182**:  Defendants refer to Defendants' Reply to DSF ¶152.

**B.     William Asmundson**

183.     Asmundson started at SMBC as an analyst in November 2015, four years after Hatzimihalis.  (Hatzimihalis 62:20-22; Asmundson 37:8-10).

**Defendants' Response to Paragraph 183**: **UNDISPUTED**.

184.     At the time, Asmundson had only three years' industry experience (Hatzimihalis Decl. ¶ 29; Licul Ex. I at p. 30)—five fewer than Hatzimihalis (Hatzimihalis Decl. ¶ 29; Chinn Ex. 14).

**Defendants' Response to Paragraph 184**:  **UNDISPUTED**.

185.     He had only worked in DCM for two years, since 2013. (Asmundson 60:7-11).

**Defendants' Response to Paragraph 185**:  **UNDISPUTED**.

186.    Asmundson earned his first regulatory license in 2015 (Hatzimihalis Decl. ¶ 30; Licul Ex. I at p. 28)—more than seven years after Hatzimihalis. (Hatzimihalis Decl. ¶ 30; Licul Ex. I at p. 6).

**Defendants' Response to Paragraph 186**:  Immaterial as the regulatory licenses at issue, Series 63 which enables an individual to sell securities and Series 79 which enables an individual to advise on debt or equity offerings, were not necessary in Nieves work prior to joining the DCM group at Nikko America.  (Bolger Supp. Dec. ¶ 3.)

187.    For fiscal year 2015, SMBC paid Asmundson, a first-year analyst, a salary of $███ (Chinn Ex. 20) – $████ more than it paid Hatzimihalis as a first-year AVP in 2011. (Chinn Ex. 17).

**Defendants' Response to Paragraph 187**:  It is irrelevant and immaterial to compare Asmundson's base salary compensation in FY 2015 to Plaintiff's compensation four years earlier in 2011 because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue.  Further, it is immaterial as it is undisputed that Defendants paid Plaintiff $████ more in total compensation than Asmundson in FY 2015.  (DSF ¶40; Chinn Dec. Exs. 17, 20.)

188.    For fiscal year 2015, SMBC paid Asmundson a bonus of $████ (Chinn Ex. 20) – $████ more than it paid Hatzimihalis as a first-year AVP. (Chinn Ex. 17).

**Defendants' Response to Paragraph 188**: It is irrelevant and immaterial to compare Asmundson's bonus compensation in FY 2015 to Plaintiff's bonus compensation four years earlier in 2011 as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc.,

Nikko America, and the DCM group and that the bonus pool changed each year

depending on those performances.  (DSF ¶¶ 191-192.)  Further, it is immaterial as it is

undisputed that Defendants paid Plaintiff $███████ more in total compensation than

Asmundson in FY 2015.  (DSF ¶48; Chinn Dec. Exs. 17, 20.)

189.    In June 2016, after only eight months, SMBC promoted Asmundson to Associate.
(Asmundson 37:15-17).

**Defendants' Response to Paragraph 189**:  Admit.  However, Asmundson worked as an

analyst for three years prior to this at his previous employer, Banco Bilbao Vizcaya

Argentaria ("BBVA"), and had been promoted to senior analyst there prior to joining

Nikko America as an analyst in 2015.  (Chinn Dec. Ex. 7, Asmundson Tr. 37:8-14,

60:12-17.)

190.    Zaman was involved in promoting Asmundson. (Asmundson 38:20-25).

**Defendants' Response to Paragraph 190**:  The cited evidence does not support the

statement in Paragraph 190.  Asmundson testified that he did not know who was involved

in the decision to promote him to Associate.  (Chinn Supp. Dec. Ex. 7, Asmundson Tr.

38:20-25.)  It is undisputed that Asmundson was promoted to Associate in 2016 based on

Satake's recommendation, and that Bolger and Zaman did not make promotion decisions

until after they became co-heads of DCM in July 2019.  (DSF ¶¶55, 208.)

191.    Although a promotion, Asmundson's responsibilities were "very much . . . the
same." (Asmundson 40:11-13).

**Defendants' Response to Paragraph 191**:  Admit.  Asmundson additionally testified

that as an associate he was responsible for generating more innovative thoughts for

presentations and client ideas than as an analyst.  (Chinn Supp. Dec. Ex. 7, Asmundson Tr. 40:11-22.)

192.    As an "analyst/associate," Asmundson's "job was to just make sure the everything is up to date and good." (Asmundson 42:18-20).

**Defendants' Response to Paragraph 192**:  Admit.  Asmundson further testified that as an analyst, his duties included preparing marketing materials for meetings, handling all daily databases and materials that go into client presentations, handling transaction work, and working on internal deal files that are used to track deals, that his job responsibilities as an associate were very much the same except that he was additionally testified responsible for generating more innovative thoughts for presentations and client ideas than as an analyst.  (Chinn Supp. Dec. Ex. 7, Asmundson Tr. 39:24-40:22, 42:18-43:6.)

193.    For fiscal year 2016, SMBC paid Asmundson, a first-years Associate, a salary of $█████ (Chinn Ex. 20) – $█████ more than it paid Hatzimihalis as a second-year AVP for 2012. (Chinn Ex. 17).

**Defendants' Response to Paragraph 193**:  It is irrelevant and immaterial to compare Asmundson's base salary compensation in FY 2016 to Plaintiff's base salary compensation four years earlier in 2012 because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue.  Further, it is immaterial as it is undisputed that Defendants paid Plaintiff $█████ more in total compensation than Asmundson in FY 2016.  (DSF ¶56; Chinn Dec. Exs. 17, 20).  Additionally, describing Plaintiff as a "second-year AVP" in 2012 is mischaracterizing the evidence as Plaintiff joined Nikko America as an AVP in October 2011 and thus was only an AVP for two months prior to the start of 2012.  (DSF ¶8.)

194.     For fiscal year 2016, SMBC paid Asmundson a bonus of $████ (Chinn Ex. 20) – $████ more than it paid Hatzimihalis as a second-year AVP for 2012. (Chinn Ex. 17).

**<u>Defendants' Response to Paragraph 194</u>**:  It is irrelevant and immaterial to compare Asmundson's bonus compensation in FY 2016 to Plaintiff's bonus compensation in 2012 as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶ 191-192.)  As further evidence of the inappropriateness of comparison between 2012 and 2016, Plaintiff's own compensation tripled from a total of $████ in FY 2012 to over $████ in FY 2016.  (*See* Chinn Dec. Ex. 17; Chinn Dec. Ex. 1, Plaintiff I Tr. 63:8-10, 64:9-22; Chinn Supp. Dec. Ex. 1, Plaintiff I Tr. 65:7-13, 95:22-96:14.)  Further, it is immaterial as it is undisputed that Defendants paid Plaintiff $████ more in total compensation than Asmundson in FY 2016.  (DSF ¶56; Chinn Dec. Exs. 17, 20).  Additionally, describing Plaintiff as a "second-year AVP" in 2012 is mischaracterizing the evidence as Plaintiff joined Nikko America as an AVP in October 2011 and thus was only an AVP for two months prior to the start of 2012.  (DSF ¶8.)

195.     In 2017, only one year after being promoted to Associate, SMBC again promoted Asmundson to VP. (Asmundson 37:16-21).

**<u>Defendants' Response to Paragraph 195</u>**:  Admit.  Asmundson testified that he was told that he was promoted to Vice President because he had provided more assistance with thought leadership in what to present to clients beyond the more supporting role of an associate and he had started to do more prospecting of clients.  (Chinn Supp. Dec. Ex. 7, Asmundson Tr. 41:24-43:6.)

196.    Hatzimihalis was "already a VP in the DCM team." (Asmundson 43:7-10).

**Defendants' Response to Paragraph 196**:  Admit.

197.    The Bank gave Amundson "a fast promotion." (Sisselman 70:17-19).

**Defendants' Response to Paragraph 197**:  The cited evidence does not support the statement in Paragraph 197.  Admit that Sisselman testified to thinking Asmundson received a fast promotion. (Sisselman 70:17-19).  However, interview notes from an interview of Sisselman stated that Sisselman considered Asmundson's promotion to Director to be "fast" in comparison to Sisselman's own promotion to Director.  (Licul Ex. M at SMBC11417.)  Sisselman additionally described Howard as being "promoted fast." (Id.)

198.    Asmundson now had the "same job responsibilities" as Hatzimihalis. (Asmundson 43:11-17, 56:5-12; Licul Ex. MM).

**Defendants' Response to Paragraph 198**:  **UNDISPUTED**.

199.    At that point, Asmundson began to get primary coverage client responsibilities. (Hatzimihalis 190:5-8).

**Defendants' Response to Paragraph 199**:  **UNDISPUTED**.

200.    Asmundson was given credit for "platinum clients" such a ▮▮▮ and ▮▮▮ even though he did not have primary coverage over those clients, meaning that he covered those clients "along with another senior banker." (Hatzimihalis 190:12-21, 191:1-12).

**Defendants' Response to Paragraph 200**:  It is unclear what is meant by "given credit" in Paragraph 200.  Admit that Asmundson provided secondary coverage to Morici on ▮▮▮ and ▮▮▮ just as it is undisputed that Plaintiff provided secondary coverage to Bolger on all Real Estate clients that were not within her own primary coverage

responsibilities (DSF ¶89), and provided secondary coverage to Bolger on the entire

healthcare portfolio during 2017 and 2018. (DSF ¶95).

201.     Asmundson had "ongoing discussions" with his supervisor, Matt Morici, "about

[his] career." (Asmundson 50:15-17, 60:23-25).

**Defendants' Response to Paragraph 201**:  Admit.  It is further undisputed that Bolger

tried to be a good mentor to Plaintiff.  (DSF ¶93.)

202.     Asmundson was given more primary coverage clients than Hatzimihalis.

(Hatzimihalis 192:8-14).

**Defendants' Response to Paragraph 202**:  The cited evidence does not support the

statement.  The cited evidence refers to Plaintiff testifying that she believed that when

Asmundson was initially assigned primary coverage responsibilities, he was assigned

more primary coverage clients than she had been.  (Chinn Dec. Ex. 1, Plaintiff I Tr.

