UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                              :
HAIDO IRENE HATZIMIHALIS,                                     :
                                                              :
                                    Plaintiff,                :
                                                              :        20 Civ. 8037 (JPC)
                    -v-                                        :
                                                              :     ~~SEALED~~ OPINION AND
SMBC NIKKO SECURITIES AMERICA, INC. *et al.*,                :             ORDER
                                                              :
                                    Defendants.               :
                                                              :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Haido Irene Hatzimihalis, a former employee of Defendant SMBC Nikko

Securities America, Inc. ("SMBC"), alleges that SMBC and two of her supervisors, Defendants

John Bolger and Omar Zaman, violated the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), the New

York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"), the New York State Pay

Equity Law, N.Y. Lab. Law § 194 ("NYSPEL"), and Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by underpaying her and by terminating her

employment.  Her claims fall into three groups.  First, in her First and Seventh Causes of Action

(collectively, the "Equal Pay Claims"), she claims that she was paid less than male employees for

performing equal work, in violation of, respectively, the EPA and the NYSPEL.  Dkt. 33 ("Third

Am. Compl.") ¶¶ 58-61, 82-85.  Second, in her Third, Fifth, and Ninth Causes of Action

(collectively, the "Sex Discrimination Claims"), she claims that Defendants discriminated against

her on the basis of sex in violation of, respectively, the NYSHRL, the NYCHRL, and Title VII.

*Id.* ¶¶ 66-69, 74-77, 90-93.  Third, in her Second, Fourth, Sixth, Eighth, and Tenth Causes of

Action (collectively, the "Retaliation Claims"), she claims that Defendants retaliated against her

for engaging in conduct that was protected under, respectively, the EPA, the NYSHRL, the NYCHRL, the NYSPEL, and Title VII. *Id.* ¶¶ 62-65, 70-73, 78-81, 86-89, 94-97. The NYSPEL Retaliation Claim, the Title VII Sex Discrimination Claim, and the Title VII Retaliation Claim (Causes of Action Eight through Ten) are pled only against SMBC; all others are pled against SMBC, Bolger, and Zaman. *Id.* at ¶¶ 58-97.

Defendants have moved for summary judgment on all ten causes of action. Dkt. 53. For reasons that follow, Defendants' motion is granted with respect to the Title VII Sex Discrimination Claim (Cause of Action Nine), is granted in part and denied in part with respect to the NYSHRL Sex Discrimination Claim (Cause of Action Three) and the NYSPEL Equal Pay Claim (Cause of Action Seven), and is denied with respect to the EPA Equal Pay Claim (Cause of Action One), the NYCHRL Sex Discrimination Claim (Cause of Action Five), and the Retaliation Claims (Causes of Action Two, Four, Six, Eight, and Ten).

## I. Background

### A. Facts[1]

Plaintiff was hired in October 2011 as an Assistant Vice President in SMBC's debt capital markets ("DCM") group. Defts. 56.1 Stmt. ¶ 8. At the time, the DCM group was predominantly involved in private, rather than public, debt markets. *Id.* ¶ 14. Starting in May 2013, it expanded its operations into public debt markets, and Plaintiff began to work in that business. *Id.* ¶¶ 13, 19. The DCM group hired a number of new employees to work in that area, as well. Chris Nieves was

---

[1] These facts are mainly drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 73 ("Defts. 56.1 Stmt."), Plaintiff's counter-statement under Rule 56.1(b), Dkt. 94 ("Pl. Counter 56.1 Stmt."), Defendants' reply to Plaintiff's counter-statement, Dkt. 116 ("Defts. Reply 56.1 Stmt."), Plaintiff's statement of additional disputed material facts under Rule 56.1(b), Dkt. 92 ("Pl. 56.1 Stmt."), Defendants' counter-statement, Dkt. 117 ("Defts. Counter 56.1 Stmt."), and the exhibits filed by the parties. Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Plaintiff does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add her own "spin" on the fact or otherwise dispute the inferences drawn from it.

hired as an Analyst in August 2014, *id.* ¶ 28; Will Asmundson was hired as an Analyst in November 2015, *id.* ¶ 42; and Kaitlin Carter[2] was hired as a Vice President in November 2016, *id.* ¶ 49.  Each employee, including Plaintiff, was promoted during his or her time at SMBC.  Plaintiff was promoted to Vice President on April 1, 2015.  *Id.* ¶ 60.  Nieves and Asmundson were each promoted to Vice President on April 1, 2017, *id.* ¶¶ 98, 101, and then to Director on July 1, 2020, *id.* ¶ 234.  Carter was promoted to Director on July 1, 2019.  *Id.* ¶ 200.

DCM employees at SMBC were assigned to work on specific client accounts in one of two possible roles—primary coverage, which involved managing the account, or secondary coverage, which involved assisting another employee with primary coverage responsibility.  *Id.* ¶¶ 77-78.  As employees became more senior, they were given more primary coverage roles and were assigned to more important clients.  *Id.* ¶¶ 81-82.  Their compensation consisted of both a base salary and a bonus.  *See* Dkt. 65-17 ("Hatzimihalis Comp."); Dkt. 65-19 ("Nieves Comp."); Dkt. 65-20 ("Asmundson Comp."); Dkt. 65-21 ("Carter Comp.").  The compensation paid to Plaintiff, Nieves, Asmundson, and Carter for each fiscal year ("FY")[3] during which they were employed at the firm is set forth in Table 1 below:[4]

| TABLE 1 | | | | |
|---|---|---|---|---|
| | **Plaintiff** | **Nieves** | **Asmundson** | **Carter** |
| FY 2014 Salary | $87,601 | $95,000 | | |
| FY 2014 Bonus | $259,249 | $105,000 | | |
| **FY 2014 Total** | **$346,850** | **$200,000** | **N/A** | **N/A** |
| FY 2015 Salary | $110,000 | $97,000 | $115,000 | |
| FY 2015 Bonus | $240,000 | $123,000 | $115,000 | |

---

[2] Because Carter continues to use her maiden name, Howard, in the workplace, Dkt. 58 ¶ 2, the parties' submissions refer to her sometimes as Kaitlin Carter and sometimes as Kaitlin Howard.  For clarity, the Court refers to her herein only by her legal surname, which is Carter.  *Id.*

[3] SMBC's FY runs from April 1 to March 31 of the following year.  Defts. 56.1 Stmt. ¶ 35.

[4] *See generally* Hatzimihalis Comp., Nieves Comp., Asmundson Comp., Carter Comp.

| **FY 2015 Total** | **$350,000** | **$220,000** | **$230,000** | **N/A** |
|---|---|---|---|---|
| FY 2016 Salary | $113,200 | $99,800 | $118,300 | $160,000 |
| FY 2016 Bonus | $301,900 | $200,200 | $181,700 | $240,000 |
| **FY 2016 Total** | **$415,100** | **$300,000** | **$300,000** | **$400,000** |
| FY 2017 Salary | $200,000 | $175,000 | $175,000 | $200,000 |
| FY 2017 Bonus | $220,000 | $250,000 | $250,000 | $300,000 |
| **FY 2017 Total** | **$420,000** | **$425,000** | **$425,000** | **$500,000** |
| FY 2018 Salary | $200,000 | $200,000 | $200,000 | $200,000 |
| FY 2018 Bonus | $230,000 | $311,000 | $311,000 | $375,000 |
| **FY 2018 Total** | **$430,000** | **$511,000** | **$511,000** | **$575,000** |
| FY 2019 Salary | $200,000 | $200,000 | $200,000 | $225,000 |
| FY 2019 Bonus | $100,000 | $425,000 | $425,000 | $500,000 |
| **FY 2019 Total** | **$300,000** | **$625,000** | **$625,000** | **$725,000** |
| FY 2020 Salary | $200,000 | $225,000 | $225,000 | $233,500 |
| FY 2020 Bonus | $0 | $585,000 | $585,000 | $815,000 |
| **FY 2020 Total** | **$200,000** | **$810,000** | **$810,000** | **$1,048,500** |

Of these four employees, and factoring in bonuses, Plaintiff was paid the most in FYs 2014, 2015, and 2016, but was paid the least in FYs 2017, 2018, 2019, and 2020, when Carter was paid the most instead. Nieves and Asmundson received identical total compensation in each year they both worked at SMBC other than FY 2015, when Asmundson received $10,000 more.