192:8-14.)  However, Plaintiff admitted she did not know which clients over which

Asmundson had primary coverage or how he obtained those clients. (Chinn Dec. Ex. 1,

Plaintiff I Tr. 192:18-23; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 312:8-11, 395:13-17.)

Further, it is undisputed that after Nikko America promoted Asmundson to Vice

President, he was assigned one to two lower-tiered clients.  (DSF ¶102.)

203.     In 2019, after Bolger and Zaman became co-heads of the group, Asmundson's

primary coverage revenue increased by approximately $██████, from $██████ to

$██████. (Hatzimihalis 386:12-18; Nieves Ex. 2).

**Defendants' Response to Paragraph 203**:  Admit that Asmundson's primary coverage

revenue was $██████ in FY 2018 and $██████ in FY 2019 but it is immaterial that

this increase occurred after Bolger and Zaman became co-heads of DCM.  Further,

Nieves Ex. 2 does not support the statement in Paragraph 203 as it does not reference any revenue generated by Asmundson.

204.    Asmundson did not "buil[d]" any businesses at SMBC. (Hatzimihalis 388:20-23).

**Defendants' Response to Paragraph 204**:  The cited evidence does not support the statement in Paragraph 204.  Plaintiff testified that she is not aware of any business that Asmundson built but admitted that she is unaware of what conversations resulted in various coverage responsibilities for Asmundson's clients. (Chinn Dec. Ex. 1, Plaintiff I Tr. 192:18-23; Chinn Dec. Ex. 2, Plaintiff II Tr. 308:3-5, 312:8-11, 395:13-17.)  Further, it is undisputed that Asmundson does a lot of prospecting, a couple of his primary coverage clients were prospects that had not been previously banked within the DCM group and Asmundson is now primary coverage on them because he was responsible for prospecting them, and he has successfully prospected at least 4 clients to the DCM group since becoming a Vice President.  (DSF ¶¶131-133.)

205.    For fiscal year 2017, SMBC paid Asmundson, a first-year VP, a salary of $███ (Chinn Ex. 20) – $███ more than it paid Hatzimihalis as a first-year VP for 2015. (Chinn Ex. 17).

**Defendants' Response to Paragraph 205**:  It is irrelevant and immaterial to compare Asmundson's base salary compensation in FY 2017 to Plaintiff's base salary compensation two years earlier in 2015 because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue.

206.    For fiscal year 2017, SMBC paid Asmundson a bonus of $███ (Chinn Ex. 20) – $███ more than it paid Hatzimihalis as a first-year VP. (Chinn Ex. 17).

**Defendants' Response to Paragraph 206**:  It is irrelevant and immaterial to compare Asmundson's bonus compensation in FY 2017 to Plaintiff's bonus compensation two years earlier in 2015 as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶191-192.)

207.    SMBC paid the two male first-year VPs, Nieves and Asmundson, the exact same salaries ($███████), bonuses ($███████) and total compensation ($███████). (Chinn Exs. 19, 20).

**Defendants' Response to Paragraph 207**:  It is irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2017. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

208.    SMBC paid these two men $██████ more in total compensation than it paid Hatzimihalis, a woman, as a first-year VP. (Chinn Exs. 17, 19, 20).

**Defendants' Response to Paragraph 208**:  It is irrelevant and immaterial to compare Nieves and Asmundson's compensation in FY 2017 to Plaintiff's compensation two years earlier in FY 2015 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶ 191-192.)

209.    For fiscal year 2018, SMBC paid Asmundson, a second-year VP, a salary of

$███ (Chinn Ex. 20) – $███ more than it paid Hatzimihalis as a second-year VP for 2016.

(Chinn Ex. 17).

**Defendants' Response to Paragraph 209**:  It is irrelevant and immaterial to compare

Asmundson's base salary compensation in FY 2018 to Plaintiff's base salary

compensation two years earlier in 2016 because as explained at DSF ¶¶13-14, 20-23,

Satake altered base salaries between 2013 and 2017 to address the legacy and new hire

issue

210.    For fiscal year 2018, SMBC paid Asmundson a bonus of $███ (Chinn Ex. 20)

– $███ more than it paid Hatzimihalis as a second-year VP for 2015. (Chinn Ex. 17).

**Defendants' Response to Paragraph 210**:  It is irrelevant and immaterial to compare

Asmundson's bonus compensation in FY 2018 to Plaintiff's bonus compensation two

years earlier in 2016 as it is undisputed that Satake received a bonus pool each year from

SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc.,

Nikko America, and the DCM group and that the bonus pool changed each year

depending on those performances.  (DSF ¶¶ 191-192.)

211.    SMBC paid the two male second-year VPs the exact same salary ($███),

bonus ($███) and total compensation ($███). (Chinn Exs. 19, 20).

**Defendants' Response to Paragraph 211**:  It is irrelevant and immaterial as to whether

Nieves and Asmundson were paid the same compensation in FY 2018. It is undisputed

Satake, Bolger, and Zaman considered multiple factors when determining pay and

undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194,

197-198, 246-247, 248, 253-254.)

212.    SMBC paid these two men $▮▮▮ more in total compensation than it paid Hatzimihalis, a woman, as a second-year VP. (Chinn Exs. 17, 19, 20).

**<u>Defendants' Response to Paragraph 212</u>**:  It is irrelevant and immaterial to compare Nieves and Asmundson's compensation in FY 2018 to Plaintiff's compensation two years earlier in 2016 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶191-192.).

213.    As third-year VPs, Asmundson (2019) and Hatzimihalis (2017) were paid the same base salary ($▮▮▮ (Chinn Exs. 17, 20). However, Asmundson's bonus ($▮▮▮ (Chinn Ex. 20) was nearly double Hatzimihalis's bonus ($▮▮▮ (Chinn Ex. 17).

**<u>Defendants' Response to Paragraph 213</u>**:  It is irrelevant and immaterial to compare Asmundson's bonus compensation in FY 2019 to Plaintiff's bonus compensation two years earlier in FY 2017 as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶191-192.)

214.    SMBC paid the two male third-year VPs, Nieves and Asmundson, the exact same salaries ($▮▮▮ bonuses ($▮▮▮ and total compensation ($▮▮▮ (Chinn Exs. 19, 20).

**<u>Defendants' Response to Paragraph 214</u>**:  It is irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2018. It is undisputed

Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

215.   SMBC paid these two men $███ more in total compensation than it paid Hatzimihalis, a woman, as a second-year VP. (Chinn Exs. 17, 19, 2).

**Defendants' Response to Paragraph 215**:  It is irrelevant and immaterial to compare Asmundson and Nieves' compensation in FY 2019 to Plaintiff's compensation three years earlier in 2016 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)

216.   In 2020, SMBC promoted Asmundson to Director. (Asmundson 37:18-21).

**Defendants' Response to Paragraph 216**:  Admit.

217.   Whether a VP or Director, "you're still covering clients and you're still putting together presentation materials, working on transactions when they come in." (Asmundson 57:19-22).

**Defendants' Response to Paragraph 217**:  Admit.

218.   For fiscal year 2020, SMBC paid Asmundson a salary of $███ (Chinn Ex. 20) – $███ more than it paid Hatzimihalis as a fourth-year VP performing the same job, (Chinn Ex. 17).

**Defendants' Response to Paragraph 218**:  Admit but immaterial.  Howard's base salary in FY 2020 as a Director was $███████ which is $█████ more than Asmundson's base salary in FY 2020 as a Director.  (Chinn Dec. Exs. 17, 20, 21.)

219.    SMBC also paid Asmundson a bonus of $██████ (Chinn Ex, 20) – $███████ more than it paid Hatzimihalis for performing the same job as an VP, (Chinn Ex, 17),

**Defendants' Response to Paragraph 219**:  Immaterial as it is undisputed that Satake received a bonus pool each year from SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool changed each year depending on those performances.  (DSF ¶¶191-192.) Further, Plaintiff's bonus for FY 2019 was reduced due to her poor performance and Gaps performance evaluation. (DSF ¶249.)

220.    Once again, SMBC paid the two men in lock step, Specifically, SMBC gave the two men the exact same salary ($██████ bonus ($██████ and total compensation ($███████ (Chinn Exs. 19, 20), while it paid Hatzimihalis $██████ less, (Chinn Ex. 17),

**Defendants' Response to Paragraph 220**:  It is irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2020. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

221.    Asmundson used an analysis authored by Hatzimihalis titled "2021 Challenged Sectors Structural Response to US Execution" to share with his clients. (Hatzimihalis Decl. ¶ 31).

**Defendants' Response to Paragraph 221**: Admit and immaterial that a single analysis authored by Plaintiff was used.

**C.    Kaitlin Carter**

222.    SMBC hired Carter, a woman, in November 2016 as a VP. (Hatzimihalis 164:5-20; Carter 22:5-6).

**Defendants' Response to Paragraph 222**:  **UNDISPUTED**.  Kaitlin Carter uses her maiden name, Kaitlin Howard, at work.  (Declaration of Kaitlin Carter (Howard) ("Howard Dec.") ¶2.)

223.    At the time, Carter had 11 years' industry experience (Licul Ex. I at p. 41), five years more than Nieves and Asmundson. (Id. at pp. 19, 30).

**Defendants' Response to Paragraph 223**: The cited evidence does not support the statement.  It is undisputed that Carter graduated from college in 2010 and joined ███████ following graduation (DSF ¶¶50-51), thus Carter would have had 6 years' industry experience when joining Nikko America in November 2016 and 11 years' industry experience in 2021.  It is undisputed Nieves graduated the same year as Carter in 2010 and joined ██████ after graduation, so had the same years' industry experience as Howard but had specialized in DCM four years later than she did.  (DSF ¶¶29-31.) Asmundson graduated in 2012 and specialized in DCM in 2013, so Carter had two years' more industry experience and three years' more DCM experience than Asmundson. (DSF ¶¶43-45.)

224.    At the time, Carter had "6 years of relevant Capital Markets experience at ██████ and ██████ (Chinn Ex. 33).

**Defendants' Response to Paragraph 224**: Admit except that Howard's six years of experience included ███████ ██████ and ██████ (Chinn Dec. Ex. 5, Howard Tr. 35:18-36:7, 36:21-23; Chinn Supp. Dec. Ex. 5, Howard Tr. 37:8-18.)