When Plaintiff was hired at SMBC, the DCM team was headed by Yoshihiro Satake. *Id.* ¶ 12. During his tenure as head of the group, Satake hired Omar Zaman as an Executive Director in December 2013, *id.* ¶ 26, and hired John Bolger as an Executive Director in October 2016, *id.* ¶ 83. Satake returned to Japan on July 1, 2019, *id.* ¶ 199, at which point Bolger and Zaman succeeded him as heads of DCM. *Id.* ¶ 207. In that capacity, they determined compensation for employees in the DCM group, including Plaintiff, Nieves, Asmundson, and Carter. *Id.* ¶ 209. By March 2020, Bolger and Zaman had decided to include Plaintiff in a series of layoffs planned as part of a reduction in force. *Id.* ¶ 227; Pl. Counter 56.1 Stmt. ¶ 227. That reduction in force,

4

however, was deferred due to the onset of the COVID-19 pandemic.  Defts. 56.1 Stmt. ¶ 230.

Nonetheless, Bolger and Zaman gave Plaintiff a "Gaps" rating, the lowest possible, in her FY 2019

performance evaluation, which was completed in March 2020, and they reduced her bonus to

$100,000, substantially less than what she received in prior years.  *Id.* ¶¶ 236-37, 249.  During the

summer of 2020, SMBC Human Resources, Zaman, and Bolger discussed carrying out the planned

reduction in force in the coming September.  *Id.* ¶¶ 255-56.  Plaintiff then sent a demand letter

alleging discrimination on August 5, 2020, *id.* ¶ 257, and ultimately commenced this lawsuit on

September 29, 2020, *id*. ¶ 259.  She was not terminated in October 2020, when the reduction in

force took place.  *Id.* ¶ 260.  Subsequently, in connection with this lawsuit, the parties attended

mediation in early 2021, which was unsuccessful.  Pl. 56.1 Stmt. ¶ 133; *see also* Defts. Counter

56.1 Stmt. ¶ 133; Dkt. 16.

Defendants point to two performance issues with Plaintiff that occurred in late 2020 and

early 2021.  On October 30, 2020, Plaintiff sent an e-mail to the CFO of ███████, a company that

she was responsible for covering.  Defts. 56.1 Stmt. ¶¶ 263-65.  Because the content of the e-mail

appeared to be in tension with advice SMBC had previously given to ███████, the CFO was

confused and angry, and contacted multiple senior SMBC employees to seek clarification.  *Id.*

¶¶ 266-68, 270-72.  Then, on March 4, 2021, multiple SMBC employees, including Plaintiff,

conducted a client call with the CFO and other senior officials of ██████████████

███████, an SMBC client that Plaintiff was primarily responsible for covering.  *Id.* ¶¶ 277, 279.

Plaintiff did not speak on the call.  *Id.* ¶ 280.  Subsequently, Richard Eisenberg, who had

participated in the call in his capacity as a Managing Director of SMBC and co-General Manager

of U.S. Corporate and Investment Banking, called Bolger to complain about Plaintiff's lack of

participation on the call.  *Id.* ¶¶ 278, 281-82.  Bolger discussed Eisenberg's feedback with Zaman.

*Id.* ¶¶ 286-87.  The two then decided to terminate Plaintiff's employment at SMBC as of March 12, 2021.  *Id.* ¶¶ 288-90.

## B.  Procedural History

As mentioned, Plaintiff filed the Complaint that initiated this action on September 29, 2020.  Dkt. 1.  It pled eight causes of action, alleging pay discrimination and retaliation in violation of each of the EPA, the NYSHRL, the NYCHRL, and the NYSPEL.  *See id.* at 8-12.  On the same date, Plaintiff alleges that she filed a Charge of Discrimination and Retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC").  Third Am. Compl. ¶ 6.  Defendants answered the original Complaint on November 30, 2020.  Dkt. 11.  Subsequently, pursuant to the Second Amended Standing Administrative Order, Dkt. 3, *In re Counseled Employment Discrimination Cases Assigned to Mediation by Automatic Referral*, 11 Misc. 3 (S.D.N.Y. Oct. 1, 2015), the Court ordered that the parties participate in mediation through the court-annexed mediation program.  Dkt. 12.  Mediation sessions occurred on February 8, 2021 and March 9, 2021, but were unsuccessful.  *See* Minute Entry dated Feb. 8, 2021; Minute Entry dated Mar. 9, 2021; Dkt. 16.  Shortly thereafter, on April 26, 2021, Plaintiff filed the First Amended Complaint, which amended the original Complaint principally to allege that SMBC had fired her.  Dkt. 22 ¶¶ 52-57.  It further alleged that Plaintiff had filed an additional Charge of Discrimination and Retaliation with the EEOC following her termination.  *Id.* ¶ 6.  The First Amended Complaint was answered on May 10, 2021.  Dkt. 23.  After the EEOC issued its initial Notice of Right to Sue, Dkt. 24-1, Plaintiff filed the Second Amended Complaint on May 26, 2021, which principally added two counts pleading that SMBC had violated Title VII.  Dkt. 26 ¶¶ 90-97.  Defendants answered the Second Amended Complaint on June 9, 2021.  Dkt. 27.  On July 23, 2021, Plaintiff filed the Third Amended Complaint, which differed only in alleging that the EEOC had issued a second Notice of Right to Sue in response to Plaintiff's second Charge of Discrimination and Retaliation.  Third

Am. Compl. ¶ 6.  Defendants answered the Third Amended Complaint on August 6, 2021.  Dkt. 34.

On March 11, 2022, following the close of discovery, Defendants moved for summary judgment on all causes of action in the Third Amended Complaint.  Dkts. 53, 77 ("Defts. Br.").  Plaintiff opposed the motion on April 16, 2022.  Dkt. 100 ("Pl. Opp.").  Defendants replied on May 20, 2022.  Dkt. 107 ("Defts. Reply").

## II.  Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A]

nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

## III.  Discussion

### A.  The Equal Pay Claims

The EPA prohibits an employer from "paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).  Such pay differentials are nonetheless permitted, however, where they are "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." *Id.*  Consequently, claims under the EPA are governed by a burden-shifting framework.  "[A] plaintiff must first establish a *prima facie* case of discrimination by showing: i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (internal quotation marks omitted).  As these elements indicate, an EPA claim—

unlike discrimination claims based on pay—imposes strict liability, in that "proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim." *Id.* at 136. Thus, once a plaintiff has shown that her employer pays different wages to employees of the opposite sex for the same work, the burden shifts to the employer, who must show "that the wage disparity is justified by one of the affirmative defenses provided under the Act." *Id.* Should the employer satisfy that burden, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Id.* Whether the employer's nondiscriminatory justification is pretextual, in turn, depends on "whether the employer has use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Id.* (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986)). The NYSPEL, N.Y. Lab. Law § 194, employs language extremely similar to the EPA, and "[a]n equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act." *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 580 n.5 (2d Cir. 2020) (internal quotation marks omitted). Thus, the Court will apply the EPA to jointly analyze whether Defendants are entitled to summary judgment on both Equal Pay Claims.

### 1. *Prima Facie* Case

Defendants first argue that they are entitled to summary judgment on Plaintiff's Equal Pay Claims because she has failed to make out a *prima facie* case. Defts. Br. at 16-17. In particular, they argue, she runs aground on the first element of the *prima facie* case—namely, showing that "the employer pays different wages to employees of the opposite sex," *Belfi*, 191 F.3d at 135. *See* Defts. Br. at 16-17. Plaintiff, by contrast, insists that she has made that showing. Pl. Opp. at 9-12. The basis for the parties' dispute differs for different periods of Plaintiff's employment.

### a. FYs 2017-2020

According to the undisputed facts, during FYs 2017-2020 Plaintiff was paid less than two male comparators, Nieves and Asmundson, who were paid less than a female comparator, Carter.[5] *See supra* Table 1.  This evidence thus shows that during those four years SMBC paid Plaintiff less than comparable male employees, but it arguably does not show that SMBC paid comparable female employees as a group less than it paid comparable male employees as a group.  The parties disagree over whether a *prima facie* EPA case requires proof of the former, as Plaintiff argues, or of the latter, as Defendants argue.

The weight of authority, including most importantly the Second Circuit decision in *Lavin-McEleney v. Marist College*, 239 F.3d 476 (2d Cir. 2001), favors Plaintiff's view of the EPA's requirements.[6]  Although *Lavin-McEleney* arose in the context of a Rule 50 motion for judgment as a matter of law following a trial, rather than a Rule 56 motion for summary judgment, *id.* at 479, the Second Circuit addressed what showing is required to establish that a plaintiff was paid different wages than comparable employees of the opposite sex.[7]  There, the plaintiff-appellee, a

---

[5] Defendants' briefing treats Nieves, Asmundson, and Carter as appropriate comparators for Plaintiff, *e.g.*, Defts. Br. at 4, 7, and Plaintiff appears to accept that premise, *see, e.g.*, Pl. Opp. at 9 (describing Nieves and Asmundson as Plaintiff's "male peers"); *id.* at 11 (comparing Carter to Nieves and Asmundson).  Thus, the parties do not appear to dispute that Plaintiff can sustain the second and third elements of her *prima facie* case: that the employees performed equal work on jobs requiring equal skill, effort, and responsibility, and that their jobs were performed under similar working conditions.  *See Belfi*, 191 F.3d at 135.