225.    Carter had already worked as a VP at her previous job where she "had close to 15 clients that were here primary coverage responsibility." (Carter 37:19-23; Licul Ex. I at p. 41).

**Defendants' Response to Paragraph 225**: Admit.  Carter was a Vice President at ██████ for one year.  (Chinn Dec. Ex. 5, Howard Tr. 35:22-36:4; Chinn Supp. Dec. Ex. 5,  Howard Tr. 37:8-18.)

226.    Carter earned her first regulatory license in 2010 (Licul Ex. I at p. 39) – five years before either Nieves or Asmundson. (Id. at pp. 17, 28).

**Defendants' Response to Paragraph 226**: Immaterial as the regulatory licenses at issue, Series 63 which enables an individual to sell securities and Series 79 which enables an individual to advise on debt or equity offerings, were not necessary in Nieves work prior to joining the DCM group at Nikko America.  (Bolger Supp. Dec. ¶ 3.)

227.    Carter had "more transactional experience than most of [her] colleagues at the time that [she] joined SMBC." (Carter 26:2-4).

**Defendants' Response to Paragraph 227**:  Admit that Howard so testified but she was not asked to expand on which colleagues she was referring to.

228.    Carter was "universally regarded as one of, if not the, best bankers on the team." (Chinn Ex. 45 at p. 2; Zaman 113:12-114:5).

**Defendants' Response to Paragraph 228**: Admit.

229.    She generated more revenue than her male Nieves and Asmundson at comparable points in their career. (Bolger Ex. 9; Nieves Ex. 2).

**Defendants' Response to Paragraph 229**:  Admit.

230.    Unlike her male peers, Carter was required to "build her own portfolio" and "buil[d] a financial institutions group [FIG] practice" at SMBC. (Hatzimihalis 272:1-4, 272:23-273:3, 388:16-389:2; Carter 22:14-16).

**Defendants' Response to Paragraph 230**: The cited evidence does not support the statement.  No evidence has been cited to support the statement that Howard was "required" to build her own FIG practice.  Plaintiff admitted she is not aware of what the client or business arrangements were for Howard when Howard joined Nikko America. (Chinn Dec. Ex. 2, Plaintiff II Tr. 272:5-10, 274:14-21.)  Howard testified that when she was hired, she was assigned 11 clients to provide her the opportunity to immediately be a P&L producing originator.  (Chinn Dec. Ex. 5, Howard Tr. 22:11-20, 23:14-23; Howard Dec. ¶8-9.) Howard further testified that in addition to learning her client coverage responsibilities with a small subset of clients, the expectation was she would grow the relationships and prospect new business as well just as other Vice Presidents were expected to do in other sectors.  (Chinn Dec. Ex. 5, Howard Tr. 24:11-25.)

231.    Carter was "only given clients when [she] first joined the firm." "They were tier three, tier four names. . . [A]t the time there was not much business or revenue associated with them." (Carter 23:2-12).

**Defendants' Response to Paragraph 231**:  Admit.  Howard further testified that she had succeeded in generating so much business through prospecting that she decided to redistribute the clients she had been assigned because she no longer had time to cover them.  (Chinn Dec. Ex. 5, Howard Tr. 28:9-29:2; Howard Dec. ¶21.)

232.    Carter was paid less than comparable men who performed the same job. SMBC

paid Carter's two male colleagues, Nieves and Asmundson, starting VP salaries of $███

each (Chinn Exs. 19, 20) – $████ more than it paid Carter in 2016 (Chinn Ex. 21), even though

she had substantially more industry experience and had previously worked as a VP in another

institution. (Licul Ex. I at pp. 32-42).

> **Defendants' Response to Paragraph 232**:  It is irrelevant and immaterial to compare
>
> Nieves and Asmundson's salary in FY 2017 to Howard's salary one year earlier in FY
>
> 2016 because as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between
>
> 2013 and 2017 to address the legacy and new hire issue.  Further, Defendants paid
>
> Howard more in total compensation than Nieves and Asmundson in FY 2016 and in FY
>
> 2017.  (DSF ¶198; Chinn Dec. Exs. 19-21.)

233.    Neither Nieves nor Asmundson had previously worked as VPs in any institution.

(Id. at pp. 10-31).

> **Defendants' Response to Paragraph 233**:  Admit.

234.    As first year VPs in 2017, SMBC paid each of the two men $████ bonuses

(Chinn Exs. 19, 20) – $████ more than it paid to Carter as a first-year VP at SMBC. (Chinn

Ex. 21).

> **Defendants' Response to Paragraph 234**:  It is irrelevant and immaterial to compare
>
> Nieves and Asmundson's bonus compensation in FY 2017 to Howard's bonus
>
> compensation one year earlier in FY 2016 as it is undisputed that Satake received a bonus
>
> pool each year from SMFG based on the financial performance of SMFG, SMBC
>
> Americas Holdings, Inc., Nikko America, and the DCM group and that the bonus pool
>
> changed each year depending on those performances.  (DSF ¶¶191-192.)  Further,

Defendants paid Howard more in total compensation than Nieves and Asmundson in FY 2016 and in FY 2017.  (DSF ¶198; Chinn Dec. Exs. 19-21.)

235.    SMBC paid first-year VPs who were men, Nieves and Asmundson, the exact same salary ($████████ bonus ($████████ and total compensation ($████████ (Chinn Exs. 19, 20), which was more than it paid either of its female first-year VPs Carter ($████████ (Chinn Ex. 21) and Hatzimihalis ($████████ (Chinn Ex. 17).

**Defendants' Response to Paragraph 235**: It is irrelevant and immaterial to compare Asmundson and Nieves' compensation in FY 2017 to Howard's compensation a year earlier in 2016 and Plaintiff's compensation two years earlier in 2015 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)  Additionally, it is undisputed Howard made more in total compensation than Nieves and Asmundson in FY 2016 and FY 2017. (DSF ¶198; Chinn Dec. Exs. 19-21.) Further, it is irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2017. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

236.    SMBC paid Carter and her two male colleagues, Nieves and Asmundson, the same salaries as second-year VPs. (Chinn Exs. 19, 20, 21). However, it paid each of the two men

the same bonuses of $█████ (Chinn Exs. 19, 20), which were $████ more than it paid Carter as a second-year VP at SMBC. (Chinn Ex. 21)

**Defendants' Response to Paragraph 236**:  It is irrelevant and immaterial to compare Asmundson and Nieves' compensation in FY 2018 to Howard's compensation one year earlier in 2017 because it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.) Additionally, it is undisputed Howard made more in total compensation than Nieves and Asmundson in FY 2017 and FY 2018. (DSF ¶198.) It is further irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2018. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

237.    SMBC paid second-year VPs who were men, Nieves and Asmundson, the exact same total compensation ($█████ (Chinn Ex. 19, 20), which was more than its paid female second-year VPs Carter ($█████ (Chinn Ex. 21) and Hatzimihalis ($█████ (Chinn Ex. 17).

**Defendants' Response to Paragraph 237**:  It is irrelevant and immaterial to compare Asmundson and Nieves' compensation in FY 2018 to Howard's compensation a year earlier in FY 2017 and Plaintiff's compensation two years earlier in FY 2016 because (i) as explained at DSF ¶¶13-14, 20-23, Satake altered base salaries between 2013 and 2017 to address the legacy and new hire issue; and (ii) it is undisputed that Satake received a bonus pool from Nikko America's parent company Sumitomo Mitsui Financial Group,

Inc. ("SMFG") based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.) Additionally, it is undisputed Howard made more in total compensation than Nieves and Asmundson in FY 2017 and FY 2018 (DSF ¶198) and that Plaintiff made more in compensation than Nieves and Asmundson in FY 2016.  (DSF ¶¶56-57.)  It is further irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2018. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

238.     In July 2019, SMBC promoted Carter to Director. (Hatzimihalis 206:13-16, 359:11-14; Carter 22:6-8).

**Defendants' Response to Paragraph 238**: **UNDISPUTED**.

239.     SMBC promoted Carter because she "had grown a business from nothing into a reputable FIG DCM practice." (Carter 26:24-25:2).

**Defendants' Response to Paragraph 239**:  Admit this is what Howard testified was her understanding of why she was promoted to Director.  In the Promotion Recommendation form Satake completed when recommending Howard for promotion, he wrote that Howard had "████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████."  (Satake Dec. Ex. 8, SMBC6163.)  Satake further wrote in her recommendation form that the goal in adding value to clients is that "███████████████████████████████████

████████████████████████████████" and that Howard had

"████████████████████████████████████████████

████████████████████████. (Id.)  Satake also referenced Howard ████████

███████████████████████████████. (Id.)  As

examples of applicable business metrics to support a "compelling business case" for

Howard's promotion, Satake identified Howard's ████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

████████████████████████." (Id. at SMBC6164)  Lastly, Satake

described Howard as being "████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████." (Id. at SMBC6164)

240.     SMBC paid Carter and her male colleagues the same base salary ($████████ as

first-year Directors. (Chinn Ex. 19, 20, 21). However, it paid each of the two men, Nieves and

Asmundson, bonuses of $████████ (Chinn Exs. 19, 20), which was $████████ more than it paid

Carter, a woman, as a second-year Director. (Chinn Ex. 21)

**<u>Defendants' Response to Paragraph 240</u>**: The cited evidence does not support the

statement.  As a second-year Director in FY 2020, Defendants awarded Howard a bonus

of $████████ which was $████████ more than Nieves and Asmundson's $████████ bonuses

in FY 2020.  If the comparison was meant to be against Howard's first year as a Director,

it is irrelevant and immaterial to compare Asmundson and Nieves' bonus compensation in FY 2020 to Howard's compensation one year earlier in FY 2019 because it is undisputed that Satake received a bonus pool from Nikko America's parent company SMFG based on the financial performance of SMFG, SMBC Americas Holdings, Inc., Nikko America, and the DCM group, and that the bonus pool allocated to Satake each year varied depending on the business performance at each of those levels.  (DSF ¶¶191-192.)  Additionally, it is undisputed Howard made more in total compensation than Nieves and Asmundson in FY 2019 and FY 2020 (DSF ¶¶248, 253-254.) It is further irrelevant and immaterial as to whether Nieves and Asmundson were paid the same compensation in FY 2020. It is undisputed Satake, Bolger, and Zaman considered multiple factors when determining pay and undisputed Howard was paid more than Nieves and Asmundson every year.  (DSF ¶¶194, 197-198, 246-247, 248, 253-254.)