[6] While Defendants are correct that in section I.A of its opinion "the *Lavin-McEleney* court examined whether the male employee's position was 'substantially equivalent,'" Defts. Reply at 2, Plaintiff relies on section I.B of that opinion, which analyzes what a plaintiff must prove to show that she was paid unequally for unequal work.

[7] The defendant-appellant in *Lavin-McEleney* incorrectly framed the argument on appeal as challenging whether the plaintiff-appellee established a *prima facie* case of discrimination under the EPA, which is not the appropriate inquiry on appeal following a jury trial.  *See Lavin-McEleney*, 239 F.3d at 479.  The Second Circuit therefore "construe[d the defendant-appellant's] appeal as a challenge to the district court's denial of its Rule 50(a) motion for a judgment as a matter of law."  *Id.*  Defendants thus correctly note that the "quantum of proof needed to avoid summary judgment" was "no longer relevant" for the Second Circuit's analysis.  Defts. Reply at 2

college professor, presented two types of evidence to show that she was paid less than male employees. First, she identified two comparators within her division—one male and one female—who were both paid more than she, with the female comparator having the highest salary of the three. *Id.* at 480. Second, she introduced a multiple regression analysis of all salaries her employer paid to show that her salary was lower than the salary a male professor sharing her characteristics would be expected to receive. *Id.* at 478. In reaching its holding that the multiple regression analysis "properly contributed to plaintiff's case in conjunction with her identification of a specific male comparator," *id.* at 481, the Second Circuit quoted favorably from the Ninth Circuit, which had adopted "similar reasoning" to conclude that "the proper test for establishing a prima facie case in a professional setting . . . is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale," *id.* at 482 (quoting *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983)).

The approach adopted in *Lavin-McEleney* clearly supports Plaintiff's position that she has established a *prima facie* case. The Second Circuit's holding confirms that the EPA can be violated even if comparators of one sex as a group are not paid less than comparators of the opposite sex as a group: while the plaintiff-appellee in that case was paid less than one comparable man, another comparable woman was paid the most of the three employees, *id.* at 480, much as Carter was paid more than Plaintiff's male comparators, and the average salary paid to the two women in *Lavin-*

---

(quoting *Lavin-McEleney*, 239 F.3d at 479). But the significance here of *Lavin-McEleney* is not for the amount of proof a plaintiff must produce, but rather what facts she must prove. Furthermore, while "once a discrimination case has been fully tried on the merits, the question whether the plaintiff has established a prima facie case is no longer relevant," and instead "the only issue to be decided at that point is whether the plaintiff[] has actually proved discrimination," *Lavin-McEleney*, 239 F.3d 476 at 479 (internal quotation marks, brackets, and citations omitted), *Lavin-McEleney*'s holding is nonetheless relevant here, since a defendant's motion for summary judgment should be denied if the record contains facts *Lavin-McEleney* held sufficient for a jury to grant a plaintiff relief.

*McEleney* exceeded the salary paid to the man, *id.*  Furthermore, in *Lavin-McEleney* the Second Circuit favorably cited the Ninth Circuit's explicit statement of law that a *prima facie* EPA case requires a comparison between the plaintiff's compensation and the average compensation of comparable employees of the opposite sex.  Thus, because in FYs 2017-2020 Plaintiff's wages were lower than the wages paid to the two male employees identified by the parties as performing substantially equal work, she would satisfy the first element of a *prima facie* EPA case under the approach employed in *Lavin-McEleny*.

In support of their contrary position, Defendants rely on *Talwar v. Staten Island University Hospital*, 610 F. App'x 28 (2d Cir. 2015).  Defts. Reply at 1 ("To avoid those facts, Plaintiff completely ignores the Second Circuit's *Talwar v. Staten Island Univ. Hosp.* decision." (citation omitted)); *accord* Defts. Br. at 16-17.  The plaintiff-appellant in *Talwar* was a female attending pathologist who was paid more than two male attending pathologists but less than two other attending pathologists, one male and one female.  610 F. App'x at 31.  In explaining why the plaintiff-appellant had not sustained a *prima facie* case under the EPA on these facts, the Second Circuit reasoned that "male attending pathologists were not, as a group, paid more than female attending pathologists."  *Id.* at 30-31.  Defendants argue that this explanation for why a *prima facie* case failed means that to make out a *prima facie* case, Plaintiff here must show that individuals of one sex, as a group, were paid less than individuals of the other.  Defts. Reply at 1-2.  And because "throughout FY 2014 - FY 2020, [SMBC] paid a woman the most among Plaintiff, [Carter], Nieves, and Asmundson," Defendants conclude that "males 'as a group' were not paid more than females."  Deft. Br. at 16-17 (quoting *Talwar*, 610 F. App'x at 31).[8]

---

[8] Although Defendants' motion for summary judgment with respect to Plaintiff's Equal Pay Claims will be denied on other grounds, the Court notes that it is unclear whether Defendants would prevail even if a *prima facie* EPA case did require proof that an employer paid individuals of one sex less, as a group, than individuals of the other.  Defendants do not provide any analysis of when individuals of one sex are paid less, as a group, than individuals of the other, but under

For a variety of reasons, the holding in *Lavin-McEleney* controls here. First, and most importantly, to the extent there is any inconsistency between the analyses in *Talwar* and *Lavin-McEleney*, *Talwar* was a summary order while *Lavin-McEleney* was a precedential published opinion. While the Second Circuit permits citation to summary orders, its applicable Local Rule explicitly provides that "[r]ulings by summary order do not have precedential effect." Second Circuit Local Rule 32.1.1(a), (b)(1). And *Lavin-McEleney* reflected a considered view that resulted from canvassing opinions handed down in multiple circuits, squarely examining and addressing the merits of various approaches, and then at some length setting forth whether the plaintiff-appellee there established liability under the EPA. *See Lavin-McEleney*, 239 F.3d at 481-83. Furthermore, while the court in *Talwar* did mention that the defendants-appellees paid women as a group as much as men as a group, its holding, affirming the district court's conclusion that the plaintiff-appellant had not made out a *prima facie* case under the EPA, appears to be entirely consistent with *Lavin-McEleney*, since it does not in fact appear that the plaintiff-appellant's salary in *Talwar* was less than the average salary paid to comparable men. *See Talwar*, 610 F. App'x at 30-31 ("Two male attending pathologists on staff in 2007 and 2008 . . . earned substantially less than [the plaintiff-appellant], and even [another male doctor], who was hired in 2008 and was paid more than [the plaintiff-appellant], was paid less than another female attending pathologist . . . ."). In short, it is implausible that, in a single sentence, the Second Circuit would *sotto voce* modify the requirements for establishing a *prima facie* case under the EPA in a case that did not even present the question.

---

the most natural and obvious approach—namely, comparing the average compensation paid to men with the average compensation paid to women—SMBC paid women as a group less than men during FYs 2018-2020, and paid women as a group more than men only during FY 2017. *See supra* Table 1. Defendants' arguments instead appear to presume that if the highest-paid comparable employee is female, women as a group are not paid less than men regardless of how other employees are paid, but they provide no authority for this proposition.

Lastly, setting aside the weight of *Lavin-McEleney* and *Talwar* as authorities, the approach set forth in *Lavin-McEleney* is more plausible, considered in itself, as an interpretation of the EPA. As the Supreme Court has explained, the EPA enacted into law "the principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). And that principle would seem violated on its face so long as an employer pays a particular woman less than it pays comparable men—she performs equal work, after all, yet does not receive equal pay—regardless of whether or not other women are also paid unequally for performing equal work. A requirement of equal pay for equal work simply prohibits paying an employee less than members of the opposite sex who perform the same work are paid. Obviously, that rule is violated more egregiously if multiple employees are paid unequally for equal work, but under the approach advocated by Defendants, no plaintiff could recover at all unless the rule were violated with respect to an entire group of employees. And it is unclear why one individual's ability to recover for violations of the EPA should depend on whether other employees' compensation also violated the law: one would expect one woman's being paid the same as comparable men to prevent *her* from recovering under the EPA, but not also to prevent *other* women who *were paid less* than comparable men from recovering, too. The fact that other women were paid more may be evidence that an employer did not discriminate intentionally on the basis of sex, but "proof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her [EPA] claim," *Belfi*, 191 F.3d at 136. Similarly, while the higher pay received by some women may support an employer's defense that the plaintiff was paid less for a legitimate nondiscriminatory reason, that argument does not undermine the plaintiff's *prima facie* case but rather might constitute evidence in support of an affirmative defense. Because the EPA prohibits paying an employee less than members of the opposite sex for performing the same work, a *prima facie* case requires proof only that the

14

plaintiff was paid less than comparable members of the opposite sex, as in *Lavin-McEleney*.[9] Because Plaintiff was paid less than comparable men during FYs 2017-2020, *see supra* Table 1, she has made out a *prima facie* case under the EPA for those years.