241.    SMBC refused to promote Carter to Executive Director because she had not been in her prior position for at least one year. (Zaman 129:6-23).

**Defendants' Response to Paragraph 241**:  Admit that Bolger and Zaman recommended Howard for promotion to Executive Director in 2020 but that Nikko America did not promote Howard at that time and it was Zaman's understanding that it was because it would be an unusual move for the Company to approve promotions in two consecutive years.  (Chinn Dec. Ex. 4, Zaman Tr. 126:16-19, 127:19-128:22, 129:19-130:11; Bolger Dec. Ex. 5, SMBC 8577.)

242.    In April 2021, SMBC promoted Carter to Executive Director and Head of FIG Capital Markets. (Carter 21:21-23; 22:8-10).

**Defendants' Response to Paragraph 242**: **UNDISPUTED**.

243.    For fiscal year 2020, Carter's clients brought in "just over ▮▮▮▮ dollars" to SMBC. (Carter 35:2-4).

**Defendants' Response to Paragraph 243**:  **UNDISPUTED**.

244.    Carter's "business ha[d] grown to be basically the most on the entire DCM desk." (Carter 30:3-6).

**Defendants' Response to Paragraph 244**:  It is unclear what is meant by the business had grown to be the most as there are multiple business metrics that can be considered and Carter was not asked to elaborate further in her deposition.  Howard testified that her "business has grown to be basically the most active on the entire DCM desk by a number of active book runner titles by percentage of P&L growth".  (Chinn Supp. Dec. Ex. 5, Howard Tr. 30:3-7.)

245.    During Carter's employment with SMBC, a colleague made "sexually explicit comments to" her. (Carter 11:16-22).

**Defendants' Response to Paragraph 245**: It is irrelevant and immaterial as none of Plaintiff's claims allege sexual harassment or sexually explicit comments, Nikko America terminated the employment of the individual identified, and Nikko America promptly addressed the issue when the comments were reported.  (Chinn Supp. Dec. Ex. 5, Howard Tr. 11:23-25, 13:14-14:3.)

**D.    Jeremy Sisselman**

246.    Sisselman joined SMBC as a Vice President ("VP") in March of 2014, three years after Hatzimihalis. (Hatzimihalis 69:2-5; 69:25-70:2).

**Defendants' Response to Paragraph 246**:  Admit.  Sisselman joined Nikko America as a Vice President when Plaintiff was an Assistant Vice President.  (DSF ¶¶27, 65-66.)  It

is irrelevant and immaterial that Sisselman joined Nikko America three years after

Plaintiff as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at

any time.

247.   Sisselman does not have any graduate degrees. (Sisselman 35:21-23).

**<u>Defendants' Response to Paragraph 247</u>**: Admit.  It is irrelevant and immaterial as to

whether Sisselman has any graduate degrees as none of Plaintiff's claims allege

Sisselman was a comparator to Plaintiff at any time.

248.   SMBC paid him an initial salary of $███████ (Sisselman 21:21-22:2)

**<u>Defendants' Response to Paragraph 248</u>**:  Admit.  Sisselman's initial salary is

irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator

at any time.

249.   When he arrived, Sisselman was "basically asked to cover everything other than

energy and power and utilities." (Sisselman 23:17-23).

**<u>Defendants' Response to Paragraph 249</u>**:  Admit.  What Sisselman was tasked with

covering in FY 2014 as a Vice President is irrelevant and immaterial as none of

Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.

250.   Sisselman was given primary coverage of these sectors. (Sisselman 24:24-25:6,

25:18-26:5).

**<u>Defendants' Response to Paragraph 250</u>**:  Admit.

251.   Sisselman managed Hatzimihalis from the time he joined the Bank until October

2016, when Hatzimihalis "switched teams." (Sisselman 19:6-16; Hatzimihalis 136:6-137:25).

**<u>Defendants' Response to Paragraph 251</u>**:  Admit.  (DSF ¶65.)

252.   Sisselman was considered ███████████ with. (Bolger 147:16-148:18).

**Defendants' Response to Paragraph 252**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.  Further, it is undisputed Sisselman did not make decisions about Plaintiff's pay or promotions (DSF ¶67) and did not make any inappropriate statements about gender or sex or any statement revealing any sort of discriminatory intent.  (DSF ¶¶68-69.)

253.   ███████████████   about Sisselman. (Bolger 149:3-7, 151:8-21).

**Defendants' Response to Paragraph 253**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.  Further, it is undisputed Sisselman did not make decisions about Plaintiff's pay or promotions (DSF ¶67) and did not make any inappropriate statements about gender or sex or any statement revealing any sort of discriminatory intent.  (DSF ¶¶68-69.)

254.   As a result, █████████████████████████████ ███ (Bolger 155:4-22).

**Defendants' Response to Paragraph 254**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.  Further, it is undisputed Sisselman did not make decisions about Plaintiff's pay or promotions (DSF ¶67) and did not make any inappropriate statements about gender or sex or any statement revealing any sort of discriminatory intent.  (DSF ¶¶68-69.)

255.   In 2017, ██████████████████████. (Sisselman 20:8-12).

**Defendants' Response to Paragraph 255**:  Admit.  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.

256.   Since 2019, Bolger and Zaman "████████████████████████ ██████████. (Bolger 158:14-20).

**Defendants' Response to Paragraph 256**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.

257.     Sisselman was given "█████ ratings. (Zaman 39:6-18).

**Defendants' Response to Paragraph 257**: The cited testimony does not support the statement.  Zaman testified that Sisselman was given a "█████ rating for a single metric and his overall rating was "█████ (Chinn Supp. Dec. Ex. 4, Zaman Tr. 40:11-41:3.) Further, after reviewing his deposition testimony, Zaman submitted an errata sheet clarifying that although he accurately recalled █████████ of Sisselman in certain respects, he mistakenly remembered assigning a █████ rating to Sisselman.  (Chinn Supp. Dec. Ex. 14 at p. 2.)  It is further irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.

258.     The Bank needed Sisselman "███████████████████████████████████████████████████████████████████." (Zaman 39:24-40:4).

**Defendants' Response to Paragraph 258**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time. Zaman further testified that Sisselman subsequently improved.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 45:11-17.)

259.     Zaman "clearly told" Sisselman that he was a █████ performer. (Zaman 44:7-15, 45:8-10).

**Defendants' Response to Paragraph 259**: Deny.  After reviewing his deposition testimony, Zaman submitted an errata sheet clarifying that although he accurately recalled █████████ of Sisselman in certain respects, he mistakenly remembered assigning a █████ rating to Sisselman.  (Chinn Supp. Dec. Ex. 14.)  It is further irrelevant

and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.

260.    Zaman did not believe that Sisselman "████████████████████." (Zaman 40:18-20).

**<u>Defendants' Response to Paragraph 260</u>**:  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.  Zaman further testified that Sisselman subsequently improved.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 45:11-17.)

261.    Bolger and Zaman discussed among themselves ████████████████ ████████████. (Bolger 160:6-11).

**<u>Defendants' Response to Paragraph 261</u>**:  Admit ███████████████ ████████████████████████████████ ████████████. (Chinn Dec. Ex. 3, Bolger Tr. 160:6-11.)  It is further irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time. Zaman further testified that Sisselman subsequently improved.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 45:11-17.)

262.    SMBC ████████ Sisselman. (Hatzimihalis Decl. ¶ 32).

**<u>Defendants' Response to Paragraph 262</u>**:  Admit.  Irrelevant and immaterial as none of Plaintiff's claims allege Sisselman was a comparator to Plaintiff at any time.  Zaman further testified that Sisselman subsequently improved.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 45:11-17.)

**E.      <u>Chris Dalton</u>**

263.    SMBC hired Dalton in April 2015, as an analyst for DCM. (Licul Ex. I at p. 52).

**Defendants' Response to Paragraph 263**: Admit.  Irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator to Plaintiff at any time.

264.    Dalton was a member of a "pod" supervised by Bolger. (Bolger 45:16-23, 46:23-47:2).

**Defendants' Response to Paragraph 264**: Admit. Irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator to Plaintiff at any time.

265.    Dalton was already at SMBC as an analyst when Bolger arrived in 2016. (Bolger 199:14-16, 200:15-18).

**Defendants' Response to Paragraph 265**: Admit.  Irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator to Plaintiff at any time.

266.    Typically, an analyst is promoted within three years. (Chinn Supp. Dec. Ex. 3, Bolger 200:9-14).

**Defendants' Response to Paragraph 266**:  Admit that Bolger so testified the most typical period of time an individual remains an analyst is three years.  (Bolger Tr. 200:9-14.)

267.    Dalton, however, ███████████████████ as analyst. (Bolger 201:4-5).

**Defendants' Response to Paragraph 267**:  Admit.  ██████  Dalton may have had █████

███████  while Plaintiff was a Vice President are irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.)  Bolger additionally

testified that he believed Dalton ████████████████████████████████

████████████████████████████████████. (Chinn Supp.

Dec. Ex. 3, Bolger Tr. 210:9-23.)

268.    Dalton's performance "███████." He made "█████████████████

████████████████████████████████████." (Sisselman

49:17-24).

**Defendants' Response to Paragraph 268**: Admit Sisselman so testified.  Dalton's

████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator at any time.  Nor

was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr.

78:13-20.) Bolger additionally testified that he believed Dalton █████████████

██████████████████████████████████

████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

269.    Dalton had to "██████████████████████████

████████████████████████████." (Bolger 202:9-12).

**Defendants' Response to Paragraph 269**: The cited evidence does not support the

statement in Paragraph 269.  Admit that Sisselman █████████████████████

████████.  Dalton's ████████████████ while Plaintiff was a Vice President is

irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.

Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles

come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████ ████████████████████████████████████████████████████ ███████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

270.    Sisselman ██████████████████████████████████ ████████████████████ (Bolger 207:15-23.)

**Defendants' Response to Paragraph 270**: Admit. Dalton's ██████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Supp. Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ████████████████████████████████████████████ ████████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

271.    Dalton would "████████████████████████ (Sisselman 54:4-6.)

**Defendants' Response to Paragraph 271**:  Admit Sisselman so testified.  Dalton's ██████████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr.

78:13-20.) Bolger additionally testified that he believed Dalton ██████████████

████████████████████████████████████████████████████████

██████████████   (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

272.    Sisselman had "████████████████████████████████████.

(Sisselman 52:8-11.)

**<u>Defendants' Response to Paragraph 272</u>**:  The cited evidence does not support the

statement in paragraph 272.  Sisselman testified that ████████████████████

████████████████████████████████████████████████████████

██████████████   (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 52:5-11.)  Sisselman's

discussions with Dalton ████████████████████ while Plaintiff was a

Vice President are irrelevant and immaterial as none of Plaintiff's claims allege Dalton

was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman

testified that "titles come with different responsibilities" and that a Vice President is

responsible for revenue generation while a more junior title, such as an analyst, is

responsible for support, not client facing and not responsible for revenue generating.

(Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed

████████████████████████████████████████████████████████

██████████████████████████.  (Chinn Supp. Dec. Ex. 3, Bolger Tr.

210:9-23.)

273.    Sisselman was ████████████████████████████████████████████

████████████████ (Sisselman 50:15-18).

**Defendants' Response to Paragraph 273**:  Admit.  Sisselman satisfaction with Dalton's

████████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was

Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Supp. Dec. Ex. 4,

Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ████████

█████████████████████████████████████████████

████████████████████████. (Chinn Dec. Ex. 3, Bolger Tr. 210:9-23.)

274.    Sisselman ████████████████████████████████████████████

████████ (Sisselman 51:9-14).

**Defendants' Response to Paragraph 274**:  Admit.  Dalton's ████████████████████

while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's

claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko

America.  Further, Zaman testified that "titles come with different responsibilities" and

that a Vice President is responsible for revenue generation while a more junior title, such

as an analyst, is responsible for support, not client facing and not responsible for revenue

generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he

believed Dalton ████████████████████████████████████████████

█████████████████████████████████████████. (Chinn Supp. Dec. Ex. 3,

Bolger Tr. 210:9-23.)

275.   ████████████████████████████████████████████

██████████████████t. (Sisselman 54:19-55:3.)

**Defendants' Response to Paragraph 275**:  The cited evidence does not support the

statement.  Sisselman testified that ███████████████████████████████████████

████████████████████████████████████. (Chinn Supp. Dec.

Ex. 8, Sisselman Tr. 54:19-55:3.)  Satake, Bolger, and Zaman's statements regarding

Dalton ████████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was

Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr.

78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████

█████████████████████████████████████████████████████████████

█████████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

276.   ████████████████████████████████████████. (Sisselman 55:11-19).

**Defendants' Response to Paragraph 276**: Admit.  Sisselman's views on Dalton's

███████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was

Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.)

277.    Hatzimihalis also ████████████████████████████████, including sending Bolger emails. (Bolger 202:16-20, 203:7-13, 203:14-18; Licul Ex. NN at pp. 3-4, 19).

**Defendants' Response to Paragraph 277**:  Admit.  Dalton's ██████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ██████████████████████████████ ████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

278.    Bolger agreed with those concerns. (Bolger 205:12-21). █████████████ █████████████████████████████████████████████. (Bolger 205:12-206:15).

**Defendants' Response to Paragraph 278**:  The cited evidence does not support the statement in Paragraph 278.  Bolger testified he agreed with some of the complaints Plaintiff raised ████████████████████████████████████ ██████████████████████████████████████████

██████████████████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 205:16-206:4.)  Dalton's ████████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator. Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████ ████████████████████████████████████████ ███████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

279.   Dalton ██████████████████████ (Sisselman 72:5-7; Licul Ex. NN at p. 5).

**Defendants' Response to Paragraph 279**:  Admit Sisselman informed Dalton ████ ████████████████ (Chinn Supp. Dec. Ex. 8, Sisselman Tr. 72:5-7.) Dalton's ████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████ ████████████████████████████████████████ ███████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

280.    Dalton ███████████████████████████████." (Sisselman 72:17-20;
Licul Ex. NN at p. 5).

**<u>Defendants' Response to Paragraph 280</u>**:  The cited evidence does not support the

statement in Paragraph 280.  Further, Dalton's █████████████████ while Plaintiff

was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege

Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further,

Zaman testified that "titles come with different responsibilities" and that a Vice President

is responsible for revenue generation while a more junior title, such as an analyst, is

responsible for support, not client facing and not responsible for revenue generating.

(Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.)

281.    Bolger had ██████████████████████████████

████████████████████████████████████."

(Bolger 208:8-14).

**<u>Defendants' Response to Paragraph 281</u>**:  Bolger testified that "██████████████

████████████████████████████."  (Chinn

Supp. Dec. Ex. 3, Bolger Tr. 208:8-14.)  Dalton's ██████████████ while

Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims

allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.

Further, Zaman testified that "titles come with different responsibilities" and that a Vice

President is responsible for revenue generation while a more junior title, such as an

analyst, is responsible for support, not client facing and not responsible for revenue

generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he

believed Dalton ████████████████████████████

 (Chinn Supp. Dec. Ex. 3,

Bolger Tr. 210:9-23.)

282. ███████████████████████████████

**Defendants' Response to Paragraph 282**:  Admit these statements were so made.

Dalton's ████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was

Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr.

78:13-20.) Bolger additionally testified that he believed Dalton ████████████████

██████████████████████████████████████████████████████

███████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

283.    Nieves wrote ████████████████████████████████████

██████████████████████████████████." (Licul Ex. OO).

**Defendants' Response to Paragraph 283**:  Admit these comments were made in 2015.

Dalton's ███████████████████ while Plaintiff was a Vice President is irrelevant and

immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was

Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come

with different responsibilities" and that a Vice President is responsible for revenue

generation while a more junior title, such as an analyst, is responsible for support, not

client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr.

78:13-20.) Bolger additionally testified that he believed ████████████████████

██████████████████████████████████████████████

███████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

284.    SMBC ██████████ Dalton as "██████ expectations and, in fact, rated him ███

███████." (Bolger 207:5-10).

**Defendants' Response to Paragraph 284**:  The cited evidence does not support the

statement in Paragraph 284.  Bolger stated ████████████████████████████

██████████████████████████████████████████████

██████████████████████████ (Chinn Supp. Dec. Ex. 3, Bolger

Tr. 207:5-10.)  Further, Dalton's ██████████████████ while Plaintiff was a Vice

President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a

comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman

testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating. (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████████████████████████████████████ ████████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

285.    Bolger and Zaman discussed that ██████████████████████████ ███████████████████████" (Bolger 209:20-25).

**Defendants' Response to Paragraph 285**: Admit.  Dalton's ██████████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ██████████████████████████████████████████████ ████████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

286.    Dalton was given "████ ratings. (Zaman 39:6-17; Zaman 39:6-18).

**Defendants' Response to Paragraph 286**: Admit.  Dalton's ███████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko

America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████████████████████████████████████ ████████████████████████████████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

287.    The Bank "██████████████████████████████████████ ███████████████████████████." (Zaman 42:5-14).

**Defendants' Response to Paragraph 287**: Admit.  Dalton's ███████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████████████████████████████████████ ████████████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

288.    SMBC did not tell Dalton ███████████████████████████████ ███████████. (Zaman 42:24-25:5).

**Defendants' Response to Paragraph 288**: Admit.  Dalton's ███████████████ while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's

claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████████████████████████████

███████████████████████████████████████ (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

289.    SMBC ██████████ Dalton. (Licul Ex. I at p. 52; Hatzimihalis Decl. ¶ 33).

**Defendants' Response to Paragraph 289**: Admit.  Dalton's █████████████████

while Plaintiff was a Vice President is irrelevant and immaterial as none of Plaintiff's claims allege Dalton was a comparator.  Nor was Plaintiff ever an analyst at Nikko America.  Further, Zaman testified that "titles come with different responsibilities" and that a Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.) Bolger additionally testified that he believed Dalton ███████████████████████████████████████████

███████████████████████████████████████. (Chinn Supp. Dec. Ex. 3, Bolger Tr. 210:9-23.)

290.    SMBC credited Dalton ████████████████████████████████████

█████████████████. (Licul Exs. N, U).

**Defendants' Response to Paragraph 290**: Deny.  It is unclear what is meant by "credited."  Zaman testified that "titles come with different responsibilities" and that a

Vice President is responsible for revenue generation while a more junior title, such as an analyst, is responsible for support, not client facing and not responsible for revenue generating.  (Chinn Dec. Ex. 4, Zaman Tr. 78:13-20.)  As Dalton is not a Vice President, he is not responsible for revenue generation or receiving credit for revenue generation.  (Chinn Dec. Ex. 3, Bolger Tr. 198:9-20.)  It is undisputed that Plaintiff provided secondary coverage to Bolger on all Real Estate clients that were not within her own primary coverage responsibilities (DSF ¶89), and provided secondary coverage to Bolger on the entire healthcare portfolio during 2017 and 2018.  (DSF ¶95).  As to the reference to Licul Exs. N and U, Defendants further refer to Defendants' Reply to DSF ¶152.

291.    In July 2019, when Bolger and Zaman were promoted to co-heads of DCM, the Bank promoted Dalton. (Bolger 199:24-200:8).

**Defendants' Response to Paragraph 291**: Irrelevant and immaterial as to when Dalton was promoted as none of Plaintiff's claims allege Dalton was a comparator.

292.    After firing Hatzimihalis in 2021, SMBC gave secondary responsibility for Hatzimihalis's accounts to Dalton. (Hatzimihalis 223:13-17).