### b. FYs 2014-2016

With regard to FYs 2014-2016, unlike the following years, Plaintiff does not and cannot argue that her total compensation was lower than Nieves's, Asmundson's, or Carter's. *See supra* Table 1. Instead, Plaintiff proposes two alternative methods of comparing pay for those years that would assess her as having been paid differently than Nieves and Asmundson, each of which is more complex than simply comparing total compensation within the same FY. Neither alternative method of comparison, however, suffices to sustain a *prima facie* case for FYs 2014-2016.[10]

Plaintiff's first proposal shifts the temporal basis of the relevant comparison: rather than arguing that her compensation from SMBC was less than the compensation Nieves and Asmundson were paid in the same year, she instead compares her compensation in a particular year to the compensation Nieves and Asmundson received once they had been employed by SMBC for the same number of years as she, in the same role. Pl. Opp. at 10-11. So, for example, Plaintiff argues that she was paid less because her compensation in FY 2016, her second year as a Vice President at SMBC, was lower than Nieves's and Asmundson's compensation in FY 2018, their

---

[9] Indeed, courts in this District have interpreted *Lavin-McEleney* as holding that a plaintiff can survive summary judgment simply by showing she was paid less than a single male comparator without making any comparison to the average compensation paid to men. *See, e.g.*, *Eisenberg v. Culinary Inst. of Am.*, No. 19 Civ. 10933 (PED), 2021 WL 5112625, at *5-6 (S.D.N.Y. Nov. 3, 2021) (citing *Isbell v. City of New York*, 316 F. Supp. 3d 571, 589 (S.D.N.Y. 2018)).

[10] Because the EPA's statute of limitations is at most three years, *see* 29 U.S.C. § 255(a); *Lavin-McEleney*, 239 F.3d at 483, Plaintiff cannot recover under the EPA for underpayment during FYs 2014-2016. Nonetheless, the six-year statute of limitations under the New York Labor Law, of which the NYSPEL is a part, would stretch back to 2014. N.Y. Lab. Law § 198(3). As mentioned, the substantive standards of liability do not differ between the NYSPEL and the EPA, so the Court's analysis is not affected by which statute creates Plaintiff's claim.

second year as Vice Presidents at SMBC. *Id.* at 10.  The Second Circuit ordinarily evaluates EPA claims by comparing the compensation paid to different employees in the same year without considering or articulating explicit principles governing the temporal aspects of that comparison, perhaps because it seemed sufficiently obvious that comparisons should be made within the same time period. *See, e.g.*, *Lavin-McEleney*, 239 F.3d at 480; *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 143 (2d Cir. 2000) (citing *Ryduchowski v. Port Auth. of N.Y. & N.J.*, No. 96 Civ. 5589 (JG), 1998 WL 812633, at *12 (E.D.N.Y. Nov. 19, 1998)); *Belfi*, 191 F.3d at 132-33. Furthermore, Plaintiff's only citation in this Circuit in support of her approach involved claims under statutes other than the EPA or the NYSPEL.  *See generally Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314 (S.D.N.Y. 2021) (applying Title VII, the NYSHRL, and the NYCHRL).  Thus, no prior caselaw in this Circuit appears to set forth a rule to determine when, or if, between-year comparisons may sustain a *prima facie* equal pay claim.  Nonetheless, in the Court's view the evidence presented in this case cannot justify Plaintiff's use of a different-year comparison to make out her *prima facie* case.

In general, a rule of law permitting plaintiffs always to make out a *prima facie* equal pay claim based on any different-year comparison would be overly broad.  Disparities in pay over time occur naturally for a variety of reasons, including changes in corporate strategy; changes in negotiating power among employers, employees, or unions; changes in law; and changes in inflation and the cost of living.  As mentioned, the purpose of the EPA was to enact "the principle of equal pay for equal work regardless of sex," *Corning Glass Works*, 417 U.S. at 190, not to prohibit the common and wholly legitimate practice of raising wages over time.  Thus, the EPA and its state law counterparts should not be interpreted so that mere changes in compensation over time suffice to violate the law.  But were plaintiffs able to make out a *prima facie* case simply by pointing to employees of the opposite sex who were paid more at some later date, an employer

would cede a *prima facie* equal pay claim to all its past employees simply by generally raising wages.  Such a massive expansion of potential liability would extend the EPA and its state law counterparts well beyond its mission of ensuring that men and women receive equal pay for equal work.  And, indeed, in its regulations interpreting the EPA, the EEOC has explicitly required comparisons with employees of the opposite sex to be made "during a similar work cycle."[11]  29 C.F.R. § 1620.24.  Just as an equal pay claim requires a plaintiff to be comparable to the employees of the opposite sex who were paid more than her, the time periods during which each employee was paid those different amounts must be comparable as well.

Requiring plaintiffs to prove the similarity of the relevant time periods as part of their *prima facie* case also would be more consistent with the overall burden-shifting scheme of the EPA and its state law counterpart than requiring defendants to prove dissimilarity as an affirmative defense.[12]  In general, to sustain a *prima facie* case an employee must justify the comparison that, she claims, shows her to have been paid unequally.  Thus, a plaintiff bears the burden of showing that her opposite-sex comparators performed equal work under equal conditions.  *See Lavin-McEleney*, 239 F.3d at 480 ("[A] plaintiff . . . must show that the two positions are substantially equal in skill, effort, and responsibility." (internal quotation marks omitted)).  Just as the plaintiff must show that the job held by a comparator was sufficiently similar to presumptively require equal pay, so too should she be required to show that the time period under examination was

---

[11] While EEOC regulations are federal and the NYSPEL is a New York statute, the Court finds those regulations to be persuasive authority in interpreting the NYSPEL, inasmuch as the substantive standards imposed by the two statutes are the same.  Furthermore, Plaintiff herself urges the Court to rely on EEOC regulations in evaluating her equal pay claims during FYs 2014-2016.  *See* Pl. Opp. at 12.

[12] While temporal dissimilarity is not among the affirmative defenses explicitly enumerated in 29 U.S.C. § 206(d)(1), pay disparities resulting from changes in compensation over time might be considered "a differential based on any other factor other than sex," the catch-all affirmative defense authorized by 29 U.S.C. § 206(d)(1)(iv).  *Accord* N.Y. Lab. Law § 194(1)(d) (authorizing pay disparities based on "a bona fide factor other than sex").

sufficiently similar to presumptively require equal pay.  Furthermore, permitting a plaintiff to make out a *prima facie* case based on comparisons between *any* time periods licenses inferences that are implausible on their face.  Plaintiffs ordinarily bear the burden in their *prima facie* case of justifying the choice of a particular coworker as a comparator, *see id.*, because the many differences that exist between most pairs of employees make it unreasonable to infer, from the mere fact that two employees are paid differently, that their employer pays different compensation to employees of different sexes.  Given the many legitimate reasons why rates of pay change over time, similar considerations make it equally implausible to infer, from the mere fact that two employees were paid differently at different times, that their employer pays different compensation to employees of different sexes.  Instead, before that inference is justified, a plaintiff must first produce evidence showing that the purported comparator was paid more than she during a time period sufficiently similar with respect to the various factors that influence the compensation employees were paid.

Whether a plaintiff's job was sufficiently similar to a purported comparator's job is ordinarily a question of fact for the jury.  *Cf. Lavin-McEleney*, 239 F.3d at 480 ("Whether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury.").  So too should be the question of whether two time periods are sufficiently similar.  When a reasonable jury could conclude that the time periods at issue are similar, a plaintiff may rely on between-year comparisons to make out a *prima facie* case.  For example, if throughout multiple years employees were all classified into the same pay grades, which in turn determined their pay, a plaintiff could make out a *prima facie* case by showing that in different years comparable men and women were classified into different grades.  *See, e.g.*, *U.S. Equal Emp. Opportunity Comm'n v. Md. Ins. Admin.*, 879 F.3d 114, 117-19, 122 (4th Cir. 2018).