**Defendants' Response to Paragraph 292**:  The cited testimony does not support the statement as it does not reference Dalton or the topic of client coverage following Plaintiff's termination of employment.  Further, Plaintiff was not working at Nikko America following her termination of employment and thus could not testify to who was given secondary responsibility for her accounts.  Additionally, it is unclear what is meant in Paragraph 292 by "gave secondary responsibility."  When asked who took over Plaintiff's accounts following the termination, Bolger identified himself.  (Chinn Supp. Dec. Ex. 2, Bolger Tr. 223:13-14.)  Dalton provided junior support as an Analyst and

later as an Associate to the Real Estate and Healthcare sectors prior to Plaintiff's employment being terminated and continued providing junior support as an Associate following her departure from the Company.  (Chinn Supp. Dec. Ex. 3, Bolger Tr. 156:10-17, 156:22-157:10, 163:24-164:9, 166:9-21, 223:13-17; Chinn Dec. Ex. 3, Bolger Tr. 197:7-198:20.)

## IV.   **SMBC INFLATES MALE EMPLOYEES' REVENUE NUMBERS**

### A.   **Nieves**

293.     According to SMBC's internal documents, Nieves had "primary" coverage responsibilities for ██████████████████████████████████. (Hatzimihalis Decl. ¶ 34; Licul Exs. N, U).

**Defendants' Response to Paragraph 293**: The statement in paragraph 293 does not indicate what time period it is asserted Nieves had primary coverage responsibilities over these three clients.  It is undisputed Howard was initially assigned primary coverage over ████████████████████████████████ when she joined Nikko America in November 2016.  (DSF ¶¶96, 176; Chinn Dec. Ex. 5, Howard Tr. 23:14-21; Howard Dec. ¶8.)  It is further undisputed that shortly before she was promoted to Director, which occurred in 2019, Howard decided to redistribute those three clients to Nieves.  (Chinn Dec. Ex. 5, Howard Tr. 28:9-29:2; Howard Dec. ¶23.)  Therefore, Nieves had primary coverage over these three clients starting around 2019.  As to the reference to Licul Exs. N and U, Defendants further refer to Defendants' Reply to DSF ¶152.

294.     In 2017, Nieves generated ██████ from these clients. (Nieves Ex. 2 at p. 4).

**Defendants' Response to Paragraph 294**: Admit that Nieves ██████████████ from ████████████████████████████ in 2017 ██████████████

█████████████████████████████████████; Howard did.  Defendants

further refer to Defendants' Reply to DSF ¶152.

295.    SMBC, however, gave Nieves $██████ in primary revenue credit for clients

covered by Zaman. (Nieves Ex. 2 at p. 4; Licul Exs. N, U).[9]

**Defendants' Response to Paragraph 295**: In response to Paragraph 295, Defendants

refer to Defendants' Reply to DSF ¶152.

296.    In 2018, Nieves again generated ████████ from his primary coverage clients.

(Nieves Ex. 2 at p. 3; Licul Exs. N, U).

**Defendants' Response to Paragraph 296**:  In response to Paragraph 296, Defendants

refer to Defendants' Reply to DSF ¶152.

297.    SMBC, however, gave Nieves $██████ in primary revenue credit for clients[10]

covered by Zaman. (Id.).

**Defendants' Response to Paragraph 297**:  In response to Paragraph 297, Defendants

refer to Defendants' Reply to DSF ¶152.

298.    In 2019, Nieves again generated ████████ from him primary coverage clients.

(Nieves Ex. 2 at p. 2; Licul Exs. N, U).

**Defendants' Response to Paragraph 298**: In response to Paragraph 298, Defendants

refer to Defendants' Reply to DSF ¶152.

---

[9]    These clients are ███████████████████████████████████ (Licul Exs. N, U). SMBC gave Nieves credit for ████████████████. even though he had not responsibilities (primary ♂′ secondary) for the client.  (Id.)

[10]    These clients are █████████████████████████████████████████ (Id.). Once again, SMBC awarded Nieves revenue credit for █████████████ a client for which he had no responsibilities. (Id.).

299.     SMBC, however, gave Nieves $██████ in primary revenue credit for clients[11]

covered by Zaman, (Id.).

**Defendants' Response to Paragraph 299**: In response to Paragraph 299, Defendants

refer to Defendants' Reply to DSF ¶152.

300.     In 2020, Nieves, for the first time, ███████████ from two primary coverage

accounts (███████████████████████) in the amount of $███████ (Nieves

Ex. 2 at p. 1).

**Defendants' Response to Paragraph 300**:  Admit that Nieves generated this revenue

from ████████████████████████ in 2020.

301.     SMBC, however, gave Nieves an additional $██████ in primary coverage

credit for clients[12] covered by Zaman. (Nieves Ex. 2 at p. 1; Licul Exs. N, U).

**Defendants' Response to Paragraph 301**: In response to Paragraph 301, Defendants

refer to Defendants' Reply to DSF ¶152.

**B.     Asmundson**

302.     According to SMBC's internal documents, Asmundson had primary coverage for

████████████████████████████████████████████████████████

██████████████████████. (Licul Exs. N, U).

**Defendants' Response to Paragraph 302**: In response to Paragraph 302, Defendants

refer to Defendants' Reply to DSF ¶152.

---

[11]     These clients are ████████████████████████████████████ (Id.).

[12]     These clients are ████████████████████████████████████████████
████████████████ (Nieves Ex. 2 at p. 1; Licul Exs. N, U). SMBC awarded Nieves credit for three clients,
████████████████████████, where he had no primary or supported
role. (Nieves Ex. 2 at p. 1; Licul Exs. N, U).

303.     In 2017, Asmundson generated $█████ from some of these clients. (Chinn Ex.

50 at pp. 6-7).

**Defendants' Response to Paragraph 303**:  Admit.

304.     In 2018, Asmundson generated $█████ from some of these clients. (Chinn Ex.

50 at pp. 6-7).

**Defendants' Response to Paragraph 304**: Admit.

305.     In 2019, Asmundson generated $█████ from four of these clients. (Chinn Ex.

50 at pp. 6-7).

**Defendants' Response to Paragraph 305**: In response to Paragraph 305, Defendants

further refer to Defendants' Reply to DSF ¶152.

306.     SMBC, however, gave Asmundson an additional $█████ in primary revenue

credit for clients[13] covered by Bolger and Morici. (Chinn Ex. 50 at pp. 3-4).

**Defendants' Response to Paragraph 306**:  In response to Paragraph 306, Defendants

refer to Defendants' Reply to DSF ¶152.  Further, Plaintiff's statement regarding the

revenue identified within Asmundon's primary coverage is incorrect and not supported

by the evidence.   Asmundson testified, and the supporting document supports, that he

specifically identified which clients he had primary coverage over and contributed to his

primary coverage revenue generation and which clients he had was secondary coverage

providing support as part of the broader deal team.  (Chinn Dec. Ex. 7, Asmundson Tr.

---

[13]      These clients are █████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ (Chinn Ex. 50; Licul Exs. N, U).

53:16-17; Chinn Supp. Dec. Ex. 7, Asmundson Tr. 54:2-25;  Chinn Dec. Ex. 50.)  The

vast majority of clients Plaintiff alleges are misattributed to Asmundson for primary

coverage revenue are not misattributed at all.  The document identifying Asmundson's

primary coverage revenue identifies Morici was primary coverage and Asmundson was

secondary coverage over ███████████████████████

███████████████████████████████

█████████████████████████

██████████████████████████

█████████████████████████

██████████████████████████████

█████████████████████████ Contrary to

Plaintiff's assertion, revenue from transactions with these clients was not included in

Asmundson's primary coverage revenue generation.  (Chinn Dec. Ex. 7, Asmundson Tr.

53:16-17; Chinn Supp. Dec. Ex. 7, Asmundson Tr. 54:2-25; Chinn Dec. Ex. 50.)  And for

████████████, all supporting documents identify Asmundson as primary

coverage.  (*See* Chinn Dec. Ex. 50, Licul Dec. Exs. N, U.)

**V.**   ████████

307.   ██████ was a client that Hatzimihalis had secondary coverage responsibility.

(Hatzimihalis Decl. ¶ 35).

**<u>Defendants' Response to Paragraph 307</u>**: Admit.

308.   As part of her coverage responsibilities, she sent ██████████, ██████ CFO,

weekly updates that included, information about the most recent trade and its size. (Hatzimihalis

Decl. ¶ 36).

**<u>Defendants' Response to Paragraph 308</u>**: Admit.  Immaterial and irrelevant because it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶264-267.)

309.    Hatzimihalis had been sending such emails to ███████ on a weekly basis from June 2020 through November 2020. (Hatzimihalis Decl. ¶ 37).

**<u>Defendants' Response to Paragraph 309</u>**:  Admit.  Immaterial and irrelevant because it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶264-267.)

310.    On October 30, 2020, Hatzimihalis sent ████████ her typical email, informing him "where his bonds were traded, the most recent trade and the size of it." (Hatzimihalis 234:18-22).

**<u>Defendants' Response to Paragraph 310</u>**:  Admit.  Immaterial and irrelevant because it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶264-267.)

311.    The "subject of the email was a . . . market update, color on the market" and an "email of what happened that week." (Bolger 296:18-21).

**<u>Defendants' Response to Paragraph 310</u>**:  Admit.  Immaterial and irrelevant because it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶264-267.)

312.    The email was "part of [Hatzimihalis's] weekly update to" ███████ (Hatzimihalis 236:8; Bolger 296:22-297:5).

**<u>Defendants' Response to Paragraph 312</u>**:  Admit. Immaterial and irrelevant because it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶264-267.)

313.    There was nothing "misrepresent[ed]" or "misleading" in her email. (Hatzimihalis 237:11-13).

**<u>Defendants' Response to Paragraph 313</u>**:  Admit Plaintiff did not see anything misrepresenting or misleading in her email but it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko

America's earlier advice, that Plaintiff was aware of the advice when sending the email, that within twenty minutes of receiving Plaintiff's email, the client emailed expressing confusion over what Plaintiff wrote and called Bolger asking how the email could have been sent in light of the earlier guidance provided, and that Bolger understood the client to be angry based on the client's tone of voice and use of swear words.  (DSF ¶¶264-267, 270-272.)

314.  ███████ was confused because earlier in the week SMBC provided him information concerning a proposed ████ bond offering. (Licul Ex. PP).

**Defendants' Response to Paragraph 314**: Admit that ██████ was confused by Plaintiff's email because earlier in the week Nikko America provided him information concerning a proposed ████ bond offering, Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, and that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice.  (DSF ¶¶264-267.)