In this case, however, no reasonable jury could conclude that different FYs constituted similar periods for the purposes of compensation.  Undisputed evidence in the record indicates that bonuses, a major component of compensation at SMBC, *see supra* Table 1, depended on the profitability of both the firm as a whole and of the various units within the firm where an employee worked, Defs. 56.1 Stmt. ¶¶ 191-92; *see also* Pl. Counter 56.1 Stmt. ¶¶ 191-92.  Furthermore, undisputed evidence in the record indicates that the size of the bonus pool for DCM employees increased "each year" because the DCM business grew during the period of Plaintiff's employment.  Defs. 56.1 Stmt. ¶ 193; *see also* Pl. Counter 56.1 Stmt. ¶ 193.  Given that a crucial factor determining compensation for DCM employees—namely, the profitability of the DCM group—changed between the different years upon which Plaintiff relies, the evidence in the record would not permit a reasonable jury to conclude that those different FYs were sufficiently similar to permit comparisons across them, particularly since Plaintiff bears the burden of establishing similarity.  And because no genuine dispute of fact exists concerning whether those FYs were similar, Plaintiff cannot make out her *prima facie* case by comparing her compensation to the compensation Nieves and Asmundson were paid in the different FYs when they had been employed by SMBC for the same amount of time, in the same roles, as Plaintiff.

Second, Plaintiff argues that she can sustain a *prima facie* case by focusing not on the total compensation paid to her and her comparators but rather only on the portion of her compensation that was paid as a base salary rather than as an annual bonus.  Plaintiff was paid a lower base salary than Nieves in 2014, before Asmundson was hired, and she was paid a lower base salary than Asmundson—though not than Nieves—in 2015 and 2016.  *See supra* Table 1.  However, because she was paid higher bonuses in each year, her total compensation exceeded Nieves's and Asmundson's.  *See id.*  Nonetheless, Plaintiff argues that "making up a salary gap with a promise of future pay" does not comply with the equal pay laws.  Pl. Opp. at 12.

As mentioned, the first element of a *prima facie* equal pay case is whether "the employer pays different wages to employees of the opposite sex." *Belfi*, 191 F.3d at 135 (interpreting the EPA). Thus, one theory on which Plaintiff could sustain a *prima facie* case would be if the "wages" to be considered encompassed only an employee's underlying salary, not her bonus. This theory appears to be foreclosed, however, by EEOC regulation. "Under the EPA, the term 'wages' generally includes all payments made to . . . an employee as remuneration for employment. The term includes all forms of compensation . . . ." 29 C.F.R. § 1620.10. By including "all payments made to . . . an employee as remuneration" and "all forms of compensation," the term "wages" encompasses both an employee's base salary and her annual bonus. Furthermore, while Plaintiff argues that an employer may not "mak[e] up a salary gap with a promise of future pay," Pl. Opp. at 12, the EEOC's definition of wages "includes all forms of compensation *irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, . . . bonus, . . . or some other name*." 29 C.F.R. § 1620.10 (emphasis added). Because EEOC regulations expressly define "wages" to include bonuses irrespective of the time of payment, the term encompasses both the base salaries and the annual bonuses paid to SMBC employees. And because Plaintiff's total compensation, including both base salary and bonus, exceeded the total compensation paid to both Nieves and Asmundson during FYs 2014-2016, she was not paid lower wages than those comparable men during those years.

Alternatively, Plaintiff could concede that her wages were greater than Nieves's and Asmundson's during FYs 2014-2016, but then appeal to the technical language of the Second Circuit's test for a *prima facie* EPA case—namely, the requirement that a plaintiff show she was paid "*different* wages [than] employees of the opposite sex." *Belfi*, 191 F.3d at 135 (emphasis added). Taken literally, a higher salary and lower bonus is indeed "different" from a lower salary and higher bonus, regardless of whether the total amounts differ. Furthermore, Plaintiff identifies

an EEOC regulation suggesting that at least sometimes an employer can violate the EPA by paying different employees differently even if their total compensation is the same: "In addition, an employer would be prohibited from paying higher hourly rates to all employees of one sex and then attempting to equalize the differential by periodically paying employees of the opposite sex a bonus." 29 C.F.R. § 1620.19.

Nonetheless, these arguments too are unavailing. First, the statutory text is unambiguous that wage differences violate the law when they involve different rates of pay: "No employee shall be paid a wage *at a rate less than the rate* at which an employee of the opposite sex in the same establishment is paid for equal work . . . ." N.Y. Lab. Law § 194 (emphasis added); *accord* 29 U.S.C. § 206(d)(1) ("No employer . . . shall discriminate . . . on the basis of sex by paying wages to employees . . . *at a rate less than the rate* at which he pays wages to employees of the opposite sex . . . ." (emphasis added)). Furthermore, 29 C.F.R. § 1620.19 does not directly bear on this case. By its own terms, it prohibits only equalizing different hourly rates through periodic bonuses, which clearly did not occur here. And even if that regulation could be extended somewhat beyond its explicit scope, it could not legitimately be extended to cover the facts of this case, in which all employees were compensated through a combination of base salary and annual bonus, and in which only the allocation of funds between salary and bonus differed.

Thus, because Plaintiff's total compensation in FYs 2014-2016 exceeded Nieves' and Asmundson's total compensation during the same years, her *prima facie* equal pay case fails for that time period.

### 2. Affirmative Defense and Pretext

As mentioned, once a plaintiff makes out a *prima facie* equal pay case, the defendant may still prevail by showing that the wage disparity was justified by one of the four affirmative defenses authorized by the EPA and the NYSPEL. *Belfi*, 191 F.3d at 136. The plaintiff, then, may counter

by showing that the affirmative defense purportedly justifying the wage disparity is in fact pretextual, which depends in turn on whether "the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." *Id.* (internal quotation marks and brackets omitted). In this case, Defendants argue that Plaintiff ultimately should not prevail on her Equal Pay Claims, even if she has established a *prima facie* case, because they "have established legitimate business-related factors other than sex on which they based pay decisions: individual production and performance." Defts. Br. at 17. Plaintiff, in turn, argues that the evidence raises a genuine dispute of fact as to whether Defendants' justification for the pay disparity is pretextual: "[T]here is overwhelming proof form [sic] which a jury could reject SMBC's argument that Hatzimihalis was a poor performer and, as a result, was paid less." Pl. Opp. at 16. The Court agrees that a reasonable jury could conclude, from the evidence in the record, that Defendants' justification for the pay disparity between Plaintiff and her male comparators for FYs 2017-2020 is pretextual.

Defendants cite a few different categories of evidence as proof that the disparity between Plaintiff's compensation and her male comparators' compensation resulted from differences in their production and performance as employees. First, Defendants present contemporaneous performance reviews for Plaintiff and her male comparators, as well as testimony from employees and supervisors in the DCM group concerning the job performance of Plaintiff and her male comparators. Defts. 56.1 Stmt. ¶¶ 104-25, 177-85, 195, 210-12; Defts. Br. at 17-18. Second, Defendants present testimony from DCM employees and supervisors to show that Plaintiff was less successful than her comparators at "prospecting," or bringing in new business to the group. Defts. 56.1 Stmt. ¶¶ 126-34; Defts. Br. at 18. Third, Defendants present testimony from DCM employees and supervisors identifying the number and types of deals that Plaintiff and her male comparators secured for SMBC, as well as the total revenue thereby generated. Defts. 56.1 Stmt.

¶¶ 135-72.  Much of this evidence supports Defendants' contention that Plaintiff was paid less than her male comparators because she performed worse than they did, measured in terms of her production as an employee.  And compensating employees of different sexes differently because of distinctions in production is explicitly permitted under both the EPA and the NYSPEL.  29 U.S.C. § 206(d)(1)(iii); N.Y. Lab. Law § 194(1)(c).  Were this the only pertinent evidence, Defendants might well be entitled to summary judgment on Plaintiff's Equal Pay Claims for FYs 2017-2020.  Under the burden-shifting framework, however, Plaintiff may defeat Defendants' affirmative defense by showing that Defendants' justification for the pay disparity is pretextual.

In order to make that showing, Plaintiff attempts to rebut each category of evidence that Defendants offer.  First, she cites other, more positive assessments of her performance to dispute the testimony and performance evaluations Defendants cite.  Pl. 56.1 Stmt. ¶¶ 28-31, 36-41, 65-67, 91-93, 96, 101-103; Pl. Opp. at 15-17.  Second, she cites a performance review that explicitly identified prospecting as an optional stretch goal rather than a target goal to show that success at prospecting was a pretext rather than a genuine reason for her lower compensation.  Pl. 56.1 Stmt. ¶ 35; Pl. Opp. at 15 n.9.  Third, she offers two lines of argument to rebut Defendants' claim that she was paid less because she generated less revenue.  She cites evidence showing that even though Nieves and Asmundson generated substantially different revenue from one another, their performance reviews employed identical language and they were paid identically in each year other than FY 2015, when their pay differed by only $10,000.  Defts. 56.1 Stmt. ¶¶ 112, 114, 152-55, 162-65; Pl. Counter 56.1 Stmt. ¶¶ 112, 114; Table 1 *supra*.  From these facts, she urges the inference that revenue generation did not actually determine SMBC employees' pay but rather is a pretext to justify her lower compensation.  Pl. Opp. at 13-14.  And she cites internal SMBC documents indicating that SMBC computed the revenue Nieves and Asmundson generated based on clients assigned to them for primary or secondary coverage, while it computed the revenue

Plaintiff and Carter generated based only on clients assigned to them for primary coverage.  Pl. 56.1 Stmt. ¶¶ 293-306; Dkts. 91-14, 91-21; Pl. Opp. at 14-15.  Defendants respond that the internal documents on which Plaintiff relies do not accurately reflect client coverage for the full period at issue in this case, citing both the documents' metadata and testimony submitted through the sworn declarations of Bolger and Zaman.  Defts. Reply 56.1 Stmt. ¶ 152; Dkt. 118 ¶¶ 14-15; Dkt. 119 ¶¶ 8-12; Dkt. 120 ¶¶ 4-8; Defts. Reply at 6.