315.  ██████ "did not complain" about Hatzimihalis's "performance." Rather, he had "questions" and "was confused." (Hatzimihalis 398:12-16).

**Defendants' Response to Paragraph 315**:  The cited evidence does not support the statement as Plaintiff admitted she was not present for the phone call between ██████ and Bolger and that she does not know what was said in that phone call.  (Chinn Dec. Ex. 2, Plaintiff II Tr. 398:24-399:5.)  Further, it is undisputed ██████ contacted Bolger by phone and asked specifically about how *Plaintiff's* email could have been sent in light of

the earlier guidance provided and that his tone of voice and use of swear words led Bolger to understand he was angry.  (DSF ¶¶271-272.)

316.    However, Hatzimihalis's email was not intended to "give [███████] pricing on" the bond deal. (Hatzimihalis 234:8-9.)

**<u>Defendants' Response to Paragraph 316</u>**:  Immaterial and irrelevant as it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, that Plaintiff was aware of the advice when sending the email, that within twenty minutes of receiving Plaintiff's email, the client emailed expressing confusion over what Plaintiff wrote and called Bolger asking how the email could have been sent in light of the earlier guidance provided, and that Bolger understood the client to be angry based on the client's tone of voice and use of swear words.  (DSF ¶¶264-267, 270-272.)

317.    [███████] "might have misread or misunderstood" Hatzimihalis's email. (Hatzimihalis 240:11-12.)

**<u>Defendants' Response to Paragraph 317</u>**:  Immaterial and irrelevant as it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, that Plaintiff was aware of the advice when sending the email, that within twenty minutes of receiving Plaintiff's email, the client emailed expressing confusion over what Plaintiff wrote and called Bolger

asking how the email could have been sent in light of the earlier guidance provided, and that Bolger understood the client to be angry based on the client's tone of voice and use of swear words.  (DSF ¶¶264-267, 270-272.)

318.    ████ wrote to Bolger to clear up the confusion. (Hatzimihalis 242:8-13; Licul Ex. PP).

**Defendants' Response to Paragraph 318**:  The cited evidence does not support the statement in Paragraph 318.  Licul Ex. PP does not make this statement and Plaintiff admitted she was not present for the phone call between ████ and Bolger and that she does not know what was said in that phone call (Chinn Dec. Ex. 2, Plaintiff II Tr. 398:24-399:5) so could not testify as to whether this was the reason ████ wrote to Bolger.  It is undisputed that within 20 minutes of receiving Plaintiff's email, ████ emailed Bolger and two other senior Company members asking about the email (DSF Chinn ¶268; Dec. Ex. 46) and that ████ also called Bolger and asked how the email could have been sent in light of the earlier guidance provided and that based on ████ tone of voice and use of swear words, Bolger understood him to be angry. (DSF ¶¶271-272.)

319.    At no point following the October 30, 2020, email exchange did ████ or any other corporate representative ask that Hatzimihalis stop providing any other communications and/or market updates or to be removed from the contemplated deal team. (Licul Ex. QQ).

**Defendants' Response to Paragraph 319**:  Irrelevant and immaterial as it is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged

did not in fact impact Nikko America's earlier advice, that Plaintiff was aware of the advice when sending the email, that within twenty minutes of receiving Plaintiff's email, the client emailed expressing confusion over what Plaintiff wrote and called Bolger asking how the email could have been sent in light of the earlier guidance provided, and that Bolger understood the client to be angry based on the client's tone of voice and use of swear words.  (DSF ¶¶264-267, 270-272.)

320.    None of Hatzimihalis's actions concerning the October 30, 2020 incident damaged or negatively impacted SMBC's relationship with ███████ as just days later on November 5, 2020, ██████ offered $███████ in new deposits to SMBC. (Licul Ex. RR).

**Defendants' Response to Paragraph 320**:  The cited evidence does not support the statement.  Licul Ex. RR does not demonstrate that Plaintiff's actions concerning the October 30, 2020 incident damaged or negatively impacted Nikko America's relationship with ██████  It is undisputed ████████ contacted Bolger by phone and asked specifically about how Plaintiff's email could have been sent in light of the earlier guidance provided and that his tone of voice and use of swear words led Bolger to understand he was angry.  (DSF ¶¶271-272.)

321.    Bolger continued to send similar information to ████████  For example, on November 2, 2020, at 2:29:1 PM (UTC)—three days later—Bolger sent ████████ an email titled "SMBC's Real Estate & Lodging Debt Capital Markets Weekly," which contained similar market commentary as the one Hatzimihalis sent to ██████ on October 30, 2020. (Licul Ex. SS).

**Defendants' Response to Paragraph 321**:  The cited evidence does not support the statement.  Ex. SS does not support the statement that Bolger sent ███████ "similar

information" as in Plaintiff's October 30, 2020 email as Plaintiff's email was directed

specifically to ▮▮▮ and identified a small trade specific to ▮▮▮ (Chinn Dec. Ex.

46) and it is undisputed that Plaintiff's reference in the October 30, 2020 email to the

small trade suggested something contrary to the advice that had been given by Nikko

America earlier in the week, that Plaintiff offered no explanation in her email as to why

the trade she flagged did not in fact impact Nikko America's earlier advice, and that

Plaintiff was aware of the advice when sending the email.  (DSF ¶¶265-267.)  Bolger

email in Licul Ex. SS is an email not specifically directed to ▮▮▮ and does not

identify a specific ▮▮▮ trade that suggests something contrary to advice previously

given.  Nor has Plaintiff offered any evidence that the email in Licul Ex. SS resulted in

▮▮▮ emailing or calling in response in confusion and anger.

322.    On February 12, 2021 at 3:10:28 PM (UTC), Bolger sent ▮▮▮ and email

titled "SMBC's Indicative Bond Pricing & Market Update" referencing the levels the ▮▮▮



▮▮▮ 04/2029 notes were being marked at the time and historical data points on these bonds as

well as "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" which differs from the number

provided by Bolger in his email to ▮▮▮ October 30, 2020. (Licul Exs. QQ, TT).

**Defendants' Response to Paragraph 322**:  Irrelevant and immaterial it is undisputed

that Plaintiff's reference in the October 30, 2020 email to the small trade suggested

something contrary to the advice that had been given by Nikko America earlier in the

week, that Plaintiff offered no explanation in her email as to why the trade she flagged

did not in fact impact Nikko America's earlier advice, that Plaintiff was aware of the

advice when sending the email, that within twenty minutes of receiving Plaintiff's email, the client emailed expressing confusion over what Plaintiff wrote and called Bolger asking how the email could have been sent in light of the earlier guidance provided, and that Bolger understood the client to be angry based on the client's tone of voice and use of swear words.  (DSF ¶¶264-267, 270-272.)  Plaintiff offered no evidence that the emails in Licul Exs. QQ or TT resulted in ███████ emailing or calling in response in confusion and anger.

323.     Nevertheless, Bolger falsely told Zaman that Hatzimihalis "provided incorrect information" in her email. (Zaman 88:12-89:3).

**Defendants' Response to Paragraph 323**:  The cited evidence does not support the statement.  It is undisputed that Plaintiff's reference in the October 30, 2020 email to the small trade suggested something contrary to the advice that had been given by Nikko America earlier in the week, that Plaintiff offered no explanation in her email as to why the trade she flagged did not in fact impact Nikko America's earlier advice, and that Plaintiff was aware of the advice when sending the email.  (DSF ¶¶265-267.)

**VI.**     ███████

324.     Hatzimihalis covered ██████ (Hatzimihalis Decl. ¶ 38).

**Defendants' Response to Paragraph 324**:  Admit.  It is undisputed that as of March 2021, Plaintiff had primary coverage over ██████ for over four years.  (DSF ¶279.)

325.     During a March 4, 2020 call between ██████ and SMBC, ██████████, the Relationship Manager, invited the following required attendees: Richard Eisenberg, Monty Gandhi, Bolger, Hatzimihalis, Aaron Franklin, Charles Grassie, Matt Baldwin, David Szmigielski, Mariel Green, Van Buchanan, Jonathan Anderson and Amanda Lim and invited one optional attendee: Raj Gramma. (Licul Exs. UU, VV).

**Defendants' Response to Paragraph 325**:  The cited evidence does not support the statement.  Admit that Licul Ex. VV is a call report from the March 4, 2021 call between ███ and Nikko America and the attendees listed there attended the call and that the call lasted for one hour.  The statement in Paragraph 325 lists the date incorrectly as 2020 and Ex. VV does not reference who invited the attendees to the call or who was required versus optional.  Licul Ex. UU is from 2019 and does not reference ███

326.   "████████████████████████████████████████

████████████████████████████████████

████████."  (Licul Ex. VV).

**Defendants' Response to Paragraph 326**:  Admit.

327.    Hatzimihalis was not given the opportunity to speak during the call. (Hatzimihalis Decl. ¶ 39). The only opportunity to speak was a question directed to Bolger regarding what he hears from his clients on Green Bonds. (Hatzimihalis Decl. ¶ 40; Licul Ex. VV).

**Defendants' Response to Paragraph 327**:  Irrelevant and immaterial that Plaintiff believes she was not given an opportunity to speak.  The call lasted an hour (Chinn Dec. Ex. 48; Chinn Dec. Ex. 3, Bolger Tr. 273:6-9) and it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, and undisputed that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call.  (DSF ¶¶279-282.)

328.    There was not an occasion that necessitated Hatzimihalis speaking on this call. (Hatzimihalis Decl. ¶ 41).

**Defendants' Response to Paragraph 328**:  Irrelevant and immaterial that Plaintiff believes there was not an occasion that necessitated her speaking on the call.  The call lasted an hour (Chinn Dec. Ex. 48; Chinn Dec. Ex. 3, Bolger Tr. 273:6-9) and it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, and undisputed that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call.  (DSF ¶¶279-282.)

329.    Bolger did not even realize that Hatzimihalis had not participated on the call until Eisenberg pointed it out to him. (Bolger 277:4-13).

**Defendants' Response to Paragraph 329**: Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call, and that Bolger and Zaman believed Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on

DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)  Bolger

further testified that he had not realized Plaintiff had not participated because he had

become so used to Plaintiff's passive skills of covering clients.  (Chinn Dec. Ex. 3,

Bolger Tr. 277:17-22.)