In deciding a motion for summary judgment, "the court's task is issue identification, not issue resolution." *Repp v. Webber*, 132 F.3d 882, 890 (2d Cir. 1997).  At this stage, the Court cannot weigh the evidence offered by the parties to determine whether it is more likely than not that Defendants' justification for the pay disparity between Plaintiff and her male comparators is pretextual; instead, the Court must decide only whether a reasonable factfinder could conclude, based on that evidence, that Plaintiff has shown Defendants' justification to be pretextual.  Plaintiff has met that standard:  the evidence she cites establishes a genuine dispute of fact as to whether she was paid less than her male comparators because of her worse performance, or if instead that proffered rationale is merely a pretext.  A reasonable jury could credit the testimony that the internal SMBC documents Plaintiff cites contained errors or were out of date, could find that Nieves's and Asmundson's near-lockstep compensation was explained by performance-related factors, and could therefore conclude that Plaintiff was, in fact, paid less than those two men because she performed worse.  But a reasonable jury could also decide that the internal documents show revenue to have been allocated differently to different employees, find that Nieves's and Asmundson's near-lockstep compensation and identical performance reviews undermine the claim that a genuine evaluation of their performance determined their pay, and therefore conclude that Defendants' performance-based justification for the pay differential is pretextual.  To be sure, that a reasonable fact-finder could rule in favor of either party based on this evidence does not indicate

that the evidence and the arguments it supports necessarily lie in equipoise. But because a genuine

dispute of material fact exists, Defendants' motion for summary judgment must be denied with

respect to Plaintiff's Equal Pay Claims for FYs 2017-2020.

**B. The Sex Discrimination Claims**

In support of her Sex Discrimination Claims, Plaintiff argues that Defendants paid her less

based on her sex, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), the NYSHRL, N.Y. Exec.

Law § 296(1)(a), and the NYCHRL, N.Y.C. Admin. Code § 8-107(1)(a)(3), which each prohibit

employers from discriminating on the basis of sex. Although all three statutes target the same type

of conduct, they do not all impose the same substantive standards. Prior to 2019, "discrimination

claims under the NYSHRL and Title VII were generally treated as analytically identical, and

addressed together." *Edelman v. NYU Langone Health Sys.*, No. 21 Civ. 502 (LGS), 2022 WL

4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (internal quotation marks omitted). In 2019, however,

the NYSHRL was amended. *See* 2019 N.Y. Laws chap. 160. In relevant part, that amendment

did not change the text of the NYSHRL's operative provisions; instead, it amended the preamble,

which now provides that "[t]he provisions of this article shall be construed liberally for the

accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws,

including those laws with provisions worded comparably to the provisions of this article, have

been so construed." N.Y. Exec. Law § 300 (2022). While New York courts have not yet produced

any substantive analysis of how this amendment changes standards of liability under the NYSHRL,

courts in this District have interpreted the amendment as "render[ing] the standard for claims closer

to the standard of the NYCHRL," *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14

(S.D.N.Y. 2021), which contains similar language mandating liberal construction "regardless of

whether federal or New York state civil and human rights laws, including those laws with

provisions worded comparably to provisions of this title, have been so construed," N.Y.C. Admin.

Code § 8-130(a).[13]  Thus, the Court will analyze Plaintiff's NYSHRL Sex Discrimination Claim for the period prior to August 12, 2019, the date upon which the amendment went into effect, *see* 2019 N.Y. Laws chap. 160 §§ 6, 16, 16(d), together with her Title VII Sex Discrimination Claim, then will analyze her NYSHRL Sex Discrimination Claim for the period on or after August 12, 2019 together with her NYCHRL Sex Discrimination Claim.

### 1.  The Title VII and Pre-Amendment NYSHRL Claims

Claims under Title VII are governed by the burden-shifting framework first set forth in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that approach, a plaintiff must first make out a *prima facie* case of sex discrimination in her pay by showing that "(1) she was a member of a protected class; (2) she was qualified for the job in question; (3) she was paid less than those who were not members of her protected class for the same work; and (4) the employer's adverse employment decision occurred under circumstances that raise an inference of discrimination."  *Boatright v. U.S. Bancorp*, No. 18 Civ. 7293 (LJL), 2020 WL 7388661, at *14 (S.D.N.Y. Dec. 16, 2020); *accord Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019); *Belfi*, 191 F.3d at 140.  Once a plaintiff has made that showing, "the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action."  *Lenzi*, 944 F.3d at 107 (internal quotation marks omitted).  Then, "[i]f the employer puts forth a legitimate, non-discriminatory justification . . . the plaintiff must establish, by a

---

[13] The relatively few New York state court decisions to have cited the amended version of New York Executive Law section 300 have likewise highlighted its similarity to the analogous provision of the NYCHRL.  *See, e.g.*, *Hosking v. Memorial Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 n.1 (App. Div. 2020); *Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*, 125 N.Y.S.3d 697, 703 & n.1 (App. Div. 2020).  Indeed, some opinions have explained that "because plaintiff's claims under the State HRL accrued before the enactment of Executive Law § 300, the standard for the discrimination claim under the State HRL differs from the standard for the discrimination claim under the City HRL," thereby implying that a claim accruing *after* the enactment would not encounter different standards under the NYCHRL and the NYSHRL.  *Kwong v. City of New York*, 167 N.Y.S.3d 9, 11 n.1 (App. Div. 2022); *accord Alshami v. City Univ. of N.Y.*, 162 N.Y.S.3d 720, 720 n.1 (App. Div. 2022).

preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Id.* at 107-08 (internal quotation marks omitted).   Defendants argue that they are entitled to summary judgment because the evidence is inadequate to "raise an inference of discrimination," as required to prove the fourth element of a *prima facie* case.   Defts. Br. at 20-21.   Because the Court agrees, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII Sex Discrimination Claim and her pre-August 12, 2019 NYSHRL Sex Discrimination Claim.

Plaintiff does not adduce any additional evidence to support her Sex Discrimination Claims; instead, she rests them on the same body of evidence she employs to support her Equal Pay Claims.   As noted, then, Plaintiff has presented sufficient evidence to show that she was paid less than comparable men and to raise a genuine dispute of fact as to whether Defendants' rationale for that pay disparity—namely, differences in the employees' job performance—is pretextual. And in arguing that Defendants are not entitled to summary judgment on her Sex Discrimination Claims, Plaintiff cites only the evidence supporting those two facts.   Pl. Opp. at 20 ("For the same reasons stated above with respect to the equal pay claims, a jury can also find that SMBC intentionally discriminated against Hatzimihalis in pay.").   Nonetheless, proving these two allegations is insufficient as a matter of law to sustain the fourth element of a *prima facie* Title VII case.   The Second Circuit's decision in *Belfi* is almost exactly on point.[14]   191 F.3d 129.   In that

---

[14] Though it addresses a closely related question, the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), does not undermine this Court's reliance on *Belfi*.   In *Reeves*, the Court held that once a plaintiff makes out a *prima facie* case, a jury can legitimately infer that the employer discriminated solely from evidence showing that the non-discriminatory reason proffered by the defendant is pretextual.   *Id.* at 147.   But *Reeves* was addressed not to a plaintiff's *prima facie* case but rather to the question of ultimate liability, and thus the basis from which a jury might reasonably infer discrimination consisted of both the evidence offered to prove the *prima facie* case and the evidence offered to prove pretext.   *Id.* at 148 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").   As the Court explained, the jury's verdict for the plaintiff was supported in part by the evidence of age-related animus introduced to prove the *prima facie* case. *Id.* at 151 ("Petitioner testified that Chesnut had told him that he 'was so old [he] must have come

27

case, the plaintiff, an employee of the Long Island Railroad ("LIRR"), "relied in her Title VII proof on the fact that her counterparts were paid more than she was and were men . . . [and] on the inconsistency and pretextual nature of the railroad's explanation for the wage disparity." *Id.* at 140.  This proof, the court held, was insufficient to sustain a *prima facie* Title VII case, since "inconsistent and pretextual explanations do not constitute proof that the LIRR intended to discriminate against plaintiff because she was a woman." *Id.*  And recent Second Circuit decisions have not suggested that this rule is no longer valid.  *Lenzi*, for example, which identified one respect in which district courts in this Circuit have too stringently construed the requirements for a *prima facie* case, *see* 944 F.3d at 109-111, held that the plaintiff's *prima facie* case could be based jointly on the pay disparity she identified and the evidence of "pervasive disparagement of women" on the part of the employer's CFO, *id.* at 111-12.  Plaintiff, however, has not presented any evidence of animus on the part of her employer; instead, she seeks to infer discrimination solely from her being paid worse than comparable men and from Defendants' pretextual rationale for the pay disparity.  *Belfi* forecloses that approach.  Furthermore, additional evidence actively undermines an inference of discrimination—in particular, the fact that during FYs 2017-2020, Carter, a female employee, was paid most of the four DCM comparators the parties have identified. *See supra* Table 1.  For these reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's Title VII Sex Discrimination Claim and her pre-August 12, 2019 NYSHRL Sex Discrimination Claim.

---

over on the Mayflower' and, on one occasion when petitioner was having difficulty starting a machine, that he 'was too damn old to do [his] job.'" (alterations in original)).  But *Reeves* held only that the evidence proving the *prima facie* case may suffice for a final verdict once a plaintiff has shown the defendant's competing, non-discriminatory reason to be pretextual; it would go considerably further to hold that the evidence of pretext itself suffices for the *prima facie* case.

### 2.  The NYCHRL and Post-Amendment NYSHRL Claims

The NYCHRL employs a different standard for sex discrimination than Title VII:  a plaintiff need prove only that "she has been treated less well at least in part '*because of* her gender'" to prevail under the NYCHRL.  *Mihalik v. Credit Agricole Chevreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (emphasis in original) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (App. Div. 2009)).   Under this rule, an employer complies with the law only if "discrimination . . . play[s] no role in decisions relating to employment."  *Williams*, 872 N.Y.S.2d at 39 n.27.  Furthermore, New York state courts have explained that the standard *McDonnell Douglas* burden-shifting framework from Title VII is often inappropriate when deciding a defendant's motion for summary judgment under the NYCHRL:  "Where a defendant in a discrimination case has moved for summary judgment and has offered evidence in admissible form of one or more non-discriminatory motivations for its actions, a court should ordinarily avoid the unnecessary and sometimes confusing effort of going back to the question of whether a prima facie case has been made out in the first place."  *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 120 (App. Div. 2011).[15]  Instead, since a defendant's motion for summary judgment necessarily claims that no reasonable factfinder could conclude from the evidence in the record that the plaintiff is entitled to relief, "the court should turn to the question of whether the defendant has sufficiently met its initial burden as the moving party of showing that there is no evidentiary route that could allow a jury to believe that discrimination played a role in the challenged action."  *Id.*

As mentioned, the evidence Plaintiff relies on in this case consists primarily of evidence showing that a pay disparity existed between her and her male comparators and evidence showing that Defendants' proffered explanation for that disparity is pretextual.  As discussed, this evidence,

---

[15] While *Bennett* has not been addressed at any length by the New York Court of Appeals, the New York City Council amended the NYCHRL after *Bennett* was decided to explicitly identify the opinion as a correct interpretation of the statute.  N.Y.C. Admin. Code § 8-130(c).

the Second Circuit has held, does not suffice for a Title VII claim to survive summary judgment. *See Belfi*, 191 F.3d at 140; *supra* III.B.1.  But as *Bennett* explained, under the NYCHRL, "[o]nce there is some evidence that at least one of the reasons proffered by defendant is false, misleading or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to coverup the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons."  *Bennett*, 936 N.Y.S.2d at 123.  Only "in the most extreme and unusual circumstances" should a court remove such questions from the jury.  *Id.*

This rule controls the outcome of Defendants' motion for summary judgment with respect to Plaintiff's NYCHRL Sex Discrimination Claim and post-amendment NYSHRL Sex Discrimination Claim.  Plaintiff has introduced evidence to show that Defendants' proffered rationale for the pay disparity—namely, her inferior job performance compared to Nieves and Asmundson—is pretextual.  And *Bennett* instructs that in almost all circumstances it is the jury's role, not the court's, to determine whether an employer's pretextual explanation shows that discrimination played some role in motivating its treatment of employees.  *Id.*  Because a genuine question of fact exists both as to whether performance determined Plaintiff's compensation and, if not, as to whether Defendants' pretextual explanation indicates that Plaintiff was paid less because of her sex, Defendants' motion for summary judgment is denied with respect to Plaintiff's Sex Discrimination Claims under the NYCHRL and the post-amendment NYSHRL.

## C.  The Retaliation Claims

Lastly, in support of her Retaliation Claims, Plaintiff argues that she was terminated in retaliation for filing this lawsuit and the related EEOC Charge of Discrimination and Retaliation in September 2020, and for failing to reach a settlement with Defendants at a mediation conference

held in February 2021.[16]  Pl. Opp. at 21-24.  In general, "[f]ederal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."  *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citation omitted).  To make out a *prima facie* case, a plaintiff must show "that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (Title VII and NYSHRL); *accord Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir 2010) (setting forth a substantively identical standard under the Fair Labor Standards Act, of which the EPA is a part); *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (setting forth a substantively identical standard under the NYSHRL); *id.* at 129 (setting forth a substantively similar standard under the NYCHRL); *id.* at 130 (setting forth substantively identical standards under the Fair Labor Standards Act and the New York Labor Law, of which the NYSPEL is a part); *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 245-46 (App. Div. 2021) (setting forth a substantively identical standard under the NYSHRL and a substantively similar standard under the NYCHRL).[17]  The plaintiff's burden of proof as to this

---

[16] Defendants argue that "Plaintiff's claims that Defendants reduced her bonus in May 2020 and terminated her in March 2021 in retaliation for protected activity fail for multiple reasons," Defts. Br. at 25, and similarly that Plaintiff cannot establish protected activity prior to August 5, 2020, *i.e.*, the date of the demand letter, *id.* at 27-28.  But Plaintiff relies only on her March 2021 termination as constituting unlawful retaliation, and she does not argue that any protected activity occurred prior to her filing the charge with the EEOC and this lawsuit in late September 2020.  *See* Pl. Opp. at 21-24.  Accordingly, the Court does not analyze whether any other facts presented might form the basis of a claim for retaliation.

[17] Title VII and the NYCHRL differ in the sort of causal connection they require a plaintiff to show to prevail on her *prima facie* case: while under the former, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), under the latter a plaintiff need only show that the action "was caused at least in part by retaliatory motives," *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015) (internal quotation marks and ellipsis omitted).  Nonetheless, because Plaintiff's rehabilitation claims survive summary judgment on either standard, the Court will not separately apply the two in its analysis.  For the same reason, the Court

first step "has been characterized as minimal and *de minimis*." *Zann Kwan*, 737 F.3d at 844 (internal quotation marks omitted).  Should she make out her *prima facie* case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Id.* at 845.  Finally, "after the defendant has articulated a non-retaliatory reason for the employment action . . . [t]he plaintiff must then come forward with [evidence that the] non-retaliatory reason is a mere pretext for retaliation." *Id.*

### 1. *Prima Facie* Case

The parties do not dispute that Plaintiff has satisfied the first three elements of her *prima facie* case, at least with respect to her activity related to this lawsuit and her subsequent termination.  Defts. Br. at 27-28.  Defendants, however, argue that she cannot establish the fourth element, causation.  *Id.* at 28-29.  The primary evidence upon which Plaintiff relies is the temporal proximity between her engaging in protected activity and her termination.  She sent a demand letter in August 2020, Defts. 56.1 Stmt. ¶ 257, she filed this lawsuit in September 2020, *id.* ¶ 259, and she engaged in an unsuccessful mediation session with Defendants in February 2021, Pl. 56.1 Stmt. ¶ 133; *see also* Defts. Counter 56.1 Stmt. ¶ 133; Third Am. Compl. ¶ 6 (alleging that she filed her EEOC charge on September 29, 2020); Pl. Br. at 21 (citing the EEOC charge as protected activity).[18]  In March 2021, seven months following the demand letter, six months following the filing of this lawsuit, and one month following the unsuccessful mediation, she was terminated.  Ordinarily, as Defendants acknowledge, Defts. Br. at 26, "a plaintiff can indirectly establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan*, 737 F.3d at 845 (brackets, ellipsis, and internal

---

need not analyze how the 2019 amendment to the NYSHRL affects retaliation claims under that statute.

[18] Defendants do not challenge whether these acts qualify as protected activity under the relevant anti-retaliation laws.  *See* Defts. Br. at 25-30; Defts. Reply at 8-10.

quotation marks omitted).   The one month that passed between the unsuccessful mediation conference and Plaintiff's termination is a sufficiently short time period to sustain the *prima facie* inference that her protected activity caused her to be terminated.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 111 (2d Cir. 2010) (holding a four-month gap between an employer's protected complaint and her termination to be short enough to sustain an inference of causation for the purposes of a *prima facie* case); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (same).

Defendants, however, argue that mere temporal proximity is insufficient here because Plaintiff's termination was the culmination of a series of events that began before she engaged in protected activity.   In support, Defendants point to the previously discussed evidence that, by March 2020, Bolger and Zaman had wanted to include Plaintiff in a series of layoffs planned as part of a reduction in force, Defts. 56.1 Stmt. ¶ 227, which reduction was then deferred due to the onset of the COVID-19 pandemic, *id.* ¶ 230.   Furthermore, Bolger and Zaman gave Plaintiff the lowest possible performance evaluation in March 2020, *id.* ¶¶ 236-37, substantially reduced her FY 2019 bonus from previous years, *id.* ¶ 249, and continued to plan for her to be included in the deferred reduction in force to take place in fall 2020, *id.* ¶¶ 255-56.   After Plaintiff sent her demand letter and filed this lawsuit, however, she ultimately was not included among layoffs when the reduction occurred.  *Id.* ¶¶ 257, 259-60.  In *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87 (2d Cir. 2001), the Second Circuit explained that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."   *Id.* at 95.   Thus, Defendants argue, because they had begun contemplating Plaintiff's termination before she engaged in protected activity and had further taken adverse employment actions—namely, giving her a poor performance evaluation and reducing her bonus—no inference of retaliation can arise from the

temporal proximity of her protected activity and termination under the rule articulated in *Slattery*. *See* Defts. Br. at 28-29.

The undisputed facts here do not, however, allow for the application of *Slattery* to find an absence of causation and to grant summary judgment in Defendants' favor on the Retaliation Claims.  In general, the temporal proximity between protected activity and termination is a rational basis from which to infer retaliation on the presumption that the plaintiff would not otherwise have been terminated.  *Slattery* sensibly restricts the scope of that inference in circumstances when the presumption is not warranted:  when a gradual history of adverse job actions that would naturally culminate in the plaintiff's termination indicates that termination would have occurred anyway, the protected activity cannot reasonably appear to be the cause of the termination.  As the Second Circuit emphasized in *Slattery*, in such situations "the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline." *Id.* (internal quotation marks omitted).  And that fact is crucial to *Slattery's* reasoning.  Because those job actions would naturally be expected to progress to their "ultimate product," termination, it would be unreasonable to infer that the termination had some other cause.

In this case, however, it is not clear from the undisputed evidence that Plaintiff's actual termination was part of and the ultimate product of a gradual history of adverse job actions.  To be sure, she was initially selected for a reduction in force that was first scheduled to occur in March 2020 and that eventually took place in October 2020.  Including her in that reduction in force—or even in a subsequent reduction in force—could plausibly be the ultimate product of the adverse job actions Defendants had begun prior to her protected activity.  And it would indeed be unreasonable to infer that her protected activity caused her to be included in a reduction in force when, before she had engaged in that activity, her employer had already planned to include her. But Plaintiff was specifically exempted from the reduction in force.  Because of this intervening

event between the earlier adverse job actions and her ultimate termination, her termination was not "part, or the ultimate product, of" those adverse job actions, thereby undermining the inference that those actions would naturally have led to her termination regardless of her protected activity. Instead, a separate analysis is necessary to determine whether, once she had been removed from a path naturally leading to termination, she was placed back on that path as retaliation. In that analysis, the temporal proximity between the mediation conference and Plaintiff's termination raises an inference of retaliation that meets her "minimal" burden, *Zann Kwan*, 737 F.3d at 844, in making out a *prima facie* case.

### 2. Affirmative Defense and Pretext

Under the burden-shifting framework that governs retaliation claims, Defendants must offer a non-retaliatory reason for Plaintiff's termination to defeat the presumption of retaliation that arises from her *prima facie* case. In addition to background dissatisfaction with Plaintiff's performance, Defendants cite two particular episodes to justify her termination: a confusing e-mail she sent to the CFO of ▮▮▮▮, a client she was responsible for covering, and her lack of participation on a call with the CFO and other senior officials of ▮▮▮, another of her clients. Defts. Br. at 29-30. Plaintiff may then "prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Swan*, 737 F.3d at 846. Furthermore, as mentioned, on a motion for summary judgment the Court must decide not whether Plaintiff has in fact made out that proof but rather only whether a reasonable factfinder could conclude from the evidence in the record that she has.

Because evidence exists in the record indicating weaknesses and implausibilities in Defendants' proffered explanations, a reasonable factfinder could conclude that Plaintiff was not terminated for those reasons but instead as retaliation for her protected activity. While Plaintiff's

e-mail to the ▮▮▮ CFO may have caused confusion, the confusion was minor and quickly resolved.  Defts. 56.1 Stmt. ¶ 273.  Furthermore, the confusion arose not because any information contained in the e-mail was inaccurate but rather because the CFO interpreted it to be making a suggestion inconsistent with previous advice provided by SMBC.  Pl. 56.1 Stmt. ¶¶ 314, 316-17; *see also* Defts. Counter 56.1 Stmt. ¶¶ 314, 316-17.  A reasonable factfinder could conclude that the confusion was Plaintiff's fault and constituted the type of mistake warranting termination, but a reasonable factfinder could also conclude that the CFO unreasonably misunderstood the e-mail or that the confusion it engendered was minor.  Furthermore, a reasonable factfinder could be skeptical that an e-mail sent over four months before Plaintiff's termination caused that termination.  Similarly, while Plaintiff may not have participated in the ▮▮▮ call, many other participants on that call were senior to her, and no questions were directed specifically at her during the call.  Pl. 56.1 Stmt. ¶¶ 325, 327-28; *see also* Defts. Counter 56.1 Stmt. ¶¶ 325, 327-28.  Indeed, Bolger did not find Plaintiff's lack of participation sufficiently noteworthy to notice it.  Pl. 56.1 Stmt. ¶¶ 329; *see also* Defts. Counter 56.1 Stmt. ¶¶ 329.  Furthermore, Plaintiff routinely participated in other client calls.  Pl. 56.1 Stmt. ¶¶ 333-37; *see also* Defts. Counter 56.1 Stmt. ¶¶ 333-37.  A reasonable factfinder could conclude that failing to speak on a single call was the sort of mistake that warranted termination, at least combined with Defendants' other complaints about Plaintiff's job performance.  But a reasonable factfinder could also conclude that failing to speak on a single call was a minor issue, and that Bolger and Zaman instead seized on the complaint about Plaintiff lodged by Eisenberg (the SMBC Managing Director who was on the call) as a pretextual justification for a termination where the actual motivation was retaliatory.  In short, because a genuine dispute of fact exists as to whether Defendants actually terminated Plaintiff because of their proffered rationale, or whether instead that rationale is a pretext for their

retaliatory motivation, Plaintiff's Retaliation Claims must be decided by a jury, and Defendants' motion for summary judgment is denied with respect to those claims.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Cause of Action Nine, which alleges sex discrimination in violation of Title VII, is dismissed in full; Cause of Action Three, which alleges sex discrimination in violation of the NYSHRL, is dismissed with respect to time period prior to August 12, 2019; and Cause of Action Seven, which alleges unequal pay in violation of the NYSPEL, is dismissed with respect to FYs 2014-2016.  Summary judgment is denied as to all other Causes of Action.  Both parties also have moved to seal certain documents submitted in connection with Defendants' motion for summary judgment.  Dkts. 52, 85, 114.  After reviewing the subject documents, the Court grants the parties' uncontested motions to seal.

The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 52, 53, 85, and 114.  In addition, the Clerk of Court is respectfully directed to file this Opinion and Order under seal, with the viewing level set to case participants only.  The Court will subsequently file a public version.  Should either party seek redactions in the public version, by March 7, 2023 that party shall file a letter requesting such redactions and justifying them pursuant to *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) and other relevant authorities.  Any opposition to proposed redactions shall be filed by March 14, 2023.

The parties are directed to appear for a status conference on February 28, 2023, at 2:30 p.m., to discuss a trial date.  The conference will take place in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007.

SO ORDERED.

Dated: February 21, 2023
       New York, New York

                                    _____
                                              JOHN P. CRONAN
                                         United States District Judge