330.    No one from ████ ever complained about Hatzimihalis's lack of participation on

the March 4, 2020 call, (Hatzimihalis Decl. ¶ 42).

**<u>Defendants' Response to Paragraph 330</u>**:  It is undisputed that Plaintiff had primary

coverage over ████ for over four years at the time of the call, that she did not speak on

the call, and that Richard Eisenberg, the most senior Nikko America employee on the

call, was disappointed in her failure to participate on the call because he expects DCM

coverage officers to provide relevant commentary on a call with a client's senior

leadership, particularly where the call included the client's CFO as it did here, and

undisputed that Eisenberg subsequently called Bolger to complain about Plaintiff's lack

of participation and initiative on the call.  (DSF ¶¶279-282.)

331.    Bolger, who was on the call, did not notice anything improper. (Bolger 277:4-13).

**<u>Defendants' Response to Paragraph 331</u>**: Irrelevant and immaterial as it is undisputed

that Plaintiff had primary coverage over ████ for over four years at the time of the call,

that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko

America employee on the call, was disappointed in her failure to participate on the call

because he expects DCM coverage officers to provide relevant commentary on a call

with a client's senior leadership, particularly where the call included the client's CFO as

it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack

of participation and initiative on the call, and that Bolger and Zaman believed

Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)  Bolger further testified that he had not realized Plaintiff had not participated because he had become so used to Plaintiff's passive skills of covering clients.  (Chinn Dec. Ex. 3, Bolger Tr. 277:17-22.)

332.     Over the next ten days, Hatzimihalis spoke to ███ management three times, including one call with ███ (Hatzimihalis Decl. ¶ 43).

**Defendants' Response to Paragraph 332**:  Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call, and that Bolger and Zaman believed Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)

333.     On March 8, 2021, Hatzimihalis had a call with ███ management and provided them discussion materials prior to said call. (Hatzimihalis Decl. ¶ 44).

**Defendants' Response to Paragraph 333**:  Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call

because he expects DCM coverage officers to provide relevant commentary on a call

with a client's senior leadership, particularly where the call included the client's CFO as

it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack

of participation and initiative on the call, and that Bolger and Zaman believed

Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on

DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)

334.    On March 10, 2021, ███ and SMBC had another call, organized by

Hatzimihalis, to seek feedback on the DCM coverage efforts and discuss the potential for DCM

ancillary business. (Hatzimihalis Decl. ¶ 45).

**Defendants' Response to Paragraph 334**:  Irrelevant and immaterial as it is undisputed

that Plaintiff had primary coverage over ███ for over four years at the time of the call,

that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko

America employee on the call, was disappointed in her failure to participate on the call

because he expects DCM coverage officers to provide relevant commentary on a call

with a client's senior leadership, particularly where the call included the client's CFO as

it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack

of participation and initiative on the call, and that Bolger and Zaman believed

Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on

DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)

335.    On March 12, 2021, there was a Senior SMBC Management call, "CATF

meeting/call," regarding ███ one-year amendment and extension request on their Credit

Facility, for which Hatzimihalis provided a document that summarized her discussions with

███████ senior management on DCM ancillary business prospects as well as ███████ view on SMBC's DCM. (Hatzimihalis Decl. ¶ 46).

**Defendants' Response to Paragraph 335**:  Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ██████ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call, and that Bolger and Zaman believed Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)  Further, the call referenced in Paragraph 335 is an internal call, not a call with the client.

336.    Hatzimihalis and ███████ were the key speakers regarding the relationship with SMBC. (Hatzimihalis Decl. ¶ 47).

**Defendants' Response to Paragraph 336**:  Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ██████ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call, and that Bolger and Zaman believed

Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.) Further, the call referenced in Paragraph 335 is an internal call, not a call with the client.

337.     Hatzimihalis was never given the opportunity to explain to Bolger and Zaman that she proactively reached out to ███ after the March 4, 2021 call with ███ in order to set up further calls with ███ senior management. (Hatzimihalis Decl. ¶ 48).

> **Defendants' Response to Paragraph 337**:  Irrelevant and immaterial as it is undisputed that Plaintiff had primary coverage over ███ for over four years at the time of the call, that she did not speak on the call, and that Richard Eisenberg, the most senior Nikko America employee on the call, was disappointed in her failure to participate on the call because he expects DCM coverage officers to provide relevant commentary on a call with a client's senior leadership, particularly where the call included the client's CFO as it did here, that Eisenberg subsequently called Bolger to complain about Plaintiff's lack of participation and initiative on the call, and that Bolger and Zaman believed Eisenberg's dissatisfaction with Plaintiff's performance on the call reflected poorly on DCM given Eisenberg's seniority at the Company.  (DSF ¶¶279-282, 287.)

## VII.     ███

338.     ███ was an SMBC client that did not "do a lot of bond deals." (Sisselman 70:23-25).

> **Defendants' Response to Paragraph 338**: Admit Sisselman so testified.  Based on public Bloomberg reporting, ███ conducted a bond deal in 2013, 2014, and 2015 prior to Plaintiff having primary coverage over ███ in 2016.  (Bolger Supp. Dec. ¶ 19.) While Plaintiff had primary coverage over the ███ account, ███ conducted two bond deals in 2017, and one bond deal in 2018 and 2020, each instance of which she had

the opportunity to try to secure active bookrunning business for Nikko America.  (Bolger Supp. Dec. ¶ 20.)  Bolger considers this history to indicate a fairly regular issuer in the bond market.  (Bolger Supp. Dec. ¶ 20.)

339.     Hatzimihalis met with the Treasurer of ██████ three times in one year, in contrast to competitors who only met with the Treasurer once a year. (Licul Ex. WW.)

**Defendants' Response to Paragraph 339**: Admit Plaintiff so wrote in Ex. WW. Immaterial and irrelevant as to Plaintiff meeting with a single client three times in a year as it is undisputed that Satake, Bolger, and Zaman considered Plaintiff to be the poorest performer in regards to proactive client coverage as compared to Howard, Nieves, and Asmundson (DSF ¶¶104-105, 115-119), Plaintiff was never able to secure an active bookrunner role for any of her clients (DSF ¶140-142), and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶¶135, 222.)

340.     She also sent indicative pricing every three weeks in contrast to competitors who only provide those numbers every couple of months. (Id.).

**Defendants' Response to Paragraph 340**: Admit Plaintiff so wrote in Ex. WW. Immaterial and irrelevant as to Plaintiff sending indicative pricing every three weeks to a single client as it is undisputed that Satake, Bolger, and Zaman considered Plaintiff to be the poorest performer in regards to proactive client coverage as compared to Howard, Nieves, and Asmundson (DSF ¶¶104-105, 115-119), Plaintiff was never able to secure an active bookrunner role for any of her clients (DSF ¶140-142), and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶¶135, 222.)

341.    She pushed to uptier SMBC to Tier 2 from Tier 3. (Id.).

**Defendants' Response to Paragraph 342**: Admit Plaintiff so wrote in Ex. WW. Immaterial and irrelevant as it is undisputed that Tier 1 is the most desirable for a bank because it has the most revenue generation potential for the bank; Tier 2 is the next most desirable; and Tiers 3 and 4 have less revenue generating potential for the bank. (DSF ¶80.)  And it is further undisputed that Satake, Bolger, and Zaman considered Plaintiff to be the poorest performer in regards to proactive client coverage as compared to Howard, Nieves, and Asmundson (DSF ¶¶104-105, 115-119), Plaintiff was never able to secure an active bookrunner role for any of her clients (DSF ¶140-142), and that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment. (DSF ¶¶135, 222.)

342.    In November 2017, she successfully convinced the client to award SMBC a senior co-manage role with ▮ economics. (Licul Ex. XX).

**Defendants' Response to Paragraph 342**:  Admit.  Immaterial and irrelevant as it is undisputed that "co-manager" is an underwriter who does not sell bonds and has less economics (DSF ¶221), that the desired outcome with respect to a public DCM transaction at Nikko America was to receive the active book runner assignment (DSF ¶¶135, 222), and Plaintiff was never able to secure an active bookrunner role for any of her clients (DSF ¶140-142).

343.    SMBC had not been previously invited to participate in the ▮ deal in 2015. (Licul Ex. WW).

**Defendants' Response to Paragraph 343**: Admit.  Immaterial and irrelevant as it is undisputed that "co-manager" is an underwriter who does not sell bonds and has less

economics (DSF ¶221), that the desired outcome with respect to a public DCM

transaction at Nikko America was to receive the active book runner assignment (DSF

¶¶135, 222), and Plaintiff was never able to secure an active bookrunner role for any of

her clients (DSF ¶140-142).  It is further undisputed that Satake, Bolger, and Zaman

considered Plaintiff to be the poorest performer in regards to proactive client coverage as

compared to Howard, Nieves, and Asmundson.  (DSF ¶¶104-105, 115-119.)

344.    The passive bookrunner role in ██████ $██████ deal, priced in September

2019, was the highest bond underwriting role SMBC ever received on ██████ bond

transactions. (Hatzimihalis Decl. ¶ 49.)

**Defendants' Response to Paragraph 344**: Admit.  Immaterial and irrelevant as it is

undisputed that that the desired outcome with respect to a public DCM transaction at

Nikko America was to receive the active book runner assignment (DSF ¶¶135, 222), and

Plaintiff was never able to secure an active bookrunner role for any of her clients (DSF

¶140-142).  It is further undisputed that Satake, Bolger, and Zaman considered Plaintiff to

be the poorest performer in regards to proactive client coverage as compared to Howard,

Nieves, and Asmundson.  (DSF ¶¶104-105, 115-119.)



Dated: May 20, 2022
      New York, New York           Respectfully submitted,

                                        **PROSKAUER ROSE LLP**

                                        By: /s/ Lloyd B. Chinn

                                          Lloyd B. Chinn
                                          Eleven Times Square
                                          New York, New York 10036

(212) 969-3000
lchinn@proskauer.com

Alexandra R. Reynolds
One International Place
Boston, MA 02110
Tel. 617.526.9600
Fax 617.526.9899
areynolds@proskauer.com

*Attorneys for Defendants*
*SMBC Nikko Securities America, Inc.*
*John Bolger*
*Omar Zaman